# 19CV8359

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE CAPRONI

RELEVENT SPORTS, LLC,

Plaintiff,

v.

UNITED STATES SOCCER FEDERATION, INC.

Defendant.

Civil Action No.

**COMPLAINT**

Plaintiff Relevent Sports, LLC ("Relevent"), by its undersigned attorneys for its Complaint, alleges as follows:

## INTRODUCTION

1.     This action seeks redress for Defendant United States Soccer Federation's ("USSF") violations of the federal antitrust laws and state tort law, the effect of which has been to thwart the efforts of Relevent—one of the premier promoters of soccer events around the globe—to enhance the experience of soccer fans in the United States by conducting official season professional international soccer matches within the U.S.  It is also to redress the antitrust violations that arise from USSF's participation in (1) an anticompetitive agreement with the Fédération Internationale de Football Association ("FIFA") and others to boycott professional clubs and players and exclude them from FIFA-affiliated competitions if they participate in professional soccer events in the U.S. that have not been "sanctioned" by USSF on behalf of FIFA and (2) an anticompetitive scheme with FIFA to create barriers to entry for Relevent and other promoters in the U.S. market for such events to benefit USSF's economic partner, Soccer United Marketing, LLC ("SUM"), which is also a promoter of such events.

1

2.      This conspiracy in restraint of trade has increased the cost and reduced the output of a unique class of soccer events in the U.S., including events that Relevent has conducted or sought to conduct.  The anticompetitive agreements among USSF, FIFA and others are a naked limitation on output with no offsetting procompetitive benefits, and have inflicted significant damages on Relevent, as well as fans, sponsors and media partners of international soccer events located in the U.S.

3.      In addition to, and apart from, the demand for (1) Major League Soccer ("MLS") and other U.S. men's professional soccer league matches and (2) matches between the U.S. Men's National Team and a foreign men's national team, there is a significant demand for live attendance in the U.S. at "International Soccer Game Events": men's soccer matches between (1) foreign countries' men's national teams;[1] (2) foreign professional men's soccer clubs;[2] and (3) foreign professional men's soccer clubs and U.S. professional men's soccer clubs.  When these matches are not part of an official regular season league schedule or an official domestic or regional tournament, they are referred to as international men's "friendlies."

4.      Most recently, fans of men's international soccer in the U.S. have yearned for "Official Season International Soccer Game Events"—official matches between foreign men's professional clubs, which, unlike international men's "friendlies," would count towards the competing clubs' official league or tournament records but would be played outside of the clubs' home territory—to be played in the U.S.

5.      Relevent's business is to, among other things, promote professional soccer matches around the world and within the U.S. by conducting and promoting all categories of high-profile

---

[1] Such as the match between Brazil and Peru scheduled for September 10, 2019 in Carson, California.

[2] Such as the 2014 match between English powerhouses Manchester City and Liverpool played in front of nearly 50,000 people at Yankee Stadium.

International Soccer Game Events.  Recently, Relevent has specifically attempted to promote and host Official Season International Soccer Game Events in the U.S., but its attempts to do so have been blocked by USSF, which has entered into an agreement with FIFA and others not to sanction any Official Season International Soccer Game Events in the U.S. and thus to prevent them from occurring.  This boycott has deprived fans of international soccer in the U.S. of the opportunity to attend Official Season International Soccer Game Events in the U.S. and is a blatant antitrust violation.

6.      Because USSF, FIFA and other FIFA-affiliated governing bodies, leagues and clubs have agreed to participate in a boycott of any players who participate in unsanctioned International Soccer Game Events in the U.S., and because other penalties are threatened against any FIFA-affiliated leagues or clubs who participate in such unsanctioned events, no high quality international professional soccer clubs (all of whom are affiliated with FIFA) will participate in any International Soccer Game Events, including Official Season International Soccer Game Events, in the U.S. without a USSF sanction.

7.      Relevent has attempted, three times within the last twelve months, to bring Official Season International Soccer Game Events—two regular season and one post-season—to venues in the U.S.  At every turn, however, Relevent's efforts have been thwarted by USSF's conspiracy with FIFA and others.

8.      In October 2018, FIFA issued a policy prohibiting the staging of Official Season International Soccer Game Events outside of the participant league's home country (the "FIFA Policy").  In April 2019, USSF exercised its sanctioning power on behalf of FIFA to deny Relevent's application to host an Official Season International Soccer Game Event in the U.S. between two Ecuadorian clubs from LigaPro Serie A, the top division of Ecuadorian men's

professional soccer, which was scheduled for play on May 5, 2019 ("the May 5 Event"), citing its anticompetitive agreement to adhere to the FIFA Policy prohibiting such events.

9.    Without USSF's sanction, the May 5 Event had to be cancelled, and the match was played in Ecuador.  By the time USSF refused to sanction the May 5 Event because of its unlawful agreements with FIFA and others, Relevent had already secured a stadium, received approval letters from the Ecuadorian league, national association, and regional governing body, and committed significant resources to the event.

10.    Relevent and other soccer promoters have also had to pay a fee to USSF in order to obtain a sanction for any International Soccer Game Event that USSF has permitted to be played in the U.S.  The imposition of these sanctioning fees has been enforced by the anticompetitive agreements between USSF, FIFA and others to boycott and penalize any players or clubs that participate in an unsanctioned event.  These agreements have no procompetitive purpose and have had the anticompetitive effect of restricting the output of International Soccer Game Events in the U.S. by increasing their costs and thereby creating barriers to entry, to the detriment of all fans, sponsors and media partners of international soccer events in the U.S.

11.    The anticompetitive agreements entered into by USSF with FIFA and others to prohibit all Official Season International Soccer Game Events in the U.S., to punish teams and players that participate in unsanctioned events, and to otherwise limit the output of International Soccer Game Events in the U.S. are—collectively and individually—a *per se* illegal group boycott and naked restriction of output in violation of Section 1 of the Sherman Act.  Such agreements also constitute an unreasonable restraint of trade under the "quick look" doctrine and rule of reason.

12.    Further, by enforcing its illegal conspiracy with FIFA and others to block Relevent from promoting or hosting Official Season International Soccer Game Events in the U.S., USSF

has tortiously interfered, and continues to tortiously interfere, with Relevent's business relations in violation of New York state and other state laws.

**PARTIES**

**Plaintiff Relevent Sports, LLC**

13.     Plaintiff Relevent is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

14.     Since 2013, Relevent has organized and promoted the famed International Champions Cup (the "ICC"), an annual series of "friendly" International Soccer Game Events between international clubs staged throughout the world, including in the U.S.  The 2019 edition of the ICC featured eleven "friendly" International Soccer Game Events throughout the U.S., four in Asia, and three in Europe.

15.     Relevent has also organized, promoted, and hosted three of the five highest attended soccer matches in the U.S.  The 2014 "friendly" International Soccer Game Event between Real Madrid (Spain) and Manchester United (England) still holds the attendance record for a soccer match in the U.S., with over 109,000 fans in attendance.

16.     Between 2013 and 2018, Relevent paid approximately $20.5 million to USSF in required sanctioning fees for Relevent's "friendly" International Soccer Game Events in the U.S.  Relevent had no choice but to pay such fees in order to get a sanction for each match, which was essential for the events to take place given the anticompetitive conspiracy between USSF, FIFA and others.  Relevent estimates that it will pay another $2.4 million to USSF in 2019 for events that have already been sanctioned, bringing the seven-year total to nearly $23 million.

17.     These sanctioning fees have the effect of reducing output in the U.S. for International Soccer Game Events, as they significantly increase the costs of promoting and conducting such events.  In fact, sanctioning fees are paid to USSF based on revenues generated

5

from the applicable International Soccer Game Event without regard for the costs borne by the promoter, such as Relevent.  Thus, a promoter of an International Soccer Game Event in the U.S. assumes a substantial risk of losing money in connection with that event, while USSF, which does not incur any costs in connection with the applicable International Soccer Game Event or have any role in organizing or promoting the event, only stands to profit.

18.     In 2018, Relevent and La Liga—Spain's premier men's professional soccer league—created a joint venture, La Liga North America, to market and promote La Liga in the U.S., and to bring International Soccer Game Events, including Official Season International Soccer Game Events involving La Liga clubs, to U.S. venues.

19.     Due to the conspiracy among USSF, FIFA and others to prohibit all Official Season International Soccer Game Events outside of the participating clubs' home territory, Relevent has not been able to promote any Official Season International Soccer Game Events in the U.S. for teams from La Liga or any other foreign soccer league.  Two events blocked pursuant to the conspiracy were Relevent's proposed Official Season International Soccer Game Event in the U.S. between FC Barcelona and Girona FC and the May 5 Event.

