**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RELEVENT SPORTS, LLC,

                    Plaintiff,

        v.

UNITED STATES SOCCER FEDERATION, INC.

                Defendant.

Case No. 1:19-cv-08359-VEC

---

**PLAINTIFF RELEVENT SPORTS, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION OR IN THE ALTERNATIVE TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

    A.    USSF's Obligations as a National Governing Body Under the Ted Stevens Act Have Nothing to do with Regulating Professional Soccer ........................................4

    B.    USSF's FIFA Affiliation Does Not Require it to Participate in Agreements that Violate U.S. Law ....................................................................................................5

    C.    Relevent Has Demonstrated the Ability to Organize and Promote Official Season International Soccer Game Events in the U.S. ........................................................6

    D.    The Prior Disputes Between Relevent and USSF Do Not Preclude this Action .......7

    E.    USSF's Conspiracy with FIFA and FIFA-Affiliated Horizontal Competitors to Unreasonably Restrain Trade .................................................................................8

ARGUMENT ......................................................................................................................... 9

I.    USSF's Motion to Compel Arbitration Must be Denied as USSF is Precluded from Invoking the FIFA Match Agent Arbitration Agreement to Relevent's Claims ............... 9

    A.    FIFA Lacks Jurisdiction to Rule upon U.S. Antitrust or Other U.S. Law Claims ....9

    B.    Collateral Estoppel Bars USSF's Motion to Compel Arbitration ..........................11

    C.    Relevent's Claims are also Beyond the Scope of the Arbitration Agreement .........12

    D.    Relevent is Not a Party to the Arbitration Agreement Between FIFA and Stillitano .............................................................................................................13

II.    Relevent's Claims Are Not Barred by the Covenant Not to Sue ...................................... 14

    A.    Relevent's Claims Are Not Within the Narrow Scope of the Covenant Not to Sue ......................................................................................................................15

    B.    The Covenant is Unenforceable Against Relevent's Post-Covenant Antitrust and Tort Law Claims as a Matter of Public Policy ........................................................17

III.    FIFA Is Not an Indispensable Party............................................................................... 20

    A.    FIFA Is Not "Necessary" to This Action .............................................................20

        1.    The Court can Provide Relevent Complete Relief Without Joining FIFA ………………………………………………………………………21

            a.    FIFA has not Asserted that its Interests will be Impaired by this Action and USSF is not at Risk of Inconsistent Legal Obligations………………………………………………………24

    B.    Joinder of FIFA Would Be Feasible If Required ..................................................26

    C.    Equity Further Supports the Conclusion that FIFA Is Not an Indispensable Party 27

IV.    USSF's Antitrust Merits Arguments Are Not Proper Grounds for Dismissal................. 27

    A.    Relevent has Pled a Section 1 Conspiracy in Unreasonable Restraint of Trade .....28

B.    The Single-Entity Doctrine Does Not Immunize the Alleged Agreement Between USSF and its Co-Conspirators, All of Whom Have Separate Economic Interests .31

C.    Relevent Has Pled Antitrust Standing ...................................................................33

V.    Relevent Has Adequately Pled Tortious Interference Under New York Law................. 34

CONCLUSION...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguinaga v. UBS AG*,
   2010 WL 5093433 (S.D.N.Y. Dec. 14, 2010) ........................................................24

*In re Am. Express Merchants Litig.*,
   634 F.3d 187 (2d Cir. 2011) ...................................................................3, 17, 20

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*,
   456 U.S. 556 (1982) ................................................................................32

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ..............................................................................32, 33

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) .......................................................................29

*Arizona v. Maricopa Cty. Med. Soc.*,
   457 U.S. 332 (1982) ................................................................................32

*Assoc'd Press v. United States*,
   326 U.S. 1 (1945) ..................................................................................29

*Baidu, Inc. v. Register.com, Inc.*
   2010 WL 2900313 (S.D.N.Y. July 22, 2010) ......................................................19

*Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*,
   821 F.3d 297 (2d Cir. 2016) .......................................................................16

*Bifolck v. Philip Morris USA, Inc.*,
   936 F.3d 74 (2d Cir. 2019) ........................................................................11

*BRB Internacional S.A. v. Weinstein Co. LLC*,
   2018 WL 1111060 (S.D.N.Y Feb. 27, 2018) ......................................................25

*Bridgeport Music Inc. v. Universal Music Grp., Inc.*,
   440 F. Supp. 2d 342 (S.D.N.Y. 2006) ..............................................................15

*BSG Res. Ltd. v. Soros*,
   2017 WL 5897450 (S.D.N.Y. Nov. 29, 2017) ......................................................12

*Carvel Corp. v. Noonan*,
   350 F.3d 6 (2d Cir. 2003) .......................................................................34, 35

*Catalano v. Applied Biometrics Prods., Inc.*,
　2003 WL 22004902 (S.D.N.Y. Aug. 25, 2003)................................................................2, 12

*ChampionsWorld, LLC v. United States Soccer Federation, Inc.*,
　2008 WL 4861522 (N.D. Ill. Nov. 7, 2008) ................................................................10, 11

*ChampionsWorld, LLC v. United States Soccer Federation, Inc.*,
　276 F.R.D. 577 (N.D. Ill. 2011)........................................................................................2, 9

*ChampionsWorld, LLC v. United States Soccer Federation, Inc.*,
　487 F. Supp. 2d 980 (N.D. Ill. 2007) ....................................................................................1

*ChampionsWorld, LLC v. United States Soccer Federation, Inc.*,
　726 F. Supp. 2d 961 (N.D. Ill. 2010) ....................................................................................5

*ChampionsWorld, LLC v. United States Soccer Federation, Inc.*,
　890 F. Supp. 2d 912 (N.D. Ill. 2012) ..........................................................................*passim*

*Charles Schwab Corp. v. Bank of Am. Corp.*,
　883 F.3d 68 (2d Cir. 2018)..................................................................................................27

*Charron v. Sallyport Global Holdings*,
　2014 WL 464649 (S.D.N.Y. Feb. 3, 2014)........................................................................17

*Chatham Brass Co. v. Honeywell, Inc.*,
　512 F. Supp. 108 (S.D.N.Y. 1981)......................................................................................23

*Collins & Aikman Prods. Co. v. Sermatech Eng'g Grp., Inc.*,
　746 N.Y.S.2d 698 (1st Dep't. 2002) ...................................................................................15

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merill, Lynch,
　Pierce, Fenner & Smith Inc.*,
　232 F.3d 153 (2d Cir. 2000)................................................................................................15

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
　2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014).......................................................................27

*Copperweld v. Independence Tube Corp.*,
　467 U.S. 752 (1984)............................................................................................................31

*De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.*,
　2010 WL 2541495 (S.D.N.Y. June 22, 2010) ....................................................................10

*Delgado v. Plaza Las Americas, Inc.*,
　139 F.3d 1 (1st Cir. 1998)...................................................................................................25

*Direxion Shares, ETF Tr. v. Leveraged Innovations L.L.C.*,
　2014 WL 6469084 (S.D.N.Y. Nov. 18, 2014).....................................................................15

*Dumann Realty, LLC v. Faust*,
    267 F.R.D. 101 (S.D.N.Y. 2010) ........................................................22

*Fischer v. Brushy Mt. Bee Farm, Inc.*,
    2019 WL 935957 (S.D.N.Y. Feb. 26, 2019)........................................11

*Fox Midwest Theatres v. Means*,
    221 F.2d 173 (8th Cir. 1955) ............................................................19

*Fraser v. Major League Soccer, L.L.C. et al.*,
    7 F. Supp. 2d 73, 75 & n.1 (D. Mass. 1998) .............................. *passim*

*Freedom Holdings, Inc. v. Spitzer*,
    357 F.3d 205 (2d Cir. 2004)...............................................................29

*Freedom, N.Y., Inc. v. United States*,
    1986 WL 6163, at *3 (S.D.N.Y. May 27, 1986).................................24

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)...........................................................................29

*Great N. Assocs., Inc. v. Cont'l Cas. Co*,
    596 N.Y.S.2d 938 (N.Y. App. Div. 1993) ......................................3, 17

*Hunt v. Mobil Oil Corp.*
    654 F. Supp. 1487 (S.D.N.Y. 1987)...................................................20

*Int'l Fid. Ins. Co. v. Cty. of Rockland*,
    98 F. Supp. 2d 400 (S.D.N.Y. 2000)..................................................16

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019)......................................................33, 34, 35

*Jack Russell Terrier Network v. Am. Kennel Club, Inc.*,
    407 F.3d 1027, 1035 (9th Cir. 2005) .................................................32

*Katsoris v. WME IMG, LLC*,
    237 F. Supp. 3d 92 (S.D.N.Y. 2017)..................................................14

*In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)...........................................29, 30

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959)...........................................................................30

*Kraebel v. NYC Dep't of Hous. Pres. & Dev.*,
    1994 WL 132239 (S.D.N.Y. Apr. 14, 1994)......................................23

*Kwatinetz v. Mason*,
    356 F. Supp. 3d 343 (S.D.N.Y. 2018)...................................................................................13

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019) .......................................................................................................13

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955)......................................................................................................19, 20

*In re London Silver Fixing, Ltd.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016)...............................................................................33

*Madison Square Garden v. NHL*,
    2008 WL 4547518, at *6 (S.D.N.Y. Oct. 10, 2008) ..................................................18, 19, 32

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003)..........................................................................................26, 27

*McClellan Ecological Seepage Situation v. Perry*,
    47 F.3d 325 (9th Cir. 1995) .............................................................................................16

*Meyer v. Kalanick*,
    2016 WL 3509496 (S.D.N.Y. June 20, 2016) ................................................................23, 24

*Meyer v. Kalanick*,
    291 F. Supp. 3d 526 (S.D.N.Y. 2018)...............................................................................26

*Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.*,
    1997 WL 166497 (S.D.N.Y. Apr. 9, 1997)......................................................................17, 19

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)..........................................................................................................16

*NASL v. NFL*,
    670 F.2d 1249 (2d Cir. 1982)........................................................................................32, 33

*NCAA v. Board of Regents*,
    468 U.S. 85 (1984)............................................................................................................32

*New Mexico v. Gen. Elec. Co.*,
    467 F.3d 1223 (10th Cir. 2006) .........................................................................................16

*Parklane Hosiery Co., Inc. v. Shore*,
    439 U.S. 322 (1979)..........................................................................................................12

*Peregrine Myanmar Ltd. v. Segal*,
    89 F.3d 41 (2d Cir. 1996) .................................................................................................24

*Pullman v Alpha Media Pub., Inc.*,
   2013 WL 1290409 (S.D.N.Y. Jan. 11, 2013) ........................................................25

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
   317 F. Supp. 2d 301 (S.D.N.Y. 2003)...............................................................4, 35

*Redel's Inc. v. Gen. Elec. Co.*,
   498 F.2d 95 (5th Cir. 1974) ...........................................................................19, 20

*Relevent Sports, LLC v. USSF, Inc.*,
   No. 154104/2019 (N.Y. Sup. Ct. Apr. 23, 2019) .................................................7, 8

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*,
   545 F.2d 18 (7th Cir. 1976) .................................................................................18

*In re Salomon Inc. S'holders Derivative Litig.*,
   68 F.3d 554 (2d Cir. 1995)..................................................................................10

*Singleton v. Grade A Mkt., Inc.*,
   607 F. Supp. 2d 333 (D. Conn. 2009)..................................................................10

