USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___7/20/2020___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
RELEVENT SPORTS, LLC,          :
        :
       Plaintiff,      :
        :
     -against-      :         19-CV-8359 (VEC)
        :
        :        OPINION AND ORDER
UNITED STATES SOCCER FEDERATION,  :
INC.,        :
        :
       Defendant.   :
---------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This action stems from Plaintiff's desire to promote Official Season International Soccer Game Events ("Official Games") in the United States. Plaintiff alleges that its attempts to promote these Official Games have been thwarted by Defendant's refusal to sanction them. Specifically, Plaintiff alleges that Defendant has entered into an agreement with the Fédération Internationale de Football Association ("FIFA") and other regional confederations and national associations to refuse to sanction Official Games in the United States and to boycott professional leagues, clubs, and players that participate in unsanctioned Official Games. Defendant moves to compel arbitration or in the alternative to dismiss the complaint. Dkt. 32. For the following reasons, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

The Fédération Internationale de Football Association ("FIFA") is the international federation and world governing body of soccer. Compl., Dkt. 31 ¶ 27. It administers soccer worldwide through its statutes, regulations, and directives. *Id.* Beneath FIFA organizationally are six regional confederations that oversee soccer at the continental level and assist FIFA in carrying out its regulations. *Id.* ¶ 29. The Confederation of North, Central and Caribbean

Association Football ("CONCACAF") is the regional confederation governing North American soccer. *Id.* ¶ 30. Beneath the six regional confederations are over two hundred national associations, each of which is authorized to represent FIFA as the governing body for soccer at the national level. *Id.* ¶¶ 29-31. The United States Soccer Federation ("USSF") is the FIFA-recognized national association for administering and overseeing soccer in the United States. *Id.* ¶ 31. USSF is a member of CONCACAF. *Id.* ¶ 30. Pursuant to the authority granted to the United States Olympic Committee by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq.* (1998), USSF is also the recognized national governing body for soccer in the United States. *Id.* ¶ 22.

As FIFA's recognized national association for soccer in the United States, USSF has the authority to sanction, on behalf of FIFA, "Official Season International Soccer Game Events" ("Official Games") and "Friendly Games" held in the United States. *Id.* ¶¶ 31, 33. Official Games are soccer matches that count towards the competing clubs' official league or tournament records; they can be between foreign countries' men's national teams, foreign professional men's soccer clubs, or foreign professional men's soccer clubs and U.S. professional men's soccer clubs. *Id.* ¶¶ 3-4. By contrast, friendly matches are not part of an official regular season league schedule or an official tournament; in other words, they do not count towards a club's official record. *Id.*

It is a violation of FIFA statutes for a soccer club to play in the United States without USSF's sanction; USSF has agreed to notify FIFA of any international game that is played in the United States without its sanction. *Id.* ¶ 33. In addition to obtaining a sanction from USSF, third-party promoters, such as Plaintiff, seeking to organize a game must also obtain approval from (i) each team's national association(s); (ii) each team's regional confederation(s); and (iii) the host country's regional confederation. Buterman Decl., Dkt. 34 Ex. 2, Art. 72 § 2; Ex. 4, Art.

6 § 2, Art. 8 § 2; *see* Compl. ¶ 59.  FIFA's approval is also required for certain types of games.[1]

Any player who competes in an unsanctioned game risks being deemed ineligible to participate

in FIFA-sanctioned competitions, including the FIFA World Cup.  Compl. ¶ 60.

Promoters such as Plaintiff may only seek a sanction or organize a game through a FIFA-

licensed match agent.  *Id*. ¶ 117; Def. Mem. of Law, Dkt. 33 at 6.  The match agent must be a

natural person and agree to FIFA's Match Agents Regulations.  Buterman Decl., Ex. 3, Arts. 1-3,

6.  Plaintiff's match agent is Charlie Stillitano ("Stillitano").  Def. Mem. of Law, Dkt. 33 at 2; Pl.

Opp., Dkt. 35 at 9, 13.  Through Stillitano, Plaintiff has organized and promoted numerous

friendly games in the United States.[2]  *See id*; Compl. ¶¶ 14-15.

**The FIFA Directive**

In 2018, Plaintiff announced that it intended to host an Official Game in Miami between

two La Liga teams, FC Barcelona and Girona.  Compl. ¶¶ 18, 85.  In response, FIFA's President,

Gianni Infantino, expressed doubt whether FIFA would permit an Official Game to occur outside

the teams' home territory.  *Id*. ¶ 85.  As a result, the Spanish national association ("RFEF"),

CONCACAF, and USSF sought guidance from FIFA on whether the game could occur in the

United States, rather than in Spain.  *Id*. ¶ 86.  In October 2018, the FIFA Council issued a

directive prohibiting the staging of official season games outside of the participant league's

