**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RELEVENT SPORTS, LLC,

               Plaintiff,

        v.

UNITED STATES SOCCER FEDERATION, INC.,

               Defendant.

Case No. 1:19-cv-08359-VEC

**PLAINTIFF RELEVENT SPORTS, LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR LEAVE TO AMEND THE COMPLAINT**

## TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................................ 1

LEGAL STANDARD...................................................................................................... 4

ARGUMENT .................................................................................................................. 5

I.      The Amended Complaint Properly Joins FIFA as a Defendant ......................................... 5

II.     The Amended Complaint Plausibly Pleads a Horizontal Market Division Agreement
and States a Section I Claim ............................................................................................. 10

        A.     Industry Organizations Such as USSF and FIFA Are Liable Under Section 1
for Anticompetitive Agreements Entered into by Their Members Pursuant to
the Organizations' Rules and Procedures.............................................................. 13

        B.     The FIFA National Associations' Constituent Member Leagues and Teams
Are Actual or Potential Competitors with USSF's Division I League, MLS, in
the Relevant United States Market ........................................................................ 14

        C.     The Adherence of USSF, FIFA, the National Associations and Their
Constituent Member Leagues and Teams to the FIFA Market Division Policy
Is an Agreement Under the Sherman Act............................................................... 17

        D.     The Amended Complaint Plausibly Pleads that the FIFA Market Allocation
Agreement Horizontally Restricts Output and Is an Unlawful Restraint............... 21

III.    The Amended Complaint Also Plausibly Pleads An Unlawful Vertical Agreement ....... 23

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Rent a Car Sys. v. Grand Rent a Car Corp.*,
  98 F.3d 25 (2d Cir. 1996) ...........................................................................................7

*Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*,
  No. 18 Civ. 10364 (LGS), 2020 WL 2085875 (S.D.N.Y. Apr. 30, 2020),
  *reconsideration denied,* 2020 WL 2538394 (S.D.N.Y. May 19, 2020) ...................................6

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)...................................................................................................13

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)...............................................................................13, 14, 15, 17

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*,
  456 U.S. 556 (1982)...................................................................................................13

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).................................................................................11, 21

*Ariz. v. Maricopa Cnty. Med. Soc.*,
  457 U.S. 332 (1982)...................................................................................................18

*Associated Press v. United States*,
  326 U.S. 1 (1945)............................................................................................. *passim*

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)...........................................................................................6

*Contant v. Bank of Am. Corp.*,
  385 F. Supp. 3d 284 (S.D.N.Y. 2019)......................................................................6, 10

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005).........................................................................................7

*In re del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2019).........................................................................................7

*DGI-BNSF Corp. v. TRT Lease Co., LLC*,
  No. 18-CV-3252 (VEC), 2019 WL 5781973 (S.D.N.Y. Nov. 6, 2019)
  (Caproni, J.) ............................................................................................................5

*Duplan Corp. v. Deering Milliken, Inc.*,
  594 F.2d 979 (4th Cir. 1979) .....................................................................................20

ii

*Eades v. Kennedy, PC Law Offices*,
   799 F.3d 161 (2d Cir. 2015)......................................................................................10

*Eastman Kodak Co. v. Henry Bath LLC*,
   936 F.3d 86 (2d Cir. 2019)..........................................................................................4

*Engine Specialties, Inc. v. Bombardier, Ltd*,
   605 F.2d 1 (1st Cir. 1979).........................................................................................15

*Foman v. Davis*,
   371 U.S. 178 (1962)....................................................................................................4

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)..................................................................................................17

*Gracia v. City of New York*,
   No. 16-CV-7329 (VEC), 2017 WL 4286319 (S.D.N.Y. Sept. 26, 2017)..............4, 5

*Hayden v. Cnty of Nassau*,
   180 F.3d 42 (2d Cir. 1999)..........................................................................................4

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
   62 F.3d 69 (2d Cir. 1995) ...........................................................................................1

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)..................................................................................................22

*In re London Silver Fixing, Ltd.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016)........................................................................17

*Longhi v. Lombardi Risk Sys., Inc.*,
   No. 18-CV-8077 (VSB), 2019 WL 4805735 (S.D.N.Y. Sept. 30, 2019) ....................5

*Los Angeles Memorial Coliseum Comm'n v. NFL*,
   726 F.2d 1381 (9th Cir. 1984) ........................................................................ *passim*

*MasterCard Int'l v. FIFA*,
   No. 06 Civ. 3036 (LAP), 2006 WL 2320408 (S.D.N.Y. Aug. 10, 2006),
   *vacated on other grounds*, 239 F. App'x 625 (2d Cir. 2007) .....................................7

*Meyer v. Kalanick*,
   174 F. Supp. 3d 817 (S.D.N.Y. 2016)........................................................................25

*N. Am. Soccer League v. NFL*,
   670 F.2d 1249 (2d Cir. 1982)........................................................................14, 18, 23

*N. Am. Soccer League v. USSF*,
   883 F.3d 32 (2d Cir. 2018)........................................................................................19

iii

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*,
  375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd* 958 F.3d 1239 (9th Cir. 2020) ............13, 18, 20

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984) ................................................................................................ *passim*

*Palmer v. BRG of Georgia. Inc.*,
  498 U.S 46 (1990)...............................................................................................15, 22

*RV Skincare Brands LLC v. Digby Invs. Ltd.*,
  394 F. Supp. 3d 376 (S.D.N.Y. 2019)........................................................................6

*In re SSA Bonds Antitrust Litig.*,
  420 F. Supp. 3d 219 (S.D.N.Y. 2019)........................................................................7

*United States v. Apple*,
  791 F.3d 290 (2d Cir. 2015)...............................................................................22, 25

*United States v. Nat'l Ass'n for College Admission Counseling*,
  No 1:19-cv-03706-BAH (D.D.C. Dec. 20, 2019) ...................................................13

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) ...............................................................................................21

*United States v. Sealy*,
  388 U.S. 350 (1967)......................................................................................19, 21, 22

*United States v. Topco Assocs.*,
  405 U.S. 596 (1972)..........................................................................................20, 21

*United States. v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003).....................................................................................17

*Varges v. Davies*,
  No. 15 Civ. 3525 (ER), 2016 U.S. Dist. LEXIS 69865 (S.D.N.Y. May 27,
  2016) .......................................................................................................................5

## Statutes

Sherman Antitrust Act, 15 U.S.C. § 1.................................................................... *passim*

15 U.S.C. § 22 .................................................................................................................7

Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
  Their Application* ...............................................................................................15, 20, 21

