**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RELEVENT SPORTS, LLC,

                Plaintiff,

       v.

FÉDÉRATION INTERNATIONALE DE FOOTBALL
ASSOCIATION and UNITED STATES SOCCER
FEDERATION, INC.,

              Defendants.

Civil Action No. 19-cv-8359 (VEC)

**Amended Complaint**

Plaintiff Relevent Sports, LLC ("Relevent"), by its undersigned attorneys for its Amended Complaint, alleges as follows:

## INTRODUCTION

1.    This action seeks redress for Defendant Fédération Internationale de Football Association's ("FIFA") and Defendant United States Soccer Federation, Inc.'s ("USSF") violations of the federal antitrust laws (and USSF's violation of state tort law[1]). Specifically, FIFA and USSF, in combination with numerous FIFA-affiliated men's top-tier professional soccer leagues and teams, including Major League Soccer ("MLS") and its teams, have entered into an agreement to divide geographic markets, including the United States market, which stifles competition in the U.S. The purpose and effect of Defendants' anticompetitive agreement is to thwart cross-border competition between top-tier men's professional soccer leagues and their

---

[1] In light of the Court's order compelling arbitration and staying Plaintiff's tort claim, Plaintiff has left that claim materially unchanged herein.

teams.  Absent this geographic market division, top-tier men's professional soccer leagues and teams would compete with each other to conduct official season games in the U.S.

2.    The specific purpose and effect of FIFA's and USSF's geographic market division agreement is to block the efforts of Relevent, and companies like it, which have attempted to host and promote games in the U.S. that are part of the official season of a foreign top-tier men's professional soccer league.  Indeed, this anticompetitive agreement was expressly formulated in 2018 in response to Relevent's efforts to organize and promote an official season foreign league game in the U.S. in competition with MLS.

3.    By suppressing this competition, FIFA and USSF have maintained a monopoly in the relevant U.S. market for USSF's most prominent member, MLS, which is the only top-tier men's professional soccer league permitted by FIFA and USSF to conduct its official season games in the U.S.  This geographic market division unreasonably restrains competition in the U.S., reduces output below competitive levels in the relevant market, and directly inflicts antitrust injury on promoters, like Relevent (who directly participate in the relevant market) and on U.S. fans of top-tier men's professional soccer leagues.

4.    Defendants' geographic market division agreement is effectuated both horizontally and vertically.  Horizontally, it is an agreement among the FIFA-affiliated top-tier men's professional soccer leagues and their teams, who are actual and potential competitors with one another, to geographically allocate the markets in which they are permitted to stage official season games, including in the U.S. market.  These leagues and teams have agreed, along with their respective FIFA-affiliated "National Associations," to adhere to the FIFA rules and policies establishing and enforcing the horizontal market division agreement.

5.      Absent this anticompetitive horizontal agreement, and the available penalties to enforce it, a number of these leagues and their teams would compete with each other and with MLS to conduct official season games in the relevant U.S. market.  Indeed, some of these leagues and teams, as described below, have already expressed a desire to conduct official season games in the U.S.—and to have them promoted by Relevent—but have been blocked and coerced from doing so by the prospect of FIFA penalties, which are used to enforce the unlawful market division agreement.

6.      Vertically, the market division agreement is directed and facilitated by FIFA and carried out and enforced downstream through the agreement and actions of USSF, and FIFA's other National Associations, which agree to apply FIFA's market division rules against their member leagues and teams.  FIFA's enforcement of what amounts to a horizontal cartel agreement to divide markets is maintained by the threat of a group boycott and other FIFA penalties for any league, team or player who violates the market division agreement by playing in an unsanctioned official season game (and thus cheats on the cartel's rules).

7.      Under the market division agreement, men's top-tier professional soccer leagues' official season games (i.e., regular season or tournament games which count towards the competing teams' official league or tournament records) are only permitted to be played in the geographic territory allocated to each league by FIFA and FIFA's National Associations.  In the U.S., this means that only MLS—the sole men's professional soccer league sanctioned by USSF as top-tier (Division I)—and its teams are able to conduct official season games in this country. As a result, MLS faces *no* competition in the U.S. for men's top-tier official season professional soccer league games.

8.      Defendants' market division agreement has prohibited, and continues to prohibit, foreign top-tier men's professional soccer leagues and teams—such as "La Liga" in Spain and "LigaPro Serie A" in Ecuador—from participating in official season games in the U.S.  It further prohibits Relevent and other promoters like it from hosting and promoting such games.  The agreement has thus suppressed competition and the output of men's top-tier official season professional soccer league games in the U.S., notwithstanding the significant demand for such games by U.S. fans and sponsors, and notwithstanding the desire of Relevent and others to conduct and promote such games in competition with MLS.

9.      Unsurprisingly, MLS—whose Commissioner serves on both the Board of USSF and one of the key FIFA policy-making Committees—has been directly involved in proposing, supporting, and implementing the unlawful market division agreement in order to shield itself from official season game competition.

10.      The Antitrust Division of the U.S. Department of Justice has recently written to both FIFA and USSF to express its concern that the FIFA market division agreement could violate Section 1 of the Sherman Antitrust Act, as it precludes foreign top-tier men's professional soccer leagues from conducting official season games in the U.S. in competition with MLS and in competition with each other.[2]

11.      Despite the Antitrust Division's warning, FIFA, USSF and their co-conspirators have continued their unlawful market division agreement, and have continued to apply it to prohibit any FIFA-affiliated foreign leagues and teams who seek to compete in the U.S. from playing such games in this country.  Pursuant to this unlawful market division agreement, USSF has refused to grant a FIFA sanction for any official season games by foreign teams that Relevent

---

[2] A copy of the Department of Justice's communication to FIFA and USSF is attached hereto as Exhibit 1.

has sought to host and promote in the U.S.  If a game were played absent such a sanction, FIFA penalties would be applied to any of the game's participants.

12.     In this action, Relevent seeks a permanent injunction against the continued application and enforcement by FIFA and USSF of their unlawful geographic market division agreement, so that a FIFA sanction will be made available by USSF to any qualified promoter, such as Relevent, who seeks to host and promote official season games in the U.S.  Such an injunction would permit all FIFA-affiliated leagues and teams to choose for themselves whether to participate in official season games in the U.S., in competition with MLS and each other.

13.     Relevent also seeks treble damages for the antitrust injuries it has suffered as a result of Defendants' unlawful market division agreement, as Defendants have blocked each of Relevent's prior efforts to promote official season games in the U.S, causing Relevent to suffer significant antitrust injury to its business and property.

14.     Section 1 of the Sherman Antitrust Act applies to Defendants' global market division agreement, which is expressly intended to cause, and has the effect of imposing, an unreasonable restraint of trade in the relevant U.S. market.  This Court should thus grant a permanent injunction, treble damages, and other appropriate relief to prevent FIFA and USSF from continuing to violate U.S. antitrust law with impunity in the face of Department of Justice warnings.

15.     Further, by participating in and enforcing the illegal market division agreement to block Relevent from promoting official season games in the U.S—i.e., by denying it a FIFA sanction for such games—USSF has tortiously interfered, and continues to tortiously interfere, with Relevent's business relations in violation of New York state and other state tort laws.

## PARTIES

**Plaintiff Relevent Sports, LLC**

16.     Relevent is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

17.     Since 2013, Relevent has organized and promoted the famed International Champions Cup (the "ICC"), an annual series of "friendly," *i.e.*, exhibition, men's professional soccer games between international teams staged throughout the world, including in the U.S.  The 2019 edition of the ICC featured eleven "friendly" men's professional soccer games throughout the U.S., four in Asia, and three in Europe.

18.     Relevent has also organized, promoted, and hosted three of the five highest-attended soccer games in the U.S.  The 2014 "friendly" between Real Madrid (Spain) and Manchester United (England) still holds the attendance record for a soccer game in the U.S., with over 109,000 fans in attendance.

19.     In 2018, Relevent and La Liga—Spain's top-tier men's professional soccer league—created a joint venture, La Liga North America, to market and promote La Liga in the U.S., and to bring official season La Liga soccer games to U.S. venues.

20.     Such an official season game between La Liga teams in the U.S. would directly compete for fans and sponsors with the official season games of USSF-member MLS, which currently benefits from a monopoly position in the U.S. market—granted to it by FIFA and USSF—for men's top-tier official season professional soccer league games.

21.     Due to the market division agreement among USSF, FIFA, and FIFA's other National Associations—on behalf of their respective professional soccer leagues and teams—to prohibit all official season games outside of the participating league's and teams' home territory,

Relevent has been blocked from conducting and promoting an official season game in the U.S. for teams from La Liga, LigaPro Serie A or any other foreign soccer league.

22.     Should USSF's and FIFA's implementation and enforcement of their anticompetitive market division agreement be enjoined, Relevent is ready, willing and able to conduct and promote men's top-tier official season professional soccer league games in the U.S. that would not otherwise take place due to Defendants' anticompetitive agreement.

23.     A number of foreign top-tier men's professional soccer leagues and their teams, including La Liga, Liga MX (Mexico) and LigaPro Serie A (Ecuador), would, if not blocked by the unlawful market division agreement, be interested in participating in official season games in the U.S. and have them organized and promoted by Relevent.

**Defendant Fédération Internationale de Football Association**

A.     **FIFA's Organizational Structure and Rule-Making Procedures**

24.     FIFA is a private international membership-based association, which identifies itself as "an association registered in the Commercial Register of the Canton of Zurich in accordance with art. 60 ff. of the Swiss Civil Code."[3]

25.     FIFA is a self-declared, international governing body for soccer and is organized as a private membership-based association.  Its voting members are the over 200 National Associations that FIFA authorizes to act on its behalf in countries around the world, including USSF in the U.S.

26.     FIFA's National Association members vote upon and agree to adhere to and enforce numerous policies and rules which regulate the soccer leagues and teams that are members of the National Associations.  Many of these policies, such as the rules of the game itself (e.g., the size

---

[3] FIFA STATUTES, at 10, Art. I.1(1) (June 2019).

of the field, the number of players, etc.) are benign.  But other FIFA rules and policies have an economic purpose and effect, and when they seek to restrain economic competition among the professional leagues and teams that are National Association members, they must comply with applicable competition laws in the jurisdictions in which the rules are applied.

27.     FIFA's rules and policies do not have any governmental or statutory source of authority.

28.     To help adopt, enforce and effectuate FIFA rules and policies, FIFA's National Association members belong to a network of six regional governing bodies (known as "Confederations").  The regional Confederations assist FIFA in enforcing its policies and rules at (roughly) the continental level.  The Confederation that covers North American soccer is the Confederation of North, Central and Caribbean Association Football ("CONCACAF").  USSF has been a member of CONCACAF since 1961.

