**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

RELEVENT SPORTS, LLC,

                             Plaintiff,

      -against-

FÉDÉRATION INTERNATIONALE DE FOOTBALL
ASSOCIATION and UNITED STATES SOCCER
FEDERATION, INC.,

                       Defendants.

No. 19-cv-08359 (VEC) (BCM)

**ORAL ARGUMENT
REQUESTED**

---

**DEFENDANT UNITED STATES SOCCER FEDERATION, INC.'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................................1

II. BACKGROUND ................................................................................................................4

    A.     Factual History.........................................................................................................4

           1.     U.S. Soccer and FIFA ................................................................................4

           2.     FIFA's Governance Structure ...................................................................4

           3.     FIFA Has Long Regulated the Staging of International Matches...............5

           4.     Relevent Develops Plans to Stage Official La Liga Matches
                 Outside of the League's Home Territory ....................................................6

    B.     Procedural History ...................................................................................................7

           1.     Relevent's Original Complaint and this Court's Dismissal Order..............7

           2.     Relevent's Amended Complaint .................................................................9

III. ARGUMENT .....................................................................................................................9

    A.     Relevent Fails To Allege An Unlawful Agreement.................................................9

           1.     Though It Uses Different Conclusory Labels, Relevent Complains
                 of the Same Conduct that the Court Previously Held Failed ....................10

           2.     Relevent Has Not Alleged An Unlawful Vertical Agreement
                 Between FIFA And U.S. Soccer................................................................11

           3.     Relevent Has Not Alleged An Unlawful Agreement Between U.S.
                 Soccer And Other FIFA Members .............................................................15

                 a.     Relevent Has Not Cured the Deficiencies that Plagued its
                       Prior Claim of a Horizontal Conspiracy .........................................15

                 b.     Relevent's "Walking Conspiracy" Theory Does Not
                       Plausibly Allege A Horizontal Agreement .....................................17

    B.     Relevent's Alleged Antitrust Markets Are Implausible.........................................18

           1.     Relevent's Geographic and Product Markets Are Fatally
                   Mismatched..............................................................................................19

           2.     Relevent's Alleged Product Market Is Implausibly Narrow....................20

    C.     Relevent Fails to Allege Plausible Anticompetitive Effects..................................22

    D.     Relevent's Antitrust Claim Should Be Dismissed in its Entirety For
           Failure To Join An Indispensable Party.................................................................23

    E.     Relevent's Covenant Not To Sue Bars Its Antitrust Claim ...................................24

IV. CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

AD/SAT v. Assoc. Press,
181 F.3d 216 (2d Cir. 1999)....................................................................14, 17, 21

Am. Dental Ass'n v. Cigna Grp.,
605 F.3d 1283 (11th Cir. 2010) ...........................................................................17

Am. Tobacco Co. v. United States,
328 U.S. 781 (1946)..............................................................................................13

Anderson News, L.L.C. v. Am. Media, Inc.,
680 F.3d 162 (2d Cir. 2012).......................................................................9, 10, 13, 16

Ashcroft v. Iqbal,
556 U.S. 662 (2009)..............................................................................................21

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007)..................................................................................10, 13, 17

Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,
985 F. Supp. 2d 612 (S.D.N.Y. 2013)........................................................12, 19, 20

Brown Shoe Co. v. United States,
370 U.S. 294 (1962)..............................................................................................18

Cenedella v. Metro. Museum of Art,
348 F. Supp. 3d 346 (S.D.N.Y. 2018)..................................................................16

Chapman v. N.Y. State Div. for Youth,
546 F.3d 230 (2d Cir. 2008)..................................................................................19

Comm. Data Servs. v. Int'l Bus. Machines,
166 F. Supp. 2d 891 (S.D.N.Y. 2001)..................................................................20

Concord Assocs., L.P. v. Entm't Props. Trust,
817 F.3d 46 (2d Cir. 2016)......................................................................18, 20, 22

Copperweld Corp. v. Independence Tube Corp.,
467 U.S. 752 (1984)..............................................................................................14

E.E.O.C. v. Peabody W. Coal Co.,
610 F.3d 1070 (9th Cir. 2010) ........................................................................23, 24

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
    243 F.3d 980 (6th Cir. 2001) ......................................................................13

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)..........................................................................22

*Gianna Enters. v. Miss World (Jersey) Ltd.*,
    551 F. Supp. 1348 (S.D.N.Y. 1982).............................................................22

*Heerwagen v. Clear Channel Comms.*,
    435 F.3d 219 (2d Cir. 2006), *overruled on other grounds by Teamsters Local
445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir.
2008) ...........................................................................................................19, 21

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) .............................................................18, 21, 22

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) .......................................................................19

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
    407 F.3d 1027 (9th Cir. 2005) .....................................................................14

*Jessup v. American Kennel Club, Inc.*,
    61 F. Supp. 2d 5 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 111 (2d Cir. 2000)..................17

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)..........................................................................21

*LaFlamme v. Société Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ........................................................17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MDL 2262 (NRB), 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ............14

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016)........................................................................22

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)........................................................................22

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020).........................................................18

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)........................................................................18

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*,
    545 F.2d 18 (7th Cir. 1976) ...................................................................25

*Theatre Party Assocs., Inc. v. Shubert Org.*,
    695 F. Supp. 150 (S.D.N.Y. 1988)....................................................21, 22

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..............................................................18, 22

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)....................................................................23

*United States v. McKeon*,
    738 F.2d 26 (2d Cir. 1984)........................................................................7

*Universal Grading Service v. eBay, Inc.*,
    No. C-09-2755 RMW, 2012 WL 70644, (N.D. Cal. Jan. 9, 2012), (9th Cir.
    2014), *aff'd*, 563 F. App'x 571 ..............................................................12

*US Airways, Inc. v. Sabre Holdings Corp.*,
    105 F. Supp. 3d 265 (S.D.N.Y. 2015)....................................................25

*Viazis v. Am. Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) ...................................................................13

## STATUTES

Sherman Act § 1...............................................................................................8, 10

Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501, *et seq.* ...........3, 4, 12, 14, 24

## RULES

Fed. R. Civ. P. 19......................................................................................3, 9, 23, 24

## OTHER AUTHORITIES

Jamie Jackson, *Plan For 39th Game 'Still On,'* The Guardian (Aug. 2, 2008),
    https://www.theguardian.com/football/2008/aug/03/premierleague ...........................6

Mike Adamson, *Blatter Attacks Premier League's Overseas Plans*, The Guardian
    (Feb. 14, 2008), https://www.theguardian.com/football/2008/feb/14/
    newsstory.premierleague1 ........................................................................6

Relevent Sports Group, "About," https://www.releventsportsgroup.com/about..........................23

Rodney D. Fort, SPORTS ECONOMICS 24 (3d ed. 2011) ................................................20

