**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RELEVENT SPORTS, LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>FÉDÉRATION INTERNATIONALE DE<br>FOOTBALL ASSOCIATION and UNITED<br>STATES SOCCER FEDERATION, INC.,<br><br>　　　　　　　Defendants. | No. 1:19-cv-8359 (VEC) |

**FIFA'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO DISMISS COUNT I OF THE AMENDED COMPLAINT**

PAUL, WEISS, RIFKIND,
　WHARTON & GARRISON LLP
H. Christopher Boehning
Andrew C. Finch
Daniel A. Crane
Justin D. Ward
1285 Avenue of the Americas
New York, New York  10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
Email:  cboehning@paulweiss.com
　　　　afinch@paulweiss.com
　　　　dcrane@paulweiss.com
　　　　jward@paulweiss.com

*Attorneys for Defendant FIFA*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND .................................................................................................................... 2

LEGAL STANDARD............................................................................................................... 6

ARGUMENT ......................................................................................................................... 7

I.      Plaintiff's Claims Against FIFA, a Swiss Non-Profit, Should Be Dismissed for
Lack of Personal Jurisdiction.................................................................................... 7

     A.      Neither Section 12 of the Clayton Act nor the New York Long-Arm
Statute Authorizes Jurisdiction over FIFA. ........................................... 8

         1.      Section 12 of the Clayton Act Does Not Support Personal
Jurisdiction over FIFA. ................................................................ 8

         2.      New York's Long-Arm Statute, CPLR § 302(a)(1), Also
Does Not Authorize Jurisdiction over FIFA. .......................... 10

     B.      Exercising Jurisdiction over FIFA Would Be
Inconsistent with Due Process. ............................................................. 12

         1.      The Court Lacks General Jurisdiction over FIFA................................... 12

         2.      The Court Lacks Specific Jurisdiction over FIFA for Purposes of
Plaintiff's Antitrust Claim....................................................... 12

II.      Alternatively, Plaintiff's Antitrust Claim Against FIFA
Should Be Dismissed Under Rule 12(b)(6). .......................................................... 15

     A.      Like the Prior Complaint, the Amended Complaint Fails to Allege
Facts Showing the Existence of a Conspiracy to Divide Markets or
Boycott Rivals...................................................................................... 16

     B.      To the Extent the Amended Complaint Challenges FIFA's Regulatory
Role with Respect to Domestic League Regular Season Games, It Fails
Adequately to Allege the Elements of a Rule of Reason Claim. ......................... 18

         1.      The Amended Complaint Does Not Adequately Allege a Relevant
Product and Geographic Market. ............................................. 20

         2.      The Amended Complaint Fails Adequately to Allege
Anticompetitive Effects. .......................................................... 23

CONCLUSION...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*,
   181 F.3d 216 (2d Cir. 1999) ...................................................................................17

*Agra Chem. Distrib. Co.* v. *Marion Labs., Inc.*,
   523 F. Supp. 699 (W.D.N.Y. 1981) ..........................................................................9

*Ohio* v. *American Express Co.*,
   138 S. Ct. 2274 (2018) ..................................................................................20, 23, 24

*American Needle, Inc.* v. *NFL*,
   560 U.S. 183 (2010) ..................................................................................................19

*Aquiline Capital Partners LLC* v. *FinArch LLC*,
   861 F. Supp. 2d 378 (S.D.N.Y. 2012) .....................................................................13

*Arouh* v. *Budget Leasing, Inc.*,
   883 N.Y.S.2d 4 (App. Div. 1st Dep't 2009) ...........................................................12

*Bell Atlantic Corp.* v. *Twombly*,
   550 U.S. 544 (2007) ....................................................................................15–16, 17

*Best Van Lines, Inc.* v. *Walker*,
   490 F.3d 239 (2d Cir. 2007) .....................................................................................10

*Charles Schwab Corp.* v. *Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018) .......................................................................................14

*City of Long Beach* v. *Total Gas & Power N. Am., Inc.*,
   465 F. Supp. 3d 416 (S.D.N.Y. 2020) .......................................................................9

*City of New York* v. *Group Health, Inc.*,
   649 F.3d 151 (2d Cir. 2011), 817 F.3d ...................................................................21

*Coast to Coast Energy, Inc.* v. *Gasarch*,
   53 N.Y.S.3d 16 (App. Div. 1st Dep't 2017) ...........................................................11

*Concord Assocs., L.P.* v. *Ent. Props. Trust*,
   817 F.3d 46 (2d Cir. 2016) ..........................................................................20, 21, 23

*Daimler AG* v. *Bauman*,
   571 U.S. 117 (2014) ..................................................................................................12

*Daniel* v. *Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005) ....................................................................................8, 9

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...............................................25

*Hesse* v. *Godiva Chocolatier, Inc.*,
463 F. Supp. 3d 453 (S.D.N.Y. 2020).....................................................4

*Jessup* v. *Am. Kennel Club, Inc.*,
61 F. Supp. 2d 5 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 111 (2d Cir. 2000) ..................................17

*Kingsepp* v. *Wesleyan Univ.*,
763 F. Supp. 22 (S.D.N.Y. 1991).............................................................8

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
551 U.S. 877 (2007)...............................................................................24

*MacDermid Printing Sols., LLC* v. *Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)...................................................................23

*Major League Baseball Properties, Inc.* v. *Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)...................................................................19

*Mehr* v. *FIFA*,
115 F. Supp. 3d 1035 (N.D. Cal. 2015) .............................10, 12, 13, 14

*Metro. Intercollegiate Basketball Ass'n* v. *NCAA*,
339 F. Supp. 2d 545 (S.D.N.Y. 2004).....................................................19

*NBA* v. *SDC Basketball Club, Inc.*,
815 F.2d 562 (9th Cir. 1987) .................................................................19

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
958 F.3d 1239 (9th Cir. 2020) ...............................................................19

*NCAA* v. *Bd. of Regents of Univ. of Oklahoma*,
468 U.S. 85 (1984)...........................................................................19, 24

*O'Bannon* v. *NCAA*,
802 F.3d 1049 (9th Cir. 2015) ...............................................................19

*PepsiCo, Inc.* v. *Coca-Cola, Inc.*,
315 F.3d 101 (2d Cir. 2002)............................................................20, 23

*Plant Oil Powered Diesel Fuel Sys., Inc.* v. *ExxonMobil Corp.*,
801 F. Supp. 2d 1163 (D.N.M. 2011) .....................................................17

*Polansky* v. *Gelrod*,
798 N.Y.S.2d 762 (App. Div. 3d Dep't 2005) ........................................................11

*Relevent Sports, LLC* v. *USSF*,
No. 19-cv-8359 (VEC), 2020 WL 4194962 (S.D.N.Y. July 20, 2020) .......................... passim

*Santamaria* v. *Hilton Worldwide, Inc.*,
No. 19-CV-10795 (VEC), 2020 WL 2036724 (S.D.N.Y. Apr. 28, 2020)...........................6–7

*SPV Osus Ltd.* v. *UBS AG*,
882 F.3d 333 (2d Cir. 2018).............................................................................14

*In re SSA Bonds Antitrust Litig.*,
420 F. Supp. 3d 219 (S.D.N.Y. 2019) ...................................................................8

