UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
```

RELEVENT SPORTS, LLC,                     :

                                               :

                              Plaintiff,        :

                                                 :

           -against-                           :        19-CV-8359 (VEC)

                                               :

FÉDÉRATION INTERNATIONALE DE            :        OPINION AND ORDER
FOOTBALL ASSOCIATION and UNITED         :
STATES SOCCER FEDERATION, INC.,         :

                                               :

                            Defendants.  :

```
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/20/2021_

VALERIE CAPRONI, United States District Judge:

      This action stems from Plaintiff's desire to host official international soccer games

("Official Games") in the United States.  Plaintiff alleges that its attempts to do so have been

thwarted by Defendants' refusal to sanction the games.  Specifically, Plaintiff alleges that the

United States Soccer Federation ("USSF") violated Section 1 of the Sherman Act by conspiring

with the Fédération Internationale de Football Association ("FIFA") and all other FIFA-affiliated

regional confederations, National Associations, leagues, and teams to adopt and enforce a policy

that prohibits sanctioning Official Games in the United States and to boycott leagues, clubs, and

players that participate in unsanctioned Official Games.  *See* Am. Compl., Dkt. 57.  Defendants

moved to dismiss the Amended Complaint.  Dkts. 65, 68.  For the following reasons,

Defendants' motions are GRANTED.

## BACKGROUND[1]

      FIFA is the international federation and world governing body of soccer.  Am. Compl. ¶¶

24-25.  It administers soccer worldwide through its statutes, regulations, and directives.  *Id.* ¶¶

---

[1]     For purposes of this opinion, Plaintiff's well-pled factual allegations are taken as true.  Conclusory
allegations unsupported by facts are not accepted as true.

26, 34.  Beneath FIFA organizationally are six regional confederations that oversee soccer at the continental level and assist FIFA in carrying out its regulations.  *Id.* ¶ 28.  The Confederation of North, Central and Caribbean Association Football ("CONCACAF") is the regional confederation governing soccer in North America.  *Id.*  Beneath the six regional confederations are 211 National Associations ("National Associations"), each of which is authorized to represent FIFA as the governing body for soccer at the national level.  *Id.* ¶¶ 25-28; Silvero Decl., Dkt. 70 ¶ 4.  To compete in any FIFA-affiliated event, a soccer league and its team must be sanctioned by their corresponding National Association and by FIFA.  Am. Compl. ¶ 29.

USSF is the FIFA-recognized National Association for administering and overseeing soccer in the United States.  *Id.* ¶ 31.  USSF is a member of CONCACAF.  *Id.* ¶ 28.  Pursuant to the authority granted to the United States Olympic Committee by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq*. (1998), USSF is also the recognized national governing body for soccer in the United States.  *Id*. ¶ 68.

As FIFA's recognized National Association for soccer in the United States, USSF has the authority to sanction, on behalf of FIFA, Official Games and so-called "friendly games" that are played in the United States.  *Id*. ¶¶ 29, 54, 70.  Official Games are soccer matches that count towards the competing clubs' official league or tournament records.  Am. Compl. ¶ 96; Pl. Opp., Dkt. 77 at 3.  By contrast, so-called friendly games are not part of a regular season league schedule or an official tournament; friendly games can be between foreign countries' men's national teams, foreign professional men's soccer clubs, or foreign professional men's soccer clubs and U.S. professional men's soccer clubs.  Am. Compl. ¶¶ 17-18, 96.  Friendly games do

not count towards a club's official record.  *Id*. ¶ 96.  Plaintiff has promoted numerous friendly games in the United States.[2]  *Id.* ¶¶ 17-18, 102-103.

It is a violation of FIFA statutes for a soccer club to play in the United States without USSF's sanction.  *Id*. ¶ 98.  In addition to obtaining a sanction from USSF, third-party promoters, such as Plaintiff, seeking to organize an international match must also obtain approval from (i) each team's National Association(s); (ii) each team's regional confederation(s); (iii) the host's National Association; and (iv) FIFA.  Boehning Decl., Dkt. 71, Ex. A, Arts. 71-73; Ex. B, Arts. 6-8.  Any player who competes in an unsanctioned game risks being deemed ineligible to participate in FIFA-sanctioned competitions, including the FIFA World Cup.  Am. Compl. ¶ 100.

### The FIFA Policy

In August 2018, Plaintiff announced that it intended to host an Official Game in Miami between two La Liga teams, FC Barcelona and Girona FC.  Am. Compl. ¶ 111.  In response, FIFA's President, Gianni Infantino, expressed doubt whether FIFA would permit an Official Game to occur outside the teams' home territory and stated that he "would prefer to see a great MLS game in the U.S. rather than La Liga being in the U.S."  *Id*. ¶ 113.  The Spanish National Association ("RFEF"), CONCACAF, and USSF "referred the issue to the FIFA Council" to address whether the game could occur in the United States, rather than in Spain.  *Id.* ¶ 114.  The FIFA Council, which is comprised of 37 individuals from various National Associations, has the authority to interpret the FIFA statutes adopted by the FIFA Congress and to adopt other rules

---

[2]      For example, Plaintiff promotes the annual International Champions Cup, a series of friendly international soccer game events.  Am. Compl. ¶ 17.  Plaintiff also organized and promoted a friendly game between Real Madrid and Manchester United in the United States in 2014.  *Id*. ¶ 18.