20.     Should USSF's anticompetitive adherence to its agreement with FIFA be enjoined, Relevent is ready, willing and able to host International Soccer Game Events in the U.S. that would not otherwise take place in the U.S., including Official Season International Soccer Game Events.

**Defendant United States Soccer Federation, Inc.**

21.     Defendant USSF is a not-for-profit corporation organized under the laws of the State of New York, with its principal place of business in Chicago, Illinois.

22.     Based on the authority granted to the United States Olympic Committee by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq.* (1998) ("Ted Stevens Act"), USSF is recognized as the National Governing Body ("NGB") for amateur soccer in the U.S.

23.     However, the Ted Stevens Act does not provide any authority for USSF to regulate or sanction professional soccer matches or events.  Instead, USSF claims such authority from FIFA.

24.     USSF exercises the authority to act on behalf of FIFA as its national affiliate in the U.S. and, among other things, uses that private authority to sanction—or refuse to sanction—all professional soccer matches played in the U.S. by FIFA-affiliated professional soccer leagues and clubs.  All of the most successful and prominent professional soccer leagues and clubs in the world are affiliated with FIFA through one of FIFA's national federations and thus will not participate in unsanctioned events in the U.S. because of the anticompetitive agreements between USSF, FIFA and others.

25.     As USSF recently stated, pursuant to its agreements with FIFA, it exclusively determines which professional soccer matches and events may be played in the U.S.[3]  It thus has the power to use its sanctioning authority to restrict output and competition in the market for International Soccer Game Events—including Official Season International Soccer Game Events—in the U.S.

---

[3] Mem. of Law in Supp. Of Resp.'s Cross-Mot. to Compel Arbitration and Dismiss at 4, *Relevent Sports, LLC v. USSF et al.*, No. 154104/2019 (N.Y. Sup. Ct. May 17, 2019) (Dkt. No. 48).  *See also* FIFA STATUTES, 67, Art. XIII.71(1) (June 2019), https://resources.fifa.com/image/upload/fifa-statutes-5-august-2019-en.pdf?cloudid=ggyamhxxv8jrdfbekrrm; FIFA REGULATIONS GOVERNING INTERNATIONAL MATCHES, 7, Art. 6(1)–(2), https://resources.fifa.com/image/upload/regulations-governing-international-matches-2325685.pdf?cloudid=pywuivvlfl5aqvhsw2i7.

**Non-Party Co-Conspirator Fédération Internationale de Football Association**

26.     FIFA is a private international football federation, which identifies itself in its governing "Statutes" as "an association registered in the Commercial Register in accordance with art. 60 ff. of the Swiss Civil Code."[4]

27.     FIFA is the self-declared, private, international governing body for soccer.  It administers worldwide soccer through its Statutes, as well as other regulations, decisions and directives issued by it and its governing councils and committees.

28.     These rules and regulations are privately derived, and do not have any governmental or statutory source of authority.

29.     To enforce and effectuate its anticompetitive rules and agreements, FIFA utilizes a network of six regional governing bodies (known as "Confederations") and over 200 national governing bodies (known as "National Associations") throughout the world.  Each Confederation and National Association is a separate economic actor with distinct economic interests.

30.     The regional Confederations assist FIFA in carrying out its regulations at (roughly) the continental level.  The Confederation that governs North American soccer is the Confederation of North, Central and Caribbean Association Football ("CONCACAF").  USSF has been a member of CONCACAF since 1961.

31.     Subject to, and beneath, the Confederations are the respective National Associations, each of which is authorized to represent FIFA as the governing body for soccer at its respective national level.  USSF has been the FIFA-recognized National Association for the U.S. since 1914.

---

[4] FIFA STATUTES at 10, Art. I.1(1).

32.     In order to maintain its status with FIFA, USSF agrees to "comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time. . ."[5]  Failure to do so can result in USSF's suspension or expulsion from FIFA.[6]  "FIFA bodies" includes the FIFA Council, which is comprised of the FIFA President, the Presidents of each regional Confederation and additional members elected by and from the National Associations.

33.     As FIFA's recognized National Association for soccer in the U.S., USSF is vested with exclusive authority to sanction, on behalf of FIFA, International Soccer Game Events played in the U.S., and has the right to charge sanctioning fees to those who wish to promote International Soccer Game Events.  It is a violation of the FIFA Statutes for a soccer club to play in the U.S. without USSF's sanction, and USSF has agreed to notify FIFA of any International Soccer Game Event that is played in the U.S. without USSF's sanction.

34.     A professional soccer club affiliated with a FIFA-sanctioned league is subject to disciplinary action from both FIFA and from the applicable regional Confederation and National Association if it violates FIFA's rules.  Moreover, professional soccer players participating in any unsanctioned match may also face discipline, including a group boycott through ineligibility to participate in the FIFA World Cup and other prestigious FIFA-affiliated competitions, as well as a prohibition on being transferred—*i.e.*, traded to or signed by another FIFA-affiliated club.

35.     Because of the potential penalties involved for players, clubs and leagues, no International Soccer Game Event can occur in the U.S. without a USSF-issued FIFA sanction.

---

[5] *Id.* at 16, Art. II.14(1)(a).

[6] *Id.* at 18-19, Art. II.16-17; Mem. of Law in Supp. Of Resp.'s Cross-Mot. to Compel Arbitration and Dismiss at 1, *supra* n.3.

**Non-Party Soccer United Marketing**

36.     Non-party SUM is a limited liability company organized under the laws of Delaware that is engaged in the business of marketing soccer properties, with its principal place of business in New York, New York.

37.     Upon information and belief, SUM was founded, and is currently owned, by the owner-operators of each MLS club.  MLS Commissioner Don Garber serves as Chief Executive Officer of SUM.

38.     SUM is a competitor of Relevent in the market for International Soccer Game Events in the U.S.  For example, since 2003, SUM has partnered with the Mexican National Team to organize International Soccer Game Events in the U.S., and currently organizes the new Leagues Cup tournament, which includes games between foreign clubs played at U.S. venues.[7]  In addition, SUM organizes and promotes the championship game for Liga Mx (Mexico's top-tier men's professional league), which, for the last several years, has been held in Carson, California.  SUM also hosts and promotes the SuperCopa Mx, a championship match crowning the winner of the annual tournament between professional Mexican soccer clubs from multiple leagues.  Since 2015, the SuperCopa Mx has been played in the U.S.

39.     Since the early 2000s, USSF, MLS and SUM have entered into a series of commercial relationships designed to align USSF's economic interests with those of SUM.  According to public statements by MLS Commissioner and SUM CEO Garber, USSF receives over $30 million in annual guaranteed payments in exchange for granting SUM the right to jointly and exclusively market certain media rights and other intellectual property rights owned by USSF,

---

[7] *Leagues Cup Launches New Era of MLS-Liga MX Rivalry*, MLSSOCCER.COM (May 29, 2019), https://www.mlssoccer.com/post/2019/05/29/leagues-cup-launches-new-era-mls-liga-mx-rivalry.

including the rights for USSF's most valuable assets, the U.S. Women's and Men's National Teams.[8]

40.    SUM packages its rights to MLS properties with the rights obtained from USSF and the Mexican National Team to create and sell combined sponsorship and media opportunities.

41.    As Garber has further stated, SUM will have made more than $300 million in guaranteed payments to USSF by the conclusion of the current USSF-SUM agreement in 2022.[9]

42.    These guaranteed payments, according to the public financial statements of USSF, constitute a substantial portion of USSF's annual revenue.

43.    The deep economic relationship between USSF and SUM provides a strong economic incentive for USSF to exercise its sanctioning authority on behalf of FIFA to restrict output in the International Soccer Game Events market in the U.S. and thereby enhance the economic value of the International Soccer Game Events promoted by SUM in the U.S. and sanctioned by USSF.

## JURISDICTION AND VENUE

44.    This Court has subject matter jurisdiction over Relevent's antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337 because Relevent's claims arise under laws of the U.S. that regulate commerce and protect commerce against restraints and monopolies: Section 4 of the Clayton Act (15 U.S.C. § 15), Section 16 of the Clayton Act (15 U.S.C. § 26) and Section 1 of the Sherman Act (15 U.S.C. § 1).  This Court has supplemental jurisdiction over Relevent's state-law tort claims

---

[8] Grant Wahl, *Soccer United Marketing Fact/Fiction: Garber Opens Up on SUM's Role in U.S. Soccer, MLS*, SPORTSILLUSTRATED.COM (Jan. 25, 2018), https://www.si.com/soccer/2018/01/25/sum-soccer-united-marketing-garber-gulati-carter.
[9] *Id.*

pursuant to 28 U.S.C. § 1367 because such claims arise from the same case or controversy as the antitrust claims.