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
   2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) .........................................................31

*Sourceone Dental Inc. v. Patterson Co., Inc.*,
   310 F. Supp. 3d 346 (E.D.N.Y. 2018) .................................................................35

*In re SSA Bonds Antitrust Litig.*,
   2019 WL 4917608 (S.D.N.Y. Oct. 4, 2019)....................................................26, 27

*Stillitano v. USSF & FIFA*,
   CAS 2009/A/1812 at 19 (Sept. 24, 2009) ............................................................12

*Stillitano v. USSF & FIFA*,
   CAS 2010/A/2241 at 5 (July 12, 2011) ........................................................ *passim*

*The Rice Company (Suisse), S.A. v. Precious Flowers Ltd.*,
   523 F.3d 528 (5th Cir. 2008) ...............................................................................14

*Trina Solar US, Inc. v. JRC-Servs. LLC*,
   229 F. Supp. 3d 176 (S.D.N.Y. 2017) (Caproni, J.) .............................................14

*Trugman-Nash, Inc. v. New Zealand Dairy Bd.*,
   942 F. Supp. 905 (S.D.N.Y. 1996)......................................................................22

*United States v. Apple*,
   791 F.3d 290 (2d Cir. 2015)..........................................................................28, 30

vii

*United States v. Paramount Pictures*,
  334 U.S. 131 (1948)............................................................................31

*US Airways, Inc. v. Sabre Holdings Corp.*,
  105 F. Supp. 3d 265 (S.D.N.Y. 2015)..................................................20

*USSF v. Stillitano*,
  (Players' Status Committee Nov. 21, 2008) .........................................10

*Viacom Int'l, Inc. v. Kearney*,
  212 F.3d 721 (2d Cir. 2000)................................................................26

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988)..................................................................29

*Xerox Corp. v. Media Sciences, Inc.*
  609 F. Supp. 2d 319 (S.D.N.Y. 2009)..................................................19

*XL Specialty Ins. Co. v. Agoglia*,
  2009 WL 1227485 (S.D.N.Y. Apr. 30, 2009).......................................16

**Statutes**

36 U.S.C. § 220501 ..............................................................................4, 5, 7, 25

36 U.S.C.§ 220522 ......................................................................................5, 25

**Other Authorities**

3E Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law* § 330d (2019)..........................23

Black's Law Dictionary (11th ed. 2019) .................................................17

Bylaws of the United States Soccer Federation, Inc., 1 Bylaw 103 § 1
  (2019)......................................................................................... *passim*

Fed. R. Civ. P. 8 ........................................................................................29

Fed. R. Civ. P. 19 ............................................................................... *passim*

FIFA Match Agent Regulations at 9, Art. IV. 22(1) .................................13

Ltr. from M. Villiger and M. Kuster Hoffman to ChampionsWorld (Aug. 13,
  2008) ...................................................................................2, 9, 14

Plaintiff Relevent Sports, LLC ("Relevent") respectfully submits this Opposition to Defendant United States Soccer Federation, Inc.'s ("USSF" or the "Federation") motion to compel arbitration or in the alternative to dismiss the Complaint (the "Motion").

## PRELIMINARY STATEMENT

Faced with the prospect of antitrust and tort liability due to its *admitted* agreement with FIFA and horizontally competing Confederations,[1] National Associations, soccer leagues, and teams not to sanction Official Season International Soccer Game Events in the U.S., and to otherwise restrict the output of International Soccer Game Events in this country through a boycott of unsanctioned events, USSF seeks to shield its illegal conduct by (i) invoking a FIFA arbitration mechanism that has already been held inapplicable to the antitrust and other U.S. legal claims Relevent asserts here—a determination that USSF is precluded from re-litigating; (ii) citing an inapposite covenant not to sue that, in any event, cannot bar subsequently accrued antitrust or intentional tort claims as a matter of public policy; (iii) claiming that FIFA is an indispensable party, even though USSF—without FIFA's participation—has previously settled antitrust claims against it by agreeing to cease following certain FIFA policies that USSF concluded violated U.S. law; and (iv) misstating governing law and improperly disputing the Complaint's factual allegations, which are more than sufficient to state a claim under both Section 1 of the Sherman Act and state tort law.

*First*, USSF's attempt to compel arbitration of Relevent's claims is barred by the numerous decisions against USSF on this very issue in *ChampionsWorld*.  There, a different promoter operating through FIFA Match Agent Charles Stillitano challenged USSF's sanctioning authority and the fees charged for sanctions under U.S. antitrust, RICO, and state tort law. *ChampionsWorld, LLC v. United States Soccer Federation, Inc.*, 487 F. Supp. 2d 980, 984 (N.D. Ill. 2007).  As here, USSF argued that Stillitano agreed that all disputes with USSF were subject

---

[1] Capitalized terms herein have the same meaning as set forth in the Complaint (Dkt. No. 31).

to FIFA arbitration. *Id.* at 984. Based on that agreement, the Northern District of Illinois compelled arbitration. *Id.* at 992. FIFA then determined that "*none* of [its] deciding bodies [were] competent to hear . . . antitrust" or other claims under U.S. law.[2] And the appellate arbitral body for FIFA, the Court of Arbitration for Sport ("CAS"), held that while FIFA is competent to interpret its own rules and policies, it "is not in a position to rule on issues of U.S. law." Award, *Stillitano v. USSF & FIFA*, CAS 2010/A/2241 at 5 (July 12, 2011) ("2011 CAS Award"), submitted herewith as Ex. B to Kessler Decl. The Northern District of Illinois confirmed the 2011 CAS Award and held that, because "FIFA does not have the authority to interpret U.S. law," the court was required to decide the antitrust, RICO, and tort claims. *ChampionsWorld, LLC v. United States Soccer Federation, Inc.*, 276 F.R.D. 577, 584, 586 (N.D. Ill. 2011); *ChampionsWorld, LLC v. United States Soccer Federation, Inc.*, 890 F. Supp. 2d 912, 936-37 (N.D. Ill. 2012). Under principles of collateral estoppel, USSF is bound by these determinations of FIFA's arbitral jurisdiction, which precludes arbitration of Relevent's claims here. *See Catalano v. Applied Biometrics Prods., Inc.*, 2003 WL 22004902, at *5 (S.D.N.Y. Aug. 25, 2003).

*Second*, USSF cannot invoke the parties' 2016 covenant not to sue to seek dismissal. Pursuant to the narrow terms of the covenant, Relevent only agreed not to assert claims against USSF "challenging [USSF's] jurisdiction over International Games, [USSF's] authority to charge Sanctioning Fees, or the reasonableness of the Sanctioning Fees charged by [USSF]." Ex. 6 to Decl. of Lawrence E. Buterman, Confidential Settlement Agreement at 3, (Dkt. No. 34-6); Compl. ¶¶ 118-119. As the Complaint makes clear, Relevent does not challenge USSF's jurisdiction over International Games or the fees that it charges; rather, Relevent challenges USSF's unlawful agreement with FIFA and various competing FIFA-affiliated Confederations, National Associations, international leagues, and teams not to sanction Official Season International Soccer Game Events and to otherwise limit output in the U.S. of International Soccer Game Events

---

[2] Ltr. from M. Villiger and M. Kuster Hoffman to ChampionsWorld (Aug. 13, 2008), submitted herewith as Ex. A to Decl. of Jeffrey L. Kessler.

through an unlawful boycott of unsanctioned events.  Compl. ¶¶ 127, 133, 139, 149.  The covenant is thus inapplicable by its terms.  Moreover, even if the covenant covered Relevent's claims (it does not), it cannot bar Relevent's subsequently accrued antitrust and intentional tort claims as a matter of public policy.  *See, e.g.*, *In re Am. Express Merchants Litig.*, 634 F.3d 187, 197 (2d Cir. 2011); *Great N. Assocs., Inc. v. Cont'l Cas. Co*, 596 N.Y.S.2d 938, 940 (N.Y. App. Div. 1993).

*Third*, USSF's claim that its co-conspirator FIFA is an indispensable party flies in the face of the Federation's own history.  Specifically, in *Fraser v. Major League Soccer, L.L.C. et al.*, USSF faced an antitrust claim challenging its agreement to adhere to a FIFA policy unlawfully restraining trade in the market for professional soccer players in the U.S.  Ultimately, USSF provided complete relief to the *Fraser* plaintiffs—without FIFA ever being joined in the action and without any adverse consequences from FIFA—and was dismissed from the case in relevant part after stipulating that it would cease participating in FIFA's unlawful policy.  7 F. Supp. 2d 73, 75 & n.1 (D. Mass. 1998).  USSF's stipulation was consistent with its own Bylaws, which provide that it is contractually obligated to comply with FIFA rules only "*to the extent permitted by governing law*."  BYLAWS OF THE UNITED STATES SOCCER FEDERATION, INC., 1 Bylaws 103 § 1 (2019) (emphasis added) ("USSF Bylaws"), submitted herewith as Ex. C to Kessler Decl.  Thus, where, as here, a FIFA directive violates U.S. antitrust law, USSF is not obligated to follow the directive and can provide complete relief without FIFA.

*Fourth*, USSF's assertion of contrary facts to challenge Relevent's claim of *per se* antitrust liability fails at the outset because it ignores Relevent's allegations of a horizontal agreement to restrict output and a hub-and-spoke conspiracy to restrain trade with no procompetitive objective, both of which are *per se* unlawful.  *E.g.*, Compl. ¶¶ 2, 11, 130-33, 139.  And, since USSF does not challenge Relevent's alternative Section 1 claim that USSF's conduct constitutes an unreasonable restraint of trade under the rule of reason test, USSF's Motion cannot dispose of this claim.

Moreover, the law of this Circuit rejects USSF's arguments that (i) compulsion by FIFA to participate in the challenged conspiracy, even if true, can save USSF from antitrust liability; (ii) circumstantial facts must be pled to state a plausible conspiracy in the face of USSF's admitted agreement to enforce the unlawful FIFA Policy; (iii) USSF may immunize its unlawful agreements from Section 1 by falsely labeling itself a single entity with FIFA or any other co-conspirator; and (iv) factual disputes provide a proper basis to challenge antitrust standing at the pleadings stage.

*Finally*, USSF's claim that Relevent has not identified business relationships impacted by USSF's tortious interference is belied by the Complaint's allegations of a number of third-party agreements to conduct International Soccer Game Events in the U.S. that were intentionally blocked by USSF's unlawful conduct.  Compl. ¶¶ 18, 96, 99, 135.  And, despite USSF's assertion that its behavior was not tortious, participation in an unlawful restraint of trade satisfies the wrongful conduct element of a claim for tortious interference.  *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003).

## BACKGROUND

Although the Court must accept Relevent's allegations as true on a motion to dismiss, USSF asserts its own version of the "facts," which are hotly disputed and cannot be resolved on the pleadings.  These factual disputes include those regarding (1) USSF's obligations as a National Governing Body ("NGB") for soccer; (2) Relevent's ability to organize Official Season International Soccer Game Events; (3) the history of disputes between Relevent and USSF; and (4) the identity and interrelationships of the co-conspirators alleged in the Complaint.  A summary of the Complaint's actual allegations on these points is set forth below.