---

[1]    Tier 1 International matches, defined as matches in which "both of the teams are the 'A' representative teams of the members concerned, or an International Match involving a Scratch Team," must also be authorized by FIFA.  Buterman Decl., Ex. 4, Art. 7.  No international match or competition "shall take place without the prior permission of FIFA, the confederations and/or the member associations in accordance with the Regulations Governing International Matches."  *Id*., Ex. 2, Art. 71.  Moreover, "notwithstanding the authorization competences as set forth in the Regulations Governing International Matches, FIFA may take the final decision on the authorization of any international match or competition."  *Id.*

[2]    For example, Plaintiff promotes the annual International Champions Cup, a series of "friendly" international soccer game events.  Compl. ¶ 14.  Plaintiff also organized and promoted a friendly game between Real Madrid and Manchester United in the United States in 2014.  *Id*. ¶ 15.

home country (the "FIFA Directive").[3]  *Id.* ¶¶ 8, 84, 86, 100.  The directive is consistent with

FIFA's statutes that require Official Games to take place in the league's home territory absent

"exceptional circumstances."[4]  *See* Buterman Decl. Ex. 2, Art. 73.  In order to maintain their

status in FIFA, all confederations, national associations, leagues, clubs, and players must comply

with FIFA directives; failure to do so may result in expulsion or discipline.  Compl. ¶¶ 32, 60,

100; Buterman Decl. Ex. 2, Art. 14.  Accordingly, following the announcement of the FIFA

Directive, FC Barcelona withdrew its commitment to participate in the match Plaintiff proposed

to sponsor in Miami.[5]  Compl. ¶ 93; Def. Mem. of Law, Dkt. 33 at 21 n.25.

In March 2019, Plaintiff, through its match agent Mr. Stillitano, submitted a sanctioning

application to USSF, seeking approval to host an Official Game between two Ecuadorian clubs

in Miami.  Compl. ¶¶ 95-96.  Prior to submitting the application to USSF, Plaintiff obtained

approval from Ecuador's governing regional confederation, the Ecuadorian national association,

and the participating teams' league.  *Id.* ¶ 96.  In April 2019, USSF denied Plaintiff's application,

explaining that sanctioning the match would violate the FIFA directive prohibiting the staging of

Official Games outside the clubs' home territory.  *Id.* ¶ 99.

---

[3]     The FIFA Council is comprised of the FIFA President, the Presidents of each Regional Confederation and additional members elected by and from the National Associations.  Compl. ¶ 32. The Council is "responsible for issuing regulations for organizing international matches and competitions."  Buterman Decl. Ex. 2, Art. 71(1).  The FIFA directive reads: "Consistent with the opinion expressed by the Football Stakeholders Committee, the [FIFA] Council emphasized the sporting principle that official league matches must be played within the territory of the respective member association."  Compl. ¶ 86.

[4]     The FIFA statute reads: "Associations, leagues or clubs that are affiliated to a member association may only join another member association or take part in competitions on that member association's territory under exceptional circumstances.  In each case, authorisation must be given by both member associations, the respective confederation(s) and by FIFA."  Buterman Decl. Ex. 2, Art. 73.

[5]     RFEF, the Spanish National Association, was vocal in its opposition to Plaintiff's proposal to host the Barcelona-Girona game in Miami.  *See Atletico Madrid v. Villareal: La Liga submits request to hold fixture in Miami*, BBC (Oct. 18, 2019), https://www.bbc.com/sport/football/50085162 (noting that "RFEF and the players' union (AFE) were both vocal in objecting" to moving the Barcelona-Girona game to Miami); *Report: Atletico Madrid and Villarreal Set For Game In United States*, BEIN Sports (Oct. 16, 2019), https://www.beinsports.com/us/laliga/video/atletico-madrid-villarreal-laliga-match-miami/1321379 (noting that the Barcelona-Girona match "fell apart due to push back from players, RFEF, FIFA and others.").

Plaintiff alleges that USSF's denial of its sanctioning application reflects an anticompetitive agreement with FIFA to limit the output of Official Games in the United States by refusing to sanction Official Games outside of the teams' home territory. *See id.* ¶¶ 124-33. Plaintiff further claims that USSF entered into an anticompetitive agreement with FIFA and "horizontally competing" regional confederations and national associations to boycott professional leagues, clubs, and players that participate in Official Games without a USSF sanction. *Id*; Pl. Opp., Dkt. 35 at 1, 39. Finally, Plaintiff alleges that USSF unlawfully exercises its sanctioning authority to enhance the competitive market position of USSF's economic partner, Soccer United Marketing ("SUM"). Compl. ¶ 127. Plaintiff asserts a separate tort claim, alleging that USSF interfered with its existing and prospective business relationships. *Id.* ¶¶ 134-147.

USSF moves to compel arbitration, or in the alternative, to dismiss Plaintiff's complaint, arguing that Plaintiff's claims are barred by the parties' prior covenant not to sue, that FIFA is an indispensable party, and that Plaintiff has failed to state an antitrust claim. *See* Dkt. 33.