## Other Authorities

Fed. R. Civ. P. 4(k)(1)(C) ...............................................................................................7

iv

Fed. R. Civ. P. 12(b)(6)..............................................................................................5, 21

Fed. R. Civ. P. 15 ..........................................................................................................1

N.Y. C.P.L.R. § 302(a)(1)..............................................................................................7

U.S. DOJ & FTC, *Antitrust Guidelines for International Enforcement and
    Cooperation* (rev'd Jan. 13, 2017).......................................................................6, 22

Plaintiff Relevent Sports, LLC respectfully submits this motion for leave to file the Amended Complaint, submitted herewith as Exhibit A,[1] pursuant to Federal Rule of Procedure 15 and the Court's Order of July 20, 2020 (ECF No. 47).   Relevent's proposed amendments supplement its factual allegations to: (1) address the issues identified by the Court's Order; (2) join FIFA[2] as a defendant and add jurisdictional facts in support of the Court's personal jurisdiction over FIFA; (3) more clearly delineate, with new, more detailed factual allegations, the plausible support for both the horizontal market allocation agreement and vertical agreement component of its Sherman Act claim, and the facts showing that the Defendants entered into their geographic market allocation agreement with the specific anticompetitive intent to shield MLS from the competition presented by the official season games Relevent seeks  to promote in the United States; (4) more precisely define the relevant U.S. market as the market for men's top-tier official season professional soccer league games; and (5) include additional allegations based on a letter sent by the Antitrust Division of the U.S. DOJ to both USSF and FIFA in March of this year, advising it of the DOJ's view that the FIFA policy at issue is a horizontal market allocation agreement that could violate the U.S. antitrust laws.   This letter was not disclosed by USSF either to Plaintiff or to this Court.   The Court may consider the DOJ's letter, attached as Exhibit 1 to the Amended Complaint, in evaluating the sufficiency of the amended pleading.   ECF No. 47 at 10 (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

## **BACKGROUND**

Relevent is one of the preeminent soccer event promoters in the world.   It has built an extremely successful business by, among other things, hosting and promoting "friendly"—*i.e.*, exhibition—games between foreign top-tier men's professional soccer teams.   Am. Compl. ¶ 17.

---

[1] A redline of the proposed Amended Complaint is also submitted herewith as Exhibit B.

[2] All acronyms and abbreviations herein are defined as in the proposed Amended Complaint unless otherwise noted.

The natural next step for Relevent was to bring foreign top-tier **official season** professional soccer league games—*i.e.*, games that count towards the participating teams' official league or tournament records—to the U.S. In 2018, Relevent entered into a joint venture with Spain's top-tier men's professional soccer league, La Liga, with the goal of organizing and promoting official season La Liga games in the U.S. *Id*. ¶ 19.

In order to bring official season games to the U.S., Relevent needed a FIFA sanction from USSF. In response to Relevent's efforts to seek such a sanction, USSF and MLS officials organized a horizontal market division agreement between and among the top-tier professional soccer leagues and teams affiliated with FIFA in order to preclude official season games competition in the U.S. by foreign professional soccer leagues. *Id*. ¶¶ 2, 3, 37, 99. The effect of this horizontal market division agreement in the United States was to protect MLS's monopoly position in the market for men's top-tier official season professional soccer league games. USSF Board Member and MLS Commissioner Don Garber, former USSF President Carlos Cordeiro, and former USSF President and former MLS executive Sunil Gulati each used their positions on key FIFA decision-making bodies—the FIFA Football Stakeholders Committee and the FIFA Council—to orchestrate the adoption, in October 2018, of a written horizontal market division agreement by the FIFA Council. USSF and FIFA then enforced this agreement to deny Relevent, and any other promoter, a FIFA sanction to conduct official season games by foreign soccer league teams in the United States. *Id*. ¶¶ 39, 44, 48, 50-51, 73, 99, 114, 135-137, 174.

As a condition of their FIFA affiliation, USSF and other National Associations, as well as their member leagues and teams—who are horizontal actual or potential competitors with each other—have been required to agree to adhere to the FIFA market division policy or face severe penalties. *Id*. ¶¶ 4-6, 93, 98, 166. As a result, Defendants have been able to use their

2

anticompetitive market division agreement to suppress Relevent's efforts to promote official season men's top-tier professional soccer league games in the United States. *Id.* ¶¶ 5, 8, 21, 37, 175.

The Antitrust Division of the DOJ has informed USSF and FIFA in writing that their implementation of such a global geographic market division agreement in the United States could violate Section 1 of the Sherman Antitrust Act. *See* Ex. 1 to Am. Compl. Despite this warning, Defendants have continued to enforce their unlawful market division agreement. Am. Compl. ¶ 11.

On September 9, 2019, Relevent filed an antitrust and tort complaint against USSF regarding the above conduct. ECF No. 31.[3] In response, USSF moved to compel arbitration or, in the alternative, to dismiss the Complaint. ECF No. 33.

On July 20, 2020, the Court issued an Order granting in part and denying in part USSF's motion. ECF No. 47 ("Order"). Specifically, the Court granted USSF's motion to compel arbitration with respect to Relevent's tort claim, but denied the motion as to Relevent's antitrust claim. *Id.* at 6-9. In addition, the Court dismissed Relevent's antitrust claim, without prejudice, finding that the initial Complaint did not allege sufficiently detailed facts to plausibly support a claim of either a vertical or horizontal agreement to restrain trade involving USSF. *Id.* at 12-18. The Court further stated that, even if Relevent had adequately alleged facts to show an unlawful vertical or horizontal agreement by USSF, its injunctive relief claim would then be dismissed for failure to join FIFA as a defendant. *Id.* at 15 n.12. Specifically, the Court found that FIFA had to be joined as a defendant to seek injunctive relief because the FIFA market division policy was "the

---

[3] Relevent's unsealed initial Complaint is docketed at ECF No. 31.

heart" of Relevent's antitrust claim and would remain in effect for all other FIFA-affiliated bodies unless FIFA is brought before the Court. *Id*.

The Court's Order thereafter granted Relevent the opportunity to move for leave to amend its antitrust claim, on or before September 1, 2020, and directed that, should Relevent continue to pursue injunctive relief against implementation of the FIFA policy, it either join FIFA as a defendant or plead sufficient facts to allow the Court to do so. *Id.* at 19. Relevent has followed the Court's directive and submitted a proposed Amended Complaint, which joins FIFA as a defendant and adds many additional factual allegations that plausibly demonstrate the existence of both a horizontal and vertical agreement in unreasonable restraint of trade that has been orchestrated by USSF, and enforced by USSF and FIFA, to effectuate a written geographic market division agreement and inflict antitrust injury on Relevent and other participants in the relevant United States market.