29.     Each FIFA National Association is a membership-based association, made up of, among other members, professional soccer leagues and/or teams based in the National Association's territory.  To compete in any FIFA-affiliated events, a professional soccer league and its teams must be sanctioned by their corresponding National Association and FIFA.

30.     Each National Association is authorized by its members, including professional leagues and teams, to act as its members' representative in FIFA decision-making, including by exercising the National Association's right to vote in the FIFA Congress and to elect or appoint members to FIFA decision-making bodies and committees in order to establish, agree to and enforce FIFA's rules and policies.

31.     Each National Association is authorized to represent FIFA in the geographic territory to which it has been assigned.  USSF has been the FIFA-authorized National Association for the U.S. since 1914.

32.     FIFA's self-described "supreme and legislative body"[4] is the FIFA Congress.  Each National Association, including USSF, is provided one vote in the FIFA Congress.[5]  And, each National Association, including USSF, selects a delegate to represent it in the FIFA Congress.[6]

33.     The FIFA Congress is responsible for adopting and amending the FIFA Statutes, which contain many of FIFA's rules and policies.[7]  A proposal to adopt or amend the Statutes is effective if it is approved by three-quarters of the National Associations present to vote.[8]

34.     Under the agreed-upon FIFA Statutes, each National Association is required to agree to "comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time . . . ."[9]  Each National Association, in turn, agrees to require its members to agree to comply with FIFA's Statutes, regulations, directives and decisions.[10]  Failure to adhere to FIFA's policies and rules can result in suspension or expulsion from FIFA.[11]

---

[4] FIFA STATUTES at 27, Art. V.24(1).

[5] *Id.* at 28-29, Art. V.26(1).

[6] *Id.* at 29, Art. V.26(2).

[7] *Id.* at 33, Art. V.29(1).

[8] *Id.* Art. V.29(4).

[9] *Id.* at 16, Art. II.14(1)(a).

[10] *Id.* at 14, Art. II.11(4)(a).

[11] *Id.*, at 18-19, Art. II.16-17.

35.     USSF's Bylaws require USSF and its members to agree to adhere to all FIFA rules and policies so long as such rules and polices are in compliance with applicable law.[12]

36.     The FIFA Council is one of the "FIFA bodies" that has authority to interpret the FIFA Statutes and to adopt rules and policies not specifically addressed in the FIFA Statutes.  The Council is made up of individuals elected by the members of each of the six Confederations.[13] Each National Association is entitled to submit one candidate for the Council to its Confederation.[14]  There are 37 members of the Council, five of whom are elected by the North American Confederation's (CONCACAF) National Association members.[15]

37.     On October 26, 2018, the FIFA Council adopted a policy embodying the anticompetitive market division agreement at issue in this case, which prohibits official season games from being played anywhere except the territory allocated to the participating league and teams.  The Council did so in direct response to the efforts of Relevent, from its headquarters in this District, to organize and promote an official La Liga soccer game in the U.S., which is outside of La Liga's allocated territory (Spain).

38.     Sunil Gulati—who served as USSF President from 2006 until 2018, and was a member of the USSF Board of Directors—has served on the FIFA Council as a representative of CONCACAF and USSF since 2013.  From MLS's inception in 1995 until 2014, Mr. Gulati held high-level roles in MLS and its teams, including serving as the first deputy commissioner of MLS

---

[12] BYLAWS OF THE UNITED STATES SOCCER FEDERATION, INC., Bylaw 103 § 1 ("[USSF] and its members are, to the extent permitted by governing law, obliged to respect the statutes, regulations, directives and decisions of FIFA . . . and to ensure that these are likewise respected by their members.").

[13] FIFA STATUTES at 30, Art. V.27(3).

[14] *Id.*

[15] *Id.* at 36, Art. V.33(1), (4).

from 1995 to 1999 before working for Kraft Soccer Group, an MLS team investor-operator, where he held multiple positions, including President.

39.     Mr. Gulati participated in the FIFA Council's consideration and adoption of the geographic market division agreement in October 2018, with the goal of shielding USSF's sole Division I league, MLS, from official season games competition from foreign leagues.

40.     Mr. Gulati is a resident of this District and, upon information and belief, has regularly conducted business in his role on the FIFA Council from this District.

41.     Other members of the FIFA Council at the time of the adoption of the unlawful geographic market division agreement included, among others:

- David Gill.  From 2012 to 2017, Mr. Gill was Vice President of England's National Association—the English Football Association—of which all professional soccer teams in England are members.  Mr. Gill was succeeded in his role on the FIFA Council in 2019 by Greg Clarke who simultaneously serves as the Chairman of the English Football Association.

- Fernando Gomes, President of the National Association governing soccer in Portugal—Federação Portuguesa de Futebol—which reserves one of its Vice President positions (and board seats) for the President of the top-tier men's professional soccer league in Portugal.

- Vittorio Montagliani, President of CONCACAF and previously the President of Canada's National Association—the Canadian Soccer Association—of which all Canadian professional soccer teams, including the three that play in MLS, are members.  The Canadian Premier League, Canada's only professional soccer league, is also a Canadian Soccer Association member.

- Kohzo Tashima, President of Japan's National Association—the Japan Football Association—of which all professional soccer teams, as well as Japan's top-tier men's professional league, the J1 League, are members.

42.     The FIFA Council adopted the market division policy at the urging of the FIFA Football Stakeholders Committee.  The Stakeholders Committee is a "Standing Committee" tasked with "advis[ing] and assist[ing] the FIFA Council in their respective fields of function" and to "deal with football matters, particularly the structure of the game and the relationship between

clubs, players, leagues, member associations, confederations and FIFA as well as with issues relating to the interests of club football worldwide."[16]

43.     The FIFA Football Stakeholders Committee was created in 2016 upon a vote of FIFA's National Associations.[17]  Since its inception, the Committee has been chaired by Vittorio Montagliani, who serves as Vice President of FIFA, President of CONCACAF, and previously served as the President of the Canadian Soccer Association, which has three MLS teams as members.

44.     At all relevant times before March 2020, USSF has had two members on the FIFA Football Stakeholders Committee:  MLS Commissioner and USSF Board member Don Garber and then-USSF President Carlos Cordeiro.  Mr. Garber also serves on the Stakeholders Committee as a representative of the World League Forum, which he co-chairs.  The World League Forum is a collective of 42 men's professional soccer leagues around the world, including MLS, which represents approximately 1,100 men's professional soccer teams.

45.     Messrs. Cordeiro and Garber are residents of the U.S. and, upon information and belief, regularly conducted FIFA Football Stakeholders Committee business in the U.S.  Mr. Garber did so from his office at MLS Headquarters in this District, which is his primary place of business.

46.     The FIFA Football Stakeholders Committee has taken a number of actions to support the adoption, implementation, enforcement—and, most recently, the strengthening—of the geographic market division agreement being challenged in this action.

---

[16] *Id.* at 44, Arts. V.39(1)(e), V.39(2), V.44.  "Club football" refers to professional soccer leagues.

[17] *First meeting of the FIFA Football Stakeholders Committee*, FIFA.COM (Mar. 23, 2017), https://www.fifa.com/who-we-are/news/first-meeting-of-fifa-football-stakeholders-committee-2876941.

47.     Other members of the FIFA Football Stakeholders Committee who participated in the Committee's actions to support the adoption, implementation, enforcement and strengthening of the market division agreement include the following:

- Ivan Gazidis, who between 2018 and today has served in executive roles for Arsenal, a top-tier English men's professional team, and A.C. Milan, a top-tier Italian men's professional team.  Mr. Gazidis was a member of the MLS management team from its founding and, in 2001, became its deputy commissioner, a position in which he served until the end of 2008.

- Fernando Gomes, President of the National Association governing soccer in Portugal—Federação Portuguesa de Futebol.

- Vittorio Montagliani, President of CONCACAF and previously the President of the Canadian National Association—the Canadian Soccer Association—of which all of Canada's professional soccer teams, including the three that play in MLS, are members.

- Claudius Schaefer, CEO of the Swiss Football League, which includes the top-tier men's professional soccer league in Switzerland.

- Christian Seifert, CEO of the Deutsche Fußball Liga—which includes the top-tier men's professional soccer league in Germany.  Mr. Seifert also serves as the Vice President of the German National Association—the Deuscher Fußall-Bund—and as Mr. Garber's co-chair of the World League Forum.

48.     On February 27, 2020, the FIFA Football Stakeholders Committee—with the participation of Messrs. Garber and Cordeiro as USSF representatives—recommended that the market division agreement be further strengthened by formally adding it as an amendment to the FIFA Statutes.[18]

49.     This action was taken in response to Relevent's continuing efforts, from its headquarters in this District, to seek to promote foreign leagues' and teams' official season games in the U.S.

---

[18] Jeff Carlisle, *FIFA urged to ban staging of league games in other countries*, ESPN.COM (Feb. 27, 2020), https://www.espn.com/soccer/blog-fifa/story/4061817/fifa-urged-to-ban-staging-of-league-games-in-other-countries.

50.     Mr. Garber engaged in preparation for this recommendation in his role on the FIFA Football Stakeholders Committee while in this District.  Indeed, Mr. Garber spoke publicly from this District about his intention to support the efforts to have the geographic market division agreement made a formal part of the FIFA Statutes.

51.     Specifically, Mr. Garber stated that "the respective leagues don't believe it's in their best interest" to permit official season games to be held outside of their home markets.  He further stated that "[t]here might be one or two" leagues that feel differently, but indicated that MLS was not one of them.[19]  This was an admission by Mr. Garber, made in this District as a member of the FIFA Football Stakeholders Committee, and representative of USSF, of his intention to use the FIFA market division agreement to shield MLS from official games competition in the U.S. from those FIFA- affiliated leagues who "feel differently."

**B.      FIFA's Substantial Business Connections to this District**

52.     FIFA regularly conducts business in the U.S., including in this District, both through its own actions and through the actions of FIFA's National Association member USSF and members of FIFA decision-making bodies who reside in the U.S.

53.     FIFA's actions to adopt and enforce the market division agreement, as set forth above, were taken in direct response, and with the specific intent, to block the efforts of Relevent, acting out of its headquarters in this District, to seek to promote official season games in the U.S.

54.     FIFA carries out many of its actions in the U.S. through USSF, which is incorporated as a New York State non-profit.  As FIFA's National Association in the U.S., USSF is vested with the exclusive authority to sanction, on behalf of FIFA, all men's professional soccer

---

[19] Jeff Carlisle, *MLS' Don Garber against staging league games in other countries*, ESPN. COM (Feb. 26, 2020),  https://www.espn.com/soccer/major-league-soccer/story/4061460/mls-don-garber-against-staging-league-games-in-other-countries.

leagues and games played in this country.  In this regard, USSF, acting on behalf of FIFA, and pursuant to the market division agreement, has refused to sanction the official season games which Relevent, from its headquarters in this District, has sought to promote in the U.S.