Tom Bogert, *MLS Expansion Boom Continues at Unprecedented Rate in Modern Sports*, MAJOR LEAGUE SOCCER (Oct. 21, 2019), https://www.mlssoccer.com/post/2019/10/21/mls-expansion-boom-continues-unprecedented-rate-modern-sports ........................................................................................23

U.S. Soccer, "About," https://www.ussoccer.com/about..............................................................4

## I.  INTRODUCTION

The Court dismissed Relevent's original Complaint, finding that it failed to state an antitrust claim, and failed to join an indispensable party—the Fédération Internationale de Football Association (FIFA).  In allowing Relevent to amend, the Court directed it to plead facts (1) "beyond [U.S. Soccer's] mere acquiescence to the FIFA Directive, from which the Court can infer that there is an unlawful agreement between USSF and FIFA," Order at 14 n.11; and (2) "sufficient to support the exercise of personal jurisdiction over FIFA," *id*. at 19.  Relevent has done neither.  Far from curing the deficiencies that doomed its original Complaint, Relevent merely recycles and embellishes its allegations, repackaging them with a new label.  But whether the supposed conspiracy is labeled an "output reduction" (original Complaint) or "market allocation" (Amended Complaint), the "agreement" that allegedly harmed Relevent is still nothing more than U.S. Soccer's (and many unnamed "others'") compliance with the rules of soccer's international governing body.  Relevent's Amended Complaint thus founders on the same grounds as its predecessor.

*First*, there are still no allegations of a plausible agreement among U.S. Soccer, FIFA, and anyone else.  Relevent added *no* allegations to plausibly suggest that U.S. Soccer and FIFA entered into an agreement to enact a rule, restrict output, or allocate markets.  Relevent's theory is still that "USSF, and FIFA's other National Associations, [] agree to apply" FIFA's rules as part of the price of participation in FIFA's global soccer structure.  Am. Compl. ¶ 6.  The effort to make this "agreement" plausible consists of some new allegations that U.S. Soccer hoped or tried to influence FIFA's rule-making.  *Id*. ¶¶ 111-17.  But such allegations actually undermine the plausibility of a pre-existing agreement between U.S. Soccer and FIFA because there would be no need for U.S. Soccer to influence FIFA if there were a pre-existing agreement.  More

fundamentally, U.S. Soccer must comply with FIFA's rules, so the fact that it does so does not plausibly suggest an unlawful agreement.

Relevent's Amended Complaint also fails to address deficiencies that previously plagued its horizontal conspiracy claim. There still is no explanation as to how U.S. Soccer and any of the 210 other FIFA National Associations are competitors. There still is "no attempt to identify with which, if any" other FIFA members U.S. Soccer supposedly agreed. Order at 16. The self-defeating allegations that, rather than having entered into an agreement, certain FIFA members want to cast off the challenged rule, still remain. *Id*. at 17 & n.15. And critically, there still is nothing that changes the "obvious" alternative explanation for the decision by U.S. Soccer (and other FIFA National Associations) to follow FIFA's rules—namely, the risk of penalties or exclusion from FIFA tournaments for non-compliance. *Id.* at 14 n.11.

Relevent's allegations also fail for more intuitive reasons. For one, the FIFA rules have been in place for decades, so it is implausible that FIFA and its members needed to enter into an "agreement" in October 2018 to prohibit the matches the rules already govern. *See* Order at 4 (recognizing that the "directive is consistent with FIFA's statutes"); Ex. 1 (2020 FIFA Stats.) Arts. 71, 73. For another, the alleged motive underlying the agreement to adopt and apply FIFA's policy—specifically to "protect MLS from official season games competition" (Am. Compl. ¶ 122, *see also id*. ¶¶ 90, 142, 163)—defies common sense and reality. Relevent does not attempt to explain why FIFA, which governs 211 National Associations, has any interest in protecting the U.S.-based league MLS, much less why the other foreign National Associations—which Relevent claims *compete* with U.S. Soccer (*id*. ¶ 167)—would care to protect MLS from competition. The initial match Relevent sought to stage, between Barcelona and Girona, could not have been a competitive threat to MLS because it was scheduled during MLS's *offseason*. Indeed, the

Amended Complaint explicitly alleges that U.S. Soccer regularly approves Relevent's friendly matches *during* the MLS season. Relevent's own allegations accordingly demonstrate the implausibility of its "conspiracy" theory.

*Second*, Relevent's antitrust claim fails because the alleged relevant market makes no sense and ignores economic realities. If the consumers who suffer harm are fans who attend live games and sponsors who want to reach those fans (as Relevent alleges), then the relevant antitrust market cannot be a national one. Instead, it must be a local or regional market in which those fans will travel to live games—as the Second Circuit and other courts considering such markets have held. Relevent also fails to provide any plausible explanation for why its alleged product market *excludes* the very international matches it regularly hosts in the U.S., or the numerous other kinds of high-quality soccer matches that fans can (and do) consume. This failure to plead cognizable markets independently requires dismissal—as does the fact that Relevent fails to plead facts plausibly suggesting that there have been anticompetitive effects (e.g., reduced output).

*Third*, as set forth in FIFA's motion to dismiss, Relevent still has not established that this Court may exercise personal jurisdiction over FIFA. Without jurisdiction over FIFA, Rule 19 dictates dismissal of Relevent's injunctive *and* damages claims because they are both ineffectual and inequitable: ineffectual because an injunction against U.S. Soccer alone would not afford Relevent complete or adequate relief, and inequitable because any damages awarded against U.S. Soccer would punish it for complying with the rules of its international governing body, which both FIFA and the Ted Stevens Olympic and Amateur Sports Act *require*.

*Finally*, Relevent's claims against U.S. Soccer remain barred by the covenant not to sue in a 2016 settlement agreement between Relevent and U.S. Soccer.