*Sullivan* v. *Barclays PLC*,
No. 13-CV-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ...............................15

*Taormina* v. *Thrifty Car Rental*,
No. 16-CV-3255 (VEC), 2016 WL 7392214 (S.D.N.Y. Dec. 21, 2016)...............................7

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 659 (2d Cir. 2013).............................................................................12

*United States* v. *Visa USA, Inc.*,
344 F.3d 229 (2d Cir. 2003).............................................................................24

*Walden* v. *Fiore*,
571 U.S. 277 (2014)..................................................................................13, 14

*Waldman* v. *PLO*,
835 F.3d 317 (2d Cir. 2016)..............................................................................7

*Winkler-Koch Eng'g Co.* v. *Universal Oil Prods. Co. (Del.)*,
70 F. Supp. 77 (S.D.N.Y. 1946)...........................................................................9

*World Skating Fed'n* v. *Int'l Skating Union*,
357 F. Supp. 2d 661 (S.D.N.Y. 2005).....................................................................8

**STATUTES AND RULES**

Clayton Act Section 12, 15 U.S.C. § 22 .......................................................... passim

Fed. R. Civ. P. 4(k)(1)(A) ...............................................................................13

Fed. R. Civ. P. 12(b)(2)............................................................................................................1, 6

Fed. R. Civ. P. 12(b)(6)........................................................................................................1, 7, 25

Fed. R. Evid. 201(b)(2)................................................................................................................4

N.Y. C.P.L.R. § 302(a) ..............................................................................................8, 10, 11, 13

**OTHER AUTHORITIES**

Ben Abramson, *U.S. Is No. 1 at World Cup (in Visting Fans)*, USA TODAY (June
    25, 2014), https://www.usatoday.com/story/dispatches/2014/06/25/world-cup-
    traveling-fans-facebook-checkins/11389599/ .........................................................................23

*Champions League 2018/19: All the Fixtures and Results*, UEFA (June 1, 2019),
    https://www.uefa.com/uefachampionsleague/news/0252-0e9902dd97ae-
    bd3c7b568287-1000--champions-league-2018-19-all-the-fixtures-and-results/ ....................22

*Champions League*, CONCACAF,
    https://www.concacafchampionsleague.com/en/..................................................................22

*Champions League*, UEFA, https://www.uefa.com/uefachampionsleague/..................................22

*Copa Liberatadores*, CONMEBOL, https://www.copalibertadores.com/en................................22

*Europa League*, UEFA, https://www.uefa.com/uefaeuropaleague/ .............................................22

Mark Ogden, *U.S. Tops 2018 World Cup Ticket Sales to Fans Outside of Russia*,
    ESPN (June 12, 2018), https://www.espn.com/soccer/fifa-world-
    cup/story/3523402/us-tops-2018-world-cup-ticket-sales-to-fans-outside-of-
    russia .......................................................................................................................................23

*MLS Releases 2018 Regular-Season Schedule*, MLS (Jan. 4, 2018),
    https://www.mlssoccer.com/schedule/2018/announcement ....................................................4

*MLS Releases 2019 Regular-Season Schedule*, MLS (Jan. 7, 2019),
    https://www.mlssoccer.com/schedule/2019/announcement .........................................4, 22, 23

Paul Tenorio, *TV Options Sign of Soccer's Growth*, ORLANDO SENTINEL
    (June 18, 2015)........................................................................................................................25

Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), Defendant Fédération Internationale de Football Association ("FIFA"), by and through its undersigned counsel, hereby submits this memorandum of law in support of its motion to dismiss Count I of the Amended Complaint ("AC") of Plaintiff Relevent Sports, LLC ("Plaintiff" or "Relevent").

## PRELIMINARY STATEMENT

In its prior opinion and order, this Court correctly concluded that it lacked personal jurisdiction over FIFA and that Plaintiff's antitrust claim—which concern an alleged FIFA policy to prevent domestic, regular-season football matches from being played in foreign countries—should be dismissed for failure to state a claim. The allegations in Plaintiff's Amended Complaint are merely variations on the same themes Plaintiff raised before. Accordingly, the Court should reach the same conclusion as it did previously and dismiss FIFA from this case.

*First*, the allegations in the Amended Complaint offer no basis for this Court to exercise jurisdiction over FIFA, a non-profit organized under Swiss law and headquartered in Zurich. As this Court previously concluded, nothing suggests that FIFA aimed any relevant conduct toward New York or the United States. FIFA's alleged forum contacts, such as FIFA's entry into unrelated contracts with broadcasters, have no connection to this lawsuit and thus cannot support jurisdiction over FIFA. Moreover, while Plaintiff tries to attribute to FIFA the forum contacts of other persons and entities (co-defendant U.S. Soccer Federation ("USSF"), FIFA-licensed match agents, and USSF members of FIFA committees), there is no legal basis to do so. As a result, exercising jurisdiction over FIFA would be inconsistent with relevant statutory authority (Section 12 of the Clayton Act and New York's long-arm statute) and due process.

*Second*, even if the Court had jurisdiction over FIFA, it should again dismiss Plaintiff's antitrust claim on the merits. Plaintiff does not plausibly allege a conspiracy between FIFA (or anyone else) and USSF. According to Plaintiff, USSF wanted the FIFA Council to adopt

the alleged "policy" regarding domestic matches in order to protect Major League Soccer ("MLS") from foreign competition. That allegation makes little sense, because the match that allegedly prompted this "policy"—a Spanish league match that would have taken place in Miami in January 2019—was scheduled during MLS's off-season. Regardless, USSF had just one representative on the 37-member FIFA Council, and Plaintiff offers no reason to think a majority of the members shared USSF's alleged motive to protect MLS. Instead, as the Court previously concluded, the allegations suggest—at most—that USSF followed the FIFA "policy." That is not enough to plausibly allege a conspiracy. Moreover, and independently, decades of case law establish that, in the sports context, geographic restrictions are often necessary to achieve competitive balance; as a result, such restrictions are not unlawful *per se*, but subject to a rule of reason analysis. Even at the pleading stage, Plaintiff's allegations cannot support a rule of reason claim, because Plaintiff has not alleged a proper antitrust market or anticompetitive effects.

For all these reasons, Plaintiff's claims against FIFA should be dismissed.

## BACKGROUND[1]

### A. FIFA and Its Role in International Football

FIFA is the international governing body for association football ("football," also commonly called soccer). It is a non-profit association organized under the laws of Switzerland with its headquarters in Zurich. (Ex. A ("FIFA Statutes") art. 1(1); FIFA Decl. ¶ 3.) FIFA's members comprise 211 different national associations in countries across the world. (*See* AC ¶ 25; FIFA Decl. ¶ 4.) FIFA is also affiliated with six regional confederations that are not members of FIFA. (AC ¶ 28; FIFA Decl. ¶ 4.) FIFA's governing bodies include the FIFA Congress, where

---

[1]  This factual summary rests on the allegations in the Amended Complaint, documents incorporated by reference therein—some of which are attached to the accompanying declaration of H. Christopher Boehning (each cited as "Ex. __")—the accompanying declaration of Emilio Garcia Silvero ("FIFA Decl."), and facts subject to judicial notice.

all 211 member associations are represented (*see* FIFA Statutes art. 26(1)), as well as a smaller FIFA Council, which has 37 representatives that, by rule, must come from different member associations around the world (*see* FIFA Statutes art. 33(1), (4)).