and policies.[3]  *Id.* ¶ 36.  In October 2018, the FIFA Council announced a "policy" that prohibits

staging Official Games outside the participants' home territory (the "FIFA Policy" or "Policy").[4]

*Id*. ¶¶ 37, 116-17.  The FIFA Policy appeared in a press release and does not appear in FIFA's

official statutes.  *Id.* ¶ 117.  Nevertheless, the Policy is consistent with several existing statutes

and regulations, which provide that international matches may only take place with the "prior

permission of FIFA, the confederations and/or the member associations," and that official

matches may only be played in another association's territory "under exceptional

circumstances."  Boehning Decl. Dkt. 71, Ex. 1, Arts. 71, 73.  Moreover, several FIFA statutes

confirm that "FIFA may take the final decision on the authorisation [sic] of any international

match or competition."  *Id*. at Art. 71.  In order to maintain their status in FIFA, all National

Associations, leagues, clubs, and players must comply with FIFA directives; failure to do so may

result in expulsion or discipline.  Am. Compl. ¶¶ 34, 98.  Following the announcement of the

FIFA Policy, FC Barcelona withdrew its commitment to participate in the match in Miami that

Plaintiff wanted to host.  *Id*. ¶ 121.

In March 2019, Plaintiff submitted another sanctioning application to USSF, this time

seeking approval to host an Official Game in Miami between two Ecuadorian clubs.  *Id*. ¶¶ 123-

25.  Prior to submitting the application to USSF, Plaintiff obtained approval from Ecuador's

regional confederation, the Ecuadorian National Association, and the participating teams' league.

---

[3]     The FIFA Council is elected by the members of each of the six regional confederations.  Am. Compl. ¶ 36.
Each National Association is entitled to suggest one person to its Confederation for possible election to the Council.
*Id.*  CONCACAF has five members on the FIFA Council.  *Id.*

        The FIFA Congress is FIFA's self-described "supreme and legislative body;" it is responsible for adopting
and amending the FIFA Statutes.  Am. Compl. ¶¶ 32-33.  Each National Association, including USSF, is provided
one vote in the FIFA Congress.  *Id*. ¶ 32

[4]     The FIFA Policy reads: "Consistent with the opinion expressed by the Football Stakeholders Committee,
the [FIFA] Council emphasised [sic] the sporting principle that official league matches must be played within the
territory of the respective member association."  Am. Compl. ¶ 117.

*Id.* ¶ 125.  In April 2019, USSF denied Plaintiff's application, explaining that sanctioning the match would violate the FIFA Policy that prohibits staging Official Games outside the league's home territory.  *Id.* ¶¶ 128-30.  USSF has similarly declined to sanction Official Games proposed by other promoters when doing so would violate the FIFA Policy.  *Id.* ¶¶ 131-34.

Plaintiff alleges that USSF's denial of its sanctioning applications reflects an anticompetitive market division agreement with FIFA to limit the output of Official Games in the United States.  *See id.* ¶¶ 160-78.  Specifically, Plaintiff alleges an unlawful vertical agreement between FIFA and all of the National Associations, including USSF, to facilitate and enforce the market division agreement against all leagues and teams.  *Id.* ¶¶ 6, 168.  Plaintiff also alleges an unlawful horizontal agreement "between and among MLS and the other top-tier men's professional soccer leagues and teams," as well as their "respective FIFA-affiliated 'National Associations,'" to adhere to the FIFA Policy and to boycott leagues, clubs, and players that participate in unsanctioned games in the United States.  *Id.* ¶¶ 4, 6, 167-68.

On July 20, 2020, this Court granted USSF's motion to dismiss Plaintiff's antitrust claim without prejudice and granted USSF's motion to compel to arbitration Plaintiff's tortious interference with business relationships claim against USSF.  Dkt. 47.  On September 14, 2020, Plaintiff filed an Amended Complaint, adding FIFA as a defendant and reasserting its antitrust claim against both USSF and FIFA.  Dkt. 57.  The Amended Complaint also reasserts the tort claim that was included in the original complaint.[5]  Am. Compl. ¶¶ 179-92.

USSF moves to dismiss Plaintiff's Amended Complaint for failure to state a claim and failure to join an indispensable party pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7).  Dkt. 65.  USSF also renews its prior argument that Plaintiff's claim is barred by the

---

[5]     Plaintiff has not yet commenced arbitration proceedings.  Dkt. 83.  No later than July 30, 2021, Plaintiff must submit a letter indicating whether it intends to pursue its tort claim in arbitration.

parties' prior covenant not to sue. *Id.* FIFA moves to dismiss the Amended Complaint for lack of personal jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Dkt. 68. On June 15, 2021, the Court held oral argument on the motions to dismiss. *See* Tr., Dkt. 94.

## DISCUSSION[6]

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss, the Court may consider any "written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as materials "integral" to plaintiff's claims. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

### A.  Legal Framework

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1; *United States v. Apple, Inc.,* 791 F.3d 290, 314 (2d Cir. 2015). In order to plead a violation of Section 1, a plaintiff must allege "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (emphasis omitted)). In other words, an antitrust plaintiff must allege an agreement; a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am.*

---

[6]     Because the Court finds that Plaintiff has failed to state an antitrust claim, the Court will not consider Defendants' other grounds for dismissal.