45.     This Court has *in personam* jurisdiction over Defendant USSF because USSF (a) transacts substantial business in this District; (b) is incorporated in this District under New York law; (c) engages in antitrust violations in substantial part in this District; (d) organizes and holds matches in this District, including matches for the Lamar Hunt U.S. Open Cup; (e) sanctions entities in this District and receives fees for International Soccer Game Events played in this District, including the ICC (promoted by Relevent); (f) engages in a conspiracy and group boycott that is intended to have, and has had, an anticompetitive effect on commerce in this District; and (g) has substantial aggregate contacts with the U.S., generally, including in this District.

46.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391(b), (c) and (d), because a substantial part of the events giving rise to Relevent's claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and USSF does business in, has agents in, is found in or transacts business in this District.  Relevent also has its principal place of business in this District.

## **BACKGROUND**

### A. **USSF Exercises Market Power, Through Its Anticompetitive Agreements with FIFA and Others, to Control Access to the Relevant Market for International Soccer Game Events in the U.S.**

47.     The relevant product and geographic market in which USSF's conduct has unreasonably restrained competition is the market for International Soccer Game Events in the U.S.

48.     The consumers in the relevant market for International Soccer Game Events in the U.S. include fans who purchase, or would purchase, tickets to International Soccer Game Events

held in the U.S.; sponsors who purchase, or would purchase, the promotional and other benefits of association with International Soccer Game Events played in the U.S.; and media partners that purchase, or would purchase, media rights to International Soccer Game Events played in the U.S.

49.     International Soccer Game Events have attributes that distinguish them in the eyes of consumers from non-soccer professional sporting events held in the U.S.   Such other professional sports have different rules of play and competitive attributes that are not reasonably interchangeable with International Soccer Game Events and do not serve as close substitutes for those matches.  Fans, sponsors and media partners of International Soccer Game Events do not view other professional sports as close substitutes, and there is no cross-elasticity of demand between International Soccer Game Events and other professional sports in this country, such as Major League Baseball, the National Basketball Association, the National Football League and the National Hockey League.

50.     Soccer's popularity in the U.S. has grown exponentially since the U.S. hosted the FIFA World Cup in 1994.  Once a secondary sport in the country's mind, a recent Gallup poll found that 7% of Americans named soccer as their favorite sport to watch, slightly behind baseball at 9%, and ahead of hockey at 4%.

51.     International Soccer Game Events are also distinct from, and not close substitutes for, domestic professional soccer leagues such as MLS or U.S. Women's and Men's National Team matches because fans, sponsors and media partners draw a distinction between International Soccer Game Events played in the U.S. and domestic professional soccer leagues or National Team matches played in the U.S.  International Soccer Game Events played in the U.S. are special occasions where fans of foreign professional soccer teams have the opportunity to see a live match involving the world's top players, international clubs, or national teams that only rarely visit the

U.S. and that often play, with respect to men's professional soccer, at a significantly higher level than is available from MLS or even the U.S. Men's National Team.

52.     Because of the unique opportunity that International Soccer Game Events played in the U.S. offer to U.S. consumers, they are frequently better attended than domestic men's professional soccer and U.S. Men's National Team matches.

53.     For example, in July 2019, over 60,000 fans attended the ICC match between Bayern Munich (Germany) and Real Madrid (Spain) at NRG Stadium in Houston, Texas.  Three days later, nearly 53,000 fans turned out to watch Real Madrid face Arsenal (England) in Landover, Maryland.  In March 2019, over 50,000 fans packed Levi's Stadium in Santa Clara, California to watch the Mexican Men's National Team take on Chile.  By contrast, MLS has stated that its average attendance for matches played between 2013-2018 was 21,358.[10]

54.     In 2018, the average attendance for International Soccer Game Events in the U.S. involving the Mexican Men's National Team was just under 60,000 per match, with over 80,000 attending the May 28, 2018 International Soccer Game Event between Mexico and Wales in Pasadena, California.[11]  The average attendance for U.S. Men's National Team matches played in the U.S. during that same year was just over 24,000.[12]

55.     U.S. fans have also demonstrated significant interest in attending Official Season International Soccer Game Events in the U.S., which are also distinct from other U.S. professional

---

[10] Tom Bogert, *Atlanta United attendance ranked Top 10 in world, MLS is 8th among leagues,* MLSSOCCER.COM (Apr. 16, 2019, 12:49 PM), https://www.mlssoccer.com/post/2019/04/16/atlanta-united-attendance-ranked-top-10-world-mls-8th-among-leagues.

[11] Lawrence Dockery, *Mexico's average attendance in USA 14% greater than USMNT in 2018,* WORLDSOCCERTALK.COM (Dec. 15, 2018), http://worldsoccertalk.com/2018/12/15/mexicos-average-attendance-usa-59-greater-usmnt-2018/.

[12] Lawrence Dockery, *USMNT average attendance for 2018 worst since 2006,* WORLDSOCCERTALK.COM (Dec. 12, 2018), https://worldsoccertalk.com/2018/12/12/usmnt-average-attendance-2018-worst-since-2006/.

sports, domestic professional soccer leagues and U.S. National Team matches. Official Season International Soccer Game Events offer the additional unique opportunity to watch an International Soccer Game Event with a tangible impact on the participating clubs' fortunes, *i.e.*, the match affects league or tournament standings or crowns a league or tournament champion and thus will be of additional interest to consumers who are fans of those clubs.

56. The SUM-promoted 2019 Campeón de Campeones match, which crowned the champion of Liga Mx, was played on July 14, 2019 before an over-capacity crowd of 27,800 at Dignity Health Sports Park in Carson, California.[13] Just two nights earlier, an MLS match between the LA Galaxy and San Jose Earthquakes—a historic MLS rivalry known to MLS fans as the "California Clásico"—was attended by just 22,508 fans.[14]

57. The relevant market is limited to the U.S. and does not include professional soccer events, including International Soccer Game Events, that take place outside of the U.S., because such matches outside the U.S. do not permit regular attendance by U.S. fans or the purchase of on-site local sponsorships, among other factors.

58. Because of the FIFA penalties and threats involved, an International Soccer Game Event in the U.S. not sanctioned by USSF cannot be successful, as it cannot attract the participation of the highest quality teams and players in the world. The result is that USSF, as the FIFA-affiliated sanctioning authority in the U.S., has monopoly power to control access to the relevant market for International Soccer Game Events in the U.S. Indeed, USSF recently told the New

---

[13] *Minutes of the League Champion Football Match*, LIGAMX.NET, https://administrador.ligamx.net/ php/cmpt/CMPT_InfrArbt.php?pnIDPartido=99140 (last visited Aug. 27, 2019) (translated from Spanish); *Frequently Asked Questions – Stadium*, LAGALAXY.COM https://www.lagalaxy.com/club/faq/stadium# std08 (last visited Aug. 27, 2019).

[14] *Game Information*, ESPN.COM, https://www.espn.com/soccer/match?gameId=533174 (last visited Aug. 27, 2019).

York Supreme Court that it "has exclusive authority to sanction international soccer matches played in the United States."[15]

59.     To be affiliated with FIFA, Confederations, National Associations, leagues, clubs and players must comply with FIFA's rules as implemented and enforced by the Confederations and National Associations, including the rule that all International Soccer Game Events must be sanctioned by the National Association in whose territory the match will be played.

60.     Any violation of those rules is subject to discipline.[16]  For example, a National Association that sanctions an International Soccer Game Event in violation of FIFA rules may be subject to expulsion from FIFA.[17]  A league that permits its clubs to compete in an Official Season International Soccer Game Event outside of its home territory in violation of the FIFA Policy also faces discipline.[18]  And a player who competes in an unsanctioned match risks being deemed ineligible to participate in prestigious FIFA-sanctioned competitions, including the FIFA World Cup, or to be transferred to a FIFA-affiliated team—which makes it impossible, as a practical matter, for any FIFA-affiliated league or club to participate in an unsanctioned event in the U.S.[19]

---

[15] Mem. of Law in Supp. Of Resp.'s Cross-Mot. to Compel Arbitration and Dismiss at 1, *supra* n.3.

[16] FIFA STATUTES at 17, Art. II.14(2).

[17] *Id.* at 19, Art. II.17(1)(b) ("The Congress may expel a member association…if…it seriously violates the Statutes, regulations, or decisions of FIFA…."); FIFA DISCIPLINARY CODE, 14–15, tit. II.15(1) (2019) https://resources.fifa.com/image/upload/fifa-disciplinary-code-2019-edition.pdf?cloudid=eukqwuptuclcddzqjdlu ("[A]nyone who fails to comply with another final decision…passed by a body, a committee, or an instance of FIFA…[is subject to discipline]."). *See also* Mem. of Law in Supp. Of Resp.'s Cross-Mot. to Compel Arbitration and Dismiss at 1, *supra* n.3.