### A.    USSF's Obligations as a National Governing Body Under the Ted Stevens Act Have Nothing to do with Regulating Professional Soccer

USSF is recognized as the NGB for amateur soccer pursuant to the Ted Stevens Olympic and Amateur Sports Act.  Compl. ¶ 22 (citing 36 U.S.C. § 220501 *et seq*. (1998) ("Ted Stevens Act")).  Contrary to USSF's assertion (Mot. at 4), the Ted Stevens Act does not provide USSF

with any authority to regulate or sanction professional soccer matches or events in the U.S.  Compl. ¶ 23.  Instead, USSF's asserted authority over professional soccer in the U.S. is based on its private association with FIFA and the economic power of a FIFA sanction and affiliation.  *Id.* ¶¶ 23-24. That the Ted Stevens Act does not give USSF any authority to regulate professional soccer is well-settled—it was decided against USSF in *ChampionsWorld* and is binding on the Federation.[3]

### B.   USSF's FIFA Affiliation Does Not Require it to Participate in Agreements that Violate U.S. Law

USSF exercises its authority from FIFA to, among other things, sanction—or refuse to sanction—professional soccer matches played in the U.S. by FIFA-affiliated professional soccer leagues and clubs.  Compl. ¶¶ 23-24.  As USSF recently told a New York court, it exclusively determines which professional soccer matches and events may be played in the U.S. with a FIFA sanction.  *Id.* ¶ 25.  When USSF grants a sanction, it charges a sanctioning fee.  *Id.* ¶ 81.

Despite USSF's claim, it has no "legal[] oblig[ation] to follow FIFA's rules" if such rules violate U.S. law.  *Compare* Mot. at 1, 10 *with* Compl. ¶ 60.[4]  In fact, USSF's Bylaws are unequivocal that "[t]he Federation" is "obliged to respect the statutes, regulations, directives, and decisions of FIFA" only "to the extent permitted by governing law."  Compl. ¶ 76; USSF Bylaws 103 § 1.  Pursuant to this limitation, USSF has previously stipulated to cease complying with a FIFA rule that violated U.S. antitrust law.  *See Fraser*, 7 F. Supp. at 75 & n.1 (players withdrew antitrust claim against USSF after it "entered into a stipulation . . . never [to] pay nor request a

---

[3] *ChampionsWorld*, 890 F. Supp. 2d at 936-37 (denying motion to reconsider prior decision "that the Ted Stevens Act gives USSF no more . . . authority over professional soccer [] than necessary for it to oversee Olympic and related events"); *ChampionsWorld, LLC v. United States Soccer Federation, Inc.*, 726 F. Supp. 2d 961, 969-70 (N.D. Ill. 2010) (USSF has "no clear mandate from Congress to govern the whole of professional soccer in the U.S.").

[4] USSF claims such an obligation is "mandated by the Ted Stevens Act, which requires [it] to be a compliant member of FIFA."  Mot. at 5 (citing 36 U.S.C. § 220522(a)(6)).  But no such requirement exists, and the inapposite statutory provision USSF cites for this proposition requires only that USSF "demonstrate[] that it is a member of no more than one international sports federation that governs a sport . . . ."  36 U.S.C. § 220522(a)(6).  Moreover, USSF ignores that the immediately preceding provision requires the Federation to "demonstrate[] that it is autonomous in the governance of its sport in that it . . . is free from outside restraint."  *Id.* § 220522(a)(5)(C).

transfer fee payment for an out-of-contract player" despite FIFA rule requiring such payments).  It is undisputed that USSF faced no adverse consequences from FIFA for complying with U.S. antitrust law.

In October 2018, according to USSF, FIFA issued the FIFA Policy prohibiting the staging of Official Season International Soccer Game Events outside of the participant league's home country.  Compl. ¶¶ 8, 100.  Despite USSF's obligation to comply with U.S. law, and its Bylaw preserving its right not to follow a FIFA policy that is contrary to that obligation, USSF recently admitted to a New York state court (and throughout its Motion) that it has agreed to comply with the FIFA Policy and other FIFA directives concerning the unlawful boycott challenged in the Complaint.  *Id.* ¶¶ 77, 100-101; *see* Mot., *passim*.

### C.   Relevent Has Demonstrated the Ability to Organize and Promote Official Season International Soccer Game Events in the U.S.

Relevent is a premier promoter of International Soccer Game Events throughout the world, having hosted three of the five highest-attended professional soccer matches ever played in the U.S.  Compl. ¶¶ 14-15.  To date, USSF has only granted sanctions to Relevent for "friendlies," *i.e.*, exhibition matches where the results have no impact on official records or statistics.  *Id.* ¶¶ 14-16, 62-64.  By contrast, USSF has granted sanctions to its economic partner SUM to host and promote Official Season International Soccer Game Events.  *Id.* ¶¶ 56, 71, 86 n.48, 89, 107.  The entrenched economic relationship between USSF and SUM is well-pled in the Complaint, and USSF's attempt to dispute these facts is irrelevant at this stage.  *Id.* ¶¶ 39-43, 65-73; Mot. at 8 n.13.

In March 2019, after USSF blocked two of Relevent's proposed Official Season International Soccer Game Events through threats and intimidation, Relevent submitted an application to USSF seeking a sanction for the May 5 Event—an Official Season International Soccer Game Event between two clubs from Ecuador's top men's professional league.  Compl. ¶¶ 90-96.  The application contained the approvals from the hosting venue, each club, the participating league, Ecuador's National Association, and Ecuador's Confederation

6

(CONMEBOL), but USSF denied a sanction for the Event, citing its agreement to comply with the FIFA Policy. *Id* ¶¶ 96-99. Thus, USSF's contention that such events could not be conducted by Relevent even with a USSF sanction (Mot. at 6) is contrary to the well-pled Complaint allegations. Compl. ¶ 96; *see also* Ex. 5 to Buterman Decl., Application to Host International Matches (Dkt. 34-5).[5]

> ### D.   The Prior Disputes Between Relevent and USSF Do Not Preclude this Action

In May 2016, the parties entered into the 2016 Settlement Agreement after Relevent challenged USSF's sanctioning fee authority and the amount of fees it charged as inconsistent with the Ted Stevens Act and USSF's own written policy. Compl. ¶¶ 118-119. Relevent covenanted in that agreement not to pursue claims against USSF challenging three limited and specific issues: "[USSF's] jurisdiction over International Games, [USSF's] authority to charge Sanctioning Fees, or the reasonableness of the Sanctioning Fees charged by [USSF]." *Id.*; Buterman Decl., Ex. 6 at 3. The covenant not to sue does not contain any agreement not to challenge USSF's future participation in anticompetitive agreements with FIFA and competing FIFA-affiliated Confederations, National Associations, leagues, and teams in violation of U.S. antitrust and state tort laws. Compl. ¶¶ 120, 122; Buterman Decl., Ex. 6. Further, Relevent did not covenant to forgo claims that USSF has entered into anticompetitive agreements to boycott players and teams who play in unsanctioned events. *Id.*

After USSF denied Relevent a sanction to promote the May 5 Event, Relevent commenced an action in New York state court, contending that USSF's decision was arbitrary and violated Article 78 of New York's Civil Practice Law & Rules. Compl. ¶ 100.[6] Although USSF asserts that the New York case "was premised on exactly the same alleged facts, transactions and

---

[5] Relevent also alleges that another promoter obtained the necessary approvals to host a different Official Season International Soccer Game Event in the U.S., but USSF also declined to sanction that match. Compl. ¶¶ 103-106.

[6] *See also* Am. Verified Pet., *Relevent Sports, LLC v. USSF, Inc.*, No. 154104/2019 (N.Y. Sup. Ct. Apr. 23, 2019) (Dkt. No. 20), submitted herewith as Ex. D to Kessler Decl.

occurrences as this case" (Mot. at 9), it did not invoke the covenant not to sue in that proceeding, instead justifying its refusal to provide a sanction by citing its agreement to comply with the FIFA Policy.[7]  Thereafter, Relevent contacted the undersigned counsel and determined that USSF was engaging in an anticompetitive agreement in violation of U.S. antitrust law, which led to this action.[8]  To preserve party and court resources, Relevent filed a motion seeking to voluntarily dismiss the New York state case without prejudice, which was granted over USSF's objection. *See* Kessler Decl., Ex. F; Order, *Relevent Sports, LLC v. USSF et al.*, No. 154104/2019 (N.Y. Sup. Ct. Dec. 5, 2019) (Dkt. No. 76).

### E.   USSF's Conspiracy with FIFA and FIFA-Affiliated Horizontal Competitors to Unreasonably Restrain Trade

Contrary to USSF's assertion, Relevent does not just allege a conspiracy between USSF and FIFA.  *See* Mot. at 25-31.  Instead, Relevent alleges that USSF is participating in anticompetitive schemes with FIFA and various horizontally competing FIFA-affiliated Confederations, National Associations, leagues, and teams to (i) boycott professional soccer leagues, clubs, and players that participate in Official Season International Soccer Game Events in the U.S. that have not been sanctioned by USSF; and (ii) restrict output and create barriers to entry for Relevent and others in the U.S. market who seek to conduct or promote International Soccer Game Events.  Compl. ¶¶ 10, 24, 29-31, 34-35, 60, 124-133.  Further, Relevent alleges that USSF uses its anticompetitive agreement to provide a competitive advantage to its economic partner, SUM, which competes with Relevent in promoting International Soccer Game Events and has been granted sanctions by USSF to conduct Official Season International Soccer Game Events, while Relevent's requests to host such Events have been blocked.  *Id.* ¶¶ 56, 71, 86 n.48, 89 107.

---

[7] Mem. in Supp. of Resps.' Cross-Mot. to Compel Arbitration and Dismiss, *Relevent Sports, LLC v. United States Soccer Federation, Inc. et al.*, No. 154104/2019 (N.Y. Sup. Ct. May 17, 2019) (Dkt. No. 48), submitted herewith as Ex. E to Kessler Decl.

[8] Mem. in Further Supp. of Mot. for Discontinuance and Opp'n to Cross-Mot. for Dismissal, *Relevent Sports, LLC v. United States Soccer Federation, Inc. et al.*, No. 154104/2019 (N.Y. Sup. Ct. Sept. 26, 2019) (Dkt. No. 74), submitted herewith as Ex. F to Kessler Decl.

Relevent also alleges that USSF uses its agreement with FIFA and horizontally competing FIFA-affiliated Confederations, National Associations, leagues, and teams to restrict output in the relevant market for International Soccer Game Events in the U.S. without any procompetitive justification. *Id.* ¶¶ 2, 10, 17, 61, 81, 121.

## ARGUMENT

### I.   USSF's Motion to Compel Arbitration Must be Denied as USSF is Precluded from Invoking the FIFA Match Agent Arbitration Agreement to Relevent's Claims

USSF's motion to compel arbitration is both disingenuous and meritless.  As USSF knows, it has already been determined that the FIFA Match Agent arbitration agreement USSF seeks to invoke does not cover U.S. antitrust or state law causes of action.  *E.g.*, *ChampionsWorld*, 276 F.R.D. at 584, 586.  Specifically, in *ChampionsWorld*, USSF attempted to invoke this same Match Agent arbitration agreement (involving the same Match Agent, Stillitano) to cover antitrust and other U.S. claims asserted in that litigation by a different promoter.  *Id.*  During the course of that dispute, FIFA, CAS, and the Northern District of Illinois *all* unequivocally determined that the FIFA Match Agent arbitration agreement does not cover claims under U.S. law.  *E.g.*, *id.*; 2011 CAS Award at 4-10.  As a result, the *ChampionsWorld* court had jurisdiction to decide, and did decide, the antitrust and other U.S. law claims asserted in that litigation.  *ChampionsWorld*, 890 F. Supp. at 951.  These rulings, which USSF's Motion completely ignores, are binding on the Federation.