## DISCUSSION

### I.     Defendant's Motion to Compel Arbitration

USSF argues, in the first instance, that this action is subject to mandatory arbitration. Def. Mem. of Law, Dkt. 33 at 11-15. Specifically, USSF claims that Plaintiff is bound by the terms of the FIFA Match Agent Regulations, which require that any "dispute between a match agent and a national association" be submitted to the "FIFA Players' Status Committee for consideration and resolution." Buterman Decl., Ex. 3, Art. 22. Plaintiff argues, *inter alia,* that it is not bound by the Arbitration Agreement and that, even if it were, FIFA's arbitral body lacks jurisdiction to rule on its claims. Pl. Opp., Dkt. 35 at 9-13. Although the Court finds that Plaintiff *is* bound by the Arbitration Agreement, it agrees that FIFA lacks jurisdiction to decide

Plaintiff's antitrust claim.  Plaintiff's tortious interference claim, however, is subject to

mandatory arbitration.  Accordingly, Defendant's motion to compel arbitration is granted in part

and denied in part.

### A.  Legal Framework

Section 2 of the Federal Arbitration Act provides that a written agreement to arbitrate

"shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity

for the revocation of any contract."  9 U.S.C. § 2.  Section 2 manifests "a liberal federal policy

favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460

U.S. 1, 24 (1983).  Any "doubts concerning the scope of arbitrable issues should be resolved in

favor of arbitration."  *Id.* at 24-25.

### B.  Plaintiff is Bound By the Arbitration Agreement

Plaintiff does not dispute that Mr. Stillitano agreed to the terms of the FIFA Match

Agents Regulations; instead Plaintiff argues that it is not bound by the arbitration clause because

it itself is not a party to the Agreement.  Pl. Opp., Dkt. 35 at 13.  The Court disagrees.  As noted

*supra*, promoters, such as Plaintiff, can only seek sanctions and organize matches through a

FIFA-licensed match agent.  Buterman Decl. Ex. 3, Art. 2.  In other words, Plaintiff can only act

through Mr. Stillitano; all of its sanctioning applications to USSF have been and must be

submitted through him.  *See* Compl. ¶ 95; Def. Mem. of Law at 11.  Accordingly, under ordinary

principles of agency law, Stillitano functions as Plaintiff's agent and binds Plaintiff to the

agreements that he enters into on its behalf.  *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92,

107 (S.D.N.Y. 2017) (explaining that it is "clear that a nonsignatory party may be bound to an

arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'")

(citation omitted).  Plaintiff's claim that it only "indirectly benefits" from Stillitano's position as

its match agent is unpersuasive; Plaintiff can only stage matches, and reap the resulting financial rewards, through Stillitano.  As such, it directly benefits from the relationship.

Indeed, this precise issue was analyzed and decided in *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 987 (N.D. Ill. 2007).  *ChampionsWorld* involved a dispute between now-defunct promoter, ChampionsWorld, and USSF.  Mr. Stillitano served as ChampionsWorld's FIFA-licensed Match Agent.  The court concluded that because ChampionsWorld acted "as a principal of Stillitano's," and "directly benefited" from the relationship, it could not "disclaim the match agent license application [signed by Stillitano] in order to avoid its arbitration provision."  *ChampionsWorld,* 487 F. Supp. 2d at 987; *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 922 (N.D. Ill. 2012) (reiterating that "ChampionsWorld became bound [to the match agent regulations and its arbitration clause] when Stillitano applied to become a FIFA-licensed match agent").

### C.  FIFA Lacks Jurisdiction to Arbitrate Plaintiff's Antitrust Law Claim

Plaintiff argues in the alternative that FIFA lacks jurisdiction to arbitrate its antitrust law claim.  Pl. Opp., Dkt. 35 at 9-10.  On this point, the Court agrees.  The *ChampionsWorld* procedural history is informative.  After the *ChampionsWorld* court initially compelled the case, which included antitrust claims, to arbitration pursuant to the Match Agent Regulations, FIFA's legal director clarified "for the first time" that the organization was "not in a position to intervene in the [] matter" because Plaintiff's "antitrust claims were not within the categories of disputes that its regulations allowed its deciding bodies to hear."  *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.,* 06-CV-5724, 2008 WL 4861522, at *1 (N.D. Ill. Nov. 7, 2008).  Rather, FIFA's arbitration tribunal could only hear claims that fell "within the scope of application of its own

statutes and regulations." Kessler Decl., Dkt. 36 Ex. G; *ChampionsWorld,* 890 F. Supp. 2d at 922.[6]

Here, Plaintiff's complaint alleges violations of U.S. antitrust law.  It is clear, based on the *ChampionsWorld* procedural history and the "correspondence from FIFA" after the *ChampionsWorld* court initially compelled the antitrust claim to arbitration, namely its statement that "antitrust claims were not within the categories of disputes that its regulations allowed its deciding bodies to hear," that FIFA's arbitration tribunal "will not entertain the antitrust"  issue presented in this case.  *ChampionsWorld,* 2008 WL 4861522, at *3; *see* 890 F. Supp. 2d at 922. Accordingly, Defendant's motion to compel arbitration as to Plaintiff's antitrust claim is denied. *See In re Salomon Inc. S'holders' Derivative Litig.* 68 F.3d 554, 559-60 (2d Cir. 1995) (refusing to compel arbitration when the parties had agreed to arbitrate disputes only before the NYSE, and the NYSE refused to arbitrate the particular dispute in question); *De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.,* No. 07-CV-10940, 2010 WL 2541495, at *4 (S.D.N.Y. June 22, 2010) (explaining that where an arbiter was "without the ability to assist" the parties because the claims "did not fall within the scope of work" of the agreement, the plaintiff was "free to pursue her claims in [federal] court."); *Singleton v. Grade A Mkt., Inc.,* 607 F. Supp. 2d 333, 339 (D. Conn. 2009) ("Numerous Courts, including the Second Circuit, have refused to compel