## **LEGAL STANDARD**

This Court has held that "[l]eave to amend should be freely given if the proposed amendment raises at least colorable grounds for relief." *Gracia v. City of New York*, No. 16-CV-7329 (VEC), 2017 WL 4286319, at *2 (S.D.N.Y. Sept. 26, 2017) (Caproni, J.). Indeed, in this Circuit, the "usual practice is to grant leave to amend the complaint," *Hayden v. Cnty of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999), as long as the Court finds no futility, bad faith, undue delay, or undue prejudice to the opposing party. *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 98 (2d Cir. 2019); Fed R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)(2)) ("leave 'shall be freely given when justice so requires'").

Here, the Court has granted Plaintiff permission to move for leave to amend by this date. Order at 19. There are thus no grounds to find bad faith, undue delay, or undue prejudice to USSF, and leave to amend should be granted unless USSF persuades the Court that the amendment would

4

be futile.  *See Longhi v. Lombardi Risk Sys., Inc.*, No. 18-CV-8077 (VSB), 2019 WL 4805735, at
*4 (S.D.N.Y. Sept. 30, 2019) (burden is on non-movant to establish that leave should not be
granted).  An amended complaint is futile only "if the proposed new claim cannot withstand a
12(b)(6) motion to dismiss for failure to state a claim."  *DGI-BNSF Corp. v. TRT Lease Co., LLC*,
No. 18-CV-3252 (VEC), 2019 WL 5781973, at *3 (S.D.N.Y. Nov. 6, 2019) (Caproni, J.).  The
Rule 12(b)(6) pleading standard therefore applies and, in deciding the motion, the Court must
accept all well-pleaded facts as true and construe them in the light most favorable to Relevent.
*Varges v. Davies*, No. 15 Civ. 3525 (ER), 2016 U.S. Dist. LEXIS 69865, at *10 (S.D.N.Y. May
27, 2016).

     As shown below, Relevent's proposed amendments have added numerous and detailed
factual allegations in response to each of the concerns identified by the Court.  These amendments
"raise[] . . . colorable grounds for relief" and properly state a Section 1 claim upon which relief
may be granted.  *Gracia*, 2017 WL 4286319, at *2.  Indeed, as stated by the Antitrust Division of
the DOJ in its letter to USSF and FIFA, the challenged FIFA policy is a horizontal geographic
market division agreement that could be a violation of U.S. antitrust law.  Am. Compl. Ex. 1 at 2.
Further, Relevent has now joined FIFA as a defendant, and has included jurisdictional allegations
in support, making it appropriate for Relevent to seek injunctive relief against the Defendants to
end their continued enforcement of this horizontal market division agreement.  Leave to amend
should be granted.

## ARGUMENT

### I.    The Amended Complaint Properly Joins FIFA as a Defendant

     The Amended Complaint joins FIFA as a defendant to address the Court's concerns about
its ability to grant injunctive relief in FIFA's absence.  *See* Order at 15 n.12, 19.  Joinder is proper
because "[i]t is well established that the federal antitrust laws apply to foreign conduct that has a

substantial and intended effect in the United States."  U.S. DOJ & FTC, *Antitrust Guidelines for International Enforcement and Cooperation* (rev'd Jan. 13, 2017) § 3.  Based on the detailed factual allegations included in the Amended Complaint, the Court has personal jurisdiction over FIFA on any one of several grounds, including pursuant to the Clayton Act's nationwide service provisions, *see Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*, No. 18 Civ. 10364 (LGS), 2020 WL 2085875 (S.D.N.Y. Apr. 30, 2020), *reconsideration denied,* 2020 WL 2538394 (S.D.N.Y. May 19, 2020), the New York Long-Arm Statute, *see RV Skincare Brands LLC v. Digby Invs. Ltd.*, 394 F. Supp. 3d 376 (S.D.N.Y. 2019) (Caproni, J.), and the conspiracy principle of antitrust jurisdiction, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018).  Conspiracy jurisdiction is especially strong in a case, such as this, where the alleged conspiracy is a geographic market division agreement that was specifically intended to restrain trade in the United States by blocking top-tier foreign professional soccer leagues from competing with MLS in the United States.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d at 84 (2d Cir. 2018) ("It is well established that a defendant can purposefully avail itself of a forum by directing its agents or distributors to take action there."); *see also Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 295 (S.D.N.Y. 2019) (conspiracy principle may support jurisdiction over foreign defendant company that was aware of its co-conspirators' in-forum acts in furtherance of conspiracy); *Allianz*, 2020 WL 2085875, at *6 (finding jurisdiction on same ground).

The Amended Complaint alleges numerous additional facts regarding FIFA's substantive contacts with the Southern District of New York and further details how Defendants formulated and aimed the geographic market division policy at the United States in order to block the competitive efforts of Relevent, operating in this District, to promote official season games played in this country by foreign soccer league teams in competition with MLS.  All of these factual

allegations collectively demonstrate that this Court may exercise personal jurisdiction over FIFA in accordance with due process as FIFA intentionally and regularly engaged in behavior directed at the United States and this District.  Am. Compl. ¶¶ 13-15, 44-45, 48-73, 84, 99.

The additional factual allegations in the Amended Complaint state a *prima facie* case that FIFA "transacts business" in the United States and in this District sufficient to satisfy the requirements of the Clayton Act's service provision, the business activity requirement of the New York Long-Arm Statute, and the concerted behavior contacts requirement for applying the conspiracy principle of antitrust jurisdiction.  *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 230 (S.D.N.Y. 2019) (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005)); 15 U.S.C. § 22; Fed. R. Civ. P. 4(k)(1)(C); *MasterCard Int'l v. FIFA*, No. 06 Civ. 3036 (LAP), 2006 WL 2320408 (S.D.N.Y. Aug. 10, 2006), *vacated on other grounds*, 239 F. App'x 625, 626 (2d Cir. 2007); N.Y. C.P.L.R. § 302(a)(1).  Indeed, the facts set forth in the Amended Complaint show that FIFA: (1) purposefully availed itself of transacting business in this District (including by licensing Charlie Stillitano and other Match Agents in this District; by sanctioning USSF, a New York entity, to act on its behalf in this District to sanction games and collect fees; and by negotiating and entering into substantial broadcasting and consulting agreements in this District); and (2) expressly and intentionally aimed FIFA's geographic market division policy to restrain competition by Relevent, operating from this District in the United States, such that FIFA should reasonably expect to be haled into court in this forum to answer for its violation of U.S. antitrust law.  *See In re del Valle Ruiz*, 939 F.3d 520, 528-29 (2d Cir. 2019); *Agency Rent a Car Sys. v. Grand Rent a Car Corp.*, 98 F.3d 25, 32 (2d Cir. 1996).