55.     USSF, on behalf of FIFA, has also sanctioned MLS—which is headquartered in this District and features a team that plays its home games in this District (at Yankee Stadium)— as the sole Division I men's professional soccer league in the U.S.

56.     Another way that FIFA conducts business in New York and this District is through its licensing of official FIFA Match Agents.  Under USSF's rules, every foreign soccer league or team that wishes to play a game in the U.S. must have the game promoted and organized by a licensed FIFA Match Agent.[20]

57.     One of FIFA's licensed Match Agents is Mr. Charles Stillitano, who is the FIFA Match Agent employed by Relevent in this District.  It was Mr. Stillitano—along with Relevent— who was the Match Agent listed on each of the official season game sanctioning applications that Relevent submitted and that USSF has refused to sanction on behalf of FIFA because such games are prohibited by the market division agreement.

58.     Besides Mr. Stillitano, FIFA has three other licensed Match Agents in this District, where they are overseen by FIFA and carry out their Match Agent business under the auspices of, and for the benefit of, FIFA.

59.     FIFA also oversees thirteen licensed Match Agents in the U.S. outside of New York, each of whom carries out their Match Agent business in this country on FIFA's behalf.

---

[20] *International Games Approval Process*, USSOCCER.COM,  https://www.ussoccer.com/federation-services/international-games/hosting-international-matches (last visited Aug. 31, 2020)

60.     In addition, FIFA conducts business in the U.S. and in this District by authorizing USSF to sanction, on its behalf, FIFA-sanctioned soccer games.  Since 2013, six "friendlies"— exhibition games—have been sanctioned to take place in this District by USSF on behalf of FIFA, which were played in Yankee Stadium.  Between 2013 and 2019 alone, USSF sanctioned scores of soccer games in the U.S. on behalf of FIFA.

61.     According to its 2018 Financial Report, between 2016 and 2018, FIFA provided nearly $3 million in funding for soccer development in the U.S.  Upon information and belief, FIFA's funding of soccer in the U.S. continues at a similar rate through today, and a portion of this funding has been dispensed to promote soccer in this District.

62.     FIFA is currently a party to broadcasting agreements with New York-based FOX and NBCUniversal (Telemundo) worth approximately $1 billion.  Upon information and belief, FIFA has participated in negotiations that took place in this District and otherwise communicated directly with FOX and NBCUniversal executives in this District in order to enter into and maintain these broadcast agreements.

63.     On June 13, 2018, the FIFA Congress announced that its most prestigious tournament, the FIFA World Cup, will be hosted jointly by the United States, Canada and Mexico in 2026.  Upon information and belief, FIFA officials participated in meetings in this District and in other locations in the U.S. in connection with FIFA's consideration of the U.S. bid to host this tournament.  The FIFA World Cup is the source of the vast majority of FIFA's revenues.

64.     New York City is one of the locations being considered by FIFA to serve as a "Host City" for the 2026 World Cup.  Upon information and belief, FIFA officials have visited this District as part of FIFA's 2026 "Host City" considerations.  FIFA officials also visited New York City when the U.S. was under consideration as a possible host for the 2018 and 2022 FIFA World

16

Cups.  And, New York City was previously selected as a Host City by FIFA for the 1994 FIFA World Cup.

65.     In 2019, FIFA hired New York-based Raine Group to help it organize a Club World Cup event.  Upon information and belief, FIFA officials have met with Raine Group employees in this District and have otherwise communicated with Raine Group employees in this District to help plan this event, which is expected to involve 24 professional league-affiliated soccer teams from around the world competing to become the FIFA Club World Champion.

**Defendant United States Soccer Federation, Inc.**

66.     Defendant USSF is a not-for-profit corporation organized under the laws of the State of New York, with its principal place of business in Chicago, Illinois.

67.     USSF is a private, membership-based association, which includes among its members men's professional soccer leagues, such as MLS.

68.     Based on the authority granted to the United States Olympic Committee by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq.* (1998) ("Ted Stevens Act"), USSF is also recognized as the National Governing Body ("NGB") for amateur soccer in the U.S.

69.     However, the Ted Stevens Act does not provide any authority for USSF to regulate or sanction professional soccer league games or events.  Instead, USSF claims such authority from its membership as a National Association of FIFA.

70.     USSF exercises the authority to act on behalf of FIFA as its National Association in the U.S. and, among other things, uses that FIFA authority to sanction—or refuse to sanction—professional soccer league games played in the U.S.  All of the most successful and prominent professional soccer leagues and teams in the world are affiliated with FIFA through one of FIFA's National Associations, and such leagues and teams have agreed, or have been coerced to agree,

17

that they will not participate in unsanctioned official season games in the U.S. because of the group boycott and other penalties imposed by FIFA to enforce its geographic market division agreement.

71.     Pursuant to its agreements with FIFA and FIFA's other National Association members, USSF has utilized its authority to enforce FIFA's geographic market division policy and to protect MLS from official season games competition in the U.S. by refusing to sanction official season games sought to be promoted by Relevent.

72.     USSF is governed by a Board of Directors.

73.     From February 2018 to March 2020, Carlos Cordeiro was the President of USSF. As President, Mr. Cordeiro was a voting member of the USSF Board of Directors.[21]  In addition to that role, Mr. Cordeiro served as a member of the FIFA Football Stakeholders Committee where he advocated in support of the adoption of the FIFA market division policy on behalf of USSF and MLS.

74.     From 2006 to 2018, Sunil Gulati served as President of USSF.  Mr. Gulati also had a longstanding involvement in the administration of MLS.  He was one of the original employees of MLS after its creation in 1994 and served as its first deputy commissioner until 1999.  From 1999 until 2014, Mr. Gulati held various positions, including President, with Kraft Soccer Properties, which owned one or more teams in MLS during Mr. Gulati's tenure.  From 2006 until 2014, he maintained his role with Kraft Soccer Properties while simultaneously serving as President of USSF.

---

[21] USSF BYLAWS at 21, § 412(1).

75.    Although Mr. Gulati is no longer President of USSF, his status as "past President of the Federation" entitles him to a vote on the USSF National Council,[22] which is responsible for, among other things, "amend[ing USSF's] Bylaws."[23]

76.    In addition, from February 2018 until March 2020, Mr. Gulati—as "immediate past president" of USSF—was a non-voting member of the USSF Board of Directors, which entitled him to participate in all USSF affairs, including meetings of the Board of Directors.[24]

77.    In 2013, while serving as USSF President and working for MLS's Kraft Soccer Properties, Mr. Gulati was elected to the FIFA Council.[25]  In 2013 and 2014, Mr. Gulati simultaneously served on the FIFA Council, as USSF President and held a position with Kraft Soccer Properties.

78.    Mr. Gulati has continuously held his position on the FIFA Council through today and has been an advocate, on behalf of USSF and MLS, in support of the FIFA Council's adoption of the geographic market division policy to protect MLS from official season games competition in the U.S.

79.    Don Garber, whose primary place of business is in this District at MLS Headquarters, serves on the USSF Board of Directors in his role as Chairman of the USSF Professional Council.[26] Mr. Garber is also the Commissioner of MLS and the CEO of MLS's marketing and promotion arm, Soccer United Marketing ("SUM").

---

[22] *Id.* at 12, § 302(4).

[23] *Id.* § 301(2).

[24] *Id.* at 21, § 412(3).

[25]  *Sunil Gulati elected to FIFA executive committee* SPORTS ILLUSTRATED (Apr. 19, 2013), https://www.si.com/soccer/2013/04/19/sunil-gulati-fifa-executive-committee.

[26] *Id.* at 21, § 412(6).

80.     SUM is an actual and potential competitor of Relevent for the promotion of men's top-tier official season professional soccer league games in the U.S., and MLS is the sole top-tier (Division I) men's professional soccer league sanctioned by USSF to conduct official season games in the U.S.

81.     Since its inception, Mr. Garber has been one of two USSF representatives on the FIFA Football Stakeholders Committee.  As set forth in paragraphs 42-51 above, the Committee, with Mr. Garber's active participation on behalf of USSF and MLS, issued a recommendation to the FIFA Council to adopt the geographic market division policy in 2018, and more recently in February of 2020, to recommended that this anticompetitive policy be codified in the FIFA Statutes, in order to maximize the protection of MLS from official season games competition in the U.S.

## JURISDICTION AND VENUE

82.     This Court has subject matter jurisdiction over Relevent's antitrust claim pursuant to 28 U.S.C. §§ 1331 and 1337 because Relevent's claim arises under laws of the U.S. that regulate commerce and protect commerce against restraints and monopolies: Section 4 of the Clayton Act (15 U.S.C. § 15), Section 16 of the Clayton Act (15 U.S.C. § 26) and Section 1 of the Sherman Act (15 U.S.C. § 1).  This Court has supplemental jurisdiction over Relevent's state-law tort claim pursuant to 28 U.S.C. § 1367 because such claim arises from the same case or controversy as the antitrust claim.

83.     This Court has *in personam* jurisdiction over Defendant USSF because USSF (a) transacts substantial business in this District; (b) is incorporated in this District under New York law; (c) engages in antitrust violations in substantial part in this District; (d) organizes and holds games in this District, including games in the Lamar Hunt U.S. Open Cup; (e) sanctions entities

and games in this District and receives sanctioning fees for men's professional soccer games played in this District, including for the games of the ICC (promoted by Relevent); (f) adheres to and implements the FIFA geographic market division agreement that is expressly aimed at, is intended to have, and has had, an anticompetitive effect on commerce in this District (including by precluding competition from Relevent, which is headquartered in this District); and (g) has substantial aggregate contacts with the U.S., generally, including in this District.

84.    This court has *in personam* jurisdiction over Defendant FIFA because FIFA (a) transacts substantial business in this District, including through:  its multi-year billion-dollar television contracts with New York-headquartered entities; its licensing and overseeing the activities of four Match Agents in this District, including Mr. Stillitano; its work with New York City-based Raine Group in connection with the FIFA Club World Cup; its continuous funding of soccer development in this District; and its continuous business activities in this District in connection with the 2026 FIFA World Cup; (b) authorizes USSF, a New York entity, to act on its behalf to sanction and hold games in this District, including games for the Lamar Hunt U.S. Open Cup; (c) authorizes USSF, a New York entity, to act as its National Association in the U.S., including in this District; (d) authorizes USSF, a New York entity, to act on its behalf to sanction professional soccer leagues in the U.S. and this District (such as MLS, which is headquartered in this District ); (e) engages in the FIFA geographic market division conspiracy that is expressly aimed at, is intended to have, and has had, an anticompetitive effect on commerce in this District by, among other things, blocking official season soccer games sought to be promoted by Relevent and Mr. Stillitano from this District; (f) further engages in the FIFA geographic market division agreement through the actions taken by USSF, a New York entity, to implement the agreement (including its refusal to sanction the official season games sought to be promoted by Relevent from

its headquarters in this District), and through the participation in this District, by Sunil Gulati (on

the FIFA Council) and by Don Garber (on the FIFA Football Stakeholders Committee), to adopt

and implement the geographic market division agreement directed at Relevent in this District and

(g) has substantial aggregate and regular business contacts with the U.S., generally.