## II.    BACKGROUND

### A.    Factual History

#### 1.    U.S. Soccer and FIFA

U.S. Soccer is a New York non-profit corporation and the national governing body ("NGB") of soccer under the Ted Stevens Olympic and Amateur Sports Act.  *See* Am. Compl. ¶ 68 (citing 36 U.S.C. § 220501, *et seq.*).  Its mission is "to make soccer, in all its forms, the preeminent sport in the United States and to continue the development of soccer at all recreational and competitive levels."  *See* https://www.ussoccer.com/about.  Since 1914, U.S. Soccer has been the FIFA National Association responsible for administering and overseeing the governance of soccer in the United States.  Am. Compl. ¶ 31.  As the NGB for soccer, the Ted Stevens Act requires U.S. Soccer to maintain its membership in FIFA.  *See* 36 U.S.C. § 220522(a)(6).  FIFA's regulations, in turn, require member associations like U.S. Soccer to "comply fully with the Statutes, regulations, directives and decisions of FIFA bodies" at all times.  Am. Compl. ¶ 34.  Failure to adhere may result in expulsion or other penalties by FIFA.  *Id.*

#### 2.    FIFA's Governance Structure

U.S. Soccer is one of FIFA's 211 National Associations.  *Id.* ¶ 25.  Those National Associations are governed by six regional governing bodies, known as Confederations.  *Id.* ¶ 28.  The governing Confederation for North American soccer is the Confederation of North, Central and Caribbean Association Football ("Concacaf").  *Id.*

FIFA governs by Statutes, regulations, policies, and directives.  *Id.* ¶ 34.  Its main governing body is the FIFA Congress, which promulgates FIFA Statutes.  *Id.* ¶ 33.  Each FIFA National Association has a single vote in the FIFA Congress; a supermajority is required to amend FIFA Statutes.  *Id.*  The FIFA Council, comprising 37 representatives from various National Associations and Confederations, is authorized to interpret FIFA Statutes.  *Id.* ¶ 36.

3.    FIFA Has Long Regulated the Staging of International Matches

FIFA has regulated international soccer matches for more than a century.  FIFA's 1912 Statutes specified that "Inter-Club Matches between Clubs of different nationality can only be played after obtaining consent from the two national Associations concerned." Ex. 2 (1912 FIFA Stats.) Arts. 30-31.  FIFA's 1948 Statutes required that any club matches within "the territory of an affiliated Association shall be played only with the consent of this Association."  Ex. 3 (1948 FIFA Stats.) Art. 15; *see also* Ex. 4 (1958 FIFA Stats.) Arts. 33, 34.

These rules, with slight variation, remained in force until 1999, when FIFA amended them to require the consent of *both* the host and visiting National Associations, and of FIFA itself.   Ex. 5 (1999 FIFA Stats.) Art. 54.   Such matches could only go forward in "extraordinary circumstances."  *Id*.  By 2004, this rule disallowed any "club that is affiliated to" one National Association from "participat[ing] in competitions on the territory of another," except with "the authorisation of its current and prospective [National Associations] and of FIFA, except in exceptional circumstances." Ex. 6 (2004 FIFA Stats.) Art. 77.  Today, the policies on international games make clear that "[n]o such match or competition shall take place without the prior permission of FIFA, the confederations and/or the member associations" and that matches where teams seek to play in a competition on another association's territory may only be played "under exceptional circumstances," and with the ultimate approval of FIFA.  *See* Ex. 1 (2020 FIFA Stats.) Art. 71, 73.[1]

---

[1] U.S. Soccer's understanding is that Article 73 regulates games such as those proposed by Relevent, although other FIFA Statutes and Regulations also relate to international match sanctioning.  *See e.g*., Dkt. 43 (U.S. Soccer brief discussing Articles 71, 73, and FIFA's international game regulations).  In its brief, FIFA states that the sporting principle that limits the play of regular season games outside of a league's home country emanates from Article 71. Regardless, FIFA's approval is specified in both Articles 71 and 73, and the sporting principle and rule have been applied for decades as discussed herein.

Relevent's case is not the first time this longstanding sporting principle has been applied. In 2008, the English Premier League ("EPL")—England's top-tier men's professional club league—announced plans to add an extra set of "39th games" at the end of its regular season, to be played in venues around the globe. *See* Jamie Jackson, *Plan For 39th Game 'Still On,'* The Guardian (Aug. 2, 2008), https://www.theguardian.com/football/2008/aug/03/premierleague. FIFA's then-president, Sepp Blatter, made clear that "the [FIFA] executive committee [would] not sanction such an initiative." *See, e.g.*, Mike Adamson, *Blatter Attacks Premier League's Overseas Plans*, The Guardian (Feb. 14, 2008), https://www.theguardian.com/football/2008/feb/14/newsstory.premierleague1. The "39th Game" initiative thus never materialized. FIFA's limitation of official league matches in foreign territories has been on the books—and applied—for decades.

4.   Relevent Develops Plans to Stage Official La Liga Matches Outside of the League's Home Territory

Relevent is an American company, founded in 2012, that stages international soccer matches in the United States and around the world. *See* Am. Compl. ¶¶ 16-17, 102. Relevent is owned by Stephen Ross, who also owns the Miami Dolphins, the Hard Rock Stadium in Miami, and fitness companies Equinox and SoulCycle. Relevent traditionally has staged "friendlies," which are cross-border exhibition games between professional teams from either the same or different leagues. *Id.* at ¶¶ 17-18, 102-03. Unlike official league matches, friendlies do not count toward a club team's league standing and are permitted under FIFA's rules. Order at 2. Relevent has staged over 100 friendlies in the United States, receiving U.S. Soccer's approval for such matches even though they take place during MLS's regular season. Am. Compl. ¶¶ 18, 102.

In 2018, Relevent entered into a joint venture with Spain's top-tier professional league ("La Liga") to stage official La Liga matches outside of Spain. *Id.* ¶ 19. The first match Relevent sought to stage was to be played in January 2019—during the MLS offseason—between FC

Barcelona and Girona FC (both La Liga teams) at Mr. Ross's Hard Rock Stadium in Miami. *Id.* ¶¶ 111, 121. In response, FIFA President Gianni Infantino issued a statement indicating FIFA's disapproval, similar to its disapproval of the EPL's 39th Game proposal years before: "In football, the general principle is that you play a 'home' match at 'home,' and not in a foreign country . . . . There are rules [and] regulations that everyone complies with." Compl. ¶ 85.[2] When Relevent sought U.S. Soccer's permission to stage the match, U.S. Soccer asked Relevent to first obtain approvals from the other necessary authorities, pursuant to FIFA's rules. Am. Compl. ¶ 111. Understanding Relevent's proposed matches to be prohibited but noting that La Liga teams seemed willing to play, U.S. Soccer and other entities who would need to approve the match also sought clarification from FIFA. *Id.* ¶ 114. FIFA responded with a statement emphasizing "the sporting principle that official league matches must be played within the territory of the respective member association." *Id.* ¶ 117. FIFA also told the National Association for Spain, RFEF, that due to the sporting principle, the "match cannot be authorized." Dkt. 44-3 at 12, 15-16. Barcelona subsequently withdrew from the proposed game. Am. Compl. ¶ 121.