FIFA organizes and oversees a number of international football matches and competitions, including the men's and women's World Cups.  (FIFA Statutes art. 2(b); *see* AC ¶ 63.)  FIFA's objectives also include making rules and regulations for football worldwide, developing the game of football, protecting the integrity of the game, promoting the growth of women's football, and combating discrimination.  (*See* FIFA Statutes arts. 2, 4.)

### B.    The Amended Complaint

In its prior opinion, the Court summarized the allegations in the original Complaint. *See Relevent Sports, LLC* v. *USSF*, No. 19-cv-8359 (VEC), 2020 WL 4194962 (S.D.N.Y. July 20, 2020).  The Amended Complaint raises essentially the same theories.

As before, the gravamen of the Amended Complaint is that USSF conspired with FIFA to adopt a "policy"—announced at an October 2018 meeting of the FIFA Council in Rwanda—that prohibits clubs in domestic football leagues from playing regular-season matches in foreign countries.  (*See* AC ¶ 2.)  The policy Plaintiff points to is a single sentence in a press release, in which the FIFA Council "emphasised the sporting principle that official league matches must be played within the territory of the respective member association." (Ex. C.)  This statement, however, did not constitute a new policy or a change to FIFA's rules.  Rather, it was guidance, consistent with FIFA's existing rules, that was provided in response to a request from the Spanish football association, USSF, and CONCACAF (the confederation for North and Central America and the Caribbean), made after Plaintiff sought to host a regular-season match between two clubs

in LaLiga, the top-tier Spanish professional football league, in Miami on January 26, 2019. (*See id.*; AC ¶¶ 111, 121.)[2]  Plaintiff does not allege that any formal rule change ever occurred.

In Plaintiff's view, the alleged policy is a "geographic market division agreement" (AC ¶ 112) that has produced anticompetitive effects in a supposed "market for men's top-tier official season professional soccer league games in the U.S."  (AC ¶ 86).  Despite this alleged policy, however, Plaintiff concedes that it has been permitted to host several "friendly" competitions among foreign professional football clubs in the United States.  (AC ¶¶ 17–18.) Plaintiff also concedes that many other international football matches, including matches between national teams, take place in the United States.  (AC ¶ 95.)  Moreover, while Plaintiff alleges that the "policy" was motivated by USSF's desire to avoid competition between LaLiga and MLS (the top-tier U.S. professional football league) (*see* AC ¶ 122), MLS was not playing regular-season matches in January 2019 when the Miami match would have taken place:  the 2018 MLS season ended on December 8, 2018, and the 2019 MLS season began on March 2, 2019.[3]  And while

---

[2]    Before FIFA was joined in this action, the Court read Article 73 of the FIFA Statutes to apply to the types of matches Plaintiff wants to stage. 2020 WL 4194962, at *2.  Such matches fall within the ambit of Article 71 and the Regulations Governing International Matches (whereas Article 73 concerns when a team in one country may permanently join another country's national association or take part in competitions, as distinct from matches, on that member association's territory).  (*See* FIFA Statutes art. 71(1); Ex. B (Regulations Governing International Matches) § 8, at 9; *id.* § 11, at 11; *id.* App'x B, at 16–17; *id.* App'x C, at 21–22, 25–26.)  But this nuance does not make a difference for the purposes of this motion because, either way, the guidance in the October 2018 press release did not change FIFA's existing rules or regulations, which never flatly prohibited domestic, regular-season matches from being played abroad.  While Plaintiff characterizes FIFA's October 2018 press release as a "policy," it was actually guidance that the FIFA Council provided in response to a request from the Spanish Federation, USSF, and CONCACAF.  (*See* Ex. C.)

[3]    *MLS Releases 2018 Regular-Season Schedule*, MLS (Jan. 4, 2018), https://www.mlssoccer .com/schedule/2018/announcement (Ex. E); *MLS Releases 2019 Regular-Season Schedule*, MLS (Jan. 7, 2019), https://www.mlssoccer.com/schedule/2019/announcement (Ex. F).  On a motion to dismiss, Court may take judicial notice of these dates, which are not subject to reasonable dispute.  *See* Fed. R. Evid. 201(b)(2); *Hesse* v. *Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462–63 (S.D.N.Y. 2020).

Plaintiff repeatedly asserts that USSF pushed the alleged policy in pursuit of its own self-interest (*see*, *e.g.*, AC ¶ 112), it makes no allegations explaining why the other members of the FIFA Council, FIFA itself, or the ***Spanish*** football association—which also asked for the Council's guidance—would want to protect USSF or MLS from foreign competition.

The Amended Complaint also provides various allegations intended to support Plaintiff's assertion of jurisdiction over FIFA. Plaintiff claims, "on information and belief," that FIFA engaged in contract negotiations with two national television broadcasters in this District at an unspecified point in time; FIFA is not alleged to have any ongoing performance obligations in this District under these agreements. (AC ¶ 62.) Similarly, Plaintiff speculates that FIFA employees may have had meetings or telephone calls with a New York–based banker. (AC ¶ 65.) Plaintiff also alleges that FIFA visited this District while selecting the United States as one of the host countries for the 2026 World Cup, and while considering New York as one of the (yet to be selected) "host cities." (AC ¶¶ 63–64.) In addition, an unspecified amount of $3 million in annual development funds earmarked for the United States allegedly flows to this District, although Plaintiff does not identify any related activities FIFA conducted in this District. (AC ¶ 61.)

Plaintiff further alleges that other persons and entities engaged in conduct "on behalf of" FIFA in the United States. These include USSF (*see* AC ¶¶ 54–55, 60, 70) and match agents licensed by FIFA (*see* AC ¶¶ 56–59). Other allegations make clear, however, that these other persons do not represent FIFA's interests. Plaintiff alleges that USSF is a "separate economic actor" from FIFA. (AC ¶ 161.) Plaintiff also alleges that its own match agent, Mr. Stillitano, was "employed by Relevent"—not FIFA. (AC ¶¶ 56–57.) In addition, Plaintiff alleges that USSF's representatives on the FIFA Council and the FIFA Stakeholders Committee conducted unspecified "business" in New York in their roles on those committees. (*See* AC ¶¶ 40, 45.)

Finally, Plaintiff attaches, as Exhibit 1 to the Amended Complaint, a letter dated March 16, 2020, from the Antitrust Division of the U.S. Department of Justice to FIFA and USSF. The letter does not relate to any of FIFA's existing rules, but instead relates only to a "proposed rule" that FIFA had indicated that it would be considering in the future. (*See* AC Ex. 1.) FIFA never adopted any such rule and none is now pending for consideration. (*See* FIFA Decl. ¶ 7.)

## C.    Procedural History

As USSF has previously explained, this suit is only the latest of several between it and Relevent. (*See* ECF No. 33 at 8–10.) Plaintiff brought this action in September 2019 against USSF, asserting claims under Section 1 of the Sherman Act and for tortious interference.