*Tobacco Co. v. United States,* 328 U.S. 781, 809-10 (1946); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (explaining that because Section 1 of the Sherman Act does not prohibit all restraints of trade, but only *agreements* to restrain trade, the "crucial question in a Section 1 case is [] whether the challenged conduct stem[s] from independent decision or from an agreement, tacit or express.") (internal quotation marks omitted).  Independent action by one party is not proscribed; there is a "basic distinction between concerted and independent action," and a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  *Monsanto*, 465 U.S. at 760-61.

Because parallel conduct could simply be the result of "coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," allegations of parallel conduct alone are insufficient to allege the existence of a conspiracy.  *Twombly*, 550 U.S. at 556 n.4 (internal quotation marks omitted); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) (noting that while evidence of "[p]arallel conduct can be probative . . . [of] an antitrust conspiracy," such evidence "alone will not suffice.").  Indeed, parallel conduct that "does not result from an agreement is not unlawful even if it is anticompetitive."  *Apple*, 791 F.3d at 315.

In the absence of direct evidence of an agreement, such as a "recorded phone call in which two competitors agreed to fix prices," a plaintiff must present circumstantial facts, known as "plus factors," to support the inference that there was a conspiratorial agreement.  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  These plus factors may include, but are not limited to, "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."  *Id.* (citation omitted).

Regardless of whether the plaintiff presents direct or circumstantial evidence, at "the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.,* it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556, 549, 557) (alteration in original).  Mere "conclusory allegation[s] of [an] agreement at some unidentified point," are insufficient to allege a violation of Section 1 of the Sherman Act. *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (quoting *Twombly*, 550 U.S. at 557).  Finally, a complaint may be dismissed "where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants."  *Id.* (citing *Twombly*, 550 U.S. at 567; *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017)).

If an antitrust plaintiff sufficiently alleges an agreement, it must next allege that the agreement "constituted an unreasonable restraint of trade either per se or under the rule of reason."  *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).  Few restraints of trade are unreasonable per se; conduct constituting a per se violation must be so "manifestly anticompetitive that it would almost invariably tend to restrict competition and decrease output."  *Cenedella*, 348 F. Supp. 3d at 360 (citing *Hertz Corp. v. City of New York*, 1 F.3d 121, 130 (2d Cir. 1993)).  As a result, the per se rule is appropriate only "in the relatively narrow circumstance[s] where courts have sufficient experience with the [alleged wrongful] activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue."  *Hertz*, 1 F.3d at 129; *Caruso Mgmt. Co. v. Int'l Council of Shopping Centers*, 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019).  Agreements among horizontal competitors to set prices are per se illegal, while vertical agreements, or agreements between parties at different levels of a

8

market structure, are not.  *Apple*, 791 F.3d at 313–14; *see also Leegin Creative Leather Prods.,*
*Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007).

As a result of the "rigorous standard and [] presumption against applying the per se rule,"
courts apply the rule of reason in analyzing most alleged restraints of trade.  *Caruso Mgmt. Co.*,
403 F. Supp. 3d at 201.  At the motion to dismiss stage, the rule of reason inquiry requires the
plaintiff to "identify the relevant market affected by the challenged conduct and allege an actual
adverse effect on competition in the identified market."  *Watkins v. Smith*, No. 12-CV-4635,
2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014).

### B.  Plaintiff Fails to Allege an Unlawful Vertical Agreement

Plaintiff alleges that USSF and "FIFA's other National Associations" entered into a
vertical agreement with FIFA to apply the FIFA Policy against their member leagues and teams.[7]
*See, e.g.,* Am. Compl. ¶¶ 6, 21, 71, 165, 166, 168.  Plaintiff alleges that this "agreement to
adhere to the FIFA market division policy has suppressed competition and reduced output in the
relevant market."  *Id.* ¶ 98.  In support of the existence of this purported agreement, Plaintiff
alleges that USSF admitted that it will not sanction Plaintiff's proposed games "because of its
agreement to follow the FIFA geographic market division policy."  *Id.* ¶ 129.  Similarly, Plaintiff
points to a letter USSF sent to Plaintiff denying a sanction for Plaintiff's proposed Official
Game, in which USSF allegedly stated that it had "communicated with FIFA" regarding the
proposed game and FIFA had "confirmed that the game was prohibited by the market division
policy, which USSF had agreed to follow."  *Id.* ¶ 130.

---

[7]     At oral argument, Plaintiff's counsel indicated that Plaintiff was *not* alleging a separate vertical agreement.
Tr., Dkt. 94 at 51-52.  Nevertheless, because the Amended Complaint alleges an unlawful vertical agreement
between FIFA and USSF, *see e.g.,* Am. Compl. ¶¶ 4, 6, 168, and Plaintiff's opposition brief argues that a vertical
agreement exists, Pl. Opp., Dkt. 77 at 43-45, despite Plaintiff's apparent abandonment of the theory, for the sake of
completeness, the Court will address the allegations of a vertical agreement between USSF and FIFA.