[18] FIFA STATUTES at 19, Art. II.17(1)(b); *Id.* at 18, Art. II.16(1); FIFA DISCIPLINARY CODE at 14–15, tit. II.15(1).

[19] *See generally* FIFA STATUTES at 10–11, Art. I.2(g) ("The objectives of FIFA" include "to promote integrity, ethics and fair play with a view to preventing all methods or practices . . . which might jeopardise the integrity of matches, competitions, players, officials and member associations or give rise to abuse of association football"); FIFA DISCIPLINARY CODE at 7, tit. I.2(c) (players may be banned from "taking part in any football-related activity").

61.     Accordingly, by virtue of its agreements with FIFA and others, USSF maintains monopoly sanctioning power and exclusive control over access to the relevant market for International Soccer Game Events in the U.S.  USSF utilizes this monopoly power to restrict output in the relevant market and to enhance the value of events promoted by its economic partner, SUM.

**B.   Relevent's Soccer Game Event Business**

62.     Relevent's business centers on organizing and promoting international soccer matches and events in the U.S. and around the world.  Since its founding in 2012, Relevent has been responsible for the successful presentation of over 100 soccer events in the U.S., including the ICC, a "friendly" International Soccer Game Event tournament featuring premier European men's club teams playing in the U.S., Canada, Asia and Europe.  An ICC match between Manchester United and Real Madrid in 2014 set an attendance record for soccer in the U.S., with over 109,000 fans in attendance.

63.     Apart from the ICC, Relevent's business prioritizes providing U.S. soccer fans with consistent access to high quality live matches.  For example, since 2013, Relevent has been responsible for organizing and promoting "friendly" International Soccer Game Events in North America for the Brazilian Men's National Team, routinely one of the top-ranked men's national teams in the world and the only national team to have won five FIFA World Cup titles.[20]

64.     Building on its successes in promoting "friendly" International Soccer Game Events and tournaments in the U.S. and elsewhere, the next step for Relevent's business was to provide logistical and marketing support to international clubs seeking to play Official Season International Soccer Game Events in the U.S.  Despite opportunities to make these games a reality,

---

[20] *Most Men's World Cup Wins By Country,* WORLDATLAS.COM (July 8, 2019), https://www.worldatlas.com/articles/world-cup-wins-by-country.html;   *World   Cup   History*, FOXSPORTS.COM, https://www.foxsports.com/soccer/fifa-world-cup/history (last visited Aug. 27, 2019).

USSF, in carrying out its anticompetitive agreements with FIFA and others, has blocked Relevent and other promoters from offering such events to the many consumers in the U.S. who would like to experience, sponsor or partner with them.

### C. SUM's International Soccer Game Event Business and Close Economic Ties to USSF

65.     SUM, the for-profit marketing arm of MLS and its investor operators, has been described by FIFA's Confederations as the "preeminent commercial soccer enterprise in North America, overseeing the marketing, promotion and operational execution of the region's most successful soccer entities."[21]

66.     Since the early 2000s, SUM has pooled USSF's valuable marketing and broadcast rights with those of MLS and others—including the Mexican National Team—to offer the option of a single package of these rights to sponsors and broadcasters.  In exchange, SUM has committed to pay tens of millions of dollars to USSF each year in guaranteed payments.

67.     This arrangement effectively ties the economic fortunes of USSF to those of SUM and incentivizes USSF to protect SUM's interest in, among other things, organizing and promoting International Soccer Game Events in competition with other promoters such as Relevent.

68.     According to USSF's most recent Audited Financial Statement:

> Most third-party sponsorship, television, licensing and royalty revenues (excluding those received from Nike) are paid to SUM, and SUM pays the Federation annual guaranteed compensation.  Revenue under the agreement approximated $27,250,000 and $26,250,000 for the years ended March 31, 2018 and 2017, respectively.[22]

---

[21] *CONCACAF and CONMEBOL Award IMG and SUM Copa America Centenario 2016 Commercial Rights,* CONCACAF.COM (Dec. 2, 2015), https://www.concacaf.com/en/copa-america-centenario/article/concacaf-and-conmebol-award-img-and-sum-copa-america-centenario-2016-commercial-rights.

[22] USSF Consolidated Financial Statements 2018, at 16 (March 1, 2019), https://www.ussoccer.com/governance/financial-information (last visited Aug. 27, 2019).

69.     SUM CEO Garber has stated that, by the conclusion of the current SUM-USSF agreement, SUM will have paid USSF nearly $300 million in guaranteed payments.[23]  As Garber further explained, this guaranteed revenue is particularly important to the economic fortunes of USSF in years where it would otherwise struggle to generate its expected media and sponsorship revenues, such as in 2018 when one of USSF's most valuable assets, the U.S. Men's National Team, failed to qualify for the World Cup.[24]

70.     Indeed, USSF and SUM's relationship is so intertwined that, according to USSF's 2018 Audited Financial Statement, when the USSF-SUM agreement expired on December 31, 2014, the parties operated under a memorandum of understanding for over three years—through January 18, 2018—before a new agreement was finalized.[25]

71.     Relevent and other promoters compete with SUM in the market for International Soccer Game Events in the U.S.  For example, for the last five years, SUM has organized and promoted both the Liga Mx championship match and the SuperCopa Mx.  In 2015, SUM held the matches as a doubleheader in Frisco, Texas and, for the last four years, has held the doubleheader in Carson, California.  As of May 2019, SUM also organizes and promotes the Leagues Cup tournament between Liga Mx and MLS clubs.

72.     SUM also has a longstanding relationship with the Mexican National Team to organize and promote multiple International Soccer Game Events annually in the U.S.  According to USSF's 2019 International Games Report, between January and June 2019, SUM promoted four

---

[23] Wahl, *supra* n.8.
[24] *Id.*
[25] USSF Consolidated Financial Statements 2018 at 15.

USSF-sanctioned International Soccer Game Events involving the Mexican National Team in the U.S.[26]

73.    With SUM's guarantee making up a substantial portion of USSF's annual revenue, the USSF-SUM relationship provides USSF with a material economic incentive to promote the interests of SUM to the detriment of SUM's competitors, including Relevent.[27]  One way in which USSF has accomplished this has been by using its sanctioning power and anticompetitive agreements with FIFA and others to restrict output in the relevant International Soccer Game Events market in order to limit competition to, and enhance the value of, the events promoted by SUM.

### D.  The Conspiracy Between USSF, FIFA and Others to Limit Output for International Soccer Game Events in the United States

#### i.    USSF Agrees to Comply with FIFA Rules Limiting International Soccer Game Events

74.    One of FIFA's stated objectives is "to control every type of association football,"[28] or soccer, as it is known in the U.S.  FIFA controls soccer through its Statutes, which are supplemented by regulations, decisions and other private directives issued by FIFA and its official committees and councils.  FIFA relies on its network of six regional Confederations, including CONCACAF, and FIFA's over 200 National Associations, including USSF, to agree to implement and enforce these rules which, among other things, limit the output of International Soccer Game Events.

---

[26] *International Games—Schedule of Games*, USSOCCER.COM, https://www.ussoccer.com/federation-services/international-games (last visited Aug. 27, 2019).

[27] Even USSF President Cordeiro has acknowledged that "[t]he unique ownership of SUM creates conflicts that need to be addressed." Wahl, *supra* n.8.

[28] FIFA STATUTES at 10, Art. I.2(d).

75.     To maintain its membership in FIFA, USSF is required to agree to "comply fully with the statutes, regulations, directives and decisions of FIFA bodies at any time."[29]  One such "FIFA body" is the FIFA Council, which is "responsible for issuing regulations for organising international matches and competitions," such as International Soccer Game Events.[30]

76.     The FIFA Statutes also require each National Association to promulgate rules, which must include the directive that all "relevant stakeholders," *i.e.*, professional leagues, teams and players, "must agree to respect . . . the Statutes, regulations and decisions of FIFA . . . ."[31]  In accordance with that agreement, USSF has adopted Bylaw 103, which states, in relevant part, that USSF "members are, to the extent permitted by governing law, obliged to respect the statutes, regulations, directives, and decisions of FIFA . . . and to ensure that these are likewise respected by their members."[32]

77.     In a recent New York state court filing, USSF explicitly identified its agreement to comply with FIFA's Statutes and the decisions of the FIFA Council with respect to sanctioning International Soccer Game Events in the U.S. as the reason why it would not sanction an entire category of such events in the U.S.—those involving official season matches (*i.e.*, Official Season International Soccer Game Events).[33]  As USSF also stated, failure to comply with its agreement

---

[29] *Id.* at 16, Art. II.14(1)(a).

[30] *Id.* at 67, Art. XIII.71(1).

[31] *Id.* at 17, Art. II.15(e).