### A.   FIFA Lacks Jurisdiction to Rule upon U.S. Antitrust or Other U.S. Law Claims

In *ChampionsWorld*, FIFA declared that "none of [its] deciding bodies is competent to hear" claims sounding in "antitrust . . . and other misconduct."  Kessler Decl, Ex. A.  Three months later, the Players' Status Committee (FIFA's arbitration tribunal under the Match Agent agreement; hereafter, "PSC") held that FIFA may only hear "such claims submitted to it . . . insofar

as they fall within the scope of application of its *own* statutes and regulations."[9]  And CAS ruled that the "PSC is *not in a position to rule on issues of U.S. law*" and "*could not decide questions regarding U.S. law.*"  2011 CAS Award at 5, 20 (emphases added).  Thereafter, at USSF's request, the Northern District of Illinois—the U.S. court in which the *ChampionsWorld* claims against USSF were initially filed—confirmed the 2011 CAS Award and ruled that it had jurisdiction to adjudicate the merits of the antitrust and RICO claims against USSF.  *ChampionsWorld*, 890 F. Supp. 2d at 951; *see also ChampionsWorld, LLC v. United States Soccer Federation, Inc.*, 2008 WL 4861522, at *3 (N.D. Ill. Nov. 7, 2008) ("whether FIFA holds that USSF has sanctioning authority does not decide the issue whether USSF has exercised its authority in conformance with RICO and antitrust law").

While USSF relies upon a decision from the earliest stages of the *ChampionsWorld* litigation in which the court initially compelled arbitration, it ignores the subsequent FIFA, CAS, and Northern District of Illinois determinations that FIFA's arbitration mechanism is inapplicable to claims under U.S. law.  *See* Mot. at 12-13.  As the *ChampionsWorld* court explained, it initially compelled arbitration *before* FIFA "stated for the first time that Plaintiff's [] antitrust claims were not within the categories of disputes that its regulations allowed its deciding bodies to hear."  2008 WL 4861522, at *1.  USSF's attempt to turn a blind eye to these holdings speaks for itself.

"Numerous courts, including the Second Circuit, have refused to compel arbitration where the arbitral forum upon which the parties agreed is unavailable to arbitrate the dispute."  *Singleton v. Grade A Mkt., Inc.*, 607 F. Supp. 2d 333, 339 (D. Conn. 2009) (collecting cases); *De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.*, 2010 WL 2541495, at *4 (S.D.N.Y. June 22, 2010) (where arbitrator "maintain[ed] it [was] without the ability to assist" the parties, plaintiff was "free to pursue her claims in this court"); *In re Salomon Inc. S'holders Derivative Litig.*, 68 F.3d 554, 555-56 (2d Cir. 1995) (affirming refusal to compel arbitration when designated arbitral tribunal

---

[9] Decision, *USSF v. Stillitano* (Players' Status Committee Nov. 21, 2008) (emphasis added), submitted herewith as Ex. G to Kessler Decl.

"declined to arbitrate the dispute"). Since Relevent's claims raise only questions of U.S. law—questions that FIFA cannot adjudicate—there is no plausible basis to compel arbitration.[10]

### B.  Collateral Estoppel Bars USSF's Motion to Compel Arbitration

The ruling of the Northern District of Illinois in *ChampionsWorld*—based on the 2011 CAS Award—that U.S. courts must determine claims brought against USSF under U.S. law has preclusive effect under principles of collateral estoppel. "[C]ollateral estoppel applies when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Fischer v. Brushy Mt. Bee Farm, Inc.*, 2019 WL 935957, at *7 (S.D.N.Y. Feb. 26, 2019) (collecting Second Circuit authority) (quotations omitted). To invoke a decision to which it was not a party, Relevent must also show that "application of the doctrine is not unfair." *Bifolck v. Philip Morris USA, Inc.*, 936 F.3d 74, 80 (2d Cir. 2019). Each of these factors is satisfied here.

The question of FIFA's ability to arbitrate claims under U.S. law pursuant to Stillitano's Match Agent agreement—the same agreement invoked here—was a central issue decided in *ChampionsWorld* and in the 2011 CAS Award. Although USSF ignores all but one of the *ChampionsWorld* decisions, it acknowledges that "th[e] very issue" of arbitrability "was decided previously in" *ChampionsWorld*. Mot. at 12-13.

Likewise, USSF had a full and fair opportunity to litigate the issue before each of FIFA and CAS, which ultimately resulted in the 2011 CAS Award that was adopted—at USSF's request—by the Illinois district court. *See* 2011 CAS Award at 4-10 (recounting the procedural history of the issues presented to FIFA for adjudication); *ChampionsWorld*, 890 F. Supp. 2d at 924-934, 951 (confirming CAS Award and adjudicating antitrust issues in federal court). There

---

[10] Since certain claims brought in *ChampionsWorld* required interpretation of FIFA rules, they were found to be subject to FIFA arbitration. 2008 WL 4861522, at * 3. No such claims about FIFA rules are presented here.

11

also can be no dispute that determining the scope of FIFA's arbitral jurisdiction under the Match Agent agreement was necessary to the *ChampionsWorld* proceedings.  *See* 2011 CAS Award.  Nor would application of the collateral estoppel doctrine be unfair.  As the Supreme Court explained, there is no unfairness when the party resisting estoppel "received a 'full and fair' opportunity to litigate their claims" in the prior action.  *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331-32 (1979).  Quite simply, the only "unfairness" would be compelling Relevent to arbitrate its claims before an arbitral body that has already ruled it cannot hear them.

Finally, collateral estoppel can be applied to the district court's ultimate decision, the 2011 CAS Award (as confirmed), and the intervening arbitral decisions.  "It is well settled that collateral estoppel applies to arbitration rulings, particularly when, as in this case, a given ruling is confirmed by entry of judgment in court."  *Catalano*, 2003 WL 22004902 at *5; *see also BSG Res. Ltd. v. Soros*, 2017 WL 5897450, at *4 (S.D.N.Y. Nov. 29, 2017) ("[T]he doctrine of collateral estoppel has long been applied to arbitrator's decisions . . . and the effects of [an unconfirmed] foreign arbitration are no less preclusive than domestic arbitration.") (citation and quotation omitted).

## C.   Relevent's Claims are also Beyond the Scope of the Arbitration Agreement

Even if the Court were to find that FIFA can arbitrate claims under U.S. law, USSF's motion to compel arbitration would still fail because Relevent's claims do not fall within the scope of the arbitration provision USSF invokes.  While USSF acknowledges that FIFA "may consider disputes *only to the extent that they implicate FIFA's statutes and regulations*," it claims that this action raises such a dispute.  Mot. at 14 (quoting Ex. 11 to Buterman Decl., Decision, *Stillitano v. USSF & FIFA*, CAS 2009/A/1812 at 19 (Sept. 24, 2009) (Dkt. No. 34-11)) (emphasis added).  That is false.  The Complaint does not dispute the meaning of the FIFA Policy or claim any violation of a FIFA rule; it accepts USSF's position that the FIFA Policy prohibits Official Season International Soccer Game Events in the U.S.  Compl. ¶¶ 8, 84, 86.  Nor does Relevent dispute that USSF agreed in its Bylaws to comply with the FIFA Policy unless doing so is contrary to U.S.

law.  *Id.* ¶ 76.  Rather, Relevent alleges that USSF has violated U.S. antitrust and tort law through its voluntary agreement to *comply with* the FIFA Policy, and enforce the group boycott and output restriction resulting therefrom, even though such an agreement is unlawful in this country and thus not required by USSF's Bylaws.  *Id.* ¶¶ 127-133.

### D.     Relevent is Not a Party to the Arbitration Agreement Between FIFA and Stillitano

USSF's motion to compel arbitration independently fails because Relevent never agreed to, and is thus not subject to, the arbitration agreement entered into by Stillitano as part of his Match Agent Application.  As USSF admits, the basis for its motion to compel is an agreement between FIFA and Stillitano, both of whom are non-parties here.  Specifically, USSF argues that Stillitano's 2004 Match Agent Application contains an acknowledgment that he will abide by the FIFA Match Agent Regulations.  Mot. at 11 n.17 (citing Ex. 9 to Buterman Decl., FIFA Match Agent Application (Dkt. No. 34-9)).  The Match Agent Regulations, in turn, state that "[i]n the event of a dispute between a *match agent* and a national association . . . the complaint shall be submitted to the FIFA Players' Status Committee for consideration and resolution."  Ex. 3 to Buterman Decl., FIFA MATCH AGENT REGULATIONS at 9, Art. IV. 22(1) (Dkt. No. 34-3) (emphasis added).  USSF argues that, since Stillitano serves as Relevent's Match Agent, Relevent is bound by his Match Agent Application and, by extension, estopped from avoiding the arbitration provision under FIFA's Match Agent Regulations.  Mot. at 10-13.  USSF is wrong.

As the Supreme Court has held, "the first principle that underscores all . . . arbitration decisions is that arbitration is strictly a matter of consent."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (citation and quotation omitted).  In this Circuit, "[t]he 'mere fact of a nonsignator[y's] affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is.'"  *Kwatinetz v. Mason*, 356 F. Supp. 3d 343, 351-52 (S.D.N.Y. 2018) (citation and quotation omitted).  For estoppel to compel Relevent to arbitrate, the benefits to it "must be direct, which is to say flowing directly from the [Match

13

Agent Application], rather than indirect, meaning that [Relevent] exploits the contractual relation of the parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Trina Solar US, Inc. v. JRC-Servs. LLC*, 229 F. Supp. 3d 176, 189 (S.D.N.Y. 2017) (Caproni, J.) (citation and quotation omitted).[11]

While Relevent indirectly benefits from Stillitano's position as a Match Agent, it has not directly benefitted by "assuming" the Match Agent Application itself. In fact, as USSF admits, Relevent could not assume the Match Agent Application even if it wanted to. *See* Mot. at 11 ("Promoters like Relevent can only organize international matches through a FIFA-licensed Match Agent, who must be a natural person."). *See also* Kessler Decl., Ex. A (letter from FIFA explaining that a Promoter is not a permissible party in an arbitration under the FIFA Match Agent Regulations). Under the law of this Circuit, Relevent's indirect benefits from the Match Agent Application are insufficient to compel it to arbitrate pursuant to the FIFA Match Agent Regulations.

## II.      Relevent's Claims Are Not Barred by the Covenant Not to Sue

USSF's argument that the parties' 2016 Settlement Agreement and, in particular, the narrow covenant not to sue therein, bars Relevent's antitrust and tort claims fails because (1) none of Relevent's claims fall within the three limited categories of "challeng[es]" Relevent covenanted not to bring against USSF (Buterman Decl., Ex. 6. at 3); and (2) as a matter of public policy, a covenant not to sue cannot release future antitrust or intentional tort claims.

---

[11] The cases cited by USSF do not hold otherwise. *See Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 108 (S.D.N.Y. 2017) (compelling signatory's successor in interest to arbitration, but declining to compel third-party nonsignatory to arbitrate); *Trina Solar*, 229 F. Supp. 3d at 185, 189 (nonsignatory required to arbitrate when signatory "undoubtedly had actual authority" to act on behalf of nonsignatory "during the negotiation, execution, and fulfillment of" contract at issue and goods delivered under contract were "always intended for [nonsignatory's] use and were delivered directly to" nonsignatory); *The Rice Company (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 540-41 (5th Cir. 2008) (court "may not force Precious Flowers . . . into an arbitration agreement that Precious Flowers didn't sign").