---

[6]      Following the legal director's comments, the parties returned to the district court and ChampionsWorld moved to lift the previously imposed stay pending arbitration.  *ChampionsWorld,* 2008 WL 4861522, at *2 (N.D. Ill. Nov. 7, 2008).  The court explained that while it was apparent that the FIFA arbitration tribunal would not "entertain the antitrust … issues," it was still unclear whether it would arbitrate any of the other issues presented.  *Id.* at *3. Ultimately, USSF reformulated the remaining claims and presented its own case for arbitration; USSF did not request that the arbitral tribunal adjudicate plaintiff's antitrust claim.  *See ChampionsWorld,* 276 F.R.D. 577, 584 (N.D. Ill. 2011).  The district court ultimately ruled on the merits of the antitrust claim.  *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.,* 890 F. Supp. 912, 951 (N.D. Ill. 2012).

arbitration where the arbitral forum upon which the parties agreed is unavailable to arbitrate the dispute.").[7]

### D.  Plaintiff's Tort Claim Is Subject to Arbitration

Plaintiff's tortious interference claim alleges that Defendant "ignored, delayed, and/or ultimately rejected all of Relevent's attempts to obtain a USSF sanction," thereby interfering with its preexisting business relationships.  Compl. ¶¶ 138-39.  This claim does not implicate U.S. antitrust law; it plainly constitutes a dispute between a match agent and a national association and is therefore subject to mandatory arbitration under the Arbitration Agreement. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24 (explaining that any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").  Accordingly, Defendant's motion to compel arbitration is granted as to Plaintiff's tort claim.[8]

---

[7]        Defendant relies on the *ChampionsWorld* court's initial decision compelling ChampionsWorld's claims to arbitration to argue that Relevent's antitrust claim should similarly be sent to arbitration in the first instance. *See ChampionsWorld,* 487 F. Supp. 2d 980, 991 (N.D. Ill. 2007).  This argument ignores *ChampionsWorld's* subsequent procedural history.  Specifically, later decisions in *ChampionsWorld* explain that the initial decision to compel the antitrust claim to arbitration was made *before* the FIFA tribunal "stated for the first time that Plaintiff's … antitrust claims were not within the categories of disputes that its regulations allowed its deciding bodies to hear." *ChampionsWorld,* 2008 WL 4861522, at *1 (N.D. Ill. Nov. 7, 2008).   Thus, compelling the antitrust claim in the instant case to arbitration, knowing full well that FIFA's arbitral body has no jurisdiction to decide it, would be futile and inefficient.  *See In re Salomon Inc. S'holders' Derivative Litig.* 68 F.3d at 554; *De Malmanche,* 2010 WL 2541495, at *4.

[8]        The Court notes that arbitration of Plaintiff's tortious interference claim may present additional difficulties. Based on the *ChampionsWorld* procedural history, it is likely that USSF will need to substitute Stillitano as the opposing party and present its own case for arbitration so that the claim is limited to interpreting FIFA's own statutes and regulations.  *See ChampionsWorld,* 276 F.R.D. at 584; *ChampionsWorld,* 890 F. Supp. 2d at 922. Nevertheless, given the plain language of the Agreement and the fact that, unlike the antitrust claim, Plaintiff's tort claim appears to only require interpretation of FIFA's statutes rather than U.S. antitrust law, the claim is compelled to arbitration in the first instance.

## II.     Defendant's Motion to Dismiss for Failure to State a Claim[9]

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  On a motion to dismiss, the Court may consider any "written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as materials "integral to plaintiffs' claims." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

### A.  Legal Framework

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1; *United States v. Apple, Inc.,* 791 F.3d 290, 314 (2d Cir. 2015).  In order to plead a violation of Section 1, a plaintiff must first allege "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp,* 465 U.S. 752, 764 (1984) (emphasis omitted)).  In other words, an antitrust plaintiff must allege an agreement; a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."  *Am. Tobacco Co. v. United States,* 328 U.S. 781, 809-10, (1946); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (explaining that because section 1 of the Sherman Act does not prohibit all restraints of trade, but rather only *agreements* to restrain trade,

---

[9]      Defendant also moves to dismiss on the grounds that Plaintiff's claims are barred by the parties' prior covenant not to sue and that FIFA is an indispensable party.  Def. Mem. of Law, Dkt. 33 at 15-24.  Because the Court finds that Plaintiff fails to state an antitrust claim, the Court need not reach these other arguments.  As will be discussed briefly *infra*, however, even if Plaintiff had stated a claim, its claim for injunctive relief would be subject to dismissal under Federal Rule of Civil Procedure 19.