Among other things, the Amended Complaint sets forth allegations that FIFA continuously registers and oversees authorized Match Agents in this District, including Charlie Stillitano,

knowing that he works on behalf of Relevent in this District.  *See* Am. Compl. ¶¶ 57, 84.  Further, the Amended Complaint alleges that USSF has acted on behalf of FIFA in authorizing soccer matches and collecting sanctioning fees in the U.S., including for at least six games played in this District since 2013 at Yankee Stadium.  *Id*. ¶¶ 55-57, 60, 84.  USSF, a New York non-profit corporation, has also acted on behalf of FIFA in sanctioning MLS, which is headquartered in this District, as the sole Division I men's professional soccer league in the U.S.  *Id*. ¶¶ 7, 55, 66, 84.  One of the FIFA-sanctioned MLS teams is based in this District and plays all of its home games in this District at Yankee Stadium.  *Id*. ¶ 55.

The Amended Complaint also alleges that FIFA has conducted significant business in this District by negotiating and entering into a billion dollars' worth of broadcast agreements with New York entities Fox and NBCUniversal (Telemundo), and by negotiating and entering into agreements in this District in connection with its most prestigious tournament, the FIFA World Cup, which will be hosted jointly in 2026 by the United States, Canada and Mexico.  *Id*. ¶¶ 62-64, 84.  In this regard, it is alleged that FIFA has attended meetings in this District to determine whether New York City should be designated as an official "Host City" for the 2026 World Cup, as it was for the last World Cup held in the United States in 1994.  *Id*. ¶¶ 64, 84.  In addition, the Amended Complaint alleges that FIFA has hired New York-based Raine Group to help it organize a Club World Cup event, in connection with which Relevent understands that FIFA officials have met with Raine Group employees in this District (as well as in Miami, FL) and have otherwise regularly communicated with Raine Group employees in this District to help plan this important FIFA event.  *Id*. ¶¶ 65, 84.  Further, it is alleged that FIFA's 2018 Financial Report shows that, between 2016 and 2018, FIFA provided nearly $3 million in funding for soccer in the United

States, some of which would have been expended within this District, and that comparable amounts have been expended by FIFA in the U.S. to promote soccer since that date.  *Id*. ¶ 61.

Moreover, the Amended Complaint alleges facts showing that conduct relating to the promulgation of the challenged geographic market division agreement took place in this District on FIFA's behalf.  For example, it is alleged that FIFA Council member and USSF Board member Sunil Gulati resides in this District, and that he conducted FIFA Council business from this District with respect to the development and implementation of the geographic market division policy that the FIFA Council adopted in 2018.  *Id*. ¶¶ 38-40, 77-78, 84.  Similarly, it is alleged that MLS Commissioner and USSF Board Member Don Garber conducted business in this District, as a member of the FIFA Football Stakeholders Committee, in helping to develop, promote and strengthen the FIFA geographic market division policy.  *Id*. ¶¶ 44-51, 84.  Indeed, it is alleged that Mr. Garber spoke publicly from Manhattan about his work on the FIFA Football Stakeholders Committee to support the codification of the FIFA geographic market division policy in the FIFA Statutes so that it could be more strongly enforced to protect MLS from official season games competition in the United States.  *Id*. ¶¶ 50-51, 136-137.

Reading the Amended Complaint allegations in the light most favorable to the plaintiff, Relevent has met its burden to plead that jurisdiction over FIFA is grounded in statute and comports with due process in light of FIFA's many contacts with the Southern District of New York, as well as its specific intention to apply the FIFA geographic market division policy to restrain competition by Relevent and Mr. Stillitano emanating from this District.  *Id*. ¶¶ 2, 16, 37, 52-65, 84, 116.  Where, as here, "minimum contacts exist, the defendant has to present a compelling case that the presence of some other considerations would render jurisdiction

unreasonable." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 169 (2d Cir. 2015).  FIFA will not be able to present such a case.

Moreover, exercising jurisdiction over FIFA in this action is reasonable because: (1) the burden on FIFA is minimal, as it is a global organization with significant resources and authorized representatives, such as USSF and the FIFA Match Agents, that conduct business on behalf of FIFA in the U.S. and in this District; (2) New York has a "strong interest" in providing redress for a New York plaintiff, such as Relevent, and in regulating the New York behavior of Messrs. Gulati and Garber on behalf of the FIFA bodies that adopted and implemented the unlawful market division policy; (3) New York consumers have a strong interest in obtaining relief against the FIFA geographic market division policy, as it limits consumer choice; (4) this is the only U.S. action addressing these issues, and it is the most efficient forum for resolving this controversy; and (5) the shared interest of the states in furthering the substantive policies embodied in the antitrust laws would be advanced by this action against FIFA.  *See Contant*, 385 F. Supp. 3d. at 296.

Finally, if FIFA wishes to challenge this Court's jurisdiction, it will be able to do so after it is served and appears in this case.  At this point, the Court does not need to definitively answer the jurisdictional issue.  It just needs to determine that sufficient jurisdictional facts have been alleged to permit the Amended Complaint to be filed, joining FIFA, and that it would not, on its face, be futile to permit the case against FIFA to come before this Court, where FIFA can present a jurisdictional challenge if it chooses to do so.

## II.     The Amended Complaint Plausibly Pleads a Horizontal Market Division Agreement and States a Section I Claim

"To present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action. . . . '[I]t simply calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal agreement.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).  A Section 1 claim requires a plaintiff to plead (a) an agreement, by direct or circumstantial evidence; (b) in restraint of trade.  Order at 10-12 (citations omitted).

The Amended Complaint adequately alleges facts plausibly supporting a claim of a horizontal agreement, promulgated and enforced by FIFA and USSF, between and among MLS and the other FIFA-affiliated top-tier men's professional soccer leagues and teams, to allocate the geographic markets, including the U.S. market, for men's top-tier official season professional soccer league games.  The FIFA-sanctioned leagues and teams participating in this market division agreement are actual or potential competitors with each other in these markets.  *See, e.g.*, Am. Compl. ¶¶ 1-5, 7-8, 37, 48-51, 70, 100-101, 113-117, 160-178.  Indeed, the DOJ's Antitrust Division has sent a letter to USSF and FIFA specifically warning them that the FIFA policy at issue in this case is a horizontal geographic market division agreement that could be a violation of U.S. antitrust law.  Am. Compl. Ex. 1.  As the Antitrust Division explained: "The U.S. antitrust laws prohibit competitors from, among other conduct, agreeing to divide geographic markets among themselves. . . . We specifically are concerned that FIFA could violate U.S. antitrust laws by restricting the territory in which teams can play league games."  *Id*. at 2.