85.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C.

§ 22), 28 U.S.C. §§ 1391(b), (c) and (d), and N.Y.C.P.L.R. § 302(a)(1) because a substantial part

of the events giving rise to Relevent's claims occurred in this District, a substantial portion of the

affected interstate trade and commerce has been carried out in this District, USSF and FIFA have

each aimed their anticompetitive conduct at Relevent in this District, and USSF and FIFA each do

business in, have agents in, and are found in or transact business in this District.  Relevent also has

its principal place of business in this District.

### THE FIFA MARKET DIVISION AGREEMENT AND ITS ANTICOMPETITIVE EFFECTS IN THE RELEVANT MARKET

**A.     USSF, Together with FIFA, Exercises Market Power to Control Access to the Relevant Market for Men's Top-Tier Official Season Professional Soccer League Games in the U.S. and Has Granted a Monopoly Position in this Market to MLS**

86.     The relevant product and geographic market in which USSF's and FIFA's conduct

has unreasonably restrained competition is the market for men's top-tier official season

professional soccer league games in the U.S.

87.     The consumers in the relevant market include fans who purchase, or would

purchase, tickets to men's top-tier official season professional soccer league games played in the

U.S. and sponsors who purchase, or would purchase, the promotional and other benefits of

association with such games played in the U.S.

88.     The actual and potential competitors in the market for men's top-tier official season

professional soccer league games played in the U.S. include (1) MLS—which is the only Division

I men's professional soccer league sanctioned by USSF to play official season games in the U.S.— and its teams; and (2) foreign top-tier men's professional soccer leagues and their teams, working in combination with promoters like Relevent and Match Agents like Mr. Stillitano, who seek to organize and promote top-tier official season professional soccer league games in the U.S.

89.     FIFA and USSF—acting on behalf of their respective competing members—have bestowed a monopoly position in the relevant market on MLS, as it is the only league they have sanctioned to conduct men's top-tier official season professional soccer league games in the U.S., while their geographic market division agreement prevents any other men's top-tier professional soccer league from playing official season games in the U.S. in competition with MLS.

90.     The only exception has been for MLS's marketing affiliate SUM (an entity owned by MLS's investors), which has been sanctioned by USSF and FIFA to host and promote certain post-season official season games in the U.S. played by Mexico's top-tier men's professional soccer league, Liga Mx, *i.e.*, its annual championship game.  This single exception to the FIFA geographic market division agreement illustrates how a central anticompetitive objective of the agreement has been to bestow a monopoly position in the U.S. on MLS and its marketing affiliate SUM.

91.     USSF had an economic motive to advocate for and then use the geographic market division policy to protect MLS and SUM from official season games competition because USSF is economically intertwined with and dependent upon MLS and SUM.  Specifically, USSF and SUM have a longstanding agreement under which SUM conducts all of the marketing and promotion, including the sale of broadcasting and sponsorship rights, for USSF with respect to the U.S. Women's and Men's National Teams in exchange for a substantial annual guaranteed rights fee paid by SUM to USSF.  That payment constitutes the single largest source of USSF's annual

revenues.  Further, SUM markets USSF's broadcast and sponsorship rights in combination with the rights of MLS so that USSF has a substantial economic linkage to the success of MLS itself.

92.     Absent the anticompetitive FIFA market division agreement, promoters like Relevent would be able to host and promote foreign men's top-tier official season professional soccer league games in the U.S.  These games would compete with MLS's official season games and with each other.

93.     The FIFA geographic market division policy has created a barrier to entry which has prevented leagues and teams that do not want to adhere to this policy from competing in the relevant market.  Indeed, these leagues and teams are coerced into complying with the FIFA market division policy by the threat of a group boycott and other penalties that may be imposed on any league or team that violates the policy.

94.     Men's top-tier professional soccer league games have attributes that distinguish them in the eyes of consumers from non-soccer professional sporting events held in the U.S.  Such other professional sports have different rules of play and competitive attributes that are not reasonably interchangeable with men's top-tier professional soccer league games and do not serve as close substitutes for those games.  Fans and sponsors of men's top-tier professional soccer league games played in the U.S. do not view other professional sports as close substitutes, and there is no cross-elasticity of demand between men's top-tier professional soccer league games and other professional sports in this country, such as Major League Baseball, the National Basketball Association, the National Football League and the National Hockey League.

95.     Men's top-tier professional soccer league games are also distinct from, and not close substitutes for, Women's and Men's National Team soccer games because fans and sponsors draw a distinction between men's professional soccer league games played in the U.S. and

National Team games played in the U.S, and do not view such games as being interchangeable with one another. Men's top-tier professional soccer league games are also distinct from lower-tier men's professional soccer league games and collegiate soccer games, which are viewed by fans and sponsors as presenting a lower quality or minor league product in comparison to top-tier men's professional soccer league games.

96. There is also a distinction between official season games of men's top-tier professional soccer leagues—regular season or post season games which affect the official standing of teams in their leagues or tournaments—and "friendly," *i.e.*, exhibition, games played by teams in these leagues. The reason is that official season games have a direct impact on the standing and success of the game's participants. Friendly games, by contrast, do not have the same "high stakes" for the teams and players involved and thus often do not feature the participating teams' best players or strongest lineups and are frequently used as opportunities to experiment with new team strategies or help players get into game shape. Due to these differences, friendlies are not viewed by fans and sponsors as being interchangeable with official season games and there is no cross-elasticity of ticket or stadium sponsor demand between these different types of games.

97. The relevant market is geographically limited to the U.S. and does not include professional soccer league games, including men's top-tier professional soccer league games, that take place outside of the U.S., because such games outside the U.S. do not permit regular attendance by U.S. fans or the purchase of on-site stadium sponsorships in the U.S.

98. To remain affiliated with and avoid penalties from FIFA, all of FIFA's National Associations, leagues, teams and players must agree to comply with FIFA's rules and policies, including its geographic market division policy and its rule prohibiting teams and players from competing in any games in the U.S. that are not sanctioned by USSF on behalf of FIFA. This

enforced agreement to adhere to the FIFA market division policy has suppressed competition and reduced output in the relevant market.

99.     Although USSF's Bylaws only bind USSF to adhere to FIFA polices and rules that do not violate applicable U.S. law,[27] USSF has been a willing sponsor of, and participant in, the FIFA geographic market division agreement because of its desire to protect MLS from official season games competition.  Indeed, Messrs. Garber, Gulati and Cordeiro have each advocated on behalf of USSF in favor of the adoption and enforcement of the FIFA market division policy for the specific purpose of blocking Relevent's efforts to promote official season games in competition with MLS.  USSF has been a strong supporter of the FIFA market division policy and its participation in this anticompetitive agreement has not been the result of coercion.

100.    While there are some FIFA-affiliated leagues and teams that have indicated they would like to play official season games in the U.S. in competition with MLS, they have been blocked from doing so by the FIFA geographic market division policy and the knowledge that any violation of FIFA's rules or policies—such as by playing in an unsanctioned game in the U.S.— would subject the league, its teams and their players to FIFA penalties and discipline.[28]  For example, a league that does not follow FIFA rules or policies may be subject to discipline.[29]  And a player who competes in a game not sanctioned by FIFA's authorized designee, such as USSF, risks being deemed ineligible to participate in prestigious FIFA-sanctioned competitions,

---

[27] USSF BYLAWS at 1, § 103(1).

[28] FIFA STATUTES, at 17, Art. II.14(2).

[29] FIFA STATUTES, at 18-19, Art. II. 16(1), 17(1)(b); FIFA DISCIPLINARY CODE at 14-15, tit. II.15(1).

including the FIFA World Cup, or being deemed ineligible to be transferred to a FIFA-affiliated team.[30]

101.    Because of these penalties and threats, an official season soccer game in the U.S. not sanctioned by USSF on behalf of FIFA cannot obtain the participation of top-tier teams with the highest quality players.  The result is that USSF, by virtue of the sanctioning authority vested in it by FIFA, has monopoly power to control access to the relevant market for men's top-tier official season professional soccer league games played in the U.S.  As USSF recently told the New York Supreme Court, it "has exclusive authority to sanction international soccer games played in the United States."  That authority, which it exercises on behalf of FIFA, gives USSF the ability to control entry and access to the relevant market and it has used that power, pursuant to the FIFA market division policy, to bestow and maintain a monopoly position in the relevant market for MLS.

**B.      Relevent's Soccer Game Event Business**

102.    Relevent's business centers on organizing and promoting international soccer games and events in the U.S. and around the world.  Since its founding in 2012, Relevent has been responsible for the successful presentation of over 100 soccer events in the U.S., including several iterations of the ICC, a "friendly" men's professional soccer tournament featuring premier European men's club teams playing in the U.S., Canada, Asia and Europe.

103.    Apart from the ICC, Relevent's business prioritizes providing U.S. soccer fans with consistent access to high quality live games.  For example, since 2013, Relevent has been responsible for organizing and promoting "friendly" men's professional soccer games in America

---

[30] FIFA DISCIPLINARY CODE, tit. 6-7, I.6(c) (players may be banned from "taking part in any football-related activity").

for the Brazilian Men's National Team, routinely one of the top-ranked men's national teams in the world and the only national team to have won five FIFA World Cup titles.

104.    Building on its successes in promoting "friendly" men's professional soccer games and tournaments in the U.S. and elsewhere, the next step for Relevent's business was to provide logistical and marketing support, as well as a registered FIFA Match Agent, to promote official season games by foreign leagues and teams seeking to play such games in the U.S.  Despite opportunities for these games to become a reality, USSF and FIFA, in carrying out the anticompetitive market division agreement, have blocked Relevent and other promoters from offering such games to the many consumers and businesses in the U.S. who would like to attend or sponsor them.

C.    **MLS's and SUM's Business and Close Economic Ties to USSF**

105.    SUM, the marketing affiliate of MLS, has been described by FIFA's Confederations as the "preeminent commercial soccer enterprise in North America, overseeing the marketing, promotion and operational execution of the region's most successful soccer entities."