### B.     Procedural History

1.     Relevent's Original Complaint and this Court's Dismissal Order

Relevent's original Complaint alleged that U.S. Soccer, FIFA, and "each Confederation and National Association and their respective constituent members" had entered into an "anticompetitive agreement to comply" with the FIFA Council's 2018 directive forbidding the approval of Relevent's proposed Barcelona-Girona match, and had otherwise conspired to "restrict

---

[2] Relevent's Amended Complaint omits allegations from its original Complaint that undermined its claims. One example is the final clause of Mr. Infantino's statement, which underscores the longstanding FIFA rule that Relevent challenges here. *Compare* Compl. ¶ 85, *with* Am. Compl. ¶ 113. Relevent's original allegations, however, are admissions just as are those in its Amended Complaint. *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984).

entry into, and limit [the] output of, the relevant market for International Soccer Game Events in the U.S." Compl. ¶¶ 126-27. Ignoring the indisputably vertical nature of FIFA's relationship with U.S. Soccer (and the other unnamed co-conspirators), Relevent claimed it had alleged an agreement to restrict output constituting a "*per se* violation of Section 1 of the Sherman Act." *Id.* ¶ 129. Relevent also asserted a state law claim for tortious interference with business relations. *See id.* ¶¶ 134-47.

The Court compelled Relevent's tortious-interference claim to arbitration and dismissed its antitrust claim because Relevent failed to plausibly allege either an unlawful vertical agreement between U.S. Soccer and FIFA or an unlawful horizontal agreement between U.S. Soccer and any other entity. The Court faulted Relevent's reliance on U.S. Soccer's "unilateral compliance with FIFA's [2018] directive to support an inference that an unlawful agreement was made," and noted that the 2018 directive was "consistent with FIFA's statutes". Order at 4, 14. Relevent's allegations were implausible because "there are obvious rational reasons why [U.S. Soccer] would comply with the FIFA Directive without being part of an agreement to do so," including "its desire not to take action that could result in all U.S. men's soccer players and teams being deemed ineligible for World Cup play." *Id.* at 14 n.11. Even taking Relevent's allegations as true, the Complaint lacked "any factual allegations supporting an inference of an actual [horizontal] agreement" among FIFA's members to "restrict output." *Id.* at 18.

Even if Relevent had alleged an agreement between U.S. Soccer and FIFA, the Court explained that its "claim for injunctive relief would be dismissed for failure to join an indispensable party"—FIFA—to the action. *Id.* at 15 n.12. The Court recognized that if it enjoined U.S. Soccer from "complying with the FIFA directive," the FIFA directive would still remain in place, and Relevent would "have difficulty obtaining the other approvals it needs to host a match." *Id.*

Complete relief for Relevent therefore required injunctive relief *against FIFA*, but FIFA's joinder was infeasible for lack of personal jurisdiction. *Id.* Dismissal under Rule 19(b), therefore, would have been appropriate because a judgment in FIFA's absence would be inadequate. *Id.* The Court allowed Relevent to file an Amended Complaint, so long as it could allege "facts sufficient to support the exercise of personal jurisdiction over FIFA" or "join FIFA to this action." *Id.* at 19.

### 2. Relevent's Amended Complaint

Relevent's Amended Complaint adds FIFA as a defendant. Relevent maintains its Sherman Act claim against U.S. Soccer, which allegedly arises from the same conduct described in the original Complaint: U.S. Soccer's and unnamed FIFA members' "agreement to comply with the [FIFA] policy" disallowing official league matches on foreign soil, Am. Compl. ¶ 129; *see also id.* ¶ 98.[3] This widespread compliance with FIFA's rules by its members can supposedly be conceived of as either (1) a "horizontal agreement" among the various National Associations affiliated with FIFA, because they are "separate economic actors" and it has taken shape "through . . . FIFA decision-making bodies," *id.* ¶ 162; or (2) "a vertical agreement between [U.S. Soccer], FIFA, [and] the other National Associations and their respective members," *id.* ¶ 168.

## III. ARGUMENT

### A. Relevent Fails To Allege An Unlawful Agreement

To state an antitrust claim, Relevent's complaint must contain allegations that, if proved, would "reasonably tend[ ]" to show that U.S. Soccer and others shared "a conscious commitment to a common scheme designed to achieve an unlawful objective." Order at 10 (quoting *Anderson*

---

[3] Though the Court compelled Relevent's identical state law claims to arbitration, to date Relevent has not commenced arbitration on those claims and inexplicably reasserts them in its Amended Complaint. To the extent Relevent asserts new state law claims, they should be dismissed for the reasons argued in U.S. Soccer's first motion to dismiss. *See* Dkt. 33 at 34.

*News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)). Relevant must therefore plead "'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.*, it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News*, 680 F.3d at 184 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"; factual allegations supporting a Section 1 claim "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

1.     <u>Though It Uses Different Conclusory Labels, Relevent Complains of the Same Conduct that the Court Previously Held Failed</u>

Relevent's original complaint alleged that adherence by U.S. Soccer and "other" unnamed FIFA members to a FIFA directive constituted both a vertical and horizontal "agreement to comply" with FIFA's rules. Compl. ¶¶ 126-28. While Relevent's Amended Complaint now labels this "agreement to comply" as a "geographic market division agreement," the challenged conduct has not changed. *See* Am. Compl. ¶¶ 167-68. Relevent still complains about the effects of U.S. Soccer's and other FIFA members' compliance with a longstanding FIFA rule. Relevent continues to claim that such compliance somehow constitutes both a "horizontal and vertical agreement between USSF, FIFA and each of the other National Associations [and] ... their respective professional soccer leagues and teams." *Id*. ¶¶ 170, 173. The only "new" allegation aimed at tipping the plausibility scale is the illogical assertion that "the purpose and effect of" the vertical and horizontal "agreement" between FIFA, its 211 National Associations around the globe, and their leagues and teams, was *specifically* to "shield[]" MLS—a U.S. domestic league—"from any competition" *in the United States*. *Id*. ¶ 163; *see also id*. ¶¶ 90, 142. And so the only real differences between the two complaints are the conclusory labels used: the original Complaint

labeled the alleged conduct an "agreement to comply" with FIFA's directive to restrict output of "international soccer game events in the U.S." (Order at 17), whereas the Amended Complaint now calls it a "geographic market division agreement" with the purpose and effect of "limiting output" for official foreign league matches.[4] Am. Compl. ¶¶ 162-64.

This Court already dismissed Relevent's theory that compliance with FIFA's rules, without more, amounts to an unlawful agreement—vertical or horizontal. Order at 14, 18. It found instead that there are "obvious rational reasons why" U.S. Soccer would follow FIFA's directives "without being part of an agreement to do so"—including to avoid any "action that could result in all U.S. men's soccer players and teams being deemed ineligible for World Cup play." *Id.* at 14 n.11 (citing Compl. ¶¶ 32, 34). The label may have changed, but the substance remains the same. The Amended Complaint, therefore, fails for the same reasons its predecessor did.