On USSF's motion, this Court dismissed the Sherman Act claim and ordered the tortious interference claim into arbitration. *Relevent*, 2020 WL 4194962. In dismissing the Sherman Act claim, the Court held that Plaintiff had not alleged a vertical agreement between USSF and FIFA, merely that USSF followed a FIFA policy. *Id.* at *6–7. The Court further held that Plaintiff had not alleged a horizontal agreement between USSF and unspecified "others," such as other national associations, leagues, and clubs. *Id.* at *8. In a footnote, the Court concluded that, while FIFA was a necessary party, Plaintiff's complaint offered no factual basis to assert jurisdiction over FIFA under Section 12 of the Clayton Act or the New York long-arm statute. *Id.* at *7 n.12. The Court also concluded that exercising jurisdiction over FIFA would not comport with due process, because nothing suggested FIFA had aimed its conduct at the United States. *Id.*

In an effort to cure the deficiencies identified by the Court, Plaintiff filed the Amended Complaint in September 2020, adding FIFA as a defendant to Count I only.

## LEGAL STANDARD

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of establishing personal jurisdiction over the defendant." *Santamaria* v.

*Hilton Worldwide, Inc.*, No. 19-CV-10795 (VEC), 2020 WL 2036724, at *2 (S.D.N.Y. Apr. 28, 2020) (Caproni, J.) (quotation marks omitted).  The Court "may consider affidavits and documents beyond the pleadings."  *Id.* at *3 n.3 (quotation marks omitted).

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Taormina* v. *Thrifty Car Rental*, No. 16-CV-3255 (VEC), 2016 WL 7392214, at *7 (S.D.N.Y. Dec. 21, 2016) (Caproni, J.) (quotation marks omitted).  "A plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level."  *Id.* (quotation marks omitted).  In addition to considering the complaint itself, the Court may also refer to "documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Id.* (quotation marks omitted).

## ARGUMENT

### I.   Plaintiff's Claims Against FIFA, a Swiss Non-Profit, Should Be Dismissed for Lack of Personal Jurisdiction.

Personal jurisdiction requires that there be a "statutory basis for personal jurisdiction that renders . . . service of process effective" and also that "the exercise of personal jurisdiction . . . comport with constitutional due process principles."  *Waldman* v. *PLO*, 835 F.3d 317, 327 (2d Cir. 2016) (quotation marks omitted).  In its prior opinion and order, this Court sensibly found that neither requirement was satisfied with respect to FIFA—a non-profit organized under Swiss law and headquartered in Switzerland, and which allegedly adopted the "policy" at issue at a meeting held in Rwanda—because Plaintiff had not established jurisdiction under the relevant statutory authority (Section 12 of the Clayton Act and New York's long-arm statute) and because jurisdiction would not comport with due process.  2020 WL 4194962, at *7 n.12.  Nothing

in the Amended Complaint warrants reaching a different conclusion, and so the Court should dismiss FIFA from this suit for lack of personal jurisdiction.

A.    **Neither Section 12 of the Clayton Act nor the New York Long-Arm Statute Authorizes Jurisdiction over FIFA.**

In the Amended Complaint, Plaintiff rests its assertion of personal jurisdiction on Section 12 of the Clayton Act, 15 U.S.C. § 22, and New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1). (AC ¶ 85.) Neither supports jurisdiction over FIFA here.

1.    **Section 12 of the Clayton Act Does Not Support Personal Jurisdiction over FIFA.**

While Section 12 of the Clayton Act authorizes "worldwide" service of process, it does so only in cases filed consistent with Section 12's venue provision. *Daniel* v. *Am. Bd. of Emergency Med.*, 428 F.3d 408, 427 (2d Cir. 2005). That venue provision is limited to suits against "a corporation," 15 U.S.C. § 22, a requirement that "has been narrowly construed" to apply only to traditional corporations and not to voluntary associations. *Kingsepp* v. *Wesleyan Univ.*, 763 F. Supp. 22, 25 (S.D.N.Y. 1991) (collecting cases). A court in this District has held that Swiss non-profit "associations"—precisely the same sort of entity as FIFA (AC ¶ 24)—are not "corporations" subject to Section 12. *World Skating Fed'n* v. *Int'l Skating Union*, 357 F. Supp. 2d 661, 664 (S.D.N.Y. 2005). For that reason alone, Section 12 of the Clayton Act does not authorize personal jurisdiction over FIFA.

Even if FIFA were a "corporation," it still would not be subject to Section 12's venue provision, which applies only if the defendant is an "inhabitant" of the judicial district where suit is brought, is "found" there, or "transacts business" there. 15 U.S.C. § 22. FIFA meets none of these requirements. FIFA—a non-profit association headquartered in and formed under the laws of Switzerland (AC ¶ 24; FIFA Decl. ¶ 3)—is plainly not an "inhabitant" of this District. *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 230 n.4 (S.D.N.Y. 2019) ("For a corporation,

'inhabitant' means its place of incorporation."). FIFA also is not "found" here: that would require "proof of continuous local activities," *id.* at 230 n.5 (quotation marks omitted), such as having an office in the district from which the corporation's employees conduct business, *see*, *e.g.*, *Winkler-Koch Eng'g Co.* v. *Universal Oil Prods. Co. (Del.)*, 70 F. Supp. 77, 84 (S.D.N.Y. 1946). There is no allegation FIFA has an office in this District or otherwise conducts "continuous" business here.

FIFA also does not "transact[] business" in this District, a phrase that refers to "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *Daniel*, 428 F.3d at 428 (quoting *United States* v. *Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948)). "This requires 'some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district.'" *City of Long Beach* v. *Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 433 (S.D.N.Y. 2020) (quoting *Dennis* v. *JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 199 (S.D.N.Y. 2018)). For example, making SEC filings in this District, paying a settlement from a New York City bank account, and making business presentations in this District are—even taken together—not enough to constitute "transacting business" here. *See id.* Moreover, the defendant must be "transacting business" in the district at the time the complaint is served. *See Agra Chem. Distrib. Co.* v. *Marion Labs., Inc.*, 523 F. Supp. 699, 702 (W.D.N.Y. 1981). Plaintiff's allegations do not meet this test, as they consist of occasional, fleeting business activities by FIFA in this District, which are facially insufficient to support venue under Section 12. (*See* AC ¶¶ 61–65.) To the extent Plaintiff seeks to rely on activities in this District by other persons and entities (*see* AC ¶¶ 40, 45, 54–60), as explained in greater detail below, there is no basis to attribute those activities to FIFA. Thus, Section 12 of the Clayton Act does not support jurisdiction over FIFA.

### 2. New York's Long-Arm Statute, CPLR § 302(a)(1), Also Does Not Authorize Jurisdiction over FIFA.

The New York long-arm statute also cannot support personal jurisdiction here because FIFA's alleged contacts with New York have no articulable nexus with the claims in Count I. Plaintiff cites CPLR § 302(a)(1), which permits jurisdiction where the defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). But by its terms, CPLR § 302(a) extends only to "a cause of action arising from any of the acts enumerated in this section." N.Y. C.P.L.R. § 302(a). A "suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (quotation marks omitted). "A connection that is merely coincidental is insufficient to support jurisdiction." *Id.* at 249 (quotation marks omitted). The antitrust claim in Count I of the Amended Complaint concerns FIFA's alleged "policy" of prohibiting domestic matches abroad. (*See* AC ¶¶ 160–178.) Count I has no substantial relationship with FIFA's alleged contacts with New York: its contracts with broadcasters, its consideration of New York as a "host city" for the 2026 World Cup, its conversations with bankers, its funding of "soccer development," or its licensing of match agents. (*See* AC ¶¶ 38–65); *cf. Mehr* v. *FIFA*, 115 F. Supp. 3d 1035, 1052 (N.D. Cal. 2015) (rejecting jurisdiction over FIFA based on "contacts of a commercial nature that are unrelated to claims" at issue).