Plaintiff's allegations of a vertical agreement between FIFA and USSF fail to state a claim for the same reasons articulated in this Court's prior Opinion. Dkt. 47 at 12-15. Plaintiff continues to rely on USSF's admitted compliance with the FIFA Policy as evidence of an unlawful agreement between USSF and FIFA. This Court has already held, however, that USSF's compliance with the Policy, without additional factual allegations, is insufficient to constitute direct evidence of an unlawful agreement. Dkt. 47 at 13 (citing *Citigroup, Inc.*, 709 F.3d at 136 (explaining that direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level"); *Starr*, 592 F.3d at 325 (noting that allegations in a Sherman Act § 1 complaint based on direct evidence of agreement would likely require references to "specific time, place, or person involved in the alleged conspiracies") (quoting *Twombly*, 550 U.S. at 565 n.10)). Plaintiff's Amended Complaint still alleges no facts to support the inference that, in complying with the FIFA Policy, USSF actually entered an agreement with FIFA to restrict output. *See Am. Tobacco*, 328 U.S. at 809-10 (an antitrust plaintiff must allege a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"); *Monsanto,* 465 U.S. at 761 (holding that a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."). Plaintiff's repeated characterizations of USSF's decision to comply with the FIFA directive as an unlawful agreement, *see, e.g.,* Am. Compl. ¶¶ 4, 6, 21, 26, 34, 35, 71, 98, 129, 130, 131, 162, 164, 165, 166, 174, are conclusory.[8] *Twombly* 550 U.S. at 557 (holding that mere "conclusory allegation[s] of [an] agreement at some unidentified point," are insufficient to

---

[8]     Moreover, the Court notes that certain of Plaintiff's allegations are simply inaccurate. *See* Am. Compl. ¶¶ 34, 35, 98, 117. For example, Plaintiff alleges that "under the agreed-upon FIFA Statutes, each National Association is required to *agree* to 'comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time.'" *Id*. ¶ 34 (emphasis added) (quoting FIFA Stat. Art. II.14(1)(a)). As evidenced by the portion of the FIFA statute that Plaintiff  quotes directly, the statute merely requires individual National Associations to comply with its statutes, regulations, and directives; it does not require or encourage any *agreement* among National Associations or with FIFA to do so.

allege plausibly a Sherman Act violation); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51-52 (2d

Cir. 2007); *Cenedella*, 348 F. Supp. 3d at 358 (rejecting plaintiff's attempts to "summarily

assert[] several times that there is an agreement" as "nothing more than conclusory

allegations.").

As this Court noted in its prior opinion, although USSF's adherence to the FIFA Policy

may be "*consistent*" with a vertical agreement, Plaintiff must plead facts "to suggest that an

agreement *was made.*"  *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556,

549, 557) (emphasis added); *Citigroup, Inc.*, 709 F. 3d at 136 ("A plaintiff's job at the pleading

stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference

that a conspiracy actually existed.").  USSF's admitted compliance with the FIFA Policy is

insufficient to support an inference that USSF and FIFA shared a "unity of purpose or a common

design and understanding, or a meeting of minds in an unlawful arrangement."  *Am. Tobacco*,

328 U.S. at 809-10; *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (explaining that it

is not concerted action for a party to announce the terms under which it is willing to deal and to

then act in accordance with that unilateral announcement, even if the practical effect may be to

achieve conformity of behavior); *Tarrant Serv. Agency, Inc. v. Am. Standard Inc.*, 12 F.3d 609,

617-18 (6th Cir. 1993) (affirming the district court's grant of summary judgment on plaintiff's §

1 conspiracy claim on the grounds that plaintiff produced no evidence of a conspiracy and noting

that the contested "broker policy was unilaterally implemented by [defendant]" and a third

party's "mere adherence to the [] policy [did] not illustrate the existence of a conspiracy.").  As

the Court previously noted, there are obvious rational reasons why USSF would comply with the

FIFA Policy without being part of an unlawful agreement to do so, such as its desire not to take

action that could result in all U.S. men's soccer players and teams being deemed ineligible for

World Cup play.[9]  Am. Compl. ¶ 100; *Cenedella*, 348 F. Supp. 3d at 358 (noting that a complaint may be dismissed "where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants.").

In sum, Plaintiff has failed to allege adequately that there was an unlawful agreement between USSF and FIFA; without an adequate allegation of an agreement, Plaintiff has not stated a claim for a violation of Section 1 of the Sherman Act.[10]

### C.  Plaintiff Fails to Allege an Unlawful Horizontal Agreement

Plaintiff alleges a horizontal agreement among the "FIFA-affiliated top-tier men's professional soccer leagues and their teams" to "geographically allocate the markets in which they are permitted to stage official season games, including in the U.S. market."  Am. Compl. ¶ 4, *see also* ¶¶ 26, 117, 167.   Plaintiff alleges that "these leagues and teams have agreed, along with their respective FIFA-affiliated National Associations," including USSF, to "adhere to the FIFA rules and policies establishing and enforcing the horizontal market division agreement." *Id*. ¶ 4; Pl. Opp., Dkt. 77 at 27.  At the outset, the Amended Complaint nowhere specifies with

---

[9]      Plaintiff added allegations regarding the relationship among USSF, MLS, and SUM, the marketing and promotion arm of MLS, to the Amended Complaint.  *See* Am. Compl. ¶¶ 91, 105-110.  Specifically, Plaintiff alleges that USSF's alleged economic dependence on SUM "incentivizes USSF to promote, participate in and adhere to the FIFA market division agreement," because the agreement purportedly shields MLS from competition.  *Id*. ¶ 107.  Even assuming the truth of those allegations, Plaintiff's allegations do not give rise to the inference that USSF entered an agreement with FIFA to restrict output.  Instead, the fact that the FIFA Policy has beneficial economic consequences for USSF provides yet another rational reason why USSF would unilaterally comply with the Policy. If complying with the Policy were contrary to USSF's economic interests, *that* would be circumstantial evidence of an unlawful agreement.