[32] Bylaws of the United States Soccer Federation Inc., 1 Bylaw 103 § 1 (2019) https://www.ussoccer.com/governance/bylaws.

[33] Mem. of Law in Supp. Of Resp.'s Cross-Mot. to Compel Arbitration and Dismiss at 1, *supra* n.3 (quoting FIFA Statutes at 16, Art. II.14(1)(a)).

to abide by FIFA's rules or the directives of the FIFA Council "may lead to sanctions," including

"expulsion."[34]

> ### ii.   USSF Acts as the Exclusive Authority to Sanction International Soccer Game Events in the U.S. on Behalf of FIFA

78.     In accordance with FIFA's Regulations Governing International Matches, which

require all National Associations like USSF to "draw up their own regulations" for sanctioning

International Soccer Game Events,[35] USSF has promulgated Policy 521-1, which states in relevant

part:

> [USSF's] Secretary General promptly shall review requests . . . to hold international
> soccer competitions in the United States [including International Soccer Game Events]
> . . . . **The Secretary General shall ensure compliance with the Federation's**
> **obligations as a national governing body under the Amateur Sports Act and as a**
> **national association member of FIFA**.[36]

79.     In addition, the National Association in whose territory an International Soccer

Game Event is played must agree to pay a "levy" to FIFA based on "the gross receipts (ticket sales,

advertising rights for television and radio broadcast film and video rights, etc.) derived from each

such match. . . ."[37]  Each National Association, including USSF, is also instructed by FIFA that it

"may demand [its] own levy independently of FIFA, in accordance with [its] own statutes and

---

[34] Mem. of Law in Supp. Of Resp.'s Cross-Mot. to Compel Arbitration and Dismiss at 1, *supra* n.3; FIFA STATUTES at 17, Art. II.14(2); *see also id.* at 61, Art. X.60(1) ("The confederations, member associations and leagues shall agree to comply fully with any decisions passed by the relevant FIFA bodies . . . ."); *id.* Art. X.61 (authorizing sanctions for "[a]ny violation of [Statutes]" in accordance with the FIFA Disciplinary Code.).

[35] FIFA publishes Regulations Governing International Matches, which set forth its policy that any soccer match played outside of the participating teams' home territory—including any International Soccer Game Event—"must be authorised by the [National Association and Confederation] to which the participating teams belong and by the [National Association] in whose territory the match is to be played."  FIFA REGULATIONS GOVERNING INTERNATIONAL MATCHES at 5, Art. 1; *id.* at 7, Art. 6(2)–(3).

[36] USSF POLICY MANUAL, 36, Policy 521-1 § 1, https://www.ussoccer.com/governance/bylaws (emphasis added).

[37] FIFA REGULATIONS GOVERNING INTERNATIONAL MATCHES at 12, Art. 13(1)(c).

regulations,"[38] which USSF imposes based upon the "gross gate receipts" of each International Soccer Game Event that it sanctions.[39]  The imposition of such a levy by USSF has the effect of restricting output by imposing additional economic costs on the promotion of International Soccer Game Events in the U.S.

80.     USSF's website includes a page dedicated to the "International Games Approval Process."[40]  It describes a three-step procedure: the applicant must (1) submit an application fee and a half-page document listing basic information such as the date of the International Soccer Game Event to be held in the U.S., along with official letters from the host venue and participating clubs confirming their intended participation; (2) pay a performance bond based on the type of International Soccer Game Event being played; and (3) wait for USSF to review the application and request "additional assurances in any form that it deems necessary" or notify the applicant whether the request has been approved.[41]

81.     When a sanction is granted, USSF requires the payment of a sanctioning fee based on a percentage of the ticket revenues earned from the event.  As noted above, since 2013, Relevent has been required to pay approximately $20.5 million in sanctioning fees to USSF and expects to pay an additional $2.4 million this year.  These fees have materially increased the cost to Relevent and its competitors of conducting International Soccer Game Events in the U.S., while USSF's only material "contribution" to such events is the provision of a FIFA sanction.

---

[38] *Id.* at 13, Art. 13(2)(a).

[39] *Operating Procedures for International Matches* § 7, USSOCCER.COM, https://www.ussoccer.com/federation-services/international-games/operating-procedures (last visited Aug. 27, 2019).

[40] *International Games Approval Process*, USSOCCER.COM, https://www.ussoccer.com/federation-services/international-games/hosting-international-matches (last visited Aug. 27, 2019).

[41] *Operating Procedures for International Matches* § 6(B).

82.     Under USSF procedures, if a sanction is withheld, the Promoter and participating leagues and clubs are left without recourse since there is no appeal mechanism provided in either FIFA's or USSF's rules for the denial of a sanction.  And, under FIFA's rules, if any International Soccer Game Event is "played on [a National Association's] territory and for which authorisation was either not sought or not given," the National Association must notify FIFA,[42] which in turn may trigger FIFA penalties on the participating league, clubs and/or players.[43]

83.     Because avoiding FIFA penalties is essential to any high quality foreign soccer league, club or player, compliance with FIFA's rules is, as a practical matter, compulsory.  Thus, no league, club or player of high quality will participate in an International Soccer Game Event in the U.S. absent a USSF sanction.

### iii.   USSF Has Agreed with FIFA to Refuse to Sanction Any Official Season International Soccer Game Events in the U.S.

84.     FIFA has issued a policy directive prohibiting its affiliates, including USSF, from sanctioning any Official Season International Soccer Game Events to be held outside of the participants' home territory, creating an effective ban and group boycott of such events.

85.     In 2018, when Relevent announced a joint venture with La Liga to, among other things, host Official Season International Soccer Game Events annually in the U.S.—including, in 2018, a match between FC Barcelona and Girona—it was immediately met with resistance from FIFA.  For example, after the joint venture was announced, FIFA President Gianni Infantino stated: "I think I would prefer to see a great MLS game in the U.S. rather than La Liga being in the U.S.

---

[42] FIFA REGULATIONS GOVERNING INTERNATIONAL MATCHES at 6, Art. 4(5).

[43] *See* nn.5, 6, 16, 17, 18, 19, and 34, *supra*.

. . ."[44]  Although no codified FIFA or USSF rule at that time prohibited Relevent from hosting an Official Season International Soccer Game Event in the U.S., Infantino explained that "[i]n football, the general principle is that you play a 'home' match at 'home,' and not in a foreign country. . . . There are rules [and] regulations that everyone complies with."[45]

86.     In light of FIFA's statements, USSF, CONCACAF and the National Association for Spain (Real Federación Española de Fútbol, "RFEF") sought official guidance from FIFA regarding its rules on Official Season International Soccer Game Events played outside of the competing clubs' home territory.  In response, FIFA issued a decision stating its policy that FIFA-affiliated National Associations, like USSF, cannot sanction such events:

> Consistent with the opinion expressed by the Football Stakeholders Committee,[46] the [FIFA] Council emphasised the sporting principle that official league matches must be played within the territory of the respective member association.[47]

In other words, FIFA has directed that the only official season professional soccer league matches that may be played in the U.S. are those between U.S. professional clubs; Official Season International Soccer Game Events featuring foreign clubs, on the other hand, are barred by FIFA from being played in the U.S., and USSF may not sanction them without being subject to FIFA

---

[44] Adriana Garcia, *FIFA chief Gianni Infantino expresses doubt over La Liga game in U.S.*, ESPN.COM (Sept. 17, 2018), https://www.espn.com/soccer/blog-fifa/story/3636865/fifa-chief-gianni-infantino-expresses-doubt-over-la-liga-game-in-us.

[45] *Id.*

[46] The FIFA Stakeholders Committee is a "Standing Committee" tasked with "advis[ing] and assist[ing] the FIFA Council in their respective fields of function" and to "deal with football matters, particularly the structure of the game and the relationship between clubs, players, leagues, member associations, confederations and FIFA as well as with issues relating to the interests of club football worldwide."  FIFA STATUTES at 44–48, Art. V.39(1)(e), V.39(2), V.43.  USSF President Cordeiro is currently a member of the Committee, which is chaired by Vittorio Montagliani, who serves as Vice President of FIFA, President of CONCACAF and President of the Canadian Soccer Association.  *See Vittorio Montagliani*, FIFA.COM, https://www.fifa.com/about-fifa/who-we-are/fifa-council/people/236492/ (last visited Aug. 27, 2019).

[47] *FIFA Council makes key decisions for the future of football development*, FIFA.COM (Oct. 26, 2018), https://www.fifa.com/about-fifa/who-we-are/news/fifa-council-makes-key-decisions-for-the-future-of-football-development.

discipline.[48]  Any leagues, clubs or players who participate in an Official Season International Soccer Game Event without a USSF sanction would also be subject to such discipline.