### A.    Relevent's Claims Are Not Within the Narrow Scope of the Covenant Not to Sue

USSF's reliance on the covenant not to sue to seek dismissal of Relevent's claims is barred by the plain language of the covenant itself.  "In examining a contract, the Court must 'give effect to the intent of the parties *as revealed by the language of their agreement*.'"  *Direxion Shares, ETF Tr. v. Leveraged Innovations L.L.C.*, 2014 WL 6469084, at *4 (S.D.N.Y. Nov. 18, 2014) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merill, Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (Sotomayor, J.)) (emphasis added).  Moreover, in this district, "covenants not to sue . . . are not looked upon with favor[,] . . . are strictly construed against the party relying upon them, and [require] clear and explicit language in the agreement." *Bridgeport Music Inc. v. Universal Music Grp., Inc.*, 440 F. Supp. 2d 342, 345 (S.D.N.Y. 2006) (citation and quotation omitted); *see also Collins & Aikman Prods. Co. v. Sermatech Eng'g Grp., Inc.*, 746 N.Y.S.2d 698, 700 (1st Dep't. 2002) ("covenants not to sue, when considered purely defensively, are narrowly construed because they have the effect of exculpating a party from its own wrongdoing").

The covenant not to sue invoked by USSF is narrow and unambiguous.  Specifically, Relevent covenanted not to "in any way challeng[e] (x) [USSF]'s jurisdiction over International Games, (y) [USSF]'s authority to charge Sanctioning Fees, and (z) the reasonableness of the Sanctioning Fees charged by [USSF]."  Buterman Decl., Ex. 6 at 3.  Relevent makes no such challenge here.  *See, e.g.*, Compl. ¶ 121.  Specifically, Relevent does not challenge USSF's jurisdictional authority; to the contrary, Relevent acknowledges that "USSF exercises the authority to act on behalf of FIFA . . . to sanction—or refuse to sanction—all professional soccer matches played in the U.S. . . ."  *Id*. ¶ 24.  Nor does Relevent challenge USSF's authority to charge sanctioning fees in general, or the reasonableness of any particular fee USSF has imposed.  *Id.* ¶ 121.  Rather, Relevent challenges the anticompetitive agreements entered into by USSF to use its sanctioning power to restrict output, carry out a group boycott, and unreasonably restrain trade

in violation of U.S. law. *Id.* ¶¶ 8, 43, 127, 133. Such claims are not within the limited ambit of the covenant.

Other provisions of the 2016 Settlement Agreement underscore the inapplicability of the covenant here. Specifically, in stark contrast to the narrow language employed under the covenant, the parties used far broader language in the provision of the agreement setting forth Relevent's "Release of Past or [Then] Current Claims." Buterman Decl., Ex. 6 at 2-3. In particular, Relevent agreed to release USSF from any claim "in any way *relating to or arising out of* (i) [USSF]'s authority to sanction International Games, (ii) the Sanctioning Fees charged by [USSF] and paid by Relevent, and (iii) the reasonableness of the Sanctioning Fees." *Id.* at 3 (emphasis added). Such broad language—covering any claim "in any way relating to or arising out of"—does not appear in the covenant not to sue and thus reflects the parties' agreement to more narrowly tailor the covenant's scope. *Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 309 (2d Cir. 2016). As sophisticated parties, USSF and Relevent "must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning." *Int'l Fid. Ins. Co. v. Cty. of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000).

Significantly, while courts have broadly interpreted the phrases "arising out of" and "relating to," they have more narrowly construed the term "challenge." *Compare XL Specialty Ins. Co. v. Agoglia*, 2009 WL 1227485, at *9 (S.D.N.Y. Apr. 30, 2009) ("New York courts have accorded the phrase 'arising out of' a broad interpretation, defining it as 'originating from, incident to, or having connection with'") (citation omitted) *and Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("[t]he ordinary meaning of [relating to] is a broad one—'to stand in some relation; to have a bearing or concern; to pertain; refer; to bring into association or connection with'") *with New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1249 (10th Cir. 2006) ("challenge" means to "call[] into question") *and McClellan Ecological Seepage Situation v. Perry*, 47 F.3d

325, 330 (9th Cir. 1995) (to "second guess").  *See also Challenge*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("formally questioning the legality . . . of a person, action or thing").  Because Relevent does not "call into question" USSF's "jurisdiction over International Games," its authority to charge sanctioning fees, or the amount of sanctioning fees charged, the covenant not to sue is inapplicable by its unambiguous terms.

### B.     The Covenant is Unenforceable Against Relevent's Post-Covenant Antitrust and Tort Law Claims as a Matter of Public Policy

Even if the covenant not to sue were somehow construed to encompass USSF's antitrust and intentional tort claims, it would still be unenforceable as a matter of public policy.  It has long been "a firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy." *Am. Express*, 634 F.3d at 197; *see also Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.*, 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997) ("GFI could not have waived [its antitrust] claim in the releases because a prospective waiver of an antitrust claim violates public policy").  It is equally established that New York law prohibits exculpatory agreements that purport to release a party from "intentional, willful or grossly negligent acts." *Great N. Assocs.*, 596 N.Y.S.2d at 940 (cited with approval in *Charron v. Sallyport Global Holdings*, 2014 WL 464649, at *4 (S.D.N.Y. Feb. 3, 2014)).  USSF cannot dispute this controlling law.

Indeed, USSF does not address the New York authority that bars waiver of future intentional tort claims, and its only response with respect to the bar against waiver of future antitrust claims is to misstate the facts and the law.  Specifically, USSF falsely asserts that applying the covenant to bar Relevent's antitrust claims would not violate public policy because there has been no change "in any policy or application thereof" since USSF and Relevent entered into the 2016 Settlement Agreement.  *See* Mot. at 18 n.21, 19 n.22.  USSF misstates the law by arguing that parties may waive future antitrust claims in these circumstances.

*First*, USSF admits that "*just last year*, FIFA issued a directive [*i.e.*, the FIFA Policy] prohibiting" Official Season International Soccer Game Events from being played outside the participants' home territory. *Id.* at 1 (emphasis added). The FIFA Policy, as described by USSF, is the result of USSF's and others' efforts in 2018—two years *after* the 2016 Settlement Agreement was executed—to "s[eek] guidance from FIFA on whether the official foreign league match that Relevent was seeking to promote could occur outside the league's home territory . . . ." *Id.* at 7.[12] It thus cannot be disputed that the agreement by USSF to comply with this new FIFA Policy, and to implement a group boycott with affiliated FIFA Confederations, National Associations, leagues, and teams to enforce this new output limitation conspiracy, was made two years after the covenant not to sue was executed. In addition, the Complaint challenges output limitation agreements implemented by USSF with its co-conspirators for the period extending after the covenant not to sue was executed (*e.g.*, Compl. ¶¶ 8-12, 18-19, 84-107), which also cannot be shielded as a matter of public policy.

USSF contends that the covenant applies to prospective antitrust violations by relying on inapposite cases applying a release to *pre*-agreement antitrust violations. Mot. at 18-19. In *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, a 1973 settlement agreement barred plaintiff from pursuing antitrust claims based on conduct alleged to have occurred from 1968 to 1972. 545 F.2d 18 (7th Cir. 1976). And the release upheld in *Madison Square Garden v. NHL* was only applied to the defendant's continued enforcement of "pre-existing policies." 2008 WL 4547518, at *6 (S.D.N.Y. Oct. 10, 2008) (quotation omitted). The *Madison Square Garden* court did not

---

[12] USSF's contention that Official Season International Soccer Game Events were barred prior to FIFA's announcement of the FIFA Policy in 2018 by FIFA Statute Article 73 is demonstrably false. Indeed, if that were the case, there would have been no need for USSF to "s[eek] guidance from FIFA" on the issue last year. Mot. at 7. Moreover, at a minimum, this would be a hotly disputed issue of fact that cannot be resolved at the pleadings stage.

apply the release to bar an antitrust claim against a new policy that was implemented after the parties entered into the release.  *Id*. at * 7.[13]

*Second*, public policy prohibits the waiver of future antitrust violations.  As the Supreme Court made clear, Congress intended the Sherman and Clayton Acts' private right of action to serve not just to alleviate harm to individual plaintiffs but to promote "the public interest in vigilant enforcement of antitrust laws."  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 324-329 (1955); *see also Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974) (antitrust private right of action is "granted in the public interest to effectuate public policy, [and] may not be released"). The courts have thus held that "the effect" of releasing future antitrust claims "could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well.  Such a release . . . could therefore itself operatively serve as a contract in restraint of trade."  *E.g.*, *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955).

The decision of this district in *Graham-Field* is instructive.  There, sophisticated business entities entered into releases that "covered all claims arising from the distributor relationship between [the parties] and from the termination of that relationship."  1997 WL 166497, at *3.  The court concluded that "even if the antitrust claim related to the distributor relationship or its termination, GFI could not have waived this [antitrust] claim" because the actions complained of "took place after" the release was entered into, setting up a "prospective waiver of an antitrust claim, [which] violates public policy."  *Id.*  Moreover, this broad policy prohibition against the release of future antitrust claims applies even where the future violations are part of a continuation of a prior conspiracy in restraint of trade.  *See, e.g.*, *Lawlor*, 349 U.S. at 324-29 (declining to enforce waiver of future antitrust claims, even if "defendants' conduct [could] be regarded as . . .

_____

[13] USSF's other cases do not involve a waiver of future antitrust claims.  *See Xerox Corp. v. Media Sciences, Inc.* 609 F. Supp. 2d 319, 327-28 (S.D.N.Y. 2009) (release at issue "[wa]s not a general release or waiver of antitrust liability or even a blanket covenant not to sue" but rather a requirement that the plaintiff first "avail[] itself of the arbitration provisions" in the agreement); *Baidu, Inc. v. Register.com, Inc.* 2010 WL 2900313, at *4-6 (S.D.N.Y. July 22, 2010) (assessing covenant in the context of trademark infringement, breach of contract, and gross negligence claims).

one continuing tort"); *Redel's*, 498 F.2d at 98-100 (barring claims arising from pre-release conduct but permitting claims arising from conduct continuing post-release); *Hunt v. Mobil Oil Corp.* 654 F. Supp. 1487, 1516 (S.D.N.Y. 1987) (confirming award holding "antitrust claims that arose *prior* to the execution of the [covenant] were *past* antitrust claims which were subject to the *covenant* not to sue [but] antitrust claims that arose *after* . . . were *future* claims and hence not *subject to the covenant not to sue* by virtue of the public policy exception") (emphases in original).

USSF's reliance on *US Airways* does not support a contrary conclusion. Although the court there enforced a release of certain antitrust claims for a period of seven years, it did so because of "unique factual circumstances," which involved the agreed-upon continuation of certain challenged conduct in the face of an antitrust challenge to that conduct. *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 273, 279 (S.D.N.Y. 2015).[14] Here, by contrast, the challenged conduct is the new agreements to restrict output, not a continuation of a prior restraint. Nor is the covenant at issue here a resolution of a prior antitrust dispute over past practice that the parties specifically agreed could continue for a set period of time without a renewed challenge. It is thus not possible to apply the covenant to block Relevent's challenge to USSF's new antitrust violations without running afoul of public policy prohibiting the release of private claims against future antitrust violations. *See Lawlor*, 349 U.S. at 324-29; *Am. Express*, 634 F.3d at 197.