the "crucial question in a Section 1 case is [] whether the challenged conduct stem[s] from independent decision or from an agreement, tacit or express.") (internal quotation marks omitted).  Independent action by one party is not proscribed; there is a "basic distinction between concerted and independent action," and a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  *Monsanto,* 465 U.S. at 760-61. Moreover, parallel conduct by itself is insufficient to prove the existence of a conspiracy because such behavior could simply be the result of "coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Twombly*, 550 U.S. at 556 n.4 (internal quotation marks omitted).  Indeed, parallel conduct that "does not result from an agreement is not unlawful even if it is anticompetitive." *Apple,* 791 F.3d at 315.

In the absence of direct evidence of an agreement, such as a "recorded phone call in which two competitors agreed to fix prices," a plaintiff must present circumstantial facts, known as "plus factors," to support an inference of a conspiratorial agreement.  *Mayor & City Council of Balt. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013).  Regardless of whether the plaintiff presents direct or circumstantial evidence, at "the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.,* it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News,* 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556, 549, 557) (alteration in original).  Mere "conclusory allegation[s] of [an] agreement at some unidentified point," are insufficient plausibly to allege a Sherman Act violation.  *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 355 (S.D.N.Y. 2018) (quoting *Twombly* at 557).  Finally, a complaint may be dismissed "where there is an obvious alternative explanation to the facts underlying the

alleged conspiracy among the defendants." *Id.* at 358 (citing *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017)).

If an antitrust plaintiff sufficiently alleges an agreement, it must next allege that the agreement "constituted an unreasonable restraint of trade," either per se or under the rule of reason. *Anderson News*, 899 F.3d at 97. Few restraints of trade are unreasonable per se; conduct constituting a per se violation must be so "manifestly anticompetitive that it would almost invariably tend to restrict competition and decrease output." *Cenedella,* 348 F. Supp. 3d at 360 (citing *Hertz Corp. v. City of New York*, 1 F.3d 121, 130 (2d Cir. 1993)). As a result, the per se rule is appropriate only "in the relatively narrow circumstance[s] where courts have sufficient experience with the [alleged wrongful] activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue." *Hertz*, 1 F.3d at 129; *Caruso Mgmt. Co. v. Int'l Council of Shopping Centers*, 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019). Agreements among horizontal competitors to set prices are per se illegal, while vertical agreements, or agreements between parties at different levels of a market structure, are not. *Apple*, 791 F.3d at 313–14; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 882 (2007).

As a result of the "rigorous standard and [] presumption against applying the per se rule," courts apply the "rule of reason" in analyzing most alleged restraints of trade. *Caruso Mgmt. Co.*, 403 F. Supp. 3d at 201. At the motion to dismiss stage, the rule of reason inquiry requires the plaintiff to "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Watkins v. Smith*, No. 12-CV-4635, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014).

### B.  Plaintiff Fails to Allege a Vertical Agreement Between USSF and FIFA

Plaintiff alleges that USSF entered an "anticompetitive agreement with FIFA to comply with the FIFA Policy that prohibits the sanctioning of any Official Season International Soccer

Game Event in the U.S." Compl. ¶ 127.  In support, Plaintiff points to Defendant's statement that it is "required to adhere" to FIFA's policies as "direct evidence" of the alleged anticompetitive vertical agreement.  *Id.* ¶ 100; Pl. Opp., Dkt. 35 at 28.  But Defendant's admitted compliance with the FIFA directive, without additional factual allegations, is insufficient to constitute direct evidence of an unlawful agreement.[10]  *See Citigroup, Inc.,* 709 F.3d at 136 (explaining that direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level"); *Starr,* 592 F.3d at 325 (noting that "allegations in a Sherman Act § 1 complaint based on direct evidence of agreement would likely require references to "specific time, place, or person involved in the alleged conspiracies") (quoting *Twombly,* 550 U.S. at 565 n. 10).  Put differently, Plaintiff alleges no facts to support the inference that, in adhering to the FIFA directive, USSF actually entered an agreement with FIFA to restrict output.  *See Am. Tobacco,* 328 U.S. at 809-10 (an antitrust plaintiff must allege a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 147–48 (E.D.N.Y. 2010) (dismissing plaintiffs' section 1 claim because the complaint failed to "allege any specific facts providing any basis to infer an actual unlawful agreement," but rather relied on the "bald, conclusory allegation that it 'appears that defendants and others decided to adopt the terms of [the] [r]esolution'").  Plaintiff's repeated characterizations of Defendant's unilateral decision to comply with the FIFA directive as an anticompetitive agreement, *see* Compl. ¶¶ 10, 24, 127, are conclusory.  *Twombly* 550 U.S. at 557 (holding that mere "conclusory allegation[s] of [an] agreement at some unidentified point," are insufficient to allege plausibly a Sherman Act

---

[10]     Plaintiff claims that, because it plausibly alleged a conspiracy "through direct evidence—including USSF's admissions and the rules and policies of FIFA and its affiliated members (including the FIFA Policy), it was not required to plead parallel conduct and "plus factors" to infer such a conspiracy."  Pl. Opp., Dkt. 35 at 28.

violation); *In re Elevator Antitrust Litig*., 502 F.3d 47, 51-52 (2d Cir. 2007); *Cenedella,* 348 F.