The factual allegations of the Amended Complaint plausibly show how USSF orchestrated the creation and implementation of the FIFA geographic market division policy by entering into an agreement with the other members of FIFA, through the work of the FIFA Football Stakeholders Committee and the FIFA Council.  Am. Compl. ¶¶ 37-44, 46, 48-51, 81, 114, 136.  This resulted in the adoption of a written policy for the horizontal allocation of geographic markets to which all of the competing leagues and teams were required to adhere as part of their affiliation with FIFA,

with discipline available if they failed to comply with the agreement.  *Id.* ¶¶ 6, 37, 43-48, 70, 98, 115-117, 166-167, 174.  While leagues and teams from Spain and Ecuador indicated that they did not want to participate in the market division agreement and tried to partner with Relevent to participate in official season games in the United States, the allegations of the Amended Complaint show that, ultimately, USSF, FIFA and their co-conspirators were able to use the market division policy and the threat of penalties to coerce even these leagues and teams to agree to comply with the market division policy.  *Id.* ¶¶ 8, 19, 110, 166, 174.

The Amended Complaint also sets forth allegations that support the relevant market definition as men's top-tier official season professional soccer league games in the United States. *Id.* ¶¶ 86-101.  And the allegations of the Amended Complaint further plausibly support the claim that the FIFA horizontal market division agreement restrained output in this relevant market and granted MLS a protected monopoly position therein.  *Id.* ¶¶ 3, 8-9, 98, 171.

The Amended Complaint further sets forth allegations showing the economic motive of USSF to orchestrate the horizontal market division agreement to shield the monopoly position of MLS in the United States.  *Id.* ¶¶ 91, 165.  It also includes detailed factual allegations about how USSF representatives Gulati, Garber and Cordeiro each worked through FIFA's various decision-making bodies to get other FIFA members to agree to the horizontal market division agreement in order to protect MLS—and other FIFA-affiliated leagues—from horizontal market competition in their respective geographic markets.  *Id.* ¶¶ 44, 48, 50-51, 73, 99, 114, 135-137, 174.  As set forth below, under governing law, these new allegations more than plausibly support the existence of a horizontal market division agreement that state a claim for a violation of Section 1 of the Sherman Act, just as the Antitrust Division forewarned.  *See generally* Am. Compl. Ex. 1.

**A.      Industry Organizations Such as USSF and FIFA Are Liable Under Section 1 for Anticompetitive Agreements Entered into by Their Members Pursuant to the Organizations' Rules and Procedures.**

FIFA is a membership-based industry association that is controlled by its National Association members, including USSF, through each National Association's voting rights.  Am. Compl. ¶¶ 24-25.  USSF is similarly a private industry-based association under the control of its voting members, including MLS.  Am. Compl. ¶ 67.  It is well-settled that such entities are fully subject to the mandates of U.S. antitrust laws based on the agreements of their members facilitated through the organization's governance.  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 191-92 (2010); *Associated Press v. United States*, 326 U.S. 1, 19 (1945); *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99-100 (1984); *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1066 (N.D. Cal. 2019), *aff'd* 958 F.3d 1239 (9th Cir. 2020).  Further, the U.S. Supreme Court has explained the importance of ensuring that industry organizations are held responsible, under the antitrust laws, for the actions of their agents:

> When [an industry association's] agents act in its name, they are able to affect the lives of large numbers of people and the competitive fortunes of businesses throughout the country.  By holding [an industry association] liable under the antitrust laws for the antitrust violations of its agents committed with apparent authority, we recognize the important role of [the industry association] and its agents in the economy, and we help to ensure that standard-setting organizations will act with care when they permit their agents to speak for them.

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 577-78 (1982).  Where, as here, a membership-based organization's rule enforcement is challenged as anticompetitive under the Sherman Act, an exacting level of antitrust scrutiny is required.  *See* Competitive Impact Statement at 6, *United States v. Nat'l Ass'n for College Admission Counseling*, No 1:19-cv-03706-BAH (D.D.C. Dec. 20, 2019) (ECF No. 5) ("when a trade association works to enforce a stated policy, it faces 'more rigorous antitrust scrutiny'") (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 n.6 (1988)); *Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1109

13

(NCAA and Conference Members of the NCAA held liable for anticompetitive NCAA rules which restricted competition among the NCAA member schools).

Courts must be vigilant in detecting when an industry association is being utilized by its members to suppress competition, as competitors "cannot simply get around antitrust liability by acting through a third-party intermediary or 'joint venture.'" *Am. Needle*, 560 U.S. at 202 (citation omitted); *see also Associated Press*, 326 U.S. at 19 ("arrangements or combinations designed to stifle competition cannot be immunized by adopting a membership device accomplishing that purpose"). Indeed, the U.S. Supreme Court has "repeatedly" found that even "members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity," including "when competitors were part of professional organization or trade groups." *Am. Needle*, 560 U.S. at 191-92; *see also N. Am. Soccer League v. NFL*, 670 F.2d 1249, 1261 (2d Cir. 1982) (NFL rule limiting competition amongst of NFL owners to invest in a competing league held to be a Section 1 violation).

**B.     The FIFA National Associations' Constituent Member Leagues and Teams Are Actual or Potential Competitors with USSF's Division I League, MLS, in the Relevant United States Market**

Previously, the Court held that Relevent "d[id] not actually allege [the FIFA-affiliated entities] are competitors" and that "none of [the] alleged horizontal competitors appears to compete" in the alleged relevant market. Order at 16 & n.13. The Amended Complaint specifically addresses the Court's concern by alleging facts that plausibly show that each of the constituent member leagues and teams of the FIFA National Associations are actual or potential competitors to each other and to MLS in the relevant market for men's top tier official season professional soccer league games in the United States. *See, e.g.*, Am. Compl. ¶¶ 8, 20, 91-92, 175-176. These allegations are more than sufficient to satisfy the "competitor" element of the alleged horizontal market division agreement, as "[a]greements not to compete among *potential*

14

competitors as well as among actual competitors are forbidden" by Section 1.  *Engine Specialties, Inc. v. Bombardier, Ltd*, 605 F.2d 1, 9 (1st Cir. 1979) (emphasis added); *see also* Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2030b ("Market-division agreements serve not merely to eliminate actual competition among the agreeing parties; they also eliminate the threat of competition . . . .").