106.    Since the early 2000s, SUM has had the exclusive right to market USSF's sponsorship and broadcast rights and bundle them with those of MLS and others—including the Mexican National Team—to offer a single package of these rights to sponsors and broadcasters. In exchange, SUM has committed to pay tens of millions of dollars to USSF each year in guaranteed payments.

107.    This arrangement effectively ties the economic fortunes of USSF to those of SUM and MLS and incentivizes USSF to promote, participate in and adhere to the FIFA market division agreement, which protect MLS's and SUM's monopoly position in the market for men's top-tier official season professional soccer league games in the U.S.

108.    According to USSF's most recent Audited Financial Statement:

[T]hird-party sponsorship, television and licensing revenues (for example, excluding those received from Nike) are paid to SUM, and SUM pays USSF annual guaranteed compensation . . . Revenue under the agreement approximated $28,500,000 and $27,250,000 for the years ended March 31, 2019 and 2018, respectively.[31]

109.    SUM CEO Don Garber has stated that, by the conclusion of the current SUM-USSF agreement, SUM will have paid USSF nearly $300 million in guaranteed payments irrespective of the value realized by SUM.  As Garber further explained, this guaranteed revenue is particularly important to the economic fortunes of USSF in years where it would otherwise struggle to generate its expected media and sponsorship revenues, such as in 2018 when one of USSF's most valuable assets, the U.S. Men's National Team, failed to qualify for the World Cup.

110.    With SUM's guarantee making up the largest single source of USSF's annual revenue, the USSF-SUM relationship provides USSF with a material economic incentive to promote, participate in and adhere to the FIFA market division agreement, which provides MLS and SUM with protection from any competition from foreign league official season games sought to be promoted by Relevent or other actual or potential competitors in the relevant market.

**D.    The Conspiracy Between and Among USSF, FIFA, FIFA's Other National Associations, and their Leagues and Teams, to Divide Geographic Markets and Restrict Output for Men's Top-Tier Official Season Professional Soccer League Games in the U.S.**

**i.      USSF Has Agreed with FIFA and the Other National Associations and Their Member Leagues and Teams to Divide Geographic Markets and Refuse to Sanction Any Foreign League's or Teams' Official Season Games in the U.S.**

111.    In August 2018, after Relevent and La Liga agreed to host an official season La Liga game in the U.S. between FC Barcelona and Girona FC, Relevent met with USSF to indicate that it would be seeking a USSF sanction for the event.  In response, USSF President Carlos

---

[31] USSF Consolidated Financial Statements 2019 at 13 (Mar. 31, 2019), https://www.ussoccer.com/ governance/financial-information (last visited Aug. 31, 2020).

Cordeiro instructed Relevent to first obtain approvals from the FIFA's National Association for Spain (Real Federación Española de Fútbol, "RFEF") and the FIFA Confederation for Europe (the Union of European Football Associations, "UEFA")—before making such a proposal to USSF.

112.   In reality, USSF had no desire to grant the sanction to Relevent, as such a sanction would permit a top-tier foreign professional soccer league and its teams to compete with MLS and its teams in the U.S. market for men's top-tier official season professional soccer league games. USSF wanted to protect MLS (and SUM) from such competition and it was buying time to seek a new FIFA geographic market division agreement to block such competition.

113.   USSF found an ally for its efforts to protect MLS from competition at the highest levels of FIFA.  Indeed, shortly after Relevent met with Cordeiro, FIFA President Gianni Infantino indicated his desire to shield MLS from competition when he stated: "I think I would prefer to see a great MLS game in the U.S. rather than La Liga being in the U.S. . . ."[32]

114.   USSF, CONCACAF and RFEF—recognizing that there was no FIFA policy in place to block Relevent and La Liga from conducting an official season La Liga game in the U.S.— referred the issue to the FIFA Council.  Upon information and belief, they knew that the FIFA Council would look to the FIFA Football Stakeholders Committee—where Mr. Garber and Mr. Cordeiro would advocate for a new geographic market division policy—and that Mr. Gulati and other USSF and MLS allies would push the policy through in the FIFA Council so that it would protect MLS.

115.   Upon information and belief, Messrs. Garber, Cordeiro and Gulati were supporters of the market division policy because USSF and MLS wanted it in place to block Relevent from

---

[32] Adriana Garcia, *FIFA chief Gianni Infantino expresses doubt over La Liga game in U.S.*, ESPN.COM (Sept. 17, 2018), https://www.espn.com/soccer/blog-fifa/story/3636865/fifa-chief-gianni-infantino-expresses-doubt-over-la-liga-game-in-us.

promoting men's top-tier official season professional soccer league games in the U.S. in competition with MLS.

116.     On October 26, 2018, in direct response to the efforts of Relevent to seek to promote an official season La Liga game in the U.S., the FIFA Council, with Sunil Gulati participating on behalf of USSF, issued a policy prohibiting FIFA's National Association members, including USSF, from sanctioning any official season games held outside of the participants' home territory.

117.     The specific policy announced by the FIFA Council on October 26, 2018 was as follows:

> Consistent with the opinion expressed by the Football Stakeholders Committee, the [FIFA] Council emphasised the sporting principle that official league matches must be played within the territory of the respective member association.[33]

In other words, the FIFA Council—one of FIFA's decision-making bodies with authority to issue policies that each National Association and their member leagues and teams have agreed to follow—adopted a geographic market division policy, at the behest of USSF and MLS, that was specifically intended to block Relevent from organizing and promoting an official season game by a foreign league or its teams in the U.S.  Further, because this was a formal policy announced by a FIFA decision-making body, any leagues and teams who did not comply with it would run the risk of FIFA penalties and all such leagues and teams were required to agree to adhere to this policy.

118.     The FIFA geographic market division policy was, and is, a horizontal division of geographic markets agreement, which precludes men's top-tier professional soccer leagues and teams from competing in each other's markets to offer official season games and is intended to

---

[33] *FIFA Council makes key decisions for the future of football development*, FIFA.COM (Oct. 26, 2018), https://www.fifa.com/about-fifa/who-we-are/news/fifa-council-makes-key-decisions-for-the-future-of-football-development.

prevent any attempts by promoters like Relevent and foreign leagues and teams to conduct official season games in the U.S.

119.  In November 2018, after CONMEBOL—the South American Football Confederation under FIFA—and Argentinian soccer officials determined that the championship game for CONMEBOL's Copa Libertadores tournament between Argentinian rivals Boca Juniors and River Plate could not take place as scheduled in Argentina due to safety concerns, Relevent approached USSF President Cordeiro to discuss promoting this official season tournament championship game in Miami, Florida.  With knowledge that SUM had, for several years, received USSF's sanction to organize and promote the championship game for Mexico' official season tournament, SuperCopa Mx, in the U.S., Relevent similarly sought to obtain a sanction to promote the Copa Libertadores in the U.S.  However, USSF refused to engage in discussions with Relevent on granting such a sanction.

120.  Instead, as reported in the *New York Times*, USSF President Cordeiro "made his opposition clear" directly to CONMEBOL.[34]  Indeed, although Argentina's daily newspaper *La Nación* reported that Miami was at one time the favorite to host this game, a CONMEBOL official later explained that the game was not played in Miami because "Carlos Cordeiro (the president of US Soccer) did not want to."[35]  These actions by Mr. Cordeiro were part of the anticompetitive FIFA market division agreement, as FIFA rules would not permit CONMEBOL to play its official season championship tournament in the U.S.

---

[34] Rory Smith, *A Final for All time, Sacrificed on the Altar of the Modern Game*, NEW YORK TIMES.COM (Nov. 30, 2018), https://www.nytimes.com/2018/11/30/sports/soccer/copa-libertadores-boca-river-madrid.html.

[35] *Id.* (citing Alejandro Casar González, *La Conmebol fijó que la final de la Copa Libertadores se juegue en el Santiago Bernabéu, de Madrid, el 9 de diciembre,* LA NACION (Nov. 29, 2018), https://www.lanacion.com.ar/deportes/futbol/destino-impensado-final-copa-libertadores-se-jugara-nid2197523.).

121.    Just days later, FC Barcelona withdrew from its commitment to participate in Relevent's proposed La Liga official season game in the U.S.  The Club issued the following statement (translated from Spanish):

> The Board of Directors of FC Barcelona has decided to withdraw its decision to play the match against Girona FC in Miami, after confirming a lack of consensus on the proposal.  FC Barcelona was and remains willing to play a La Liga match in Miami . . . but acknowledges that while there is no agreement between all parties, this project will not succeed.[36]

122.    This "lack of consensus" was a veiled reference to the geographic market division policy adopted by the FIFA Council—a policy that was designed to, among other things, protect MLS from official season games competition and thereby prevent any teams, including FC Barcelona, from participating in Relevent's proposed La Liga official season game in the U.S.

123.    Thereafter, Relevent identified two more teams from a men's top-tier professional soccer league that were interested in playing an official season game in the U.S.—this time rivals from Ecuador's LigaPro Serie A.  Relevent formally sought USSF's sanction for the game, which was scheduled to be played on May 5, 2019 (the "May 5 Event").

124.    On March 29, 2019, Relevent submitted an official sanctioning application to USSF seeking approval for the May 5 Event.  The first page of the application listed New York-based Relevent and its New York-based FIFA Match Agent, Charlie Stillitano, as the promoters for the event.

125.    Prior to submitting its application, Relevent had already secured Hard Rock Stadium in Miami, Florida as the site of the May 5 Event and obtained written approval from the participating teams' league (LigaPro), the Ecuadorian national association (Ecuadorian Football

---

[36] *El Barça deja sin efecto su disposición de jugar en Miami*, FCBARCELONA.ES (Dec. 11, 2018), https://www.fcbarcelona.es/es/noticias/940120/el-barca-deja-sin-efecto-su-disposicion-de-jugar-en-miami?_ga=2.56777198.575772544.1565127786-1757679914.1565127786.

Federation), and Ecuador's governing regional Confederation (CONMEBOL).  These approvals were submitted to USSF as part of Relevent's initial application.  In accordance with USSF's application requirements, Relevent also submitted its application fee and performance bond by April 5, 2019—a full month in advance of the May 5 Event—and emailed USSF to inform its officers that the application was fully submitted.

126.    On April 8, 2019, USSF confirmed receipt of Relevent's application, but claimed the application could not be reviewed because Mr. Stillitano was purportedly renewing his Match Agent insurance and did not appear on FIFA's official Match Agent list on its website.  Relevent promptly informed USSF that Mr. Stillitano's insurance remained valid, had the insurance policy sent to USSF, and contacted FIFA to restore Mr. Stillitano to the online Match Agent list.  Relevent then sent USSF confirmation from FIFA that Mr. Stillitano remained appropriately registered and overseen by FIFA and that FIFA would update its website to correct the error.