### 2. Relevent Has Not Alleged An Unlawful Vertical Agreement Between FIFA And U.S. Soccer

In granting leave to amend, the Court directed Relevent to add "facts, beyond [U.S. Soccer's] mere acquiescence to the FIFA Directive, from which the Court can infer that there is an unlawful [vertical] agreement between USSF and FIFA." Order at 14 n.11. Relevent's Amended Complaint does no such thing. Beyond conclusory surplusage, the Amended Complaint contains no actual facts other than that U.S. Soccer opted to comply with the FIFA directive (as

---

[4] Relevent's new label for its alleged conspiracy debuted in a March, 2, 2020 letter from its counsel to FIFA and Concacaf "advis[ing]" them that FIFA's rule "is a geographic market division agreement" that increases "U.S. antitrust risks includ[ing] . . . enforcement by the U.S. Department of Justice[.]" Ex. 7 at 1. Two weeks later, the U.S. DOJ Antitrust Division sent a letter to FIFA and U.S. Soccer reporting that it "ha[d] learned" of a proposed FIFA rule and was "concerned that FIFA could violate U.S. antitrust laws by restricting the territory in which teams can play league games[.]" Am. Compl. Ex. 1 at 1, 2. Relevent's Amended Complaint subsequently adopted the "market allocation" label. The DOJ letter of course says nothing about whether Relevent has plausibly alleged any sort of unlawful agreement, which it has not.

the Ted Stevens Act requires).  A claim that this conduct amounted to a vertical "agreement" remains implausible, for several reasons.

*First*, the alleged motive for what Relevent now calls a "market division agreement"—that FIFA, U.S. Soccer, the legions of FIFA's other unnamed National Associations and their leagues and teams specifically intended "to bestow and maintain a monopoly position in the U.S. on MLS and its affiliate SUM" (Am. Compl. ¶¶ 91, 142; *see also id.* ¶ 163)—makes no sense.  Why would FIFA, the international governing body for all National Associations globally (or any of its other 210 National Associations), have an "economic motive" to "shield" a U.S. domestic league (MLS) and its marketing affiliate (SUM) from competition within the United States?  Neither FIFA nor any of the other unnamed "co-conspirators" has, or is even alleged to have, a relationship with SUM or an "economic linkage to the success of MLS." *Id.* ¶ 91.  And since FIFA, U.S. Soccer and the myriad other unnamed FIFA National Associations are allegedly "independent economic actors" who compete with one another, it certainly is not in the economic self-interest of any other National Association that "competes" with U.S. Soccer or any other foreign league that "competes" with MLS to agree to insulate MLS from competition.

The absence of any rational economic explanation for this anticompetitive motive, and the fact that it is directly undercut by Relevent's own allegations that U.S. Soccer, FIFA's other National Associations, and their respective leagues and teams are all "competitors," underscore that the alleged "agreement" is implausible.  *See Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618-19 (S.D.N.Y. 2013) (dismissing complaint that "fail[ed] to explain why the [defendants] would even want to enter into the type of restrictive agreement alleged"); *Universal Grading Service v. eBay, Inc*., No. C-09-2755 RMW, 2012 WL 70644, at *5 (N.D. Cal. Jan. 9, 2012), (9th Cir. 2014) (dismissing complaint when the alleged

scheme "simply does not make economic sense"), *aff'd*, 563 F. App'x 571. This is even starker when the proffered motive is contrasted with the "obvious rational reasons why [U.S. Soccer] would comply with the FIFA Directive without being part of an agreement to do so" (Order at 14 n.11)—which, as this Court recognized and Relevent admits, is to avoid risking penalties from FIFA or exclusion from FIFA tournaments.

*Second*, despite Relevent's efforts to cast the 2018 FIFA directive as FIFA's first-ever prohibition on official league matches being played on foreign soil, *see* Am. Compl. ¶ 37, FIFA's rule harkens back decades. *See supra* pp. 4-5; Order at 4. It has been applied outside of the United States and by U.S. Soccer to promoters other than Relevent. Am. Compl. ¶¶ 133-34. The modern iteration of the rule long predates Relevent's founding in 2012 (and also predates the U.S. Soccer-SUM marketing agreement supposedly motivating the alleged "conspiracy"). *See id.* ¶ 91; Ex. 5 (1999 FIFA Stats.) Art. 54. These realities further undermine a plausible motive for a conspiracy to enact the FIFA directive. *See Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 n.4 (5th Cir. 2002) ("[A] preexisting policy tends to support an inference of independent conduct"); *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 989 (6th Cir. 2001) (affirming summary judgment where the challenged rule "predates contact" between the alleged coconspirators).

*Third*, Relevent still has not alleged facts describing an actual agreement between FIFA and U.S. Soccer, or anyone else. Relevent needed to allege "'enough factual matter (taken as true) to suggest that an agreement was made.'" *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556). This would involve some "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946). Relevent has not pleaded anything of the sort.

None of Relevent's allegations say anything about whether there was a "unity of purpose or a common design and understanding" between U.S. Soccer and FIFA regarding FIFA's directive, much less a "meeting of the minds" between the two. They describe (at best) U.S. Soccer's hopes that FIFA would act a certain way, or (at worst) efforts to influence FIFA to act a certain way.[5]  If anything, Relevent's allegations about U.S. Soccer's "efforts" and advocacy to FIFA regarding the FIFA directive (*id*. ¶¶ 111-17) undercut an inference of an agreement.  U.S. Soccer's alleged advocacy would not have been necessary if an agreement was in place with FIFA. Nor is any agreement required for FIFA to issue a directive, or for U.S. Soccer to unilaterally apply FIFA's rules.  The self-contradictions that pervade Relevent's own allegations reflect how far it must stretch to claim that there was an "agreement" between FIFA and U.S. Soccer.  Relevent has failed yet again to allege a vertical agreement between FIFA and U.S. Soccer.  *See AD/SAT v. Assoc. Press*, 181 F.3d 216, 234 (2d Cir. 1999).

*Fourth*, as the NGB for the sport, U.S. Soccer must be a member of FIFA pursuant to the Ted Stevens Act and comply with FIFA's rules.  So when it comes to the application of FIFA's rules, there are no independent or divergent economic interests between U.S. Soccer and FIFA. This means that Relevent's vertical conspiracy claim is barred by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).  *See Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005); *In re LIBOR-Based Fin. Instruments*

---

[5] The Amended Complaint is replete with allegations of U.S. Soccer's unilateral decisions to adhere to FIFA's rules, which further undermine the plausibility of an "agreement to comply" with FIFA.  *See, e.g*., Am. Compl. ¶ 120 (U.S. Soccer denied an Argentinian official match because "FIFA rules would not permit [the match] … in the U.S."); ¶ 126 (U.S. Soccer refused to sanction match when Match Agent was not insured or listed on FIFA's registry, as required by FIFA's rules); ¶¶ 131-34 (U.S. Soccer denied an application to stage an official season match in New Jersey because of its "understanding" that such matches violated FIFA's rules).

*Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2019 WL 1331830, at *37 (S.D.N.Y. Mar. 25, 2019); Dkt. 33 at 28-31; Dkt. 39 at 13-14.

      3.    <u>Relevent Has Not Alleged An Unlawful Agreement Between U.S. Soccer And Other FIFA Members</u>

        a.    *Relevent Has Not Cured the Deficiencies that Plagued its Prior Claim of a Horizontal Conspiracy*

While Relevent's Amended Complaint includes additional conclusory statements, it still advances the same amorphous and implausible "horizontal" conspiracy amongst U.S. Soccer and numerous unnamed "others." Relevent still does not explain how any of the alleged horizontal co-conspirators actually compete with U.S. Soccer. The Court found that the horizontal conspiracy claim in the original Complaint faltered because there were "no supporting factual allegations" that "the alleged co-conspirator Confederations, National Associations, leagues and teams [] do compete with each other." Order at 16 & n.13. The Amended Complaint fares no better; it just says that the alleged co-conspirators "are actual and potential competitors with one another." Am. Compl. ¶ 4; *see also id*. ¶ 167. But merely repeating the conclusory label "competitors" is insufficient. Relevent does not even attempt to explain how the other unnamed Confederations, National Associations, leagues, and teams who are purportedly part of this global horizontal conspiracy actually compete with U.S. Soccer. That is fatal to its horizontal conspiracy claim.

The Amended Complaint also remains silent on even the most basic details as to who, other than FIFA and U.S. Soccer, is part of this supposedly vast cabal. The Court faulted Relevent's original Complaint because it "[made] no attempt to identify with which, if any, of the six regional confederations, over two hundred national associations, and countless leagues and teams Defendant actually conspired." Order at 16. Relevent's Amended Complaint is similarly defective. *See, e.g*., Am. Compl. ¶ 71 ("Pursuant to its agreements with FIFA and FIFA's other National Association members.…"). The only added specificity is an allegation that U.S. Soccer

"knew" that "other USSF and MLS allies would push the policy through in the FIFA Council." *Id.* ¶ 114. But not a single one of these "allies" is identified.

Because there still are no details as to which of the hundreds of entities supposedly participated in the "horizontal" conspiracy, the Amended Complaint does not allege anything "supporting an inference of an actual agreement[.]" Order at 18. Regardless whether it is labeled an "agreement to comply" with FIFA's directive (as before) or a "market division agreement" (now), Relevent still has not provided facts to suggest that U.S. Soccer and any of the hundreds of other supposedly competing, yet unidentified, National Associations, leagues, and teams came together to "agree" on anything, much less shared "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 10 (quoting *Anderson News*, 680 F.3d at 184). That alone is dispositive. *See Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358-59 (S.D.N.Y. 2018) (dismissing antitrust complaint where plaintiff failed to "allege during what time period the conspiracy was formed," failed to "clarify the extent to which the conspiracy is horizontal versus vertical," and alleged that "other unnamed co-conspirators, whom the plaintiff makes little effort to describe, are part of the conspiracy"); Order at 17-18.

Relevent also maintains allegations that this Court already found *undercut* inferences of a far-ranging horizontal conspiracy—namely, that it obtained two approvals for its Ecuadorian match and that Barcelona and Girona had committed to play in its proposed January 2019 match. *See* Am. Compl. ¶¶ 121, 125. These allegations, as the Court noted, were inconsistent with a wide-ranging agreement. Order at 16 n.14, 17 n.15. The allegations that affirmatively undermine an inference of a horizontal agreement, coupled with Relevent's continued inability to allege any facts regarding the most basic "who", "what", "when", "where", "why", and "how" regarding this supposed agreement, require the dismissal of Relevent's horizontal conspiracy claim.

b.      *Relevent's "Walking Conspiracy" Theory Does Not Plausibly Allege A Horizontal Agreement*

Relevent tries to overcome its failure to allege basic facts about a horizontal conspiracy by adding allegations that aim to cast FIFA as some sort of "walking conspiracy." *See, e.g.*, Am. Compl. ¶¶ 26, 36, 43-44.  This too fails.

Constituency membership organizations—even those made up of horizontal competitors, such as trade associations or standard-setting organizations—are not walking conspiracies whereby every action of the association constitutes "concerted action" under the antitrust laws. *AD/SAT*, 181 F.3d at 234; *see also Am. Dental Ass'n v. Cigna Grp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) (affirming dismissal of a complaint that sought to establish "a conspiracy . . . inferred from Defendants' participation in trade associations" because it was "well-settled before *Twombly* that participation in trade organizations provides no indication of conspiracy"); *LaFlamme v. Société Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) (dismissing antitrust complaint in part because "membership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement").  Allegations that a constituency-based organization's governance processes constitute concerted action are not sufficient to plead an antitrust conspiracy; rather, there must be facts "tending to show that association members, *in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT*, 181 F.3d at 234 (emphasis added).  Such an "agreement to agree" requires "a plausibly-alleged 'meeting of the minds'" among the members of the alleged conspiracy. *Am. Dental Ass'n*, 605 F.3d at 1296 (quoting *Twombly*, 550 U.S. at 557).  Even allegations of information sharing, parallel voting, or "irregularities" in the organization's relevant votes are insufficient. *See Jessup v. American Kennel Club, Inc.*, 61 F. Supp. 2d 5, 12 (S.D.N.Y. 1999) (dismissing evidence of procedural irregularities because "the antitrust laws are not intended

as a device to review the details of parliamentary procedure."), *aff'd*, 210 F.3d 111 (2d Cir. 2000).

Here, Relevent alleges nothing of the sort. It says only that U.S. Soccer "knew" that "other" entirely unidentified "[U.S. Soccer] and MLS allies would push the policy through" and then that the 2018 FIFA directive was adopted "at the behest of [U.S. Soccer] and MLS." Am. Compl. ¶¶ 114, 117. Such threadbare allegations do not suffice; if they did, every membership organization would be a serial antitrust violator because every Board or membership vote would be "concerted action." The Amended Complaint does not allege anything to suggest that U.S. Soccer obtained the agreement of other FIFA National Associations, Confederations, or even Council members to issue the 2018 FIFA directive.

## B. Relevent's Alleged Antitrust Markets Are Implausible

Relevent's antitrust claim also fails because it has not alleged a cognizable relevant antitrust market. Relevent's claim must be analyzed under the rule of reason. Order at 12. Thus, it must plausibly allege that the alleged agreement has harmed competition in a properly-defined "relevant market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.).