Plaintiff seeks to assert jurisdiction over FIFA based on the acts of other persons, namely USSF, match agents, and members of FIFA committees. (AC ¶¶ 40, 45, 54–60.) While jurisdiction under CPLR § 302(a)(1) can rest on activities conducted "through an agent," Plaintiff's allegations do not support an agency relationship. "To establish that a defendant acted

through an agent, a plaintiff must 'convince the court that [the New York actors] engaged in purposeful activities in this State in relation to [the] transaction for the benefit of and with the knowledge and consent of [the defendant] and that [the defendant] exercised some control over [the New York actors].'" *Coast to Coast Energy, Inc.* v. *Gasarch*, 53 N.Y.S.3d 16, 19 (App. Div. 1st Dep't 2017) (alterations in original) (quoting *Kreutter* v. *McFadden Oil Corp.*, 522 N.E.2d 40, 44 (N.Y. 1988)). The "allegations must sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a primary actor in the specific matter in question; control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation." *Id.* (quotation marks omitted). The same test governs attempts to ground jurisdiction in conduct of an alleged co-conspirator. *See Polansky* v. *Gelrod*, 798 N.Y.S.2d 762, 763 (App. Div. 3d Dep't 2005).

There is no allegation that FIFA exercised "control" over any New York–based conduct of USSF, match agents, or FIFA Council and Stakeholders Committee members. While USSF may have believed it was following FIFA rules in denying permission to host foreign matches in the United States, there is no basis to conclude that FIFA itself controlled those decisions. Indeed, Plaintiff itself describes USSF as "a separate economic actor" from FIFA. (AC ¶ 161.) Similarly, Relevent's match agent was "employed by Relevent," not FIFA. (AC ¶ 57); *see also Relevent*, 2020 WL 4194962, at *3 (correctly characterizing Mr. Stillitano as "Plaintiff's agent"). Plaintiff asserts that non-FIFA employees on the FIFA Council and Stakeholders Committee "conducted business" in this District (AC ¶¶ 40, 45), but that vague assertion cannot support jurisdiction. Perhaps Plaintiff speculates that they participated in meetings remotely from New York. That is not true (FIFA Decl. ¶¶ 5–6), but even if it were, it is well established that telephone calls matter under CPLR § 302(a)(1) only if they represent "a projection of defendant

into the State." *Arouh* v. *Budget Leasing, Inc.*, 883 N.Y.S.2d 4, 5 (App. Div. 1st Dep't 2009). Permitting committee members from all over the world to participate in meetings would not be a purposeful projection by FIFA into New York. Finally, any reliance on a conspiracy theory of jurisdiction fails because there is no plausible allegation of a conspiracy. (*See infra* pp. 16–18.)

**B.    Exercising Jurisdiction over FIFA Would Be Inconsistent with Due Process.**

Even if Plaintiff had satisfied one of the purported statutory bases for jurisdiction over FIFA, personal jurisdiction would offend due process because FIFA lacks "minimum contacts" with New York and the United States as a whole. FIFA's alleged forum contacts thus do not support either general jurisdiction (*i.e.*, jurisdiction over FIFA for purposes of any suit) or specific jurisdiction (*i.e.*, jurisdiction over FIFA for purposes of this suit).

**1.    The Court Lacks General Jurisdiction over FIFA.**

The Court plainly lacks general jurisdiction over FIFA. General jurisdiction over an entity is typically proper only where it is headquartered or where it is organized. *Daimler AG* v. *Bauman*, 571 U.S. 117, 137–39 (2014). Only in an "exceptional case" can an entity be considered "at home" in another location. *Id.* at 139 n.19. Here, FIFA is a Swiss non-profit headquartered in Zurich. (*See* FIFA Decl. ¶ 3.) Plaintiff alleges nothing to suggest this is an "exceptional case" where FIFA can be considered "at home" in New York or the United States. Thus, general jurisdiction is lacking. *See Mehr*, 115 F. Supp. 3d at 1048.

**2.    The Court Lacks Specific Jurisdiction over FIFA for Purposes of Plaintiff's Antitrust Claim.**

Specific jurisdiction is also lacking. Such jurisdiction exists where "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (citation omitted). "[T]he fact that harm in the forum is

foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Id.* Where, as here, the alleged statutory basis of jurisdiction is CPLR § 302(a), courts consider only defendants' contacts with New York for purposes of this analysis. *See* Fed. R. Civ. P. 4(k)(1)(A); *Aquiline Capital Partners LLC* v. *FinArch LLC*, 861 F. Supp. 2d 378, 390 (S.D.N.Y. 2012) (requiring contacts with forum state).

Plaintiff's primary basis for jurisdiction is its allegation that FIFA's out-of-forum conduct—namely the alleged "policy" on playing domestic matches abroad—had an effect on Plaintiff at its headquarters in New York. (*See*, *e.g.*, AC ¶¶ 53.) This fails to support jurisdiction for multiple reasons. First, FIFA's rules apply worldwide and are not "expressly aimed" at any one state or country; to conclude otherwise would subject FIFA to jurisdiction everywhere football is played. *Mehr*, 115 F. Supp. 3d at 1051. While Plaintiff asserts that the 2018 "policy" was adopted "in response to" its efforts to host a Spanish league match in Miami (AC ¶¶ 2, 116–122), no well-pleaded allegations suggest that FIFA targeted the Miami match. It is utterly implausible that FIFA—the international governing body for football—would have issued a rule to target a particular match in one country. Rather, the alleged "policy" was issued in response to a request FIFA ***received*** from ***the Spanish football association*** and USSF. (AC ¶ 114; Ex. C.) Thus, as the Court correctly concluded on the same facts, "the complaint does not adequately allege that the FIFA directive was expressly aimed at the United States," much less New York. 2020 WL 4194962, at *7 n.12. Next, while Plaintiff repeatedly points to the fact that it is headquartered in New York, that is not relevant for jurisdictional purposes. As the Supreme Court has held, specific jurisdiction must rest on a defendant's contacts with the ***forum***, not with the ***plaintiff***. *Walden* v. *Fiore*, 571 U.S. 277, 288–91 (2014). Thus, even if one accepted Plaintiff's suggestion that FIFA

targeted the Miami match (and to be clear, the Court should not), that would not support jurisdiction in New York.