[10]     Plaintiff also appears to allege that an identical vertical agreement to comply with the FIFA Policy exists among FIFA and *all* of the 211 National Associations.  *See e.g.,* Am. Compl. ¶¶ 166, 168.  But Plaintiff alleges no facts to support the inference that the remaining 210 National Associations also entered an agreement with FIFA to restrict output.  To the contrary, Plaintiff alleges that Ecuador's National Association agreed to allow two Ecuadorian teams to participate in Plaintiff's proposed Official Game in 2019, notwithstanding the FIFA Policy. Am. Compl. ¶ 125; Pl. Opp., Dkt. 77 at 30.  Moreover, as noted *supra*, a National Association's unilateral compliance with the FIFA Policy, without more, is insufficient evidence from which the Court can infer the existence of an unlawful agreement.  *See Monsanto,* 465 U.S. at 761 (holding that a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Apple,* 791 F. 3d at 318 ("[C]onduct resulting solely from competitors' independent business decisions—and not from any 'agreement'— is not unlawful under § 1 of the Sherman Act, even if it is anticompetitive.").

which of the leagues, teams, and National Associations USSF purportedly conspired, a
deficiency this Court also identified in its prior opinion.  Dkt. 47 at 16-17 (citing *Cenedella*, 348
F. Supp. 3d at 358-59 (dismissing plaintiff's complaint as including "nothing more than
conclusory allegations . . .  completely devoid of facts indicating who agreed with whom, to
what, and when," and noting that the complaint merely referred to "other unnamed co-
conspirators, whom the plaintiff [made] little effort to describe")).  In its opposition brief,
Plaintiff argues that "*all* the top-tier men's professional soccer leagues and teams" have "agreed,
through their National Associations, to adhere to all FIFA rules and policies, including the
geographic market division policy."  Pl. Opp., Dkt. 77 at 28-29 (emphasis added).[11]
Accordingly, the Court will assume that the alleged horizontal agreement is among *all* 211
National Associations and *all* leagues and teams.

### 1.    The FIFA Policy Itself is Not Direct Evidence of a Horizontal Conspiracy

Plaintiff argues that the FIFA Policy itself constitutes direct evidence of "Defendants'
and their alleged conspirators' conscious commitment to [a] common scheme."  Pl. Opp., Dkt.
77 at 32.  The Court disagrees.  Although actions of organizations comprised of horizontal
competitors are certainly subject to scrutiny as potentially unlawful conspiracies,
"[o]rganizational decisions do not inherently constitute § 1 concerted action."  *N. Am. Soccer
League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) ("*NASL*")[12]; *see*

---

[11]    Plaintiff confirmed at oral argument that its theory is that there is a worldwide conspiracy comprised of 211 National Associations and all top tier soccer leagues and teams.  *See* Tr., Dkt. 94 at 52.

[12]    Plaintiff makes much of the Second Circuit's comment in *NASL* that if the plaintiff "were challenging the Standards themselves—in totality—as violative of the antitrust laws, then the USSF Board's promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking."  883 F.3d at 41.  At the outset, that statement is dicta; the Circuit affirmed the District Court's holding that Section 1 would require an underlying "agreement to agree" among members of the USSF Board to adopt the standards in order for the standards to constitute direct evidence of an unlawful agreement.  *Id.* at 39-40.  Moreover, Plaintiff in this case is *not* challenging FIFA's standards as a whole, but merely the impact of a single FIFA Policy.  Finally, as noted *supra,* because

*also AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999)

(holding that "every action by a trade association is not concerted action by [its] members.");

*LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) (noting that

"membership and participation in a trade association alone does not give rise to a plausible

inference of illegal agreement.").   In order for an organizational decision or policy to constitute

concerted action and, therefore, to serve as direct evidence of an unlawful agreement, Plaintiff

must plausibly allege an antecedent "agreement [among horizontal competitors] to agree to vote

a particular way" to adopt such a policy. [13]  *NASL*, 883 F.3d at 39; *see also AD/SAT*, 181 F.3d at

234 ("an antitrust plaintiff must present evidence tending to show that association members, *in

their individual capacities*, consciously committed themselves to a common scheme designed to

achieve an unlawful objective.") (emphasis added); *LaFlamme*, 702 F. Supp. 2d at 147-48

(dismissing plaintiffs' § 1 claim because the complaint failed to "allege any specific facts

providing any basis to infer an actual unlawful agreement," but rather relied on the "bald,

---

Plaintiff has not alleged an underlying "agreement to agree" to adopt the Policy, the Policy does not constitute direct evidence of a conspiracy.