87.    The FIFA Policy, as agreed to and carried out by USSF and others, stands in stark contrast to the policies of other major U.S. professional sports leagues, which have played multiple official season games outside of North America.  For example, since 2017, the NHL has played at least two regular season games abroad as part of its NHL Global Series.  In 2019, the Chicago Blackhawks and Philadelphia Flyers will open their regular season with a game in Prague, Czech Republic and the Tampa Bay Lighting and Buffalo Sabres will play a pair of mid-season games in Stockholm, Sweden.[49]  Since 1990, the NBA has played nearly 30 regular season games outside of North America.[50]  And, to date, 29 of the NFL's 32 clubs have played regular season games in London.[51]  The NFL also hosted regular season games in Mexico City in 2005, 2016 and 2017, with plans to play another game in Mexico's capital during the 2019-20 season.[52]  Likewise,

---

[48] FIFA appears to have made an exception to this rule for MLS, which features three teams based in Canada that are governed by the Canadian Soccer Association (as opposed to USSF).

In addition, USSF has not applied the FIFA Policy to SUM's promotion of the Liga Mx Campeón de Campeones and SuperCopa Official Season International Soccer Game Events that have been hosted in the U.S. on multiple occasions, nor to the newly-announced Leagues Cup, which includes Official Season International Soccer Game Events played at U.S. venues.

[49] *Flyers, Blackhawks, Sabres and Lightning to open in Europe in 2019-20*, USA TODAY (Mar. 21, 2019, 3:00 PM), https://www.usatoday.com/story/sports/nhl/2019/03/21/flyers-blackhawks-sabres-and-lightning -to-europe-in-19-20/39233413/.

[50] Kevin Scheitrum, *History of the NBA Global Games*, NBA.COM, https://www.nba.com/global/ games2013/all-time-international-game-list.html (last visited Aug. 27, 2019).

[51] *Four NFL London Games to be played in 2019*, NFL.COM (Oct. 29, 2018, 9:53 PM), http://www.nfl.com /news/story/0ap3000000981459/article/four-nfl-london-games-to-be-played-in-2019.

[52] *NFL to play 4 games in London, 1 in Mexico City in 2019*, CONCORD MONITOR (Dec. 12, 2018, 9:11 PM), https://www.concordmonitor.com/NFL-to-play-4-games-in-London-1-in-Mexico-City-in-2019- 22143721.

between 1996 and 2019, Major League Baseball has played multiple regular season games in Australia, England, Japan and Mexico.[53]

88.     Since FIFA requires USSF "to comply fully with the Statutes, regulations, directives and decisions of FIFA bodies" or risk discipline, including potential expulsion from FIFA,[54] USSF has refused to sanction any Official Season International Soccer Game Events in the U.S., including the events proposed by Relevent.  This boycott has prevented Relevent from organizing and promoting such events in the U.S.

89.     At the same time, however, USSF has continued to exempt SUM alone from the FIFA Policy, sanctioning the SUM-promoted LigaMx championship, SuperCopa Mx, and now the new Leagues Cup tournament—all of which consist of Official Season International Soccer Game Events held in the U.S.

>       **iv.   USSF Blocks Relevent's Ability to Hold Official Season International Soccer Game Events in the U.S. Pursuant to Its Anticompetitive Agreements with FIFA and Others**

90.     In August 2018, after Relevent and La Liga agreed to host an Official Season International Soccer Game Event in the U.S. between FC Barcelona and Girona FC, Relevent met with USSF to indicate that it would be seeking a USSF sanction for this event.  In response, USSF President Cordeiro instructed Relevent to first obtain approvals from RFEF and the European Confederation—the Union of European Football Associations—before even proposing the Official Season International Soccer Game Event to USSF.

---

[53] David Adler, *Complete History of MLB Games Played Abroad*, MLB.COM (June 28, 2019), https://www.mlb.com/news/baseball-games-played-outside-the-us-c272441130.
[54] FIFA STATUTES at 16, Art. II.14(1)(a), (2); *id.* at 19, Art. II.17(1)(b).

91.    Then, in November 2018, USSF made it clear that, pursuant to its agreements with FIFA and others, it would not permit any Official Season International Soccer Game Events to be played in the U.S.  Specifically, after CONMEBOL—the South American Football Confederation under FIFA—and Argentinian soccer officials determined that the championship match for CONMEBOL's Copa Libertadores[55] between Argentinian rivals Boca Juniors and River Plate could not take place as scheduled in Argentina due to safety concerns, Relevent approached USSF President Cordeiro to discuss staging the match in Miami, Florida.  With knowledge that SUM had, for several years, organized and promoted Mexico's SuperCopa Mx, which is played in the U.S. with USSF's sanction, Relevent similarly sought to obtain a sanction to relocate the Copa Libertadores—an Official Season International Soccer Game Event—to the U.S.  However, USSF refused to engage in discussions with Relevent on granting such a sanction.

92.    Rather, upon information and belief, USSF alerted CONMEBOL to its intention not to sanction Relevent's proposed event.  According to the *New York Times*, USSF President Cordeiro "made his opposition clear"[56] directly to CONMEBOL.  Indeed, although Argentina's daily newspaper *La Nación* reported that Miami was at one time the favorite to host this Official Season International Soccer Game Event, a CONMEBOL official later explained that the match was not played in Miami because "Carlos Cordeiro (the president of US Soccer) did not want to."[57]

---

[55] Copa Libertadores is a tournament among the top soccer clubs in the CONMEBOL region, which qualify for the tournament by winning their domestic league or national tournament.

[56] Rory Smith, *A Final for All time, Sacrificed on the Altar of the Modern Game*, NEW YORK TIMES.COM (Nov. 30, 2018), https://www.nytimes.com/2018/11/30/sports/soccer/copa-libertadores-boca-river-madrid.html?searchResultPosition=1.

[57] *Id.* (citing Alejandro Casar González, *La Conmebol fijó que la final de la Copa Libertadores se juegue en el Santiago Bernabéu, de Madrid, el 9 de diciembre,* LA NACION (Nov. 29, 2018), https://www.lanacion.com.ar/deportes/futbol/destino-impensado-final-copa-libertadores-se-jugara-nid2197523.).

Because USSF refused to consider granting such a sanction, the match was eventually played in Spain.

93.     Just days later, FC Barcelona withdrew from its commitment to participate in Relevent's proposed La Liga Official Season International Soccer Game Event in the U.S.  The Club issued the following statement (translated from Spanish):

> The Board of Directors of FC Barcelona has decided to withdraw its decision to play the match against Girona FC in Miami, after confirming a lack of consensus on the proposal.  FC Barcelona was and remains willing to play a La Liga match in Miami . . . but acknowledges that while there is no agreement between all parties, this project will not succeed.[58]

94.     Thereafter, Relevent identified two more international soccer clubs interested in playing an Official Season International Soccer Game Event in the U.S.—this time rival clubs from Ecuador's LigaPro Serie A—and formally sought USSF's sanction for the match, *i.e.*, the May 5 Event.

95.     On March 29, 2019, Relevent submitted an official sanctioning application to USSF seeking approval for the May 5 Event.

96.     Prior to submitting its application, Relevent had already secured Hard Rock Stadium in Miami, Florida as the site of the May 5 Event and obtained written approval from the participating teams' league (LigaPro), the Ecuadorian national association (Ecuadorian Football Federation), and Ecuador's governing regional Confederation (CONMEBOL), which approvals were submitted to USSF as part of Relevent's initial application.  In accordance with USSF Policy 521-1, Relevent also submitted its application fee and performance bond by April 5, 2019—a full

---

[58] *El Barça deja sin efecto su disposición de jugar en Miami*, FCBARCELONA.ES (Dec. 11, 2018), https://www.fcbarcelona.es/es/noticias/940120/el-barca-deja-sin-efecto-su-disposicion-de-jugar-en-miami?_ga=2.56777198.575772544.1565127786-1757679914.1565127786.

month in advance of the May 5 Event—and emailed USSF to inform its officers that the application was fully submitted.

97.    On April 8, 2019, USSF confirmed receipt of Relevent's application, but claimed the application could not be reviewed because the FIFA match agent working with Relevent was purportedly renewing his match agent insurance and did not appear on FIFA's match agent list. Relevent promptly informed USSF that the insurance for the match agent remained valid, had the insurance policy sent to USSF, and contacted FIFA to restore the match agent to the online match agent list.  Relevent then sent USSF confirmation from FIFA that its match agent's FIFA license was still current and that FIFA would update its website to correct the omission.