## III.    FIFA Is Not an Indispensable Party

USSF does not come close to satisfying its burden of establishing that FIFA is an indispensable party under Rule 19. As set forth below, FIFA is not a "necessary" party, nor would joinder of FIFA be infeasible were it required. *See* Fed. R. Civ. P. 19(a), (b).

### A.    FIFA Is Not "Necessary" to This Action

USSF claims that FIFA is a "necessary" party because (i) this Court "cannot accord complete relief among [the] existing parties" in FIFA's absence since the FIFA Policy "will still

---

[14] Relevent is unaware of any case that has relied on *US Airways* to enforce a release of future antitrust claims.

stand" even if USSF is enjoined from complying with it; and (ii) FIFA "claims an interest relating to the subject of the action and is so situated that disposing of the action in [its] absence may . . . impede [FIFA's] ability to protect the interest" or leave USSF subject to "inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(A), (a)(1)(B); Mot. at 20-23.  Both contentions are meritless.

1.  This Court Can Provide Relevent Complete Relief Without Joining FIFA

USSF's assertion that the Court cannot provide Relevent complete relief in FIFA's absence flies in the face of USSF's own history, which the Motion conspicuously ignores despite Relevent referencing this history during the parties' initial conference with the Court.  Initial Report of the Parties at 2, 5 (Nov. 5, 2019) (Dkt. No. 30).  Specifically, in *Fraser*, professional soccer players challenged as a Section 1 violation agreements by USSF and Major League Soccer ("MLS") to comply with a FIFA policy imposing a "transfer fee" on players who were not under contract when they moved from one FIFA-affiliated team to another.  7 F. Supp. 2d 73.  In response, MLS filed a motion to dismiss for failure to join FIFA as an indispensable party, but USSF extricated itself from the dispute and provided complete relief to resolve the claim by "enter[ing] into a stipulation that [USSF] never has and never will pay nor request a transfer fee payment for an out-of-contract player"—*i.e.*, that it would *not* comply with FIFA's rule on this issue.  *Id.* at 75 n.1.  USSF provided such relief without FIFA ever joining as a party to the litigation and without *any* adverse consequence from FIFA.  *Fraser* thus demonstrates that this Court may similarly order USSF—or USSF may stipulate in this action—not to comply with the unlawful FIFA Policy at issue here without any joinder of FIFA.  This is the only injunctive relief needed here (in addition to damages from USSF) to resolve Relevent's claims relating to USSF's agreement to abide by the FIFA Policy.  *See, e.g.*, Compl. ¶¶ 133, 145.

USSF's own Bylaws—which USSF also ignores—independently demonstrate that FIFA is not necessary to this action.  Specifically, USSF's Bylaws provide that USSF is only "obliged to respect the statutes, regulations, directives, and decisions of FIFA" "*to the extent permitted by*

*governing law*."  USSF Bylaws 103 § 1 (emphasis added); Compl. ¶ 76.[15]  Accordingly, if this Court determines that USSF's participation in an anticompetitive agreement to comply with the FIFA Policy violates U.S. law, its Bylaws permit it to cease following the FIFA Policy, just as it agreed not to follow the unlawful FIFA policy challenged in *Fraser*.[16]

Moreover, USSF's naked assertion that no FIFA-affiliated team would participate in Official Season International Soccer Game Events in the U.S., even if USSF were enjoined from adhering to the FIFA Policy and granted a sanction for such Events (Mot. at 21), is not only disputed by the Complaint allegations, but flatly refuted by the May 5 Event that USSF refused to sanction earlier this year.  As Relevent alleges with respect to the May 5 Event, it had *already* obtained agreement for the Event from the two FIFA-affiliated teams, and written approval from the teams' league (LigaPro), the governing National Association (the Ecuadorian Football Federation), and Ecuador's governing regional Confederation (CONMEBOL), notwithstanding the FIFA Policy.  Compl. ¶ 96; Buterman Decl., Ex. 5.  It was only because USSF carried out its voluntary agreement to follow the FIFA Policy and denied a sanction for the Event that this match did not take place.  Compl. ¶¶ 90-96.[17]

Having alleged USSF's joint participation in, and enforcement of, an anticompetitive agreement in violation of Section 1 (*see, e.g.*, Compl. ¶¶ 5-12, 59-61, 90-101), the law is clear that Relevent is not required to join other co-conspirators like FIFA.  *See Trugman-Nash, Inc. v. New Zealand Dairy Bd.*, 942 F. Supp. 905, 917 n.6 (S.D.N.Y. 1996) ("There is no requirement that a plaintiff name all co-conspirators as long as their existence is set forth in the complaint.  The

---

[15] USSF's Bylaws are incorporated by reference in the Complaint.  Compl. ¶¶ 76 & n.32, 78 & n.36. Alternatively, the Court may consider evidence outside the pleadings on a motion to dismiss for failure to join a purportedly indispensable party.  Mot. at 20 n.24 (citing *Dumann Realty, LLC v. Faust*, 267 F.R.D. 101, 101 n.1 (S.D.N.Y. 2010)).

[16] It is undisputed that FIFA has never objected to the "governing law" limitation in USSF's Bylaws.

[17] USSF's argument is also belied by the teams, leagues, National Associations, and Confederations that have already agreed to participate in Relevent's other matches, as well as the matches of other promoters, had they received a USSF sanction.  *Compare* Mot. at 20-21 & n.25 *with* Compl. ¶¶ 90-106.

pleading's reference to collective conduct on the part of [co-conspirators] is sufficient to implicate the cooperatives . . ."). Moreover, USSF's assertion that Relevent's request for equitable relief requires joinder of FIFA fails in a Sherman Act case, as co-conspirators are not required to be joined in an antitrust case seeking injunctive relief. *See, e.g.*, *Chatham Brass Co. v. Honeywell, Inc.*, 512 F. Supp. 108, 116 (S.D.N.Y. 1981) (denying motion to dismiss Section 1 claim for injunctive relief where single defendant allegedly "conspired with certain unnamed distributors to . . . set territorial limits" and "exclude[d] [plaintiff] and other noncooperating distributors from favored purchaser status"). USSF cites no antitrust case to support its contention that joinder is *required* when equitable relief is sought, and the antitrust precedent it does cite expressly rejects that co-conspirators are necessary parties in actions to enjoin a defendant's participation in an anticompetitive conspiracy. *See Meyer v. Kalanick*, 2016 WL 3509496, at *3 (S.D.N.Y. June 20, 2016) ("It is true, as plaintiff notes, that 'in a suit to enjoin a conspiracy not all the conspirators are necessary parties.'"). Indeed, it is routine for antitrust plaintiffs not to join all alleged co-conspirators in an action against a participant in the alleged conspiracy. *See* 3E PHILLIP E. AREEDA & HERBERT HOVENCAMP, *Antitrust Law* § 330d (2019).

The other cases USSF cites are also unavailing. In *Kraebel*, the court found that the unnamed government agency solely responsible for providing documentation to property owners seeking to grant rent exemptions was a necessary party to claims of delay in the processing of plaintiffs' rent exemption applications. *Kraebel v. NYC Dep't of Hous. Pres. & Dev.*, 1994 WL 132239, at *4 (S.D.N.Y. Apr. 14, 1994). The court held the agency necessary because its process for providing that documentation could be the cause of the alleged delay and could therefore need to be enjoined by the court. *Id.* Here, by contrast, USSF alone is responsible for its participation in the challenged conspiracy and is capable of providing complete relief to Relevent by ceasing to abide by the unlawful FIFA Policy, as it stipulated in *Fraser*. 7 F. Supp. 2d at 75 n.1. *Meyer* is similarly distinguishable. There, the court determined that Uber was a necessary party to the action

23

against its CEO because plaintiff's challenge was directed to the lawfulness of the pricing algorithm central to Uber's operations, and relief would require that Uber, not just its CEO, be enjoined from continuing the unlawful conduct.  2016 WL 3509496, at *2-3.

> a.   FIFA has not Asserted that its Interests will be Impaired by this Action and <u>USSF is not at Risk of Inconsistent Legal Obligations</u>

USSF also seeks to characterize FIFA as a "necessary" party by asserting that "FIFA . . . has a substantial interest in defending the legality of its rules" (Mot. at 22), but in doing so, glaringly omits that FIFA has not "claim[ed]" an interest in this action as required by Rule 19.  *See* Fed. R. Civ. P. 19(a)(1)(B).  This omission is fatal: "[A] party cannot qualify as 'required' under either subsection of Rule 19(a)(1)(B) if it does not *claim*[] *an interest* relating to the subject of the action."  *Aguinaga v. UBS AG*, 2010 WL 5093433, at *10 (S.D.N.Y. Dec. 14, 2010) (quotation omitted, emphasis in original).  Nor may USSF assert an interest on FIFA's behalf.  *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) ("[Defendant's] argument fails here if only because the [absent party] has not 'claimed an interest relating to the subject of the action.' [Defendant's] attempt to assert on behalf of the [absent party] its supposed concern about the dilution of its interest . . . falls outside the language of the rule.  It is the absent party that must 'claim an interest'").  FIFA has not moved to intervene nor taken any other action to claim an interest in this matter, which is dispositive.[18]

In addition to this fatal defect, USSF's attempt to invoke an alternate ground by which FIFA may be found necessary to this action—*i.e.*, arguing that resolution of this matter in Relevent's favor would subject USSF to inconsistent legal obligations—is flawed.  USSF argues that such a resolution would place it "in the untenable position of being subject to a judgment of

---

[18] This failure by FIFA is in stark contrast to *Meyer*, in which interested party Uber not only moved to intervene in the action, but defendant Kalanick also moved to join Uber as a necessary party to the action. 2016 WL 3509496, at *1.  Likewise, in *Freedom, N.Y., Inc. v. United States*, the interested third party (which could not be joined without destroying jurisdiction) threatened to sue the defendant to vindicate its contract rights if plaintiff prevailed in the action.  1986 WL 6163, at *3 (S.D.N.Y. May 27, 1986).

this Court that conflicts with its legal duties under the Ted Stevens Act and as a FIFA national member association." Mot. at 22.  Neither of these claims has legal or factual merit.

To begin with, it is axiomatic that "[i]nconsistent obligations occur when a party is unable to comply with *one court's order* without breaching *another court's order* concerning the same incident." *Pullman v Alpha Media Pub., Inc.*, 2013 WL 1290409, at \*32 (S.D.N.Y. Jan. 11, 2013) (denying motion to dismiss where defendants did not establish "that the non-parties' absence will leave any existing party unable to comply *with a court order*") (emphasis added).  Indeed, USSF's authorities confirm that, in the absence of a competing court order, inconsistent obligations do not exist.  *See Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 4 (1st Cir. 1998) (vacating order finding inconsistent obligations on grounds other than inconsistent court orders); *BRB Internacional S.A. v. Weinstein Co. LLC*, 2018 WL 1111060, at \*2 (S.D.N.Y Feb. 27, 2018) (granting motion to join third party in light of concern that court order would make it impossible to comply with subsequent court order).  Since there is no court order that would conflict with an order for Relevent here, USSF's claimed risk of being subject to inconsistent obligations by virtue of the Ted Stevens Act or its contractual obligations to FIFA must fail.