Supp. 3d at 358 (rejecting plaintiff's attempts to "summarily assert[] several times that there is an

agreement" as "nothing more than conclusory allegations").

Although Defendant's adherence to the FIFA policy may be "*consistent*" with a vertical

agreement, at the pleading stage, Plaintiff must plead facts "to suggest that an agreement *was*

*made*."  *Anderson News,* 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556, 549, 557)

(emphasis added); *Citigroup, Inc.,* 709 F. 3d at 136 ("A plaintiff's job at the pleading stage, in

order to overcome a motion to dismiss, is to allege enough facts to support the inference that a

conspiracy actually existed.").  Here, the complaint's reliance on USSF's unilateral compliance

with FIFA's directive to support an inference that an unlawful agreement was made falls short.[11]

*See id.; Monsanto,* 465 U.S. at 761 (holding that a party "generally has a right to deal, or refuse

to deal, with whomever it likes, as long as it does so independently."); *United States v. Colgate*

*& Co*., 250 U.S. 300, 307 (1919) (explaining that it is not concerted action for a party to

announce the terms under which it is willing to deal and to then act in accordance with that

unilateral announcement, even if the practical effect may be to achieve conformity of behavior);

*Tarrant Serv. Agency, Inc. v. Am. Standard Inc.*, 12 F.3d 609, 617-18 (6th Cir. 1993) (affirming

the district court's grant of summary judgment on plaintiff's § 1 conspiracy claim on the grounds

that plaintiff produced no evidence of a conspiracy and noting that the contested "broker policy

was unilaterally implemented by [defendant]" and a third party's "mere adherence to the []

---

[11]     As noted, *infra*, Plaintiff may move for leave to amend its complaint.  Because there are obvious rational
reasons why USSF would comply with the FIFA Directive without being part of an agreement to do so (most
notably its desire not to take action that could result in all U.S. men's soccer players and teams being deemed
ineligible for World Cup play, *see* Compl. ¶¶ 32, 34), if Plaintiff chooses to amend its Complaint, it must plead
facts, beyond Defendant's mere acquiescence to the FIFA Directive, from which the Court can infer that there is an
unlawful agreement between USSF and FIFA.

policy [did] not illustrate the existence of a conspiracy.") (citing *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989)).

In sum, Plaintiff has failed to allege an unlawful vertical agreement between USSF and FIFA sufficient to support an antitrust violation.[12]

---

[12]     Even if Plaintiff had adequately alleged an agreement between USSF and FIFA, Plaintiff's claim for injunctive relief would be dismissed for failure to join an indispensable party.  In deciding to dismiss a claim pursuant to Federal Rule of Civil Procedure 19, the Court must: (i) determine whether the absent party is "necessary" to the action under Rule 19(a) and (ii) assess whether joinder of the party is feasible, and if not, whether the party is indispensable under Rule 19(b).  *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000).

FIFA is a necessary party under Rule 19(a)(1)(A); the Court cannot accord Plaintiff the relief it seeks, the ability to promote and host Official Games in the United States, in FIFA's absence.  *See Meyer v. Kalanick*, No. 15-CV-9796, 2016 WL 3509496, at *2 (S.D.N.Y. June 20, 2016).  At the heart of Plaintiff's claim is the FIFA directive that prohibits the staging of Official Games outside the participant leagues' home territory.  Plaintiff acknowledges that all FIFA-affiliated confederations, associations, leagues, clubs, and players "must comply with FIFA's rules" or face discipline.  Compl. ¶¶ 34, 59, 60.  Thus, even if the Court were to enjoin USSF from complying with the FIFA directive and order it to sanction Plaintiff's proposed matches, so long as the directive itself remains, Plaintiff will have difficulty obtaining the other approvals it needs to host a match.  *See* Def. Mem. of Law, Dkt. 33 at 21 n.25; *Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 90-CV-4391, 1994 WL 132239 (S.D.N.Y. Apr. 14, 1994).