Agreements restraining potential competitors are especially suspect in the context of territorial allocations, where the market division agreement itself would be responsible for blocking the entities from competing with one another in the same geographic market.  In *Palmer v. BRG of Georgia, Inc.*, for example, the U.S. Supreme Court reversed the lower courts' holding that two bar review course companies had not violated Section 1 by dividing the United States into exclusive territories in which they would not compete with each other.  498 U.S. 46, 50 (1990). The Court held that the district and appellate courts had erred by concluding that "an allocation of markets or submarkets by competitors is not unlawful unless the market in which the two *previously* competed is divided between them."  *Id*. at 49 (emphasis added).  Instead, "[s]uch agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."  *Id*. at 49-50.

Indeed, where, as here, geographic markets are divided amongst market participants, the "[a]bsence of actual competition may simply be a manifestation of the anticompetitive agreement itself."  *Am. Needle*, 560 U.S. at 198 (citation omitted).  Such is the case for the FIFA National Associations and their constituent member leagues and teams.  In the absence of the horizontal market allocation agreement imposed by FIFA, the facts demonstrate that, at a minimum, the top-tier professional soccer leagues and teams in Spain and Ecuador would have participated—in

competition with MLS—in official season games promoted by Relevent in the United States market. Am. Compl. ¶¶ 1, 5, 8, 19, 111, 166, 175. Other foreign leagues, such as those in Mexico, would also be interested in entering the lucrative U.S. market for official season games—which would be promoted by companies like Relevent—if the FIFA market division agreement were not in effect. *Id.* ¶¶ 5, 23, 166; *see also Los Angeles Memorial Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1391, 1394 (9th Cir. 1984) (identifying "potential for competition" in market if challenged NFL market division rule did not exist).

The Amended Complaint also alleges facts to plausibly show that Relevent was an actual and potential competitor in the relevant United States market through its efforts to host and promote official season games in this market. Am Compl. ¶¶ 2, 8, 19-23, 111-117. Indeed, the Amended Complaint allegations plausibly show that the horizontal FIFA market division agreement was specifically orchestrated by USSF and MLS to suppress the competition that Relevent posed in the relevant market if it could obtain foreign league and team partners to participate in the official season games that Relevent sought to promote in the United States. *Id.*

Relevent thus has stated a claim for exactly the type of antitrust injury that the Sherman Act proscribes as a result of such an output-limiting horizontal agreement. *See Bd. of Regents*, 468 U.S. at 99 (emphasis added) ("Because [the NCAA's rule] places a ceiling on the number of games member institutions may televise, the horizontal agreement places an artificial limit on the quantity of televised football that is available *to broadcasters and consumers*."); *Coliseum Comm'n*, 726 F.2d at 1395 (finding that "[t]he [challenged] rule" prohibiting teams from moving into other teams' territory, "also effectively foreclosed free competition among stadia such as the Los Angeles Coliseum that wish to secure NFL tenants"). Its "loss[es] stem[] from a competition-*reducing* aspect or effect of the [D]efendants' behavior," and its alleged injury "is of the type the

antitrust laws were intended to prevent." *In re London Silver Fixing*, *Ltd.*, 213 F. Supp. 3d 530,

551 (S.D.N.Y. 2016) (Caproni, J.) (citation omitted).

> **C.    The Adherence of USSF, FIFA, the National Associations and Their Constituent Member Leagues and Teams to the FIFA Market Division Policy Is an Agreement Under the Sherman Act.**

The Amended Complaint alleges numerous facts plausibly showing a horizontal agreement

between the constituent member leagues and teams, through FIFA, USSF and the other National

Associations, to adhere to and enforce the FIFA market division agreement.  The Court previously

concluded that it could not find sufficient Complaint allegations to show "that USSF 'combined

forces' with other regional confederations and national associations or that they had a 'conscious

commitment to a common scheme designed to achieve an unlawful objective.'"  Order at 18

(citations omitted).  By contrast, the allegations of the Amended Complaint clearly show, under

established legal precedent, that the commitments by USSF and the other National Associations,

on behalf of their competing member leagues and teams, to adhere to the anticompetitive

horizontal market division policy adopted by the FIFA Council, constitutes an agreement in

restraint of trade between and among all of these entities in order to achieve a common unlawful

market division objective, including the suppression of men's top-tier official season professional

soccer league games competition in the United States.  Am. Compl. ¶¶ 4, 26, 34-37, 113-117, 174.

Agreements to adhere to or enforce an association's anticompetitive rules or by-laws

readily form the basis of an agreement in violation of Section 1 of the Sherman Act.  *See U.S. v.

Visa U.S.A., Inc.*, 344 F.3d 229, 235, 242-43 (2d Cir. 2003) (finding concerted action among Visa

and MasterCard consortium members, because "[m]embers agree to abide by their association's

by-laws and other regulations"); *Am. Needle*, 560 U.S. at 187, 198 (concerted action where NFL

"teams voted to authorize NFLP to grant exclusive licenses"); *FTC v. Ind. Fed'n of Dentists*, 476

U.S. 447, 451 (1986) (concerted action where membership organization of dentists adopted "'work

rule' forbidding its members to submit x rays to dental insurers"); *Ariz. v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 335-36 (1982) (medical association's fee schedules were "agreements among competing physicians [adopted] by majority vote"); *NASL v. NFL*, 670 F.2d at 1261-62 (NFL rule followed by member teams held to be Section 1 violation); *see also Bd. of Regents*, 468 U.S. at 98-99; *Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1066, 1109; *Coliseum Comm'n*, 726 F.2d at 1391; *Associated Press*, 326 U.S. at 11 n.6.  It is clearly alleged here that, in order to maintain its FIFA affiliation, each National Association and its competing member leagues and teams have agreed to comply with the written FIFA geographic market division policy.  Am. Compl. ¶¶ 34, 98, 116-117, 162.  And, the Amended Complaint provides numerous factual details on how USSF and MLS orchestrated the creation of the market division agreement for the specific unlawful purpose of restraining competition in the relevant market.  *Id*. ¶¶ 44, 48, 51, 73, 99, 114, 135-137, 173.

In the seminal *Associated Press* decision, the U.S. Supreme Court held that "[t]he by-laws of [trade organization the Associated Press] [we]re in effect agreements between [its] members" in restraint of trade.  326 U.S. at 11 n.6.  Later decisions concerning sports-related membership associations, like the NCAA and the NFL, have similarly held that their by-laws and rules may constitute agreements in restraint of trade.  *See, e.g.*, *Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1092 ("[T]he compensation limits that Plaintiffs challenge are enacted by agreement of Defendants through the NCAA's legislative process and are embodied in NCAA rules . . . Defendants enforce these rules by requiring all NCAA members to comply with them.").  *Los Angeles Memorial Coliseum Comm'n v. NFL* is particularly instructive.  There, a football stadium challenged the NFL's market allocation rule as unlawful under Section 1.  The NFL rule limited "the exhibition of football games by member clubs [to] within the home territory of each member"

and directed that "[n]o member club shall have the right to transfer its franchise or playing site to a different city" without approval from the NFL.  726 F.2d at 1385 n.1.  The Court found that the plaintiff had satisfied the first element of its Section 1 claim by establishing that "the 28 member clubs have entered an agreement *in the form of the NFL Constitution and Bylaws . . . .*"  *Coliseum Comm'n*, 726 F.2d at 1391 (emphasis added).