127.    Despite these confirmations, USSF informed Relevent on April 12, 2019, that USSF would only consider Mr. Stillitano's status resolved when his name appeared on the FIFA website.  Further, USSF informed Relevent that it intended to contact the Ecuadorian National Association and CONMEBOL, notwithstanding the letters of approval those entities had already provided (which were in USSF's possession), to discuss the fact that the planned game was part of LigaPro's regular season, as opposed to a "friendly."  USSF closed its letter by threatening Relevent with fines, the withholding of future sanctions, and other penalties if Relevent advertised the May 5 Event before USSF issued a sanction.

128.    Although USSF was well aware of the rapidly approaching date for the May 5 Event, and was provided with copies of all signed approvals and the stadium reservation

confirmation, Relevent heard nothing from USSF until April 22, 2019, when USSF issued a letter denying Relevent's sanction application.

129.    This time, USSF expressly stated that the true reason for its refusal to provide the sanction was because of its agreement to follow the FIFA geographic market division policy, adopted by the FIFA Council, that official season games held outside of a league's home territory are prohibited.  Specifically, in a New York state court filing, USSF explicitly identified its agreement to comply with the policy adopted by the FIFA Council as the reason why it would not sanction any official season soccer games that Relevent sought to promote in the U.S.

130.    In addition, USSF stated in its denial letter to Relevent that USSF had communicated with FIFA regarding Relevent's proposed May 5 Event, and that FIFA had confirmed that the game was prohibited by the market division policy, which USSF had agreed to follow.

131.    USSF has also applied its agreement with the FIFA geographic market division policy to deny a sanction to at least one other promoter seeking to conduct an official season game in the U.S. for a foreign top-tier men's professional soccer league.  On March 1, 2019, USSF received a completed application from a FIFA Match Agent on behalf of another promoter seeking USSF's sanction to host an official season game in the U.S. between two Ecuadorian LigaPro Serie A clubs on April 14, 2019 (the "April 14 Event").[37]

132.    Prior to submitting its application, the other promoter had already secured Red Bull Arena in Harrison, New Jersey as the site of the game, obtained written agreement from the participating teams and the teams' league (LigaPro), and received letters of approval from both the

---

[37] The April 14 Event was to feature two different Ecuadorian teams than Relevent sought to feature in the May 5 Event.

Ecuadorian National Association and CONMEBOL, all of which were submitted to USSF as part of the other promoter's application.

133.    In addition to the other promoter's completed application, on March 1, 2019, USSF received an email from the Secretary General of the Ecuadorian Football Federation, copying CONMEBOL, stating the Ecuadorian governing bodies' approval of the April 14 Event.

134.    Notwithstanding the documented prior approval of its peer National Association and Ecuador's governing regional Confederation, on March 5, 2019, USSF refused to sanction the April 14 Event, citing its agreement to follow the FIFA geographic market division policy:

> Please note that we are not able to accept this application as it is our understanding that official league matches cannot be approved to be played outside of the home country. We have communicated this to the Ecuador Federation and to CONMEBOL as well.

### ii.    USSF and FIFA Continue to Enforce and Strengthen the Geographic Market Division Agreement Despite Antitrust Warnings from the U.S. Department of Justice.

135.    On September 9, 2019, Relevent filed the original complaint in this action, asserting that the agreement of USSF, in combination with FIFA and its members, to deny a sanction for official season games featuring foreign professional soccer teams in the U.S. was an antitrust violation.  Rather than reconsider the legality of the geographic market division policy, USSF and FIFA doubled down, electing to reinforce and strengthen the agreement.

136.    Specifically, on February 27, 2020, the FIFA Football Stakeholders Committee— with the support of Messrs. Garber and Cordeiro who wanted to protect MLS and SUM from any official season games competition—met to consider whether to recommend that the market division policy be formally codified into the FIFA Statutes, where it could be more easily and strongly enforced.

137.     The day before the meeting, on February 26, 2020, Mr. Garber spoke publicly, from this District, regarding his intention to seek to codify the market division policy in the FIFA Statutes.[38]  While he conceded that there were one or two leagues who disagreed with the policy, he made it clear that MLS was not one of those leagues.  In other words, his stated desire, on behalf of USSF and MLS, was to have FIFA codify the geographic market division policy in the FIFA Statutes to make sure that any top-tier league or team who might want to compete with MLS by offering official season games in the U.S. would be prohibited from doing so by an explicit and unambiguous rule in the FIFA Statutes.

138.     On February 27, 2020, the Stakeholders Committee, including USSF representatives Messrs. Garber and Cordeiro, affirmatively voted to propose to the FIFA Council that the geographic market division agreement be codified in the FIFA Statutes.

139.     Following the publicity of these actions, on March 16, 2020, the United States Department of Justice, through its Antitrust Division, wrote to FIFA and USSF to inform them of the Department's "concern[] that FIFA could violate U.S. antitrust laws by restricting the territory in which teams can play league games."

140.     Despite this warning, which set forth the Department of Justice's view that such a geographic market division agreement could violate U.S. antitrust law and that FIFA and its members were fully subject to this law, USSF and FIFA have kept their geographic market division agreement in effect and USSF has continued to defend the FIFA market division policy before this Court—arguing that it is not an agreement in violation of U.S. antitrust law—without disclosing the existence of the DOJ letter.

---

[38] *MLS' Don Garber against staging league games in other countries*, *supra* note 19.

141.   The FIFA geographic market division agreement stands in stark contrast to the manner in which professional leagues in other sports have operated.  For example, since 1997, the NHL has played 34 regular season games at venues outside North America, in six different countries—and eight total cities—across two continents.[39]  In 2019, the Chicago Blackhawks and Philadelphia Flyers opened their regular season with a game in Prague, Czech Republic[40] and the Tampa Bay Lighting and Buffalo Sabres played a pair of mid-season games in Stockholm, Sweden.[41]  Since 1990, the NBA has played nearly 30 regular season games outside of North America.[42]  And, to date, 29 of the NFL's 32 clubs have played regular season games in London.[43] The NFL also hosted regular season games in Mexico City in 2005, 2016, 2017, 2019 and was scheduled to play another game in Mexico in 2020 before it was cancelled due to COVID-19.[44] Likewise, between 1996 and 2019, Major League Baseball has played multiple regular season games in Australia, England, Japan and Mexico.[45]

---

[39] *Games Outside North America*, RECORDS.NHL.COM, https://records.nhl.com/events/games-outside-north-america (last visited Aug. 31, 2020).

[40] Sam Carchidi, *Flyers open season with 4-3 win over Chicago in Prague as Travis Konecny stars*, PHILADELPHIA INQUIRER (Oct. 4, 2019), https://www.inquirer.com/flyers/flyers-blackhawks-recap-score-prague-travis-konecny-carter-hart-20191004.html.

[41] Antony Sciandra, *Sabres swept by Lightning in Global Series*, DIEBYTHEBLADE.COM (Nov. 9, 2019), https://www.diebytheblade.com/2019/11/9/20956995/bufflo-sabres-swept-by-tampa-bay-lightning-in-global-series-sweden.

[42] Steve Swanson, *Globalisation strategies of the NFL and NBA*, Loughborough University, London, https://www.lborolondon.ac.uk/research/sport-business/case-studies/nfl-nba-strategies/ (last visited Aug. 27, 2020).

[43] *Four NFL London Games to be played in 2019*, NFL.COM (Oct. 29, 2018), https://www.nfl.com/news/four-nfl-london-games-to-be-played-in-2019-0ap3000000981459.

[44] Associated Press, *Mahomes, Chiefs Hold off Chargers 24-17 in Mexico City*, CBSSPORTS.COM (Nov. 19, 2019), https://www.cbssports.com/nfl/news/mahomes-chiefs-hold-off-chargers-24-17-in-mexico-city; *NFL cancels international games for 2020 season*, NFL.COM (May 4, 2020), https://www.nfl.com/news/nfl-cancels-international-games-for-2020-season-0ap3000001112654

[45] David Adler, *Complete History of MLB Games Played Abroad*, MLB.COM (Mar. 6, 2020), https://www.mlb.com/news/baseball-games-played-outside-the-us-c272441130.

142.     The only official season games by a foreign soccer league that USSF has sanctioned in the U.S., since the adoption of the FIFA geographic market policy in 2018, have been the SUM-promoted Liga Mx championship games.   These games, however, are consistent with the anticompetitive purpose of Defendants' market division agreement, which is to bestow and maintain a monopoly position in the U.S. for MLS and its affiliate SUM.

## RELEVENT'S CLAIMS ARE NOT SUBJECT TO ARBITRATION

143.     The ChampionsWorld litigation confirms that the antitrust claims Relevent asserts herein are not subject to arbitration.

144.     In May 2006, now-defunct soccer promoter ChampionsWorld, LLC ("ChampionsWorld") brought suit against USSF and MLS alleging, among other things, violations of the Sherman Act and RICO.   ChampionsWorld alleged that USSF "wrongly arrogated [its] authority to extract [] sanctioning fees by falsely holding itself out to be the exclusive governing body of men's professional soccer in the United States and by threatening to report ChampionsWorld to FIFA as a 'promoter in bad standing.'"[46]

145.     In May 2007, the court granted defendants' motion to compel arbitration of ChampionsWorld's claims on the basis that ChampionsWorld's Match Agent had agreed that all disputes between him and USSF would be pursued under FIFA's dispute-resolution procedures.[47] The court stayed the federal court litigation pending the FIFA arbitration.[48]   ChampionsWorld accordingly commenced an arbitration against USSF before FIFA's Players' Status Committee, asserting claims nearly identical to the antitrust and other claims in its federal court action.[49]

---

[46] *ChampionsWorld, LLC v. USSF*, 487 F. Supp. 2d 980, 984 (N.D. Ill. 2007).

[47] *Id.* at 986-87.

[48] *Id.* at 992.

[49] *See ChampionsWorld, LLC v. USSF*, 2008 WL 4861522, at *1 (N.D Ill. Nov. 7, 2008).

146.     FIFA thereafter advised that its rules only permitted individuals (as opposed to entities) to invoke the arbitration mechanism set forth under the match agent application.  FIFA further advised that ChampionsWorld's antitrust and RICO claims were not within the categories of disputes that FIFA was permitted to adjudicate as part of its arbitration process.[50]  Specifically, FIFA stated:

> [W]e understand that the dispute in question concerns claims [which] relate to 'antitrust, racketeering and other misconduct' and, therefore, neither appears to fall within the scope of [the FIFA dispute resolution regulations].  Consequently . . . it seems that none of our deciding bodies is competent to hear the present matter.[51]

147.     In light of FIFA's ruling, ChampionsWorld petitioned the court to lift the stay of the action.  Defendants objected, and USSF commenced its own arbitration before FIFA against the match agent, seeking confirmation that USSF had authority to sanction games played in the U.S. and to charge sanctioning fees for those games.  FIFA determined that it had jurisdiction over the limited issues raised by USSF's arbitration demand.