An antitrust plaintiff must "assert[] sufficient facts to allege plausibly the existence of both a product and geographic market." *Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52-53 (2d Cir. 2016). A properly defined geographic market must "'correspond to the commercial realities' of the industry and be economically significant." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 203 (S.D.N.Y. 2020) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962)). A proper product market must include "'products that have reasonable interchangeability for the purposes for which they are produced.'" *Concord Assocs.*, 817 F.3d at 53 (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)). While market definition can be "deeply fact-intensive," if the "complaint's 'relevant market' definition is facially unsustainable," it should be dismissed. *Todd*, 275 F.3d at 199, 200; *Hicks v. PGA Tour, Inc.*, 897

F.3d 1109, 1120 (9th Cir. 2018); *see also Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming dismissal of antitrust claim given a facially defective market definition); *Bookhouse of Stuyvesant Plaza*, 985 F. Supp. 2d at 621 (dismissal appropriate when the complaint omits an "obvious potential substitute").

1.   Relevent's Geographic and Product Markets Are Fatally Mismatched

While Relevent claims a *nationwide* geographic market comprising the United States, its alleged product market is limited to inherently *localized* products: tickets to, and promotion of, *live* performances of men's top-tier official season professional soccer league games in the U.S. *Compare* Am. Compl. ¶¶ 3-5, 14, 20, 157, 163, 167-68, 175, *with id.* ¶ 87. As the Second Circuit explains, numerous "courts have held that the market for certain entertainment services—such as, for example, tickets to movie theater showings—is local or regional." *Heerwagen v. Clear Channel Comms.*, 435 F.3d 219, 228 (2d Cir. 2006), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). That is because "it can be impractical for consumers to travel great distances to procure particular services," and—as a matter of "common sense"—a "purchaser of a concert ticket is hardly likely to look outside of her own area." *Id.*[6]

Relevent's product market also inexplicably excludes television broadcasts of the same matches despite the fact that fans watch such games and sponsors promote them on television. The problem for Relevent is that once broadcasts of Relevent's matches are included in the product market, the alleged "nationwide" geographic market becomes too narrow. That is because, for consumers of broadcast matches (viewers or sponsors) and broadcasters (who are themselves

---

[6] *See also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) (noting that "[b]ecause the demand for concerts is local, promoters need to target their advertising to the area surrounding a particular venue" and that "the market for concert promotion is local").

consumers of soccer matches), it does not matter whether a Barcelona-Girona game is played in Miami or in Spain. Accordingly, if broadcasts are properly included in the product market, the geographic market necessarily has to be *global*, because U.S. consumers and sponsors are perfectly *able* to view and sponsor televised broadcasts of soccer matches played around the world. This flaw in defining the relevant market warrants dismissal. *See Comm. Data Servs. v. Int'l Bus. Machines*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) (dismissing complaint that "failed to allege any facts explaining why the relevant geographic market is domestic rather than worldwide"); *see also Concord Assocs.*, 817 F.3d at 53-54 (affirming dismissal where the plaintiff "provided no basis on which to justify [its] proposed geographic market definition" and "conveniently" proposed a market definition that excluded gambling markets in other states that were well known and accessible to consumers); *Bookhouse of Stuyvesant Plaza*, 985 F. Supp. 2d at 621.

## 2. Relevent's Alleged Product Market Is Implausibly Narrow

Relevent's alleged product market also fails because it rests upon the premise that there are no reasonable substitutes for "official season professional soccer league games." Am. Compl. ¶ 86. The Amended Complaint ignores obvious alternatives including, for example, friendlies (*i.e.*, professional matches that do not count towards league or tournament standings), World Cup games, National Team games, and other professional sports that attract similar fan and sponsor interest. There is no explanation why fans, sponsors, or broadcasters do not consider any of these other products to be *reasonable substitutes* for official league soccer matches even though the fundamental economics of sports suggest that they are. *See, e.g.*, Rodney D. Fort, SPORTS ECONOMICS 24 (3d ed. 2011) ("Consumers view all manner of other entertainment as substitutes for sports."). For instance, Relevent contends that friendlies are not a substitute for regular season games, even if played by the same two teams, because friendlies do not count towards the league standings, "do not have the same 'high stakes,'" and "often do not feature the participating teams'

best players[.]" Am. Compl. ¶ 96. But Relevent also alleges that Women's and Men's national team games are not substitutes, even though those games have high stakes and feature the best players. Critically, Relevent does not explain why soccer fans or sponsors would not divert to these other kinds of soccer matches if there were a price increase on regular league games to "significantly above the competitive level." *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995); *see also AD/SAT*, 181 F.3d at 227.

Relevent's own history also belies its market definition. Relevent alleges it has successfully "organized and promoted the famed [ICC tournament] . . . throughout the world, including in the U.S." every year since 2013; its exhibition matches have been "three of the five highest-attended soccer games in the U.S."; and its "2014 'friendly' between Real Madrid (Spain) and Manchester United (England) still holds the attendance record for a soccer game in the U.S." Am. Compl. ¶¶ 17-18; *see also* Compl. ¶¶ 53-54. As Relevent's experience demonstrates, exhibition matches compete directly with MLS's (the top tier league in the U.S.) regular season matches, and other top-tier regular season matches around the world. Relevent cannot just wish away all of these admitted, common sense substitutes when it comes to defining a relevant market. *See Heerwagen*, 435 F.3d at 228; *see also Theatre Party Assocs., Inc. v. Shubert Org.*, 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) (dismissing antitrust claims where the alleged relevant market was limited to "the most popular Broadway shows" and excluded "other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events"); *Hicks*, 897 F.3d at 1121 (relying on "judicial experience and common sense" to reject a plaintiff's product-market definition at the pleading stage) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

The Second Circuit has reasoned that where, as here, the plaintiff fails "even to attempt a plausible explanation as to why a market should be limited in a particular way," the complaint

should be dismissed.  *Todd*, 275 F.3d at 200 & n.4 (citing *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982)); *see also Concord Assocs.*, 817 F.3d at 53-54.

Relevent does not explain why its alleged relevant market excludes numerous other admittedly substitutable products and is geographically limited to the United States.  The reason why is because the market has been gerrymandered to fit Relevent's case.[7]  That is the hallmark of an implausible market definition, and it warrants dismissal.  *See Theatre Party Assocs., Inc.*, 695 F. Supp. at 156; *Hicks*, 897 F.3d at 1121 (dismissing alleged market definition that was "not natural," "artificial," and "contorted to meet [plaintiffs'] litigation needs").

### C.    Relevent Fails to Allege Plausible Anticompetitive Effects

There is "only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market."  *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).  This requires plausible allegations (and ultimately proof) of increased prices, reduced output, or reduced quality.  *Id.* at 183.  Relevent certainly alleges that it was harmed, but harm to one competitor is *not* necessarily harm to competition, as the Second Circuit has repeatedly confirmed.  *E.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 308 (2d Cir. 2008).