FIFA's other alleged contacts with New York do not support specific jurisdiction because Plaintiff's claims do not "arise out of or relate to" to those contacts. As noted above, these contacts—activities like negotiating unrelated contracts and spending "development" funds—were fleeting, and Plaintiff relies on speculation in asserting that they occurred in New York at all. Such tenuous contacts must be a proximate cause of the plaintiff's injury to support personal jurisdiction. *See SPV Osus Ltd.* v. *UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018). But these contacts cannot be said to have proximately caused Plaintiff's injury; indeed, they do not relate to Plaintiff's claims at all. These contacts do not even represent a "but for" cause of Plaintiff's alleged injury. *See Mehr*, 115 F. Supp. 3d at 1052.

Here once again, to the extent Plaintiff seeks to rely on other persons' contacts with New York, that effort fails. The Supreme Court has repeatedly held that jurisdiction exists only where the plaintiff's claims "arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 277 (citation omitted). Although courts have recognized limited exceptions permitting contacts of agents or co-conspirators to be attributed to a defendant under certain circumstances, *see Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 84–88 (2d Cir. 2018), Plaintiff's vague and conclusory allegations of agency and conspiracy do not suffice, *see id.* As explained above, the Amended Complaint presents no factual basis to attribute to FIFA any New York–based conduct of USSF, licensed match agents, and members of the FIFA Council and Stakeholders Committee. To the contrary, the Amended Complaint itself establishes that these other persons acted independently of FIFA. (*See* AC ¶¶ 57, 161.) Moreover, as this

Court has previously concluded, and as we explain below, there are no plausible allegations of a conspiracy. (*See infra* pp. 16–18.)

Finally, some courts have concluded that, where jurisdiction is grounded in Section 12 of the Clayton Act, they should look beyond the forum state to the defendant's "national contacts." *See, e.g.*, *Sullivan* v. *Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *42 (S.D.N.Y. Feb. 21, 2017). Section 12 does not apply because, as explained above, FIFA is not a "corporation"; therefore, Plaintiff cannot rely on any alleged contacts outside New York. But even if Section 12 did apply, a national-contacts analysis would not change the result: Plaintiff has identified no substantial, suit-related contacts with the United States outside New York. While Plaintiff repeatedly makes bald assertions that FIFA had contacts with the entire United States (*see, e.g.*, AC ¶ 52), these conclusory statements have no value in establishing jurisdiction.

For all these reasons, Plaintiff's claims against FIFA should be dismissed for lack of personal jurisdiction.

## II. Alternatively, Plaintiff's Antitrust Claim Against FIFA Should Be Dismissed Under Rule 12(b)(6).

Even if FIFA is not dismissed for lack of personal jurisdiction, the claim against it should be dismissed for failure to state a claim. In its prior opinion and order, the Court dismissed Plaintiff's antitrust claim against USSF, correctly concluding that Plaintiff had not adequately alleged either a vertical conspiracy between USSF and FIFA or a horizontal conspiracy among USSF and vaguely identified "others." 2020 WL 4194962, at *6–8. In the Amended Complaint, Plaintiff again purports to allege both a vertical conspiracy between FIFA and USSF, and a horizontal agreement to divide markets and engage in group boycotts among FIFA's member associations. (AC ¶¶ 6, 167–168.) Plaintiff's purportedly new allegations are substantially identical to its old ones, and its antitrust claim should again be dismissed under *Bell Atlantic Corp.*

v. *Twombly*, 550 U.S. 544 (2007).  As before, Plaintiff has alleged no facts suggesting a conspiracy to divide markets or boycott rivals.  Moreover, any challenge to FIFA's regulatory functions would be subject to rule of reason analysis under Section 1 of the Sherman Act, requiring plausible allegations of a relevant product and geographic market, market power, and anticompetitive effects.  The Amended Complaint fails to make such allegations, and thus does not state a claim.

### A. Like the Prior Complaint, the Amended Complaint Fails to Allege Facts Showing the Existence of a Conspiracy to Divide Markets or Boycott Rivals.

Like the prior complaint, the Amended Complaint is full of buzzwords like "conspiracy," "market division," and "group boycott" that suggest a nefarious agreement to restrain competition.  But as this Court previously recognized, such "conclusory allegations" must be disregarded under *Twombly*.  2020 WL 4194962, at *6.  The Court thus dismissed Plaintiff's original complaint, because the well-pleaded factual allegations showed, at most, that USSF unilaterally complied with FIFA's directives, and not which particular entities supposedly entered a horizontal conspiracy to boycott Plaintiff.  The Court should reach the same conclusion now.

The Amended Complaint adds words, but not substance.  The crux of the complaint remains that, at a 2018 meeting in Rwanda, the FIFA Council adopted a supposed "policy" that "prohibits official season games from being played anywhere except the territory allocated to the participating league and teams" (AC ¶ 37; *see* Ex. C), preventing Relevent from organizing foreign matches in the United States (AC ¶¶ 119–134).  Plaintiff asserts that USSF, motivated by an alleged financial interest in MLS, spearheaded this policy to protect MLS from foreign competition.  (AC ¶ 105–114.)  USSF representatives on the FIFA Council and Stakeholders Committee allegedly recommended adoption of the "policy."  (AC ¶¶ 38–40, 45–51.)

These allegations do not support a plausible inference that the FIFA Council's alleged "policy" on playing domestic league matches abroad was the product of a conspiracy to

divide markets or boycott Relevent. Plaintiff is not challenging a "naked restraint on competition" (AC ¶ 170), but rather the FIFA Council's decision to reiterate that domestic league matches— which ordinarily **would** be played domestically—**should** be played domestically. Making rules and policies is what organizations like FIFA do, and those activities are perfectly lawful. Even in cases involving trade associations—organizations that, unlike FIFA, are made up of competitors— it is settled law that "every action by a trade association is not concerted action by the association's members," and "an antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999); *see also Plant Oil Powered Diesel Fuel Sys., Inc.* v. *ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1194–95, 1197–98 (D.N.M. 2011) (dismissing claim under *Twombly* where plaintiff alleged only that defendants participated in a standard-setting process). Here, FIFA is the international governing body for football, and its members are national governing bodies. (AC ¶¶ 25–36.) Thus, there is an "obvious alternative explanation," *Twombly*, 550 U.S. at 567, inconsistent with Plaintiff's conspiracy theory: the members of the FIFA Stakeholders Committee and FIFA Council voted for the "policy" because each, acting independently, thought it would be beneficial for the game of football. That is not an unlawful conspiracy. *See Jessup* v. *Am. Kennel Club, Inc.*, 61 F. Supp. 2d 5, 12 (S.D.N.Y. 1999) (holding that a "majority vote of . . . membership provided a safeguard" against manipulation of committee to serve "anticompetitive objectives"), *aff'd*, 210 F.3d 111 (2d Cir. 2000). And as the Court previously held, it would not be unlawful if USSF made a "unilateral decision to comply" with such a policy. 2020 WL 4194962, at *6.

In the face of this obvious explanation, Plaintiff presents no concrete facts suggesting an unlawful conspiracy. Tellingly, Plaintiff presents no facts suggesting that even

USSF itself—which had exactly one representative on the 37-member FIFA Council—had an unlawful motive. Plaintiff does not—and cannot—allege that the LaLiga game would have competed with any MLS game. The Miami match was to be played on January 26, 2019, while the 2018 MLS season ended on December 8 and the 2019 MLS season began on March 2. (*See supra* p. 4.) This fatally undermines Plaintiff's theory that USSF had a motive to protect regular-season MLS matches from competition: there were no regular-season MLS matches at that time.