[13]     Plaintiff relies on cases such as *Nat'l Collegiate Athletic Ass'n v. Alston et al.*, 141 S.Ct. 2141 (2021)*, Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 99 (1984), and *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492 (1988), to argue that the FIFA Policy itself constitutes direct evidence of a conspiracy. Those cases are readily distinguishable.  In *Alston,* the Supreme Court specifically noted that there was no dispute that NCAA and its members, which are undisputed horizontal competitors, "agreed to compensation limits on student-athletes."  141 S.Ct. at 2151.   In other words, the Court in *Alston* began its analysis from the premise of "admitted horizontal price fixing."  *Id.* at 2154.  Similarly, in *Board of Regents*, the challenged policy was indisputably agreed upon by a vote among horizontal competitors.  468 U.S. at 99.  Finally, in *Allied Tube*, the defendant "conceded that it had conspired with the other steel interests to exclude respondent's [proposal]" by, *inter alia,* strategizing with other steel workers, "packing" the meeting with new members "whose only function would be to vote against" plaintiff's proposal, and instructing the voters "where to sit and how and when to vote by group leaders who used walkie-talkies and hand signals to facilitate communication."  486 U.S. at 496-97.  Put differently, Plaintiff relies on cases in which the existence of an underlying agreement was not disputed. Here, Plaintiff's Amended Complaint fails precisely because it does not include any well-pled facts from which the Court could infer that there was an unlawful agreement among Defendants and their horizontal competitors to adopt or enforce the Policy.

conclusory allegation that 'it appears that defendants and others decided to adopt the terms of [the] [r]esolution'").

Plaintiff's Amended Complaint lacks any non-conclusory factual allegations from which the Court can reasonably infer that the 37 members of the FIFA Council unlawfully agreed to adopt the Policy, or even that USSF and some of the members of the FIFA Council unlawfully agreed to adopt the Policy.[14]  Plaintiff fails entirely to allege any facts suggesting that there was an "agreement to agree," *NASL*, 883 F.32 at 39, a "unity of purpose," *Am. Tobacco*, 328 U.S. at 810, or a "meeting of the minds," *Twombly*, 550 U.S. at 557, among USSF and any other member of the FIFA Council to adopt the Policy.  Plaintiff's allegations that the FIFA Council adopted the rule "at the behest of USSF and MLS" and that unnamed "USSF and MLS allies [] push[ed] the policy through in the FIFA Council" are conclusory.[15]  Am. Compl. ¶¶ 114, 117; *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 437 (4th Cir. 2015) (dismissing allegations that "a collective decision was made," and that the defendants "agreed to vote as a

---

[14]     The Court also notes that it is not at all clear whether the members of the FIFA Council, who represent various National Associations and regional confederations, are horizontal competitors.  The Amended Complaint alleges that the FIFA-affiliated leagues and teams are "competitors," *see e.g.,* Am. Compl. ¶ 4, 88, but it does not allege that the six regional confederations and 211 National Associations are horizontal competitors.  Instead, the Amended Complaint merely alleges that each National Association is a "separate economic actor."  *Id.* ¶ 161.

[15]     The Amended Complaint identifies four other individuals who sat on the FIFA Council on behalf of the National Associations of England, Portugal, Canada, and Japan.  Am. Compl. ¶ 41.  Plaintiff does not, however, allege that any of those four individuals agreed with USSF to vote to adopt the FIFA Policy.  Plaintiff also fails to identify the remaining members of the FIFA Council, let alone include allegations that those unidentified people agreed with USSF (or with anyone else) to vote in favor of the Policy.

        At oral argument, the Court pressed Plaintiff on the facts that support its assertion that FIFA adopted the Policy at the behest of USSF.  Tr., Dkt. 94 at 38, 54, 57-62.  The resulting exchange leads the Court to suspect that Relevant does not fully understand the pleading standard announced over a decade ago in *Ashcroft v. Iqbal* and *Bell Atlantic v. Twombly*.  Although Plaintiff's counsel assured the Court that he had "source information" and "other things" to back up the Amended Complaint's conclusory allegations regarding U.S. Soccer's role in the announcement of the FIFA Policy, when pressed on where those facts appear in the Amended Complaint, counsel could only assure the Court that the "allegations [in the Amended Complaint] are not made up out of whole cloth," and he had "a reasonable basis" for the allegations.  Tr., Dkt. 94 at 59.  If Plaintiff had sources who provided information that supported its conclusory allegations regarding USSF's role in pressing others on the FIFA Council to adopt the Policy (allegations that might have started to look like there was "an agreement to agree"), it should have included that information in the Amended Complaint, together with the sources' asserted basis for knowledge.  That is the clear teaching of *Iqbal* and *Twombly*.

bloc" as conclusory, non-specific, and insufficient to support an inference of an unlawful

agreement); *cf. Allied Tube*, 486 U.S. at 496-97 (noting specific factual allegations that defendant

had "pack[ed]" the meeting with new members "whose only function would be to vote against"

plaintiff's proposal, and instructed voters "where to sit and how and when to vote by group

leaders who used walkie-talkies and hand signals to facilitate communication.").  Similarly,

Plaintiff's allegation that former USSF President, Sunil Gulati, participated in the FIFA

Council's adoption of the Policy "with the goal of shielding USSF's sole Division I league,

MLS, from official season games competition from foreign leagues," Am. Compl. ¶ 39, is

wholly unsupported and conclusory.  The Court cannot plausibly infer, merely from Mr. Gulati's

presence on the FIFA Council, that USSF facilitated or participated in an unlawful agreement to

adopt the Policy.  *See SD3, LLC,* 801 F.3d at 436 (rejecting plaintiff's argument that the court

should "infer malfeasance because some of the defendants' representative[s] served on the

relevant standard-setting panel"); *All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*, 596