98.    Despite these confirmations, USSF informed Relevent on April 12, 2019, that USSF would only consider the match agent's status resolved when his name appeared on the FIFA website.  Further, USSF informed Relevent that it intended to contact the Ecuadorian Football Federation and CONMEBOL, notwithstanding the letters of approval those entities had already provided (which were in USSF's possession), to discuss the fact that the planned match was part of LigaPro's regular season, as opposed to a "friendly" match.  USSF closed its letter by threatening Relevent with fines, the withholding of future sanctions, and other penalties if it advertised the May 5 Event before USSF issued a sanction.

99.    Although USSF was well aware of the rapidly approaching date for the May 5 Event, and was provided with copies of all signed approvals and the stadium reservation confirmation, Relevent heard nothing from USSF until April 22, 2019, when USSF issued a letter denying Relevent's sanction application.  This time, USSF expressly stated that the reason for its refusal to provide the sanction was because of its agreement to follow FIFA policies and directions on this issue.  Specifically, USSF stated that it had agreed to adhere to the FIFA Policy—*i.e.* a

direction by FIFA that Official Season International Soccer Game Events held outside of the clubs' home territory are prohibited.

100.    When Relevent thereafter challenged USSF's decision in New York state court as arbitrary, USSF responded unequivocally that:

> [USSF] is required to adhere to the rules and decisions of soccer's international governing body, FIFA.  That requirement is set forth in both USSF's rules and FIFA's rules.  In October of last year, FIFA's decision-making body, the FIFA Council, issued a ruling that official league matches between professional soccer teams should only take place within their home country.  USSF is bound to adhere to that decision; if it did not do so, USSF would risk expulsion from FIFA.[59]

101.    In other words, USSF's admitted basis for refusing to sanction the May 5 Event was its illegal agreements with FIFA and others to prohibit Official Season International Soccer Game Events from being played in the U.S.—a naked restriction on output.

> **v.    USSF Has Similarly Blocked Other Promoters' Ability to Conduct Official Season International Soccer Game Events in the U.S. Pursuant to Its Anticompetitive Agreements with FIFA and Others**

102.    USSF has similarly enforced its illegal agreements with FIFA and others by refusing to sanction Official Season International Soccer Game Events in the U.S. that were organized by other promoters and pre-approved by the international clubs' National Association(s) and Confederation(s).

103.    Upon information and belief, on March 1, 2019, USSF received a completed application from a FIFA match agent on behalf of another promoter seeking USSF's sanction to host an Official Season International Soccer Game Event in the U.S. between two Ecuadorian LigaPro Serie A clubs on April 14, 2019 ("the April 14 Event").[60]

---

[59] Mem. of Law in Supp. Of Resp.'s Cross-Mot. to Compel Arbitration and Dismiss at 1, *supra* n.3.

[60] The April 14 Event was to feature two different Ecuadorian teams than Relevent sought to feature in the May 5 Event.

104.    Prior to submitting its application, the other promoter had already secured Red Bull Arena in Harrison, New Jersey as the site of the match, obtained written agreement from the participating clubs themselves and the clubs' league (LigaPro), and received letters of approval from both the Ecuadorian Football Federation and CONMEBOL, all of which were submitted to USSF as part of the other promoter's application.

105.    In addition to the other promoter's completed application, on March 1, 2019, USSF received an email from the Secretary General of the Ecuadorian Football Federation, copying CONMEBOL, stating the Ecuadorian governing bodies' approval of the April 14 Event.

106.    Notwithstanding the documented prior approval of its peer National Association and Ecuador's governing regional Confederation, on March 5, 2019, USSF refused to sanction the April 14 Event on the ground that it was not permitted to do so because of its adherence to the FIFA Policy:

> Please note that we are not able to accept this application as it is our understanding that official league matches cannot be approved to be played outside of the home country. We have communicated this to the Ecuador Federation and to CONMEBOL as well.

107.    Despite its enforcement of the FIFA ban, upon information and belief, USSF has persuaded FIFA to permit it to continue to sanction the International Soccer Game Events held in the U.S. by its economic partner SUM—specifically, the Liga Mx championship, SuperCopa Mx and Leagues Cup—even though these are Official Season International Soccer Game Events promoted and played outside of Mexico, where the participating foreign clubs are located.

### E.  Relevent's Claims Are Not Subject to Arbitration

108.    The ChampionsWorld litigation confirms that the antitrust and intentional tort claims Relevent asserts herein are not subject to arbitration.

109.    In May 2006, now-defunct soccer promoter ChampionsWorld, LLC ("ChampionsWorld") brought suit against USSF and MLS alleging, among other things, violations

of the Sherman Act and RICO. ChampionsWorld alleged that USSF "wrongly arrogated [its] authority to extract [] sanctioning fees by falsely holding itself out to be the exclusive governing body of men's professional soccer in the United States and by threatening to report ChampionsWorld to FIFA as a 'promoter in bad standing.'"[61]

110.    In May 2007, the court granted defendants' motion to compel arbitration of ChampionsWorld's claims on the basis that ChampionsWorld's match agent had agreed that all disputes between him and USSF would be pursued under FIFA's dispute-resolution procedures.[62] The court stayed the federal court litigation pending the FIFA arbitration.[63] ChampionsWorld accordingly commenced an arbitration against USSF before FIFA's Players' Status Committee, asserting claims nearly identical to the antitrust and other claims in its federal court action.[64]

111.    FIFA thereafter advised that its rules only permitted individuals (as opposed to entities) to invoke the arbitration mechanism set forth under the match agent application. FIFA further advised that ChampionsWorld's antitrust and RICO claims were not within the categories of disputes that FIFA was permitted to adjudicate as part of its arbitration process.[65] Specifically, FIFA stated:

> [W]e understand that the dispute in question concerns claims [which] relate to 'antitrust, racketeering and other misconduct' and, therefore, neither appears to fall within the scope of [the FIFA dispute resolution regulations]. Consequently . . . it seems that none of our deciding bodies is competent to hear the present matter.[66]

---

[61] *ChampionsWorld, LLC v. USSF*, 487 F. Supp. 2d 980, 984 (N.D. Ill. 2007).

[62] *Id.* at 986-87.

[63] *Id.* at 992.

[64] *See ChampionsWorld, LLC v. USSF*, 2008 WL 4861522, at *1 (N.D Ill. Nov. 7, 2008).

[65] *Id*.

[66] August 13, 2008 Letter from FIFA to ChampionsWorld, *filed in ChampionsWorld v. USSF*, No. 1:06-cv-05724 (N.D. Ill. Aug. 14, 2008) (ECF No. 90).

112.    In light of FIFA's ruling, ChampionsWorld petitioned the court to lift the stay of the action.  Defendants objected, and USSF commenced its own arbitration before FIFA against the match agent, seeking confirmation that USSF had authority to sanction matches played in the U.S. and to charge sanctioning fees for those matches.  FIFA determined that it had jurisdiction over the limited issues raised by USSF's arbitration demand.

113.    On appeal, the Court of Arbitration for Sport ("CAS") held that FIFA's arbitration jurisdiction was limited to interpreting its own statutes and regulations—it had no authority to arbitrate any antitrust claims or other claims under U.S. law:

> *It should be clear that the Players' Status Committee's competence exists only with respect to FIFA's statutes and regulations.*  While Article 22, paragraph 1, and Article 26 of the MARs seem to suggest that the Players' Status Committee's jurisdiction over disputes between match agents and national associations is unlimited, *it is clear that the Players' Status Committee may consider only disputes to the extent that they implicate FIFA's statutes and regulations.*[67]

114.    In a subsequent decision in the same dispute, CAS reiterated its prior ruling that FIFA's arbitral jurisdiction "existed only with respect to FIFA's statutes and regulations, since [it] *is not in a position to rule on issues of U.S. law.*"[68]

115.    Back before the U.S. federal court, USSF and MLS moved for judgment on the pleadings.[69]  In denying defendants' motion in substantial part, the court held:

> [I]t is clear that FIFA has no power to grant USSF an exemption, either express or implied, from the antitrust laws.  Only Congress may do this.  Similarly, FIFA does not have, or claim to have, authority to interpret acts of Congress.  Furthermore, it seems far-fetched to believe that FIFA would discipline USSF for obeying the antitrust laws of the United States. . . [Thus,] USSF is not entitled to an exemption from the antitrust laws regarding professional soccer, except to the extent necessary for USSF to oversee

---

[67] Decision, *Stillitano v. USSF & FIFA*, CAS 2009/A/1812, at 6 (Sept. 24, 2009) (emphases added); *ChampionsWorld v. USSF*, 890 F. Supp. 2d 912, 922 (N.D. Ill. 2012).

[68] Award, *Stillitano v. USSF & FIFA*, CAS 2010/A/2241 (July 12, 2011) (emphasis added).

[69] *See ChampionsWorld v. USSF*, 726 F. Supp. 2d 961 (N.D. Ill. 2010).