However, even if the risk of an inconsistent court order were not required, there would still be no inconsistent legal obligation here.  As noted above, there is no legal requirement in the Ted Stevens Act for an NGB to comply with unlawful directives of any international association, and USSF has not cited a single case to the contrary.  In fact, the Ted Stevens Act *requires* that NGBs act on their own without outside influence.   36 U.S.C.§ 220522(a)(5)(C).  Similarly, USSF's Bylaws expressly permit USSF to disregard FIFA policies that are inconsistent with governing law.  USSF Bylaws 103 § 1.[19]

---

[19] Further evidencing that the relief sought would not subject USSF to inconsistent obligations is that USSF already elects not to comply with the FIFA Policy when it benefits its economic partner SUM.  *See* Compl. ¶ 107.

Moreover, possible discipline or retaliation by another tortfeasor—in this case FIFA—cannot constitute a legal obligation inconsistent with a court order.  Nor can USSF show that such discipline is likely to occur in light of FIFA's failure to take any action against USSF after it agreed to disregard an unlawful FIFA policy in *Fraser.*

### B.    Joinder of FIFA Would Be Feasible If Required

Where, as here, a third party does not qualify as "necessary" under Rule 19(a), a court need not decide whether the third party's absence warrants dismissal under Rule 19(b).  *See Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000).  However, should the Court reach this issue, USSF clearly cannot carry its burden of demonstrating that joinder of FIFA is infeasible.

USSF proffers two allegedly "insurmountable impediments" to Relevent's ability to name FIFA as a defendant: purported mandatory arbitration of any claims by Relevent against FIFA and a purported lack of personal jurisdiction over FIFA.  Mot. at 23-24.  Neither has merit.  *First*, as discussed, arbitration of U.S. legal claims has already been rejected by FIFA, CAS, and the Northern District of Illinois, thereby rendering USSF's argument frivolous.[20]

*Second*, contrary to USSF's contention, FIFA would be subject to specific personal jurisdiction in the U.S. with respect to Relevent's antitrust claim.  Courts within this Circuit apply the Clayton Act to find specific personal jurisdiction over federal antitrust defendants to the extent permitted by the Due Process Clause.  *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207 (2d Cir. 2003).  For a foreign antitrust defendant, this means that jurisdiction can be established in any venue based on a nationwide minimum contacts analysis, looking to the defendant's contacts with the U.S. as a whole.  *In re SSA Bonds Antitrust Litig.*, 2019 WL 4917608, at *12 (S.D.N.Y. Oct. 4, 2019).  Where an antitrust defendant has expressly directed its business, policies, or practices at the U.S., that is sufficient to confer specific jurisdiction.  *Magnetic Audiotape*, 334

---

[20] In *Meyer v. Kalanick* (cited by USSF), the court held that the plaintiff *had* agreed to arbitrate the claims it was pursuing in that action.  291 F. Supp. 3d, 526, 535 (S.D.N.Y. 2018).  Here, both the applicable arbitral forum and a federal court have held that U.S. antitrust and state law claims of the type Relevent asserts here are not subject to FIFA arbitration.

F.3d at 208.  Here, FIFA's agreement with USSF, among others, that the FIFA Policy be followed in the U.S.—including with respect to matches played in New York—and USSF's enforcement of that Policy as part of its conspiracy (*see* Compl. ¶¶ 90-107), satisfies this jurisdictional test.[21]  The same is true with respect to the group boycott conspiracy organized by FIFA with respect to any unsanctioned International Soccer Game Events, including those that would occur in New York.

### C.  Equity Further Supports the Conclusion that FIFA Is Not an Indispensable Party

Even assuming that USSF could meet its burden on the "necessary" and "infeasible" elements of Rule 19 (it cannot), its argument would still fail.  In particular, the Court would still need to assess "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).  Here, equity and good conscience strongly militate against dismissal, as there would be no prejudice to FIFA if the Court ruled in Relevent's favor, while Relevent would be left without a remedy if this action were dismissed for non-joinder of FIFA, since there would be no other forum available to consider Relevent's antitrust claims.

## IV.  USSF's Antitrust Merits Arguments Are Not Proper Grounds for Dismissal

USSF's attempt to dismiss Relevent's Section 1 claim on the merits fails at the outset because USSF only challenges the claim's qualification under the *per se* rule, but not under the full rule of reason, as Relevent has alternatively pled.  *Compare* Mot. at 26-27 *with* Compl. ¶¶ 2, 11, 130-33, 139.  This failure, by itself, defeats USSF's argument for dismissing Relevent's claim under Section 1.  *See Concord Assocs., L.P. v. Entm't Props. Tr.*, 2014 WL 1396524, at *11 (S.D.N.Y. Apr. 9, 2014) ("The inapplicability of a *per se* analysis is not dispositive of Defendants' motion.  The conduct alleged in the [] Complaint would constitute a violation of Section 1 if that

---

[21] The Second Circuit has also recognized a "conspiracy theory of jurisdiction," which further supports personal jurisdiction over FIFA here.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86-87 (2d Cir. 2018); *SSA Bonds*, 2019 WL 4917608, at *9.  Under this principle, a co-conspirator's (*e.g.*, USSF) overt acts in the forum in furtherance of the conspiracy supports jurisdiction over a co-conspirator in the same forum.  *Id.*

conduct imposes an unreasonable restraint on competition, *i.e.*, if Defendants' conduct constitutes a violation under the rule of reason") (quotation omitted).  Beyond this threshold failure, USSF's various arguments for dismissing Relevent's antitrust claims are baseless.

### A.    Relevent has Pled a Section 1 Conspiracy in Unreasonable Restraint of Trade

USSF contends that Relevent fails to plead an agreement in violation of Section 1 because USSF's "mere compliance with the rules of its international governing body" cannot constitute a conspiracy in restraint of trade, especially in light of the "significant vertical dimension" it claims exists between USSF and FIFA.  Mot. at 27-28.  USSF further contends that Relevent's pleading is insufficient because it does not set forth the required "plus factors" for inferring an agreement or the identity of the various co-conspirators beyond USSF and FIFA.  *Id.*  These contentions simply ignore—or blatantly mischaracterize—the well-pled Complaint allegations of a conspiracy in restraint of trade.

Specifically, the Complaint contains numerous allegations setting forth the conspiracy by USSF, FIFA *and all of the FIFA-affiliated Confederations National Associations, leagues, and teams* to participate in the agreement to reduce output in the relevant U.S. market for International Soccer Game Events, including by agreeing to boycott any teams or players that play in an unsanctioned event.  *See* Compl. ¶¶ 10, 24, 29-31, 34-35, 60, 124-133.  Because Relevent has plausibly alleged the above conspiracy through direct evidence —including USSF's admissions and the rules and policies of FIFA and its affiliated members (including the FIFA Policy), it was not required to plead parallel conduct and "plus factors" to infer such a conspiracy.  *See United States v. Apple*, 791 F.3d 290, 315 (2d Cir. 2015) (an antitrust plaintiff must allege *either* "direct evidence that the defendants entered into an agreement" *or* "circumstantial facts supporting the inference that a conspiracy existed").  For example, Relevent has pled facts of an express, *admitted* agreement by USSF to follow FIFA's anticompetitive directive (Compl. ¶¶ 77, 86), and of numerous co-conspirator Confederations, National Associations, leagues, and teams that have

indicated their express agreement to comply with the written rules of FIFA that require them to participate in the boycott of players and teams who participate in unsanctioned events (*id*. ¶¶ 91-93).  This culminates in the plausible allegations that:

- USSF, FIFA and other FIFA-affiliated governing bodies, leagues and clubs have agreed . . . to punish [leagues,] teams and players that participate in unsanctioned events, and to otherwise limit the output of International Soccer Game Events in the U.S.  *Id*. ¶¶ 6, 10-11; and

- The actions of USSF and FIFA in concert with each Confederation and National Association and their respective constituent members constitutes action by separate economic actors engaged in concerted action and agreements to restrict entry into, and limit output of, the relevant market for International Soccer Game Events in the U.S.  *Id*. ¶ 126.

*See also id*. ¶¶ 8, 77, 99, 127 (as cited in Mot. at 25-26), 26, 124-133.

These allegations more than suffice to support a plausible claim of conspiracy under Rule 8.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012); *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 246 (S.D.N.Y. 2019).  And, there can be no dispute that an agreement by competing members of a private industry association, such as FIFA, to follow the association's anticompetitive directives is an actionable conspiracy in violation of Section 1.  *See Assoc'd Press v. United States*, 326 U.S. 1, 8-9, 11-12 (1945).

Moreover, the conduct plausibly alleged in the Complaint—a conspiracy among the competing FIFA-affiliated Confederations, National Associations, leagues, and teams (which compete to conduct or participate in International Soccer Game Events in the U.S.) to adhere to and enforce the FIFA Policy with USSF—states a claim for a horizontal group boycott and naked restriction of output that "should be condemned as *per se* violations of § 1."  *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 73 (2d Cir. 1988); *see also Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 225 (2d Cir. 2004) ("output limitation [is] ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high . . .."); *cf. FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("proof of actual detrimental effects, such as a reduction of output, can obviate the need for an

inquiry into market power"). This is not a mere vertical agreement between USSF and FIFA, but a horizontal one that includes all of the FIFA-affiliated Confederations, National Associations, leagues, and teams who compete with each other to, among other things, conduct International Soccer Game Events in the U.S. *See, e.g.*, Compl. ¶¶ 5-12, 29-33, 59-61, 90-101.

Nor does it matter that FIFA is not alleged to be a horizontal competitor of USSF or the other alleged co-conspirator Confederations, National Associations, leagues, and teams (which do compete with each other). In a classic "hub-and-spoke" conspiracy, FIFA is the hub for the agreements entered into by its horizontally competing members, and group boycotts or output restrictions effectuated by such conspiracies have been recognized as *per se* violations of Section 1. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-213 (1959) (boycott of competing appliance companies (the spokes) organized by an appliance store in a vertical relationship (the hub) held *per se* unlawful); *Keurig*, 383 F. Supp. 3d at 244-45.

*United States v. Apple* is instructive. There, the Second Circuit held that Apple, in a vertical platform relationship, had organized a horizontal agreement amongst book publishers to raise ebook prices. 791 F.3d at 323. As the court explained, the "threat [of a horizontal agreement] is just as significant when a vertical market participant organizes the conspiracy." *Id*. The Court then held that this conspiracy was a *per se* unlawful restraint of trade. *Id*. at 323, 325, 329. Here, the boycott conspiracy alleged similarly involves a vertical hub and horizontal spokes. Moreover, Relevent alleges that USSF's participation has the purpose and effect of reducing output in the relevant markets and bestowing a competitive advantage on USSF's economic partner, SUM, which is Relevent's horizontal competitor. Compl. ¶¶ 2, 10-11, 73-77, 86, 89, 101, 129-134, 142. This is the type of anticompetitive agreement that states a claim for violation of Section 1.[22]

---

[22] Indeed, an alleged agreement does not need to be horizontal to state an antitrust claim, as even purely vertical agreements must still satisfy the rule of reason. *Apple*, 791 F.3d at 313-314. Here, Relevent has pled not only a *per se* violation, but also all of the elements of a full rule of reason violation, including relevant markets (*e.g.*, Compl. ¶¶ 61, 126), the anticompetitive effects of the alleged conspiracy in those markets (*e.g., id* ¶¶ 10, 79, 84), and the absence of any procompetitive justification (*e.g., id*. ¶¶ 2, 10, 129-

Finally, it is no defense for USSF to claim that it was forced into the alleged conspiracy because it is required to comply with FIFA's directives.  Mot. at 28.  "[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."  *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948); *see also Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295, at *18 n.34 (S.D.N.Y. Mar. 9, 2000).  And, as discussed above, USSF's agreement to comply with the FIFA Policy is alleged to be voluntary, as its Bylaws do not require compliance with a FIFA policy that violates U.S. law.