Joinder of FIFA is infeasible for lack of personal jurisdiction.  The complaint fails to allege sufficient facts to establish FIFA's contacts with the Southern District of New York.  In the absence of such facts, the Court cannot exercise personal jurisdiction over FIFA pursuant to the Clayton Act or the New York long arm statute.  *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 230 (S.D.N.Y. 2019); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 198–99 (S.D.N.Y. 2018).  Nor does the complaint allege sufficient "overt acts in furtherance of the conspiracy" taken by USSF *in New York* to impute to FIFA under the *Schwab* conspiracy theory.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. at 239 (holding that plaintiffs did not meet "their burden of establishing conspiracy jurisdiction" because they "provide[d] no evidence as to any specific transactions that occurred in New York").  Finally, exercising personal jurisdiction over FIFA would violate due process.  Even adopting the national contacts approach, the complaint does not adequately allege that the FIFA directive was expressly aimed at the United States.  *Walden v. Fiore*, 571 U.S. 277, 289 (2014) (mere foreseeability of harm is insufficient to establish specific jurisdiction); *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) (explaining that it is insufficient "for a plaintiff to show simply that a defendant's actions caused an 'effect' in the forum state"; the plaintiff must show that the defendant has "expressly aimed its conduct at the forum.") (quoting *Licci ex rel. Licci v. Leb. Can. Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 589-90 (S.D.N.Y. 2017) (explaining that the mere knowledge that a directive would be "disseminated worldwide, including into the United States, is not enough by itself to support specific personal jurisdiction because foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.") (internal quotation marks omitted).

Lastly, FIFA is an indispensable party under Rule 19(b) because a judgment rendered in its absence would be inadequate.  As long as the FIFA directive remains, Plaintiff will likely be unable to obtain the requisite approvals to promote an official game and players will remain under threat of discipline from FIFA if they participate in such games.  Plaintiff will likely be required to resort to "piecemeal litigation" to enjoin other confederations, associations, leagues, teams, players, and even FIFA itself from adhering to the directive, which is precisely what Rule 19 seeks to avoid.  *Kermanshah v. Kermanshah*, No. 08-CV-409, 2010 WL 1904135, at *4 (S.D.N.Y. May 11, 2010); *Freedom, N.Y. Inc. v. United States*, No. 86-CV-1363, 1986 WL 6163, at *3 (S.D.N.Y. May 27, 1986).

### C.  Plaintiff Fails to Allege a Horizontal Agreement Between USSF and "Others"

Plaintiff also alleges a conspiracy among the "horizontally competing FIFA-affiliated confederations, national associations, leagues, and teams" to adhere to and enforce the FIFA directive and to boycott leagues, clubs, and players that participate in unsanctioned games in the United States.  Compl. ¶¶ 127, 129.  Plaintiff argues that this "horizontal group boycott" constitutes a per se violation of § 1.  *Id.* ¶ 129; Pl. Opp., Dkt. 35 at 29.  At the outset, the Court is not convinced that USSF and the FIFA-affiliated regional confederations, national associations, leagues, and teams are, in fact, competitors; the complaint summarily states that "[e]ach Confederation and National Association is a separate economic actor with distinct economic interests," Compl. ¶ 29, but does not actually allege that they are competitors.[13]

More significantly, the complaint is devoid of factual allegations to support an inference that Defendant entered into an agreement with other confederations, national associations, leagues, or teams to do anything, including to comply with or to enforce the FIFA Policy.[14]  For example, the complaint makes no attempt to identify with which, if any, of the six regional confederations, over two hundred national associations, and countless leagues and teams Defendant allegedly conspired; instead, Plaintiff repeatedly refers simply to the alleged conspiracy among "USSF, FIFA, and others."  *See e.g.,* Compl. ¶¶ 1, 2, 5, 7, 9, 19, 24, 61, 64,

---

[13]      Although Plaintiff's opposition asserts that the "alleged co-conspirator Confederations, National Associations, leagues, and teams [] do compete with each other," it cites to no supporting factual allegations in the complaint.  Pl. Opp., Dkt. 35 at 30.  Moreover, it alleges that the relevant market "in which USSF's conduct has unreasonably restrained competition" is the "market for International Soccer Game Events" in the United States, Compl. ¶ 47, a market in which none of its alleged horizontal competitors appears to compete.

[14]      The Court also notes that Plaintiff's allegations of a horizontal agreement among USSF and "all of the FIFA-affiliated Confederations, National Associations, leagues, and teams," to comply with the FIFA Directive, Pl. Opp., Dkt. 35 at 29-30, flies in the face of its allegation that Plaintiff had obtained approval from Ecuador's Regional Confederation, Ecuador's National Association, and the participating teams' league in advance of its proposed May 5, 2019 game.  Compl. ¶ 96.

91, 101-02, 149.  Such conclusory statements are insufficient to allege the existence of a

horizontal agreement.  *Iqbal,* 556 U.S. at 681 ("the conclusory nature of respondent's allegations

... disentitles them to the presumption of truth" on a Rule 12(b)(6) motion to dismiss); *Cenedella,*

348 F. Supp. 3d at 358-59 (dismissing plaintiff's complaint as including "nothing more than

conclusory allegations … completely devoid of facts indicating who agreed with whom, to what,

and when," and noting that it merely referred to "other unnamed co-conspirators, whom the

plaintiff [made] little effort to describe").  Plaintiff's suggestion that the other confederations',

associations', leagues', and teams' admitted compliance with the FIFA Directive somehow

"culminates in the plausible allegation" that USSF, FIFA, and all of the confederations,

associations, leagues, and teams are engaged in "concerted action and agreements to restrict

entry into, and limit output of, the relevant market for international soccer game events in the

U.S.," Pl. Opp., Dkt. 35 at 29, is wholly unsupported and unavailing.[15]  *See Integrated Sys. &*

*Power, Inc. v. Honeywell Int'l, Inc.,* 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010) ("While Plaintiff

repeatedly asserts that Defendant's conduct constitutes a 'horizontal conspiracy,' and therefore is

a *per se* violation, this characterization is a legal conclusion that the Court does not accept as true

on a motion to dismiss.").