As in the NFL, FIFA policies "are not set by one individual or parent corporation, but by the separate [leagues and] teams acting jointly."  *Coliseum Comm'n*, 726 F.2d at 1389. Specifically, FIFA's geographic market division policy was promulgated and adopted through the actions of the representatives of the various FIFA members on the FIFA Football Stakeholders Committee and the FIFA Council.   Am. Compl. ¶¶ 37, 42, 46-48, 174.   Critically, "[b]y participating in an association which prevents member institutions from competing against each other," the member institutions "have created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another." *Bd. of Regents*, 468 U.S. at 99.  Put another way, when actions as to market exclusivity are taken by an association's members, as FIFA's and USSF's members have done here, "[t]he territorial arrangements must be regarded as the creature of horizontal action by the [members]." *United States v. Sealy*, 388 U.S. 350, 352-54 (1967); *id*. at 352 ("If we look at substance rather than form, there is little room for debate.  These must be classified as horizontal restraints.").  To this end, in another case involving USSF, the Second Circuit has explained that, where an industry association's written rule documenting "[its] express regulation of its members' market" is challenged, in its totality, "as violative of the antitrust laws . . . promulgation of [the rule] would constitute *direct evidence* of §1 concerted action in that undertaking." *N. Am. Soccer League v. USSF*, 883 F.3d 32, 40-41 (2d Cir. 2018) (emphasis added).  As the Amended Complaint contains allegations that the promulgation

of the FIFA market allocation policy is being challenged in its totality as violative of the antitrust laws (*see* Am. Compl. ¶¶ 37, 42, 46-48, 174), Relevent has alleged direct evidence of concerted action in the promulgation and enforcement of this challenged horizontal market agreement.

Finally, it makes no difference that a few FIFA members, such as the top-tier leagues in Spain and Ecuador, had their agreement with the FIFA market division policy coerced by the threat of FIFA penalties—they ultimately joined the unlawful conspiracy.  An agreement to restrain trade by initially unwilling and coerced participants is still an unlawful agreement in restraint of trade; it is, in fact, a common element of unlawful conspiracies to have to enforce the compliance of other conspirators by threat of discipline.  *E.g.*, *Bd. of Regents*, 468 U.S. at 95-96 ("The NCAA cartel imposes production limits on its members, and maintains mechanisms for punishing cartel members who seek to stray from these production quotas."); *United States v. Topco Assocs.*, 405 U.S. 596, 602-603 (1972) ("Should a member violate its license agreement and sell in areas other than those in which it is licensed, its membership can be terminated under … the bylaws."); *Associated Press*, 326 U.S. at 19 ("the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations") (citation omitted); *Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1093 ("Defendants enforce these rules by requiring all NCAA members to comply with them, and by punishing violations").  Unwilling co-conspirators are still conspirators, and an unreasonable agreement in restraint of trade is still unlawful even when the participation of some of the entities is coerced.  *See* Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1408c ("Some cartels would remain uncontrolled if coercion meant that no conspiracy existed."); *see also Duplan Corp. v. Deering Milliken, Inc.*, 594 F.2d 979, 982 (4th Cir. 1979) ("it is no defense that [a conspirator's]

actions may have been reluctant or even coerced") (citing *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948)).

At a minimum, the Amended Complaint's factual allegations raise a plausible inference that a horizontal market allocation agreement was made through the FIFA member leagues' and teams' adoption and adherence to the market division policy.  This is all that is required to satisfy the applicable pleading standard.  *See Anderson News*, 680 F.3d at 184-85.  Indeed, the Second Circuit has disavowed a district court deciding whether an inference of no agreement outweighs an inference of agreement at the pleading stage; at this early juncture, the only test is whether the plaintiff's inference is plausible.  *Id*. at 185, 189-90 ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.").

### D. The Amended Complaint Plausibly Pleads That the FIFA Market Allocation Agreement Horizontally Restricts Output and Is an Unlawful Restraint

As a geographic market allocation agreement among actual or potential competitors, the FIFA market allocation policy—on its face—states a claim for a naked restraint of trade that is *per se* unlawful under the Sherman Act.  *See, e.g., Topco Assocs*., 405 U.S. at 612 ("Just as the territorial restrictions on retailing Topco-brand products must fall, so must the territorial restrictions on wholesaling.  The considerations are the same, and the Sherman Act requires identical results."); *Sealy*, 388 U.S. at 357-358 (Sealy's territorial limitation on manufacturers of Sealy products ruled *per se* illegal); *Associated Press*, 326 U.S. at 12 ("the By-Laws on their face, and without regard to their past effect, constitute restraints of trade"); Areeda and Hovenkamp, *Antitrust Law* ¶ 2030a ("[a] properly defined 'naked' [territorial] market-division agreement is unlawful per se").  As the DOJ's Antitrust Division stated in its letter to USSF and FIFA: "The U.S. antitrust laws prohibit competitors from, among other conduct, agreeing to divide geographic

21

markets among themselves.  Market allocation is a *per se* violation of the U.S. antitrust laws. Sports organizations are not categorically immune from liability under the rules."  Am. Compl. Ex. 1 at 2.  This is also true with respect to global agreements to divide up geographic markets which include the United States.  *Antitrust Guidelines for Int'l Enforcement and Cooperation* § 3.2 at 24.

According to the written FIFA market allocation policy, "official league matches must be played within the territory of the respective member association."  Am. Compl. ¶ 117.  By its terms, this policy is a naked horizontal division of geographic markets.  Am. Compl. ¶¶ 8-9, 23, 37, 117, 174-177.  In *Sealy*, an organization comprised of competing manufacturers licensed its products to the manufacturers and allocated each one an exclusive territory in which to sell the products.  388 U.S. at 351-52.  Each licensee agreed not to manufacture or sell "Sealy products" outside its designated area.  *Id.*  The Court invalidated Sealy's territorial limitations as an unlawful restraint.  *Id.* at 356-57.  And, as noted above, a geographic market division between potential competitors was summarily found to be unlawful by the Supreme Court in *Palmer v. BRG of Georgia*.  498 U.S. at 49-50.