148.     On appeal, the Court of Arbitration for Sport ("CAS") held that FIFA's arbitration jurisdiction was limited to interpreting its own statutes and regulations—it had no authority to arbitrate any antitrust claims or other claims under U.S. law:

> *It should be clear that the Players' Status Committee's competence exists only with respect to FIFA's statutes and regulations*.  While Article 22, paragraph 1, and Article 26 of the MARs seem to suggest that the Players' Status Committee's jurisdiction over disputes between match agents and national associations is unlimited, *it is clear that the Players' Status Committee may consider only disputes to the extent that they implicate FIFA's statutes and regulations.*[52]

---

[50] *Id.*

[51] August 13, 2008 Letter from FIFA to ChampionsWorld, *filed in ChampionsWorld v. USSF*, No. 1:06-cv-05724 (N.D. Ill. Aug. 14, 2008) (ECF No. 90).

[52] Decision, *Stillitano v. USSF & FIFA*, CAS 2009/A/1812, at 6 (Sept. 24, 2009) (emphases added); *ChampionsWorld v. USSF*, 890 F. Supp. 2d 912, 922 (N.D. Ill. 2012).

149.    In a subsequent decision in the same dispute, CAS reiterated its prior ruling that FIFA's arbitral jurisdiction "existed only with respect to FIFA's statutes and regulations, since [it] *is not in a position to rule on issues of U.S. law.*"[53]

150.    Back before the U.S. federal court, USSF and MLS moved for judgment on the pleadings.[54]  In denying defendants' motion in substantial part, the court held:

> [I]t is clear that FIFA has no power to grant USSF an exemption, either express or implied, from the antitrust laws.  Only Congress may do this.  Similarly, FIFA does not have, or claim to have, authority to interpret acts of Congress.  Furthermore, it seems far-fetched to believe that FIFA would discipline USSF for obeying the antitrust laws of the United States. . . [Thus,] USSF is not entitled to an exemption from the antitrust laws regarding professional soccer, except to the extent necessary for USSF to oversee Olympic and related events.  USSF has no clear mandate from Congress to govern the whole of professional soccer in the U.S.[55]

151.    In a subsequent decision confirming the arbitration award USSF had obtained from FIFA on claims not asserted under U.S. law, the court likewise reiterated that the arbitral ruling did not preclude its ability to consider whether USSF's sanctioning authority violated U.S. antitrust law.[56]

152.    It is thus established that there is no agreement to arbitrate any claim against USSF or FIFA under the United States antitrust laws.  This ruling is binding on USSF and FIFA under principles of collateral estoppel.  Further, while Relevent has employed a FIFA Match Agent (as required by FIFA and USSF sanctioning regulations), it has never itself entered into any agreement with FIFA or USSF to arbitrate any of these or other claims.

---

[53] Award, *Stillitano v. USSF & FIFA*, CAS 2010/A/2241 (July 12, 2011) (emphasis added).

[54] *See ChampionsWorld v. USSF*, 726 F. Supp. 2d 961 (N.D. Ill. 2010).

[55] *Id.* at 969–70.

[56] *ChampionsWorld*, 890 F. Supp. 2d at 946–51.

153.     On July 20, 2020, the Court in this action ruled that Relevent's antitrust claims are not subject to arbitration but also ruled that Relevent is required to arbitrate its tort claims against USSF—if Relevent intends to pursue them—while they are stayed in this action.

## THE 2016 SETTLEMENT AGREEMENT BETWEEN RELEVENT AND USSF DOES NOT BAR THIS ACTION

154.     In 2016, Relevent mounted a challenge to USSF's authority to impose sanctioning fees on the ground that they were inconsistent with the Ted Stevens Act and USSF's own written policy.

155.     Relevent and USSF resolved that specific dispute through a May 2016 settlement agreement (the "2016 Settlement Agreement").  As part of the settlement, Relevent covenanted not to sue USSF on certain limited bases enumerated in the 2016 Settlement Agreement.  Specifically, Relevent only agreed not to bring suit against USSF "challenging [USSF's] jurisdiction over International Games, [USSF's] authority to charge Sanctioning Fees, or the reasonableness of the Sanctioning Fees charged by [USSF]."

156.     The 2016 Settlement Agreement does not contain any covenant not to challenge USSF's future participation in an anticompetitive agreement, in violation of the antitrust laws and state tort law, to allocate the markets in which professional men's soccer leagues may compete and to engage in a group boycott of leagues, clubs and players who participate in unsanctioned official season games.  Nor did Relevent covenant not to pursue claims concerning USSF's exercise of its sanctioning authority, in violation of U.S. antitrust laws, to (1) prohibit official season games in the U.S. or (2) otherwise restrict output of men's professional soccer league games in the U.S.  In fact, there is no mention of antitrust claims in the limited covenant not to sue that was agreed to in the 2016 Settlement Agreement.

157.   This action does not challenge USSF's jurisdiction or authority to charge sanctioning fees in general, nor the reasonableness of any particular sanctioning fee imposed by USSF.   Instead, Relevent seeks remediation for USSF's and FIFA's violations of the federal antitrust laws as a result of their participation in the anticompetitive FIFA geographic market division agreement, which restricts output and creates barriers to entry in the U.S. market for top-tier official season men's professional soccer league games in the U.S.   These claims are not covered by the covenant not to sue.

158.   Moreover, even if the covenant not to sue were construed to apply to the antitrust and tort law claims in this action, public policy precludes any release, covenant not to sue or waiver of antitrust or intentional tort claims directed at future conduct engaged in by USSF after the date of any such covenant, release or waiver.[57]   The covenant not to sue thus cannot be applied to the claims asserted here for this additional reason, as the damages and injunction being sought are only for antitrust violations and intentional torts committed by USSF and FIFA that took place starting in 2018 after the execution of the 2016 Settlement Agreement.

---

[57] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (an agreement that "operate[s]…as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations," would be condemned); *In re Am. Express Merchants' Litig.,* 667 F.3d 204, 214 (2d. Cir. 2012) ("*Amex III*") *rev'd on other grounds* ("An agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy."); *Madison Square Garden, L.P.*, *v. Nat'l Hockey League*, 2008 WL 4547518, at *7 (S.D.N.Y. Oct. 10, 2008) ("[B]ecause '[a] no suit agreement may be one of the devices for shoring up a cartel' . . . the Supreme Court has indicated that it would condemn as against public policy an agreement that 'operated . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations.'") (internal citation omitted). *Great N. Assocs., Inc. v. Cont'l Cas. Co.,* 596 N.Y.S.2d 938, 940 (N.Y. App. Div. 1993) (cited with approval in *Charron v. Sallyport Global Holdings*, 2014 WL 464649, at *4 (S.D.N.Y. Feb. 3, 2014) (holding that New York tort law prohibits exculpatory agreements that purport to release the signatory from "intentional, willful or grossly negligent acts"); *Kalisch-Jarcho, Inc. v. City of N.Y.*, 448 N.E.2d 413, 426 (N.Y. Ct. App. 1983) ("[A]n exculpatory agreement…will not exonerate a party from [tort] liability under all circumstances…[I]t will not apply to exemption of willful or grossly negligent acts.") (cited with approval in *In re CCT Comm., Inc.*, 464 B.R. 97, 106 (S.D.N.Y. 2011)).  *See also* 8 Williston on Contracts § 19:24 (4th Ed.) ("An attempted exemption from liability for a future intentional tort . . . is generally held void.").

159.    There is thus no applicable or enforceable contractual bar to Relevent pursuing its antitrust and intentional tort claims in this action, which will vindicate not only the rights of Relevent, but of consumers and sponsors of top-tier men's official season professional soccer league games in the U.S., and further the public interest.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 1 of the Sherman Act and Claims for Relief under Sections 4 and 16 of the Clayton Act**

160.    Relevent incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this First Amended Complaint.

161.    Defendant USSF is a separate economic actor from Defendant FIFA and each National Association.  In addition, the constituent members of each Confederation and National Association, including each men's professional soccer league, and each league's respective professional soccer teams, are separate economic actors which do not share profits and losses with each other or otherwise compete as a single economic entity.

162.    These separate economic actors have agreed, through their respective representatives in FIFA decision-making bodies, to enter into a geographic market division agreement which has the purpose and effect of allocating geographic territories to specific leagues and their teams, which leagues and teams are then prohibited from staging their official season games in another geographic territory in competition with each other.

163.    This agreement was adopted with the specific purpose and effect of eliminating competition and shielding MLS from any competition from official season games that would otherwise be promoted by Relevent, or other persons, in the relevant U.S. market for men's top-

tier official season professional soccer league games.  As a result of this geographic market division agreement, MLS (and its marketing affiliate SUM) have been granted a monopoly position in the relevant market.

164.    The actions of USSF and FIFA in concert with each National Association and their respective constituent member leagues and teams constitute an agreement by separate economic actors engaged in concerted action to restrict entry into, and limit the output of, the relevant market for men's top-tier official season professional soccer league games in the U.S.  Indeed, the specific intention of this anticompetitive agreement is to create a barrier to entry and thwart the efforts of Relevent and other persons to organize and promote such official season games in the U.S. in competition with MLS.

165.    USSF has an economic motive to conspire with FIFA and FIFA's other National Associations and leagues and teams to protect the monopoly position of MLS and SUM because of its economic dependence on SUM for the majority of its annual revenues and its close economic ties to the success of MLS.  Further, USSF has expressly admitted that it has agreed to adhere to and enforce the FIFA market division policy and not issue any sanction for official season games that would violate that policy.

166.    This unlawful agreement also includes USSF's, FIFA's and each National Association's agreement to enforce the geographic market division policy against any leagues or teams that violate it.  Such enforcement mechanisms are set forth in written agreements embodied in the rules of FIFA which require all FIFA members to adhere to FIFA polices and set forth discipline which FIFA may impose on any National Associations, leagues, teams or players that do not adhere to FIFA policies, such as the market division agreement.  Absent these enforcement mechanisms for the FIFA market division agreement, there are a number of foreign men's top-tier

professional soccer leagues and teams, including those in Spain, Ecuador and Mexico, that would participate in official season games promoted by Relevent or other persons in the U.S.

167.    The FIFA market division agreement includes a horizontal agreement by each National Association's men's top-tier professional soccer leagues and teams, all of which are actual or potential competitors, to divide the geographic markets for official season games competition even though there are a number of top-tier men's professional soccer leagues and teams that would otherwise compete with each other in these markets.  The only reason such official season games competition with MLS has not taken place in the relevant U.S. market—which is lucrative and attractive to a number of top-tier foreign men's leagues and teams—is because the horizontal geographic market division agreement enforced by USSF and FIFA has blocked it.