All that could matter to the Court's anticompetitive effects analysis is Relevent's conclusion that U.S. Soccer's adherence to FIFA's rule has "reduced output and lowered the

---

[7] Relevent's attempts to manufacture a relevant antitrust market limited to precisely the kinds of soccer matches it wants to promote also highlight that Relevent is not an "efficient enforcer" of the antitrust laws, which is required for it to have antitrust standing.  *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).  Intentionally aligning the product and geographic markets to the specific business interest it is attempting to advance in this litigation brings into stark light how, as a soccer promoter rather than the actual professional soccer leagues, clubs, and players that would participate in the matches at issue or the soccer fans who would consume them, Relevent is claiming at best a derivative injury.  It is therefore not the kind of "efficient enforcer" with the requisite antitrust standing to pursue these antitrust claims.  *Id.*

quality of games." Am. Compl. ¶ 171. Such conclusions are never sufficient under *Twombly* and Relevent never pleads facts to explain how output or quality of professional soccer has actually been impacted. Relevent's manufactured relevant markets exclude the very games it successfully promotes and other high-quality soccer games such as Men's and Women's National Team games. But, Relevent describes its own ICC games as part of a "world-class tournament." https://www.releventsportsgroup.com/about. Relevent also touts the success of the games it has promoted with the approval of U.S. Soccer. Am. Compl. ¶¶ 17-18 (Relevent-promoted game between Manchester United and Real Madrid holds U.S. attendance record of 109,000 fans). When coupled with an "unprecedented expansion" in the number of MLS teams and games being played (Tom Bogert, *MLS Expansion Boom Continues at Unprecedented Rate in Modern Sports*, Major League Soccer (Oct. 21, 2019), https://www.mlssoccer.com/post/2019/10/21/mls-expansion-boom-continues-unprecedented-rate-modern-sports), it is clear that output of soccer has increased dramatically even if the relevant market were limited to the United States. Such increased output is "indicative of a thriving market," *United States v. Am. Express Co.*, 838 F.3d 179, 206 (2d Cir. 2016), and Relevent never explains why the Court can or should ignore these realities. Relevent fails to plausibly plead any adverse effect on competition.

### D. Relevent's Antitrust Claim Should Be Dismissed in its Entirety For Failure To Join An Indispensable Party

As FIFA's motion to dismiss makes clear, Relevent still has not established that jurisdiction over FIFA would be proper. Relevent's injunctive relief claim must, therefore, be dismissed.

The inability to join FIFA requires dismissal of Relevent's claim damages as well, because a damages award against U.S. Soccer in FIFA's absence would be "profoundly unfair." *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1084 (9th Cir. 2010); *see also* Fed. R. Civ. P. 19(b)(1) (instructing courts to consider "the extent to which a judgment rendered in [a necessary party's]

absence might prejudice . . . the existing parties"). Federal law requires U.S. Soccer—as the NGB of soccer in the United States—to maintain membership in FIFA. *See* 36 U.S.C. § 220522(a)(6). And FIFA, in turn, requires that U.S. Soccer follow its rules and regulations—including its prohibition on sanctioning official league games on foreign soil in the absence of FIFA approval and exceptional circumstances—or else face penalties or other repercussions from FIFA. *See* Am. Compl. ¶ 34; Order at 4; Ex. 1 (2020 FIFA Stats.) Art. 14(1)(a). U.S. Soccer is thus compelled by federal law and FIFA's statutes to uphold the very rules challenged here.

The Ninth Circuit confronted a similar situation in *Peabody Western Coal*, and concluded that "it would be profoundly unfair for a court to award damages against [the defendant] while allowing [the defendant] no redress against the government" because the defendant's "only sin, if indeed it was a sin, was to comply with" the demands of a government agency that could not be made a party to the case. 610 F.3d at 1084. The Court concluded that a claim for damages caused by that agency's demands could not proceed "in equity and good conscience," and ordered the claim dismissed. *Id.* The circumstances here likewise demand dismissal. Without FIFA in this litigation, U.S. Soccer will be hard-pressed to seek indemnification for any liability that might be imposed in connection with that claim—a claim that arises only because U.S. Soccer is required by federal law to comply with FIFA's rules. Dismissal of Relevent's antitrust claim under Rule 19 is the only means of avoiding that inequitable result.

### E. Relevent's Covenant Not To Sue Bars Its Antitrust Claim

Relevent's antitrust claim must also be dismissed because it is barred by a 2016 settlement agreement between Relevent and U.S. Soccer in which Relevent agreed, in a covenant not to sue, that it would "not assert and shall forever refrain and forbear from commencing ... any Claim, ... or proceeding of any kind against [U.S. Soccer] ... in any way challenging (x) U.S. Soccer's jurisdiction over International Games[.]" Ex. 8 (2016 Agreement) Art. 4. This is precisely that

kind of claim; it arises out of U.S. Soccer's refusal to sanction Relevent's application to stage an official foreign league match in the United States. *See* Am. Compl. ¶ 11. Relevent's assertion that the covenant does not apply because it does not mention "antitrust claims", *id.* ¶ 156, flatly defies the scope of Relevent's release in the settlement agreement, which defines "any Claim" to include "any and all action or actions, cause or causes of action, in law or in equity . . . of any nature whatsoever[.]" Ex. 8 (2016 Agreement) Art. 3(a).

Relevent's contention that public policy precludes an application of the covenant to its antitrust claims because they seek relief for violations "starting in 2018," Am. Compl. ¶ 158, also fails. *First*, public policy does not categorically forbid Relevent from releasing prospective antitrust claims against U.S. Soccer. *See Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20 (7th Cir. 1976) (a "broad covenant not to sue" is not "ordinarily contrary to public policy simply because it involves antitrust claims"); *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 279 (S.D.N.Y. 2015) (concluding that a covenant not to sue for prospective antitrust injury was not barred by public policy). *Second*, Relevent's antitrust claim is not aimed at alleged conduct that "took place starting in 2018." Am. Compl. ¶ 158. Rather, it rests on allegations of a FIFA "geographic market division policy" that long predates Relevent's founding and relationship with U.S. Soccer. *Id.* ¶ 93; *see supra* pp. 4-5. The covenant not to sue unambiguously covers this very claim.

## IV.    CONCLUSION

The Court should dismiss Relevent's Amended Complaint with prejudice.

December 7, 2020

Respectfully submitted,

**LATHAM & WATKINS LLP**

By: */s/ Christopher S. Yates*

Christopher S. Yates (admitted *pro hac vice*)
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600
Fax: (415) 395-8095
chris.yates@lw.com

Lawrence E. Buterman
885 Third Avenue
New York, New York 10022
Tel: (212) 906-1200
Fax: (212) 751-4864
lawrence.buterman@lw.com

*Attorneys for Defendant United States Soccer Federation, Inc.*