But even if USSF had a motive to protect MLS from foreign competition, nothing suggests that FIFA or the other member associations shared that motive. The FIFA Council has 37 members, only five from CONCACAF countries and one from the United States (AC ¶ 36; FIFA Statutes art. 33(4).) The Amended Complaint itself notes that the FIFA Council included officials from several other countries, including England, Portugal, and Japan. (AC ¶ 41). But the Amended Complaint offers no facts suggesting that these other members—much less a majority of the FIFA Council—had any interest in promulgating a policy to protect MLS from a match to be played more than a month after MLS's season ended. Put differently, the Amended Complaint contains no allegation suggesting that the FIFA Council as a whole had any "unity of purpose or a common design or understanding." *Relevent*, 2020 WL 4194962, at *6 (quoting *Am. Tobacco Co.* v. *United States*, 328 U.S. 781, 809–10 (1946)). Applying labels such as "conspiracy," "market division," or "boycott," to rules and polices adopted by sporting leagues adds nothing.

Thus, as the Court previously concluded, Plaintiff does not plausibly allege a conspiracy to restrain trade and its Sherman Act claim should be dismissed.

### B. To the Extent the Amended Complaint Challenges FIFA's Regulatory Role with Respect to Domestic League Regular Season Games, It Fails Adequately to Allege the Elements of a Rule of Reason Claim.

Indeed, Plaintiff does not state a claim at all, because it does not adequately allege that the "policy" at issue is anticompetitive. For decades, all levels of the federal courts have

uniformly held that restrictions within sports leagues—including geographic restrictions—are not illegal *per se* but instead must be judged under the rule of reason. *See*, *e.g.*, *American Needle, Inc.* v. *NFL*, 560 U.S. 183 (2010); *NCAA* v. *Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101 (1984); *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020); *O'Bannon* v. *NCAA*, 802 F.3d 1049 (9th Cir. 2015); *Major League Baseball Properties, Inc.* v. *Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008); *NBA* v. *SDC Basketball Club, Inc.*, 815 F.2d 562, 568 (9th Cir. 1987); *Metro. Intercollegiate Basketball Ass'n* v. *NCAA*, 339 F. Supp. 2d 545, 549 (S.D.N.Y. 2004). That is because sports represent "an industry in which horizontal restraints on competition are essential if the product is to be available at all." *NCAA*, 468 U.S. at 101.

The particular "policy" alleged here requires analysis under the rule of reason because the issue it seeks to regulate—the location of regular-season matches—goes to the core of sports competition. Since sports have existed, they have been organized geographically: clubs hail from particular cities and leagues from particular countries or regions. Within this geographic structure, home-field advantage is tremendously important, which is why clubs in football (and other sports) generally have the same number of regular-season home and away matches. Matches abroad are necessarily played on a neutral field, upsetting competitive balance within leagues. Moreover, playing matches abroad risks alienating local fans, players, referees, and other stakeholders. For that reason, many in the football community have expressed serious concerns about playing regular-season matches abroad. One of the articles cited in the Amended Complaint explains that Relevent's proposed Miami match was "controversial, in particular with the Spanish players' union." (Ex. D.) These matches require the approval of, among others, the member association for the teams' home country—which can judge the proposed match's effect on the league domestically and whether it can be played in another country consistent with that member

association's rules—and the member association for the country where the match will be played—which can decide whether the match can be held in compliance with FIFA policies (including policies designed to protect the integrity of the game, such as those against doping and match-fixing) and all local laws. (*See* Ex. B, App'x B, at 16–17.)

Rules of this sort can only be evaluated under the rule of reason, which permits courts to balance their procompetitive effects against any alleged anticompetitive effects. This analysis requires "courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Ohio* v. *American Express Co.*, 138 S. Ct. 2274, 2284 (2018) (alterations in original) (citations omitted). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* at 2284. Even at the pleading stage, Plaintiff fails to meet these requirements.

### 1. The Amended Complaint Does Not Adequately Allege a Relevant Product and Geographic Market.

Plaintiff purports to define a relevant market in "men's top-tier official season professional soccer league games in the U.S." (AC ¶ 86.) But its well-pleaded allegations do not come close to making this transparently gerrymandered market plausible as either a relevant product or geographic market. *Concord Assocs., L.P.* v. *Ent. Props. Trust*, 817 F.3d 46, 52–53 (2d Cir. 2016); *PepsiCo, Inc.* v. *Coca-Cola, Inc.*, 315 F.3d 101, 105 (2d Cir. 2002).

"A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Concord Assocs.*, 817 F.3d at 52 (quotation marks omitted). "Thus, in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic

market." *Id.* at 53. In assessing that issue, the court should consider whether the complaint sufficiently accounts for the plausible substitutes for a proposed relevant product. *City of New York* v. *Group Health, Inc.*, 649 F.3d 151, 155–56 (2d Cir. 2011) ("[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." (citation omitted)). For example, in *Concord Associates*, the Second Circuit affirmed dismissal of a complaint that alleged a "Racing/Gaming Market in the Catskills region." 817 F.3d at 53–54. The court took judicial notice of the presence of casinos in Connecticut and Atlantic City and noted that plaintiffs had "conveniently" omitted those substitute locations in narrowly defining a relevant market in the Catskills. *Id.*

Here, Plaintiff's proposed product market fails because it arbitrarily excludes a number of substitutes without any justification whatsoever. Plaintiff alleges in conclusory terms that other sports—such as baseball, basketball, gridiron football, and hockey—are not perceived as close substitutes for association football (AC ¶ 94); that men's and women's national team matches are not perceived as substitutes for league games (AC ¶ 95); that lower-tier matches are not perceived as substitutes for top-tier matches (AC ¶ 95); and that "friendly" or exhibition matches are not substitutes for regular-season matches (AC ¶ 96). But Plaintiff provides no facts that justify carving up the market in this way, and there are obvious reasons why that would be inappropriate. In particular, there are a large number of post-season and international matches involving top professional players that occur in the United States and around the world. In the United States alone, there are frequent matches between the U.S. and Mexican men's and women's national teams, as well as matches played between top-tier club teams from different countries, for

example as part of the CONCACAF Champions League.[4]  Historically, some post-season matches in the top-tier Mexican league have also been played in the United States.  Plaintiff offers no reason to think these high-caliber matches—which are not "friendlies" or exhibition matches—are any less competitive or interesting to U.S. football fans than a regular-season match between two foreign clubs would be.  Looking beyond the United States, there are similar international competitions in other countries, and Plaintiff offers no reason to think they are not substitutes for regular domestic-season matches.[5]  For example, during the 2018–2019 season, FC Barcelona— the club that Plaintiff alleges was denied the right to play a game in Miami—played 12 matches against clubs from other countries in the UEFA Champions League, six of them outside of Spain.[6] An FC Barcelona fan may well view a match between FC Barcelona and an Italian club as a substitute for a match between FC Barcelona and a Spanish club; Plaintiff alleges nothing to suggest otherwise.  And of course, many fans watch football matches on television, and Plaintiff excludes televised matches from its proposed market without explanation.