F. Supp. 2d 630, 640 (E.D.N.Y. 2009) (allegations that Defendants participated in meetings,

conversations and communications, and "reached agreement during these meetings as to their

anticompetitive practices" were insufficient allegations of the existence of an agreement to

survive a motion to dismiss).  In sum, Plaintiff fails to allege any facts from which the Court can

reasonably infer that the members of the FIFA Council, "in their individual capacities,

consciously committed themselves to a common scheme designed to achieve an unlawful

objective." *AD/SAT, Div. of Skylight, Inc.*, 181 F.3d at 234; *SD3, LLC*, 801 F.3d at 437

(dismissing certain allegations of an unlawful agreement because the complaint identified "no

fact other than consistent votes against [plaintiff's] proposal . . .  to establish the alleged illegal

agreements.").  Without such well-pled facts, the FIFA Policy is not direct evidence of an

unlawful agreement.

Plaintiff similarly fails to allege circumstantial evidence of an agreement among the members of the FIFA Council to adopt the Policy.[16]  Although Plaintiff makes much of the fact that Don Garber, MLS Commissioner and a Board Member of USSF, and Carlos Cordeiro, a former-USSF President, were on the FIFA Stakeholders Committee,[17] Am. Compl. ¶¶ 44-45, Mr. Garber and others' participation on the Stakeholders Committee is not circumstantial evidence of an agreement among the members of the FIFA Council.  At the outset, Plaintiff's allegations that Mr. Garber and Mr. Cordeiro "advocate[d] for a new geographic market division policy" and that the Stakeholders Committee "has taken a number of actions to support the adoption, implementation, enforcement—and, most recently, the strengthening—of the geographic market division agreement," *id.* ¶¶ 46, 114, are factually unsupported and conclusory. The Court cannot reasonably infer merely from Mr. Garber's presence on the Stakeholders Committee in 2018 that he "advocate[d]" for the Policy or took any action to "support the adoption, implementation, [or] enforcement" of the Policy.  Moreover, and most significantly, the FIFA Policy was announced by the FIFA Council, *not* by the FIFA Stakeholders Committee, which has no rule-making authority.  *Id.* ¶ 117.  Accordingly, even accepting that members of the FIFA Stakeholders' Committee did in fact advocate for the adoption of the FIFA Policy (a conclusory allegation totally devoid of factual support), Plaintiff alleges no facts to support the

---

[16]     As noted *supra* at note 7, at oral argument, Plaintiff's counsel strayed considerably from the allegations and arguments in his papers.  For example, when pressed about the implications of Plaintiff's allegations regarding the role of the FIFA Stakeholders Committee, Plaintiff's counsel stated that its allegations that the FIFA Council adopted the Policy at the urging or "at the behest of U.S. Soccer and Major League Soccer" are "irrelevant to whether there is an agreement."  Tr., Dkt. 94 at 35.  Plaintiff's Amended Complaint and opposition, however, argue that the actions and statements of the members of the Stakeholders Committee are circumstantial evidence of an unlawful agreement.   Am. Compl. ¶¶ 46, 51 114, 117; Pl. Opp., Dkt. 77 at 34.  Accordingly, Plaintiff's theory of the role and impact of the FIFA Stakeholders Committee vis-à-vis the alleged unlawful agreements among the members of the FIFA Council to adopt the Policy or among the National Associations, leagues, and teams to adhere to the Policy, is entirely unclear.  Nevertheless, the Court assumes that Plaintiff is relying on allegations concerning the Stakeholders Committee as circumstantial evidence of an unlawful agreement and will analyze them as such.

[17]     The FIFA Stakeholders Committee is a standing committee tasked with "advising and assisting" the FIFA Council.  Am. Compl. ¶ 42.

inference that such a recommendation had any bearing on whether the members of the FIFA Council formed a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768.  Although the Court notes that the terms of the FIFA Policy indicate that it is "consistent with the opinion expressed by the Football Stakeholders Committee," Plaintiff alleges no facts to support an inference that (i) the FIFA Council adopted the Policy "at the urging," Am. Compl. ¶ 41, of the Stakeholders Committee; (ii) the Policy reflects any "unity of purpose or a common design and understanding" among the members of the Stakeholders Committee and the FIFA Council; or (iii) the Stakeholders Committee's recommendation precipitated any unlawful underlying agreement among the members of the FIFA Council to adopt the Policy.

Finally, even assuming that all 37 members of the FIFA Council did vote to adopt the Policy,[18] which is not alleged in the Amended Complaint, "consistent votes," absent additional evidence is best viewed as "parallel conduct . . .  equally consistent with legal behavior." *SD3, LLC*, 801 F.3d at 437; *Twombly*, 550 U.S. at 556-57 ("[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").  The Court cannot reasonably infer, merely from the fact that the members of the FIFA Council met and subsequently announced a Policy, that there was a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" to adopt that Policy.  *Am. Tobacco Co.*, 328 U.S. at 809-10.

---

[18]     The Amended Complaint does not allege how many votes on the FIFA Council are required to adopt a policy nor how many members voted in favor of the Policy at issue here.