Olympic and related events.  USSF has no clear mandate from Congress to govern the whole of professional soccer in the U.S.[70]

116.     In a subsequent decision confirming the arbitration award USSF had obtained from FIFA on claims not asserted under U.S. law, the court likewise reiterated that the arbitral ruling did not preclude its ability to consider whether USSF's sanctioning authority violated U.S. antitrust law.[71]

117.     It is thus established that there is no agreement to arbitrate any claim against USSF under the United States antitrust laws or state tort laws.  This ruling is binding on USSF under principles of collateral estoppel.  Further, while Relevent has employed a FIFA match agent (as required by FIFA and USSF sanctioning regulations), it has never itself entered into any agreement with FIFA or USSF to arbitrate any of these or other claims.



---

[70] *Id.* at 969–70.
[71] *ChampionsWorld*, 890 F. Supp. 2d at 946–51.





## CLAIMS FOR RELIEF

## COUNT I

### Violation of Section 1 of the Sherman Act

124.    Relevent incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

125.    Defendant USSF is a separate economic actor from FIFA and each FIFA-affiliated Confederation and FIFA-affiliated National Association.  In addition, the constituent members of each Confederation and National Association are separate economic actors.

126.    The actions of USSF and FIFA in concert with each Confederation and National Association and their respective constituent members constitutes action by separate economic



actors engaged in concerted action and agreements to restrict entry into, and limit output of, the relevant market for International Soccer Game Events in the U.S.

127.    This unlawful conduct includes USSF's anticompetitive agreement to comply with the FIFA Policy that prohibits the sanctioning of any Official Season International Soccer Game Event in the U.S.; the anticompetitive agreement by FIFA and its affiliates to boycott and punish professional soccer leagues, clubs and players that participate in an International Soccer Game Event in the U.S. without a USSF sanction; and the anticompetitive agreement between USSF and FIFA to exercise its sanctioning authority in a manner that restricts output in the relevant market and enhances the competitive market position of USSF's economic partner, SUM.

128.    The anticompetitive agreements between USSF and FIFA and their constituent member entities have been imposed and applied in interstate commerce and have unreasonably restrained interstate commerce.

129.    The anticompetitive agreements between USSF and FIFA and their constituent member entities constitute inherently suspect group boycotts, which on their face would always or almost always tend to restrict competition and decrease output, are plainly anticompetitive, and obviously lacking any redeeming procompetitive values.  Accordingly, USSF's participation in these agreements to limit the output of International Soccer Game Events in the U.S. is a *per se* violation of Section 1 of the Sherman Act.

130.    These anticompetitive agreements between USSF, FIFA and their constituent member entities are also a naked restraint under the antitrust laws that cannot be justified on procompetitive grounds.  Accordingly, in the alternative, USSF's participation in these agreements to limit the output of International Soccer Game Events in the U.S. is a violation of Section 1 of the Sherman Act under an abbreviated rule of reason analysis, *i.e.*, the "quick look" test.

131.    The anticompetitive agreements between USSF, FIFA and their constituent member entities have had significant anticompetitive effects on the relevant market for International Soccer Game Events in the U.S., including causing antitrust injury to consumers, sponsors and competitors in the market as alleged herein.

132.    The anticompetitive agreements between USSF, FIFA and their constituent member entities serve no procompetitive purpose and have instead served to restrict output in the relevant market for International Soccer Game Events in the U.S.  Reasonable less restrictive means also exist to achieve any claimed procompetitive purpose of these agreements, which also renders them in violation of Section 1 of the Sherman Act under a full rule of reason analysis.

133.    The anticompetitive agreements between USSF, FIFA and their constituent member entities have, ███████████████████████████████████ directly and proximately caused antitrust injury and damages to the business and property of Relevent, to similarly situated competing promoters, and to consumers in the form of cancelled International Soccer Game Events that were to be held in the U.S., precluded International Soccer Game Events that would have been held in the U.S., and the inability to schedule or attend future International Soccer Game Events in the U.S., including Official Season International Soccer Game Events. Relevent, competing promoters, and consumers will continue to suffer antitrust injury and damages unless USSF is enjoined from continuing to participate in these anticompetitive agreements with FIFA and others to exercise USSF's sanctioning authority to restrict output and unreasonably restrain competition in violation of Section 1 of the Sherman Act through group boycotts and other *per se* unlawful behavior.

## COUNT II

### Tortious Interference with Existing and Prospective Business Relationships

134.    Relevent incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

135.    Relevent possesses a legitimate and protectable interest in its business relations with international soccer leagues, National Associations, clubs, and International Soccer Game Event vendors with respect to the promotion of International Soccer Game Events in the U.S.

136.    Relevent has or had preexisting business relationships with multiple international soccer leagues, National Associations, clubs, and International Soccer Game Event vendors, including La Liga, as well as other leagues and clubs that have participated in, or considered participating in, International Soccer Game Events, including Official Season International Soccer Game Events, in the U.S.

137.    USSF holds itself out as the exclusive sanctioning body for all International Soccer Game Events in the U.S. on behalf of FIFA and has required Relevent to submit applications to USSF for each proposed International Soccer Game Event to be held in the U.S., including the May 5 Event that Relevent wished to promote in the U.S.  At all relevant times, USSF was aware of Relevent's business relationships with multiple international soccer leagues, National Associations, clubs, and International Soccer Game Event vendors that were seeking to participate in such International Soccer Game Events in the U.S.

138.    In 2018 and 2019, Relevent approached USSF and informed it that Relevent had arranged to promote three separate Official Season International Soccer Game Events in the U.S. USSF intentionally ignored, delayed and/or ultimately rejected all of Relevent's attempts to obtain a USSF sanction for these events, which USSF knew was essential in order for Relevent to conduct

the events.  As a result, each of these planned events had to be cancelled and Relevent's relationships with its business partners, which were known to USSF, were severely harmed.

139.    USSF interfered with Relevent's business relationships in this manner without any legitimate justification and pursuant to its anticompetitive agreements with FIFA and others to restrict output in the U.S. of International Soccer Game Events.

140.    USSF has thus exercised its authority from FIFA to willfully interfere with and disrupt Relevent's business relationships without any lawful justification or privilege to do so.

141.    USSF's conduct was undertaken with malice, or in knowing disregard of or indifference to Relevent's rights and interests, and USSF's conduct was so outrageous as to warrant the imposition of punitive damages.

142.    USSF's intentional and malicious conduct to interfere with Relevent's business relationships was also undertaken in an effort to protect the interests of its economic partner SUM.

143.    As a direct and proximate result of USSF's willful and tortious interference, Relevent was unable to organize and promote at least three Official Season International Soccer Game Events in the U.S. and stands to lose more such business opportunities as a result of USSF's continued tortious conduct, which prevents Relevent from promoting any such future events.

144.    As a direct and proximate result of USSF's willful and tortious interference, Relevent suffered and will continue to suffer irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

145.    Relevent will suffer this harm unless and until USSF is restrained from its current and intended future tortious conduct.

146.    As a direct and proximate result of USSF's willful and tortious interference, Relevent has suffered damages in New York, which continue to accrue in the form of lost business, in an amount to be proven at trial.

147.    With respect to the events USSF interfered with that were to be held in Miami, Florida, USSF's tortious conduct also violated Florida law and caused damages to Relevent that are recoverable thereunder, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Accordingly, Relevent prays for judgment with respect to its Complaint as follows:

148.    That the unlawful contracts, conspiracies, or combinations alleged herein, and the acts done in furtherance thereof by USSF and its co-conspirators, be adjudged and decreed a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

149.    That the Court enjoin USSF from continuing to adhere to its unlawful agreements with FIFA and others to unreasonably restrain trade in the U.S., to cease withholding its sanctioning of Official Season International Soccer Game Events in the U.S. from Relevent and other promoters, and to cease exercising its sanctioning authority to restrict output and protect the competitive position of SUM, all in violation of Section 1 of the Sherman Act;

150.    That the Court award compensatory and treble damages to Relevent resulting from USSF's violation of Section 1 of the Sherman Act in an amount to be determined at trial;

151.    That the Court award compensatory damages to Relevent resulting from USSF's tortious interference with Relevent's existing and prospective business relationships;

152.    That the Court award exemplary and punitive damages for USSF's violation of New York and Florida tort law in an amount to be determined at trial;

153.    That the Court award pre-judgment and post-judgment interest at the maximum legal rate;

154.    That the Court award Relevent's costs, expenses, and reasonable attorneys' fees in this action; and

155.    That the Court award such other relief as it may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: September 9, 2019

By
Jeffrey L. Kessler
Jonathan J. Amoona
Angela A. Smedley
Adam I. Dale
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
jamoona@winston.com
asmedley@winston.com
aidale@winston.com

*Counsel for Relevent Sports, LLC*