> **B.      The Single-Entity Doctrine Does Not Immunize the Alleged Agreement Between USSF and its Co-Conspirators, All of Whom Have Separate Economic Interests**

Relying on *Copperweld v. Independence Tube Corp.*, USSF asserts that FIFA, USSF, and their co-conspirators are "legally incapable of conspiring to violate Section 1," apparently because USSF deems them to be a single entity "with respect to the sanctioning of official foreign league matches."  Mot. at 29-30 (citing 467 U.S. 752, 768-772 (1984)).  But *Copperweld's* single-entity doctrine has no application here, as it is specifically pled in the Complaint that each of the alleged conspirators are separate economic entities with different economic interests.  Compl. ¶¶ 29-33, 58-61, 125-26.  Indeed, the various FIFA-affiliated leagues and teams are distinct economic actors that have independent decision-making centers and are competitors with each other to participate in, and reap the profits from, International Soccer League Events in the U.S.  *Id.*  Such competing entities are the antithesis of the single economic entity recognized in *Copperweld*.

In *Copperweld*, the Supreme Court held that a parent and its wholly owned subsidiary had a "complete unity of interest," such that they operated with a single "corporate consciousness" and therefore were not economically separate entities capable of conspiracy under Section 1.  467 U.S. at 771.  That is not the case here.  The different economic interests of the co-conspirators are illustrated by the various Official Season International Soccer Game Events in the U.S. that

---

30).  USSF has not advanced any argument to challenge the sufficiency of these allegations to state a violation under the rule of reason.

Relevent was prepared to promote, in which multiple teams and leagues were prepared to participate if not for USSF denying a sanction for these Events because of its agreement to follow the FIFA Policy.  Compl. ¶¶ 18-19, 84-86, 90-96.

*American Needle, Inc. v. NFL* is on point.  560 U.S. 183, 196 (2010).  There, the Supreme Court held that the member clubs of the National Football League "d[id] not possess either the unitary decision-making quality or the single aggregation of economic power characteristic of independent action" to be treated as a single entity under Section 1 of the Sherman Act.  *Id.*  Like the FIFA-affiliated associations, leagues, and teams participating in the alleged conspiracy here, "[e]ach of the [NFL] teams" in *American Needle* "[wa]s a substantial, independently owned, and independently managed business" whose agreements were subject to Section 1 of the Sherman Act.  *Id.*  This ruling applies, *a fortiori*, to a conspiracy among USSF, FIFA, and the FIFA-affiliated Confederations, National Associations, leagues, and teams because the FIFA-affiliated co-conspirators here do not even share revenues among themselves, while the NFL team co-conspirators in *American Needle*—which engaged in extensive revenue sharing—were still held not to be a single entity.  *Id.* at 196, 200.[23]  And even if the lack of economic integration between USSF, FIFA, and other FIFA-affiliated co-conspirators could be disputed, the determination of any claimed single-entity status would, at best, be a fact dispute inappropriate for resolution at the pleadings stage.  *See Madison Square Garden*, 2008 WL 4547518, at *13.[24]

---

[23] *Jack Russell Terrier Network v. Am. Kennel Club, Inc.*, does not alter this analysis.  Mot. at 29-31.  That out-of-Circuit decision is not only anomalous and inconsistent with the Supreme Court's subsequent decision in *American Needle*, it is inapposite to the Complaint allegations in this case—plaintiffs there "*did not allege* that [defendant] and its regional affiliates were actual or even potential competitors."  407 F.3d 1027, 1035 (9th Cir. 2005) (emphasis added).  Here, by contrast, it is alleged that the FIFA-affiliated Confederations, National Associations, leagues, and teams are all competitors to participate in International Soccer Game Events in the U.S.  Moreover, *Jack Russell Terrier* has never been followed in this Circuit, which has long rejected single-entity treatment to separately owned teams within a common sports league.  *See, e.g.*, *NASL v. NFL*, 670 F.2d 1249, 1257 (2d Cir. 1982).

[24] Nor does it matter to the Section 1 analysis that USSF is a non-profit organization (Mot. at 4), as a non-profit is capable of a conspiracy with its members in violation of the antitrust laws.  *See, e.g.*, *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 577 (1982); *NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984); *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 339-340 (1982).  Indeed, the NFL was a non-

### C.      Relevent Has Pled Antitrust Standing

Equally meritless is USSF's claim that Relevent has failed to plead antitrust standing.  To begin, the argument that Relevent cannot allege antitrust injury is based on the false premise that it has not plausibly alleged a conspiracy in restraint of trade.  *See* Mot. at 31-32.  As demonstrated, Relevent has adequately pled a Section 1 violation under both the *per se* rule and the rule of reason.  And, Relevent has antitrust standing as a participant in promoting International Soccer Game Events in the restrained relevant markets pled in the Complaint.  Compl. ¶¶ 13-20, 62-64.

"[T]he question of actual injury becomes whether [the plaintiff] is worse off than it would be if the market were free of anticompetitive forces."  *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 64 (2d Cir. 2019).  Relevent has adequately pled an actual injury suffered as a direct result of the alleged anticompetitive conspiracy to restrict output in the relevant markets, including by USSF's agreement to deny a sanction for the May 5 Event and its participation in the conspiracy to deny sanctions to other Official Season International Soccer Game Events sought to be promoted by Relevent and other promoters.  *See* Compl. ¶¶ 90-101, 133.  These allegations more than suffice to give rise to the plausible inference that Relevent's "loss[es] stem[] from a competition-*reducing* aspect or effect of the [D]efendant['s] behavior," and that its alleged injury "is of the type the antitrust laws were intended to prevent."  *In re London Silver Fixing, Ltd.*, 213 F. Supp. 3d 530, 551 (S.D.N.Y. 2016) (Caproni, J.) (emphasis in original).

Finally, USSF cannot dispute Relevent's antitrust standing at the pleadings stage by arguing that Relevent would suffer the same injury even if it received a USSF sanction for its Events because Relevent purportedly could not obtain approvals from other FIFA-affiliated entities to conduct Official Season International Soccer Game Events in the U.S.  Mot. at 33.  The Complaint alleges that Relevent received approvals from the applicable teams, league, and Confederation and National Association for the May 5 Event before USSF blocked it by denying

---

profit entity for most of its history, but was found capable of violating the antitrust laws with its member clubs during that time.  *See Am. Needle,* 560 U.S. at 186; *NASL*, 670 F.2d at 1262.

a sanction.  Compl. ¶ 96.  These allegations must be accepted as true and preclude USSF's argument.  In any event, the purported inability of Relevent to obtain other necessary approvals is a disputed issue of fact that cannot be resolved on the pleadings when Relevent has plausibly pled contrary facts.  *E.g., id.* ¶¶ 90-107.

## V.   Relevent Has Adequately Pled Tortious Interference Under New York Law

Finally, USSF's grounds for the dismissal of Relevent's tort claim are baseless.  A tortious interference plaintiff under New York law must plausibly allege "the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are dishonest, unfair, or in any other way improper" as well as "the underlying criminal or tortious conduct on which the tortious interference claim is based." *IQ Dental*, 924 F.3d at 70 (emphasis in original).[25]  Relevent has met each element of this pleading requirement.

For starters, USSF's assertion that Relevent has not adequately alleged which of its business relationships have been interfered with is contrary to the Complaint allegations.  Relevent alleges that its May 5 Event with two Ecuadorian clubs and its joint venture with La Liga were interfered with by USSF's unlawful actions.  Compl. ¶¶ 90-107.  Similar business relationships between Relevent and leagues, teams, and vendors desiring to conduct or participate in future International Soccer Game Events in the U.S. will also be interfered with if USSF does not cease participation in the challenged conspiracy to restrict output.  Compl. ¶¶ 96-101.  No more detail is required at this stage.

Also misplaced is USSF's contention that Relevent has not adequately pled that USSF was motivated by malice or a harmful intent because, according to USSF, the Complaint pleads only that it acted in its economic self-interest and the interest of SUM.  Mot. at 35.  USSF is not a

---

[25] The tortious interference standard cited by USSF has no application here.  *Carvel Corp. v. Noonan* (Mot. at 34) considered tortious interference in the specific context of a franchisor-franchisee relationship—a context that is inapplicable to Relevent's position of being required to seek sanctions from USSF, an organization with which it does not have an economic relationship.  *See* 350 F.3d 6, 17 (2d Cir. 2003).

competitor of Relevent's, and thus may not invoke the so-called "competitor justification" for tortious interference by which interference intended "at least in part to advance the competing interest of the interferer may be justified." *Sourceone Dental Inc. v. Patterson Co., Inc.*, 310 F. Supp. 3d 346, 368-369 (E.D.N.Y. 2018) (quotation omitted).[26]   Further, the competitive self-interest defense "is only available where 'no unlawful restraint of trade is effected, and the means employed are not wrongful.'"   *Id.* at 369 (quotation omitted).   Because Relevent has pled an antitrust violation, it has alleged wrongful means.   *See* Compl. ¶¶ 124-133, 138-143; *Reading*, 317 F. Supp. 2d at 335 (S.D.N.Y. 2003).

Indeed, USSF does not and cannot deny that the alleged anticompetitive conspiracy constitutes improper means sufficient to satisfy the tortious interference standard.   Thus, USSF contends that Relevent has not pled tortious interference because it has not pled a Section 1 claim. Mot. at 35.[27]   However, because Relevent has satisfactorily pled its antitrust claim, its tort claim must also be permitted to proceed.   *See IQ Dental*, 924 F.3d at 69-70.

## CONCLUSION

For all of the foregoing reasons, USSF's Motion should be denied in its entirety.

---

[26] USSF attempts to merge this element into the tortious interference standard it cites from *Carvel*, claiming that the alleged improper motivation must be "beyond mere self-interest or other economic considerations." Mot. at 34.  But the *Carvel* court never mentioned the defendant's self-interest and drew no conclusion as to whether tortious interference had occurred.  350 F.3d at 23.

[27] USSF again relies on *Carvel*.  Mot. at 35.  But the *Carvel* court certified—it did not decide—the issue of how the improper means prong should be applied to allegations of a non-competitor's tortious interference. 350 F.3d at 23.

December 13, 2019                              Respectfully submitted,

                                              By:      _s/Jeffrey L. Kessler_
                                                       Jeffrey L. Kessler
                                                       Jonathan J. Amoona
                                                       Angela A. Smedley
                                                       Adam I. Dale
                                                       **WINSTON & STRAWN LLP**
                                                       200 Park Avenue
                                                       New York, New York 10166
                                                       Tel: (212) 294-6700
                                                       Fax: (212) 294-4700
                                                       jkessler@winston.com
                                                       jamoona@winston.com
                                                       asmedley@winston.com
                                                       aidale@winston.com

                                                       *Counsel for Relevent Sports, LLC*