---

[15]     Plaintiff seemingly relies on FC Barcelona's statement regarding Plaintiff's proposed FC Barcelona-Girona game to support the existence of an agreement.  *See* Pl. Opp., Dkt. 35 at 29.  After the FIFA Directive was issued, FC Barcelona withdrew its commitment to participate in the game, explaining that it "was [] willing to play a La Liga match in Miami . . . but acknowledge[d] that while there is no agreement between all parties, this project will not succeed."  Compl. ¶ 93.  The Court is not entirely clear in what way Plaintiff is relying on this statement.  *See* Pl. Opp., Dkt. 35 at 29.  To the extent that Plaintiff is using this statement to demonstrate a vertical agreement between USSF and FIFA, it is insufficient.  This statement merely suggests that USSF declined to sanction a game that would have been in violation of the FIFA Directive, which, as noted *supra,* without additional factual allegations, does not suggest that USSF entered an unlawful agreement with FIFA.  To the extent that Plaintiff is using FC Barcelona's statement to support the allegation of a horizontal agreement between USSF and "numerous co-conspirator confederations, national associations, leagues, and teams," Pl. Opp., Dkt. 35 at 28-29, it similarly fails.  Although FC Barcelona's reference to "all parties" is admittedly vague, the statement seems to undermine Plaintiff's position by suggesting that there is, in fact, no "agreement" among the various confederations, national associations, leagues, and teams.

Moreover, even assuming that USSF does directly compete with the FIFA-affiliated regional confederations, national associations, leagues, and teams (which is far from intuitively obvious), and assuming that each of these organizations similarly withholds a sanction for proposed official international games in the United States in compliance with the FIFA directive, in the absence of any factual allegations supporting an inference of an actual agreement to restrict output, such conduct does not violate the Sherman Act.  *See Apple,* 791 F. 3d at 318 ("[C]onduct resulting solely from competitors' independent business decisions—and not from any 'agreement'— is not unlawful under § 1 of the Sherman Act, even if it is anticompetitive."). Plaintiff's reliance on *United States v. Apple* is misplaced.  In *Apple*, ample evidence existed to establish a horizontal conspiracy among the publisher defendants.  *Apple,* 791 F. 3d at 318 ("That the Publisher Defendants were in constant communication regarding their negotiations with both Apple and Amazon can hardly be disputed.  Indeed, Apple never seriously argues that the Publisher Defendants were not acting in concert.").  Here, by contrast, Plaintiff's complaint alleges no facts to suggest that USSF "combined forces" with other regional confederations and national associations or that they had a "conscious commitment to a common scheme designed to achieve an unlawful objective."[16]  *Id.; Monsanto Co.*, 465 U.S. at 764.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is GRANTED as to Plaintiff's tort claim; litigation regarding Count II is stayed in the meantime.  The parties must provide joint quarterly updates on the status of the arbitration proceeding.  The first such update

---

[16]   Plaintiff's failure to allege a horizontal agreement also dooms its hub-and-spoke conspiracy theory. Pl. Opp., Dkt. 35 at 30. A hub-and-spoke conspiracy requires: (1) a hub; (2) entities that enter into vertical agreements with the hub, known as the spokes; and (3) the connecting agreements among the horizontal competitors, known as the rim of the wheel.  *Apple, Inc.*, 791 F. 3d at 314; *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012).  As noted, *supra*, Plaintiff fails to allege a vertical agreement between FIFA and USSF and fails to allege anything approaching a rim to the asserted wheel.

is due by **November 1, 2020;** thereafter, reports are due every three (3) months on the first business day of the applicable month.  Defendant's motion to compel arbitration is DENIED as to Plaintiff's antitrust claim.

Defendant's motion to dismiss Plaintiff's antitrust claim is GRANTED.  Plaintiff's complaint is DISMISSED without prejudice.  Plaintiff may file a motion for leave to amend Count One of its complaint by **September 1, 2020.**  If Plaintiff chooses to move for leave to amend, Plaintiff must include a redlined version of its proposed amended complaint.  If Plaintiff chooses to pursue its claim for injunctive relief, its proposed amended complaint must allege facts sufficient to support the exercise of personal jurisdiction over FIFA.  Alternatively, Plaintiff may choose to join FIFA to this action.  If Plaintiff chooses not to move to amend, it must show cause by **September 1, 2020**, why this entire case should not be dismissed without prejudice for lack of subject matter jurisdiction.

The clerk of court is respectfully directed to close the open motion at docket entry 32.


**SO ORDERED.**

**Date:  July 20, 2020**
**New York, New York**

           **VALERIE CAPRONI**
        **United States District Judge**