In addition, the Amended Complaint alleges facts which show that the FIFA market division agreement states an antitrust claim because it is a naked restriction of output in the relevant market.  It is alleged that the specific purpose and effect of the market division policy is to block official season professional league soccer game competitions that would be hosted by Relevent or other promoters in the United States.  Am. Compl. ¶¶ 1-2, 99, 162-163.  Allegations of such an output-restricting agreement state a claim for an antitrust violation.  *See United States v. Apple*, 791 F.3d 290, 322, 346 (2d Cir. 2015) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007)) ("A horizontal cartel among competing manufacturers or competing

retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful."); *Bd. of Regents*, 468 U.S. at 99 ("Because it places a ceiling on the number of games member institutions may televise, the horizontal agreement places an artificial limit on the quantity of televised football that is available to broadcasters and consumers.").

Finally, Relevent has stated an antitrust claim with respect to the horizontal agreement alleged even if the quick look or full blown rule of reason is applied, as Relevent has alleged facts which show that Defendants' market division agreement had an anticompetitive effect in the relevant market (Am. Compl. ¶¶ 1-8, 37, 48-51, 70, 100-101, 113-117) and was undertaken in the pursuit of a specific anticompetitive purpose—including to protect the MLS monopoly position in the relevant market—with no offsetting pro-competitive justifications (*id.* ¶¶ 3, 89, 90, 101, 142, 169-172). *See Coliseum Comm'n*, 726 F.2d at 1397-98; *NASL v. NFL*, 670 F.2d at 1261.

## III.    The Amended Complaint Also Plausibly Pleads an Unlawful Vertical Agreement

The Court previously concluded that the initial Complaint did not state facts plausibly pleading a vertical agreement, holding that the allegations "may be consistent with a vertical agreement" but needed more "to suggest an agreement was made."  Order at 13-14 (internal quotation marks omitted).  To remedy the Court's concern, the Amended Complaint now adds a number of allegations which plausibly plead that FIFA's and USSF's support for, implementation and enforcement of the market division agreement was, alternatively, a vertical agreement between USSF, FIFA and the various National Associations, and their member leagues and teams, to facilitate and enforce the market allocation policy adopted by the FIFA Council.  Am. Compl. ¶¶ 6, 168.  Indeed, while the Court wondered whether USSF might be following the FIFA market division policy out of fear of FIFA discipline, such that its adherence was not necessarily evidence of an agreement by USSF (Order at 14 n.11), the Amended Complaint alleges new facts which show that USSF was one of the main organizers and promoters of the FIFA market division

23

agreement, and voluntarily entered into and enforced the agreement for its own anticompetitive purpose to protect MLS's monopoly position.  Am. Compl. ¶¶ 37-51.

For example, it is alleged that USSF representatives Garber, Cordeiro and Gulati used their participation in the FIFA Football Stakeholders Committee and the FIFA Council to orchestrate the promulgation and adoption of the market division policy to fulfill the USSF objective of preserving the monopoly position of its sole Division I league and close financial partner, MLS. *Id*. ¶¶ 44, 48, 51, 73, 99, 114, 136-138, 174.  Similarly, the Amended Complaint adds allegations to show that the FIFA Football Stakeholders Committee and the FIFA Council deliberately acted, on behalf of FIFA, to formulate, join in and enforce the market division policy, and that the FIFA President himself publicly declared his support for having an agreement to prevent foreign professional soccer leagues and teams from competing in the United States against MLS.  *Id*. ¶¶ 42, 46, 48-51.

The *Coliseum Commission* Court recognized that the NFL's structure as a member-controlled association rendered the NFL itself subject to a hybrid vertical agreement claim in violation of Section 1 of the Sherman Act:

> The NFL's structure has both horizontal and vertical attributes.  On the one hand, it can be viewed simply as an organization of 28 competitors, an example of a simple horizontal arrangement.  On the other, and to the extent the NFL can be considered an entity separate from the team owners, a vertical relationship is disclosed.

726 F.2d at 1391 (citation omitted).  So, too, here with respect to FIFA and USSF.  Vertically, it is alleged that FIFA, USSF and FIFA's other National Associations agreed to carry out and enforce FIFA's market allocation rules, as adopted by the FIFA Council, to effectuate a market division allocation among their horizontally competing member leagues and teams.  Am. Compl. ¶¶ 6, 26, 28, 30, 168.

24

The vertical participants in this agreement—FIFA and USSF—are alleged to have compelled adherence to the market allocation agreement by refusing to grant a FIFA sanction for out-of-territory official season games in the U.S., and by threatening the foreign leagues and teams who sought to compete in the United States market with penalties for non-compliance.  Am. Compl. ¶¶ 6, 173-175.  It is further alleged that USSF enforced the market division agreement to deny a FIFA sanction for each of the foreign league official season games that Relevent sought to promote in the United States.  Am. Compl. ¶¶ 5, 8, 19, 21, 37, 111-117, 163, 183.

When viewed from this vertical perspective, the alleged agreement states a Section 1 violation under the rule of reason.  Specifically, allegations in the Amended Complaint plausibly show that the agreement causes significant anticompetitive effects in the relevant market, that FIFA and USSF had the power to bestow a monopoly in the relevant market upon MLS by precluding the entry of all actual and potential competitor leagues, and that the participants in the agreement had a specific anticompetitive intent to restrain competition in the relevant market with no offsetting procompetitive justification.  *See Apple*, 791 F.3d at 313-14; *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 826-828 (S.D.N.Y. 2016) (elements of a vertical rule of reason violation).

## **CONCLUSION**

For all of the foregoing reasons, Relevent's proposed Amended Complaint cannot be shown to be futile, and this Court should grant leave for it to be filed.

September 1, 2020                                Respectfully submitted,

                                                **WINSTON & STRAWN LLP**

                                                */s/ Jeffrey L. Kessler*
                                                Jeffrey L. Kessler
                                                Jonathan J. Amoona
                                                Angela A. Smedley
                                                Adam I. Dale
                                                200 Park Avenue
                                                New York, New York 10166
                                                Tel: (212) 294-6700
                                                Fax: (212) 294-4700
                                                jkessler@winston.com
                                                jamoona@winston.com
                                                asmedley@winston.com
                                                aidale@winston.com

                                                Eric Meiring (*pro hac vice* pending)
                                                1700 K Street, N.W.
                                                Washington, DC 20006
                                                Tel: (202) 282-5722
                                                Fax: (202) 282-5100
                                                emeiring@winston.com

                                                *Counsel for Relevent Sports, LLC*