168.    The FIFA market division agreement may alternatively be viewed as a vertical agreement between USSF, FIFA, the other National Associations and their respective members, in which USSF, FIFA and the other National Associations act as the vertical facilitators and enforcers of the market division agreement that is then imposed upon the foreign leagues and their teams to, among things, shield MLS from competition in the relevant U.S. market for men's top-tier official season professional soccer league games.

169.    Whether viewed from a horizontal, or a vertical perspective, the geographic market division agreement and the penalties to enforce it constitute an unreasonable market division agreement and group boycott, which on its face would always or almost always tend to restrict competition and decrease output, is plainly anticompetitive, and obviously lacks any redeeming procompetitive virtues.  Accordingly, USSF's and FIFA's participation in this agreement to

allocate the market for, and limit the output of, men's top-tier official season professional soccer league games in the U.S. is a *per se* violation of Section 1 of the Sherman Act.

170.    The horizontal and vertical agreement between USSF, FIFA and each of the other National Associations—which includes the agreement of their respective professional soccer leagues and teams—is also a naked restraint on competition, blocking entry into the relevant market, which bestows a monopoly upon MLS, that cannot be justified on procompetitive grounds. Accordingly, and in the alternative, USSF's and FIFA's participation in this agreement to allocate and limit output in the relevant market is a violation of Section 1 of the Sherman Act under an abbreviated rule of reason analysis, *i.e.*, the "quick look" test.

171.    The horizontal and vertical agreement between USSF, FIFA and each of the other National Associations—which includes the agreement of their respective professional soccer leagues and teams—has had significant anticompetitive effects in the relevant market for men's top-tier official season professional soccer league games in the U.S., resulting in antitrust injury to consumers, sponsors, competitors, and potential competitors as alleged herein.  This antitrust injury has included reduced output and lowered the quality of games.

172.    The horizontal and vertical agreement between USSF, FIFA and each of the other National Associations—which includes the agreement of their respective professional soccer leagues and teams—serves no procompetitive purpose in the relevant market (indeed, USSF and FIFA have not even tried to articulate such a procompetitive purpose) and instead serves to restrict output in, and block entry to, the relevant market, resulting in an anticompetitive monopoly position for MLS. Reasonable less restrictive alternatives also would exist to achieve any plausible procompetitive purpose of the geographic market division agreement.  As a result, the participation

of Defendants in the geographic market division agreement would, in the alternative, be a violation of Section 1 of the Sherman Act under a full rule of reason analysis.

173.    The horizontal and vertical  agreement between USSF, FIFA and each of the other National Associations—which includes the agreement of their respective professional soccer leagues and teams—which was first implemented in 2018 (subsequent to the 2016 Settlement Agreement), directly and proximately caused antitrust injury and damages to the business and property of Relevent, to similarly situated promoters, to fans and sponsors in the relevant market, and to those foreign men's top-tier professional soccer leagues and teams which, absent the anticompetitive agreement, would participate in official season games in the U.S.  Relevent is a direct participant in the relevant market as a promoter of official season games and is, in fact, a specifically intended target of the market division agreement.

174.    The anticompetitive market division agreement is directly evidenced in, among other things, the written market division policy adopted by the FIFA Council, the actions of the FIFA Council and the FIFA Football Stakeholders Committee to formulate and implement the market division policy, the admitted agreement of USSF to adhere to the market division policy, the FIFA rules which require the agreement of all the National Associations and their leagues and teams to adhere to all policies adopted by the FIFA Council as a FIFA "Body" (which includes the market division policy), the admission of USSF that it denied a sanction to the official season games that Relevent sought to promote because of USSF's agreement to adhere to the FIFA market division policy, the written FIFA rules for enforcement against any leagues, teams or players that do not adhere to the FIFA market division policy, and the actions of Sunil Gulati, Carlos Cordeiro, and Don Garber (on behalf of USSF and MLS) with other participants in the FIFA Council and FIFA Football Stakeholders Committee to adopt the FIFA market division policy, as well as in the

public statements of FIFA President Gianni Infantino indicating his support for the adoption of a FIFA policy to protect MLS as the only men's top-tier league sanctioned to offer official season games in the U.S.

175.    Further, the fact that top-tier leagues and teams in Spain and Ecuador have indicated their desire to participate in official season games in the U.S., but have been prevented from doing so by the threat of sanctions and opposition from other FIFA entities, demonstrates that absent the FIFA market division agreement, it would not be in the individual economic interests of these leagues and teams to forego competing in the relevant U.S. market.  Only concerted action leading to their coerced participation in the FIFA market division agreement can explain the ultimate decision by these leagues and teams to not participate in the official season games that Relevent has sought to promote.

176.    The FIFA market division agreement has caused antitrust injury to U.S. consumers in the form of blocked official season games that were to be held in the U.S. and the inability to attend future official season games in the U.S. involving foreign leagues and teams.

177.    Relevent, other promoters, foreign soccer leagues and teams who wish to participate in official season games in the U.S. and consumers and sponsors for such games, will continue to suffer antitrust injury unless USSF and FIFA are enjoined from continuing to implement and enforce the FIFA market division agreement and are required to sanction such games in the U.S., including games promoted by Relevent.

178.    Relevent has already suffered significant antitrust injury and damages to its business and property as a result of being prevented, by the anticompetitive market division agreement, from being able to promote any official season soccer games in the U.S. since 2018. Relevent is entitled to an award of treble damages, in an amount to be proven at trial, for the

injuries it has suffered as a result of Defendants' market division agreement in violation of Section 1 of the Sherman Act.

## COUNT II

### Tortious Interference with Existing and Prospective Business Relationships

179.   Relevent incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

180.   Relevent possesses a legitimate and protectable interest in its business relations with international soccer leagues, National Associations, clubs, and vendors with respect to the promotion of its events in the U.S.

181.   Relevent has or had preexisting business relationships with multiple international soccer leagues, National Associations, clubs, and event vendors, including La Liga, as well as other leagues and clubs that have participated in, or considered participating in, official season games promoted by Relevent the U.S.

182.   USSF holds itself out as the exclusive sanctioning body for all international men's professional soccer games in the U.S. on behalf of FIFA and has required Relevent to submit applications to USSF for each proposed game to be held in the U.S., including the May 5 Event that Relevent wished to promote in the U.S.  At all relevant times, USSF was aware of Relevent's business relationships with multiple international soccer leagues, National Associations, clubs, and event vendors that were seeking to participate in such events in the U.S.

183.   In 2018 and 2019, Relevent approached USSF and informed it that Relevent had arranged to promote three separate official season games in the U.S.  USSF intentionally ignored, delayed and/or ultimately rejected all of Relevent's attempts to obtain a USSF sanction for these events, which USSF knew was essential in order for Relevent to conduct the events.  As a result,

each of these planned official season games had to be cancelled and Relevent's relationships with its business partners, which were known to USSF, were severely harmed.

184.    USSF interfered with Relevent's business relationships in this manner without any legitimate justification and pursuant to its anticompetitive agreements with FIFA and others to restrict output in the U.S. of men's top-tier official season professional soccer league games.

185.    USSF has thus exercised its authority from FIFA to willfully interfere with and disrupt Relevent's business relationships without any lawful justification or privilege to do so.

186.    USSF's conduct was undertaken with malice, or in knowing disregard of or indifference to Relevent's rights and interests, and USSF's conduct was so outrageous as to warrant the imposition of punitive damages.

187.    USSF's intentional and malicious conduct to interfere with Relevent's business relationships was also undertaken in an effort to protect the interests of its economic partners MLS and SUM.

188.    As a direct and proximate result of USSF's willful and tortious interference, Relevent was unable to organize and promote at least three official season games in the U.S. and stands to lose more such business opportunities as a result of USSF's continued tortious conduct, which prevents Relevent from promoting any such future official season games.

189.    As a direct and proximate result of USSF's willful and tortious interference, Relevent suffered and will continue to suffer irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

190.    Relevent will suffer this harm unless and until USSF is restrained from its current and intended future tortious conduct.

191.    As a direct and proximate result of USSF's willful and tortious interference, Relevent has suffered damages in New York, which continue to accrue in the form of lost business, in an amount to be proven at trial.

192.    With respect to the official season games USSF interfered with that were to be held in Miami, Florida, USSF's tortious conduct also violated Florida law and caused damages to Relevent that are recoverable thereunder, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Accordingly, Relevent prays for judgment with respect to its Amended Complaint as follows:

193.    That the unlawful contracts, conspiracies, or combinations alleged herein, and the acts done in furtherance thereof by FIFA, USSF and their co-conspirators, be adjudged and decreed a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

194.    That the Court enjoin FIFA and USSF from continuing to implement, adhere to or enforce their unlawful market division agreement to unreasonably restrain trade in the U.S., to cease withholding the sanctioning of official season games to be played by foreign soccer leagues and teams and promoted by Relevent or other promoters in the U.S., and to cease exercising their sanctioning authority to restrict the output of official season games in the relevant market to bestow an anticompetitive monopoly on MLS, all in violation of Section 1 of the Sherman Act with relief to be provided under Section 16 of the Clayton Act;

195.    That the Court award compensatory and treble damages to Relevent resulting from the injury to its business and property caused by FIFA's and USSF's violations of Section 1 of the Sherman Act in an amount to be determined at trial with relief to be provided under Section 4 of the Clayton Act;

196.    That the Court award compensatory damages to Relevent resulting from USSF's tortious interference with Relevent's existing and prospective business relationships in an amount to be determined at trial;

197.    That the Court award exemplary and punitive damages for USSF's violation of New York and Florida tort law in an amount to be determined at trial;

198.    That the Court award pre-judgment and post-judgment interest at the maximum legal rate;

199.    That the Court award Relevent's costs, expenses, and reasonable attorneys' fees in this action; and

200.    That the Court award such other relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: September 14, 2020

By:     /s/ Jeffrey L. Kessler
        Jeffrey L. Kessler
        Jonathan J. Amoona
        Angela A. Smedley
        Adam I. Dale
        WINSTON & STRAWN LLP
        200 Park Avenue
        New York, New York 10166
        Tel: (212) 294-6700
        Fax: (212) 294-4700
        jkessler@winston.com
        jamoona@winston.com
        asmedley@winston.com
        aidale@winston.com

        Eric Meiring (*pro hac vice*)
        WINSTON & STRAWN LLP
        1700 K Street, N.W.
        Washington, DC 20006
        Tel: (202) 282-5722
        Fax: (202) 282-5100
        emeiring@winston.com

        *Counsel for Relevent Sports, LLC*