Plaintiff's attempt to limit the relevant geographic market to the United States (AC ¶ 97) is similarly deficient. MLS, the ostensible beneficiary of USSF and FIFA's conspiracy to exclude foreign competition, includes three Canadian teams.[7]  Moreover, the conclusory allegation that matches played outside the United States "do not permit regular attendance by U.S. fans" (AC ¶ 97) is belied by Plaintiff's own allegations.  In January 2019, when the Miami match would have

---

[4]   *See Champions League*, CONCACAF, https://www.concacafchampionsleague.com/en/.

[5]   *See Champions League*, UEFA, https://www.uefa.com/uefachampionsleague/; *Europa League*, UEFA, https://www.uefa.com/uefaeuropaleague/; *Copa Liberatadores*, CONMEBOL, https://www.copalibertadores.com/en.

[6]   *See Champions League 2018/19: All the Fixtures and Results*, UEFA (June 1, 2019), https://www.uefa.com/uefachampionsleague/news/0252-0e9902dd97ae-bd3c7b568287-1000--champions-league-2018-19-all-the-fixtures-and-results/ (Ex. G).

[7]   *See MLS Releases 2019 Regular-Season Schedule*, *supra* (Ex. F).

occurred, Miami did not have an MLS team.[8]  The closest MLS team was in Orlando, 235 miles away.  If fans were willing to drive that distance to see a match, why would fans living in Southern California or Texas be unwilling to drive to Mexico to attend Mexican matches played within a similar distance of the U.S. border?  Similarly, if fans are willing to travel hundreds or thousands of miles across the country to see domestic league matches, why would they be unwilling to fly to London or Madrid to see a European match?  Plaintiff has no answer—even though U.S. football fans are famous for traveling overseas to watch football.[9]

Like the plaintiff in *Concord Associates*, Relevent has invented a product and geographic market solely to suit its claims, without addressing obvious competitive substitutes. As a result, its proffered market definitions are fatally flawed and require dismissal of the complaint.  *See PepsiCo*, 315 F.3d at 111 ("[B]ecause PepsiCo has failed properly to define the relevant market here, there can be no Section 1 violation under a rule of reason analysis.").

### 2. The Amended Complaint Fails Adequately to Allege Anticompetitive Effects.

Because Plaintiff has failed adequately to allege a relevant product and geographic market, it is unnecessary to consider whether it has adequately alleged anticompetitive effects in the relevant market.  *American Express*, 138 S. Ct. at 2284.  Nonetheless, it is clear that the Amended Complaint fails on this ground as well.  Anticompetitive effects consist of "reduced output, increased prices, or decreased quality in the relevant market."  *Id.*; *see also MacDermid Printing Sols., LLC* v. *Cortron Corp.,* 833 F.3d 172, 182–83 (2d Cir. 2016) ("[T]here is really only

---

[8]  *Id.*

[9]  *See, e.g.*, Mark Ogden, *U.S. Tops 2018 World Cup Ticket Sales to Fans Outside of Russia,* ESPN (June 12, 2018), https://www.espn.com/soccer/fifa-world-cup/story/3523402/us-tops-2018-world-cup-ticket-sales-to-fans-outside-of-russia (Ex. H); Ben Abramson, *U.S. Is No. 1 at World Cup (in Visiting Fans)*, USA TODAY (June 25, 2014), https://www.usatoday.com /story/dispatches/2014/06/25/world-cup-traveling-fans-facebook-checkins/11389599/ (Ex. I).

one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market."); *United States* v. *Visa USA, Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (holding that, in a rule of reason case, "the government must demonstrate that within the relevant market, the defendants' actions have had substantial adverse effects on competition, such as increases in price, or decreases in output or quality"). Although Plaintiff alleges harm to itself (AC ¶ 178), that is of no moment, because the "purpose of the antitrust laws . . . is the protection of competition, not competitors." *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 906 (2007) (quotation marks omitted).

In particular, Plaintiff does not allege that the "policy" at issue resulted in higher prices. Rather, it alleges, in a conclusory manner, that the challenged restraint has "reduced output and lowered the quality of games." (AC ¶ 171; *see also id.* ¶¶ 172, 176). Such conclusory allegations are insufficient: a court should "not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." *American Express*, 138 S. Ct. at 2288. Plaintiff alleges that foreign regular-season matches cannot be played in the United States, but makes no allegation that FIFA's "policy" reduced the overall volume of regular-season matches. *Cf. NCAA*, 468 U.S. 85 (finding that NCAA policy of limiting number of college football games broadcast on television was a naked output reduction that increased prices). The matches that allegedly could not be played in the United States, such as the cancelled Miami match, were instead played at their regular locations in Spain. Further, Plaintiff makes no plausible allegations about the overall effect of relaxing the alleged policy against playing domestic matches abroad: if Spanish clubs could play matches in Miami, MLS clubs could similarly play matches in Mexico, South America, or Europe. The facts alleged in the Amended Complaint offer no basis to infer that the net effect would be more matches in the

United States as opposed to fewer.  Plaintiff also does not allege any effect on the number of televised football matches in the United States, and any such effect would be utterly implausible because a large number of football matches played abroad are available for viewing in the United States.[10]  Ultimately, Plaintiff alleges only that *it* could not schedule a handful of matches, which does not suggest any material effect on the marketplace given the large number of professional and amateur football matches played regularly all around the United States.  Plaintiff therefore has failed to allege a Section 1 violation under the rule of reason.

Finally, despite Plaintiff's repeated citation of the March 2020 Antitrust Division letter (*see* AC ¶ 10–11, 139–140), that letter has no bearing on its pleading obligation under *Twombly*.  *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).  The letter expressed concern about a "***proposed*** rule" that FIFA had indicated it was planning to consider, not the statement issued by the FIFA Council in October 2018 or any other action that FIFA has allegedly taken to date.  (AC Ex. 1 (emphasis added).)

Thus, the Court should conclude—as it did before—that Plaintiff has not adequately alleged an antitrust claim and dismiss Count I under Rule 12(b)(6).

## **<u>CONCLUSION</u>**

For the reasons set forth above, FIFA respectfully requests that the Court dismiss Count I of the Amended Complaint for lack of personal jurisdiction or, alternatively, for failure to state a claim on which relief can be granted.

---

[10]  *See, e.g.*, Paul Tenorio, *TV Options Sign of Soccer's Growth*, ORLANDO SENTINEL (June 18, 2015) (Ex. J) ("Every single English Premier League game is broadcast on NBC Sports Network. The Serie A and Spanish La Liga can be seen on beIN sports.  Want to catch some German Bundesliga matches? Starting this year, you can just flip on Fox Sports.").

Dated: New York, New York
       December 7, 2020

                    PAUL, WEISS, RIFKIND,
                      WHARTON & GARRISON LLP

                    By: */s/ H. Christopher Boehning*
                      H. Christopher Boehning
                      Andrew C. Finch
                      Daniel A. Crane
                      Justin D. Ward

                    1285 Avenue of the Americas
                    New York, New York  10019-6064
                    Tel:  (212) 373-3000
                    Fax:  (212) 757-3990
                    Email: cboehning@paulweiss.com
                          afinch@paulweiss.com
                          dcrane@paulweiss.com
                          jward@paulweiss.com

                    *Attorneys for Defendant FIFA*