>       **2.      Unilateral Adherence to the FIFA Policy is Not Evidence of a
>               Horizontal Conspiracy**

The National Associations, leagues, and teams' adherence to the announced FIFA Policy,

without additional factual allegations, is similarly insufficient to allege adequately the existence

of a horizontal conspiracy.  Plaintiff's repeated conclusory allegations that all of the National

Associations, leagues, and teams have agreed to adhere to the FIFA Policy, *see, e.g.,* Am.

Compl. ¶¶ 4, 35, 70, 98, 117, 162, 166, 167, 170-174, are just that – conclusory allegations that

are not entitled to the presumption of truth.  *Iqbal*, 556 U.S. at 681; *Integrated Sys. & Power,*

*Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010) ("While Plaintiff

repeatedly asserts that Defendant's conduct constitutes a 'horizontal conspiracy,' . . . this

characterization is a legal conclusion that the Court does not accept as true on a motion to

dismiss.").  Moreover, as noted *supra,* Plaintiff's allegation that FIFA "require[s]" the National

Associations "*to agree* to 'comply fully with FIFA's Statutes'" is belied by the language of the

cited FIFA statute.  Am. Compl. ¶ 34 (emphasis added); *see also* ¶¶ 35, 98, 117.  The relevant

FIFA statute requires the National Associations to adhere to FIFA policies; it does not require

them unlawfully to agree to adhere to them.  *Id.* ¶ 34.  In short, Plaintiff's Amended Complaint is

devoid of any factual allegations to support the inference that the Defendants in this case agreed

with anyone, let alone with all 210 other National Associations and countless leagues and teams,

to do anything, including to adhere to the Policy.  *See Jessup v. Am. Kennel Club*, 862 F. Supp.

1122, 1129 (S.D.N.Y. 1994) (observing the weakness of antitrust claims where the plaintiff

failed to "identify or refer to specific acts or activities suggesting any illegal agreement or

concerted action by Defendants").

        Plaintiff similarly fails plausibly to allege circumstantial evidence of an agreement

among the National Associations, leagues, and teams to adhere to the Policy.  Plaintiff relies on a

statement made by Mr. Garber that "the respective leagues don't believe it's in their best interest" to permit Official Games to be held outside of their home markets and that while there may be "one or two" leagues that feel differently, MLS was not one of them.  Am. Compl. ¶ 51. Plaintiff alleges that Mr. Garber's statement constitutes an "admission" of "his intention to use the FIFA market division agreement to shield MLS from official games competition in the U.S." *Id*.  At the outset, Mr. Garber made this statement in 2020, two years after the FIFA Policy was announced.  *Id*.  Accordingly, Plaintiff's argument that Mr. Garber's statement is circumstantial evidence of an agreement to adhere to a policy that was announced two years earlier is tenuous at best.  Moreover, Mr. Garber's expression of MLS or USSF's opinion regarding the benefits of the Policy does not necessarily signify an underlying conspiracy among all National Associations, leagues, and teams to enforce the Policy.  *See Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1195 (D.N.M. 2011) (noting that defendant's statement that it opposed changing a standard-setting organization's proposed standard did not suggest an unlawful agreement but merely "unilateral conduct.").  To the contrary, Mr. Garber's statement that there are leagues who do *not* support the FIFA Policy undermines Plaintiff's argument by suggesting that there is, in fact, no "agreement" among *all* of the National Associations, leagues, and teams to adhere to the Policy.

Finally*,* even assuming that all National Associations, leagues, and teams do comply with the FIFA Policy, in the absence of any factual allegations supporting an inference of an actual agreement to restrict output, such conduct does not violate the Sherman Act.  *See Apple*, 791 F. 3d at 318 ("[C]onduct resulting solely from competitors' independent business decisions—and not from any 'agreement'— is not unlawful under § 1 of the Sherman Act, even if it is anticompetitive."); *Anderson News*, 680 F.3d at 174 (noting that "unilateral parallel conduct" does not itself "create an inference of collusion"); *Abraham v. Intermountain Health Care*

*Inc.*, 461 F.3d 1249, 1256 (10th Cir. 2006) ("unilateral conduct, regardless of its anti-competitive effects, is not prohibited by § 1 of the Sherman Act.") (internal quotation marks omitted).

In sum, Plaintiff has failed to allege an unlawful horizontal agreement.[19]  As such, Plaintiff has not stated a claim for a violation of Section 1 of the Sherman Act.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's antitrust claim are GRANTED.

No later than **July 30, 2021**, Plaintiff must submit a letter indicating whether it intends to pursue its tort claim.  If Plaintiff intends to pursue the tort claim in arbitration, this case will be stayed pending arbitration.

The Clerk of Court is respectfully directed to close the open motions at docket entries 65 and 68.

**SO ORDERED.**

**Date:  July 20, 2021**                                              **VALERIE CAPRONI**
         **New York, New York**                               **United States District Judge**

---

[19]     Plaintiff makes much of a letter written by the Department of Justice to FIFA and USSF on March 16, 2020.  Am. Compl., Ex. 1.  The letter, which is attached to Plaintiff's Amended Complaint, concerned a proposed rule that FIFA never adopted.  The letter does not concern the FIFA Policy adopted in 2018 and does not contain any additional facts to support the existence of an unlawful vertical or horizontal agreement among FIFA, USSF, the regional confederations, National Associations, leagues, and teams to adhere to the Policy.