**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RELEVENT SPORTS, LLC,

                     Plaintiff,

            v.

FÉDÉRATION INTERNATIONALE DE FOOTBALL
ASSOCIATION and UNITED STATES SOCCER
FEDERATION, INC.,


                     Defendants.

Civil Action No. 19-cv-8359 (VEC)

**ORAL ARGUMENT REQUESTED**

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANT UNITED STATES SOCCER FEDERATION, INC.'S**</u>
<u>**SECOND MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

# TABLE OF CONTENTS

Page

I.   Introduction ................................................................................................ 1

II.  Background ................................................................................................. 2

     A.   Factual History .................................................................................. 2

     B.   Procedural History ............................................................................ 3

III. Argument .................................................................................................... 4

     A.   Relevent's Claims Are Barred By A Release And Covenant Not To
          Sue ..................................................................................................... 4

          1.   Relevent Agreed To Release And Not To Pursue Claims
               Challenging U.S. Soccer's Sanctioning Authority Over
               International Matches Or Its Fees .............................................. 4

          2.   The Second Circuit's Decision Makes Clear That Relevent
               Has Released The Claims At Issue Here ..................................... 5

          3.   Relevent's Claim That The Conduct At Issue Does Not Fall
               Within The Scope Of The Covenant Not To Sue Is
               Unavailing .................................................................................. 7

          4.   There Is No Public Policy Bar To Enforcing The Covenant
               Not To Sue .................................................................................. 9

     B.   Relevent Fails To Sufficiently Plead A *Per Se* Violation Of
          Section 1 .......................................................................................... 10

     C.   Relevent Fails To Sufficiently Allege A Violation Under The Rule
          Of Reason ........................................................................................ 11

          1.   Relevent's Alleged Relevant Market Is Implausible ............... 11

          2.   Relevent Fails To Allege Anticompetitive Effects .................. 15

     D.   Relevent Lacks Antitrust Standing .................................................. 16

     E.   USSF, FIFA, And The Alleged Co-Conspirators Are Not
          Independent Economic Actors Under *Copperweld* ........................... 17

          1.   U.S. Soccer Is Legally Incapable Of Conspiring To
               "Comply" With FIFA's Directive To Violate Section 1 ........... 17

IV.  CONCLUSION ......................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*AD/SAT, A Division of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999).............................................................................. 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................... 14

*Associated General Contractors of California v. California State Council of
    Carpenters*,
    459 U.S. 519 (1983)......................................................................................... 16

*Baidu, Inc. v. Register.com, Inc.*,
    760 F. Supp. 2d 312 (S.D.N.Y. July 22, 2010).................................................... 9

*Bookhouse of Stuyvesant Plaza Inc. v. Amazon.com, Inc.*,
    985 F. Supp. 2d 612 (S.D.N.Y. 2013)........................................................... 12, 13

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)......................................................................................... 11

*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988)......................................................................................... 11

*Chapman v. New York State Division for Youth*,
    546 F.3d 230 (2d Cir. 2008).............................................................................. 12

*Chase Manhattan Bank v. New Hampshire Insurance Co.*,
    749 N.Y.S.2d 632 (Sup. Ct. 2002)...................................................................... 8

*City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, Inc.*,
    838 F.2d 268 (8th Cir. 1998) ............................................................................ 18

*City of New York v. Pullman, Inc.*,
    477 F. Supp. 438 (S.D.N.Y. 1979)...................................................................... 8

*Commercial Data Servers, Inc. v. International Business Machines Corp.*,
    166 F. Supp. 2d 891 (S.D.N.Y. 2001)................................................................ 13

*Concord Associates*, *L.P. v. Entertainment Properties Trust*,
    817 F.3d 46 (2d Cir. 2016)...................................................................... 11, 13, 14

*Copperweld Corporation v. Independence Tube Corporation*,
    467 U.S. 752 (1984)..................................................................................... 2, 18

*G.K.A. Beverage Corp. v. Honickman,*
   55 F.3d 762 (2d Cir. N.Y. 1995) ........................................................................... 16

*Gatt Communications, Inc. v. PMC Associates, L.L.C.,*
   711 F.3d 68 (2d Cir. 2013) ..................................................................................... 16

*Gianna Enterprises. v. Miss World (Jersey) Ltd.,*
   551 F. Supp. 1348 (S.D.N.Y. 1982) ....................................................................... 14

*Greenfield v. Philles Recs., Inc.,*
   98 N.Y.2d 562 (2002) ............................................................................................... 7

*Heerwagen v. Clear Channel Communications,*
   435 F.3d 219 (2d Cir. 2006) ............................................................................. 12, 14

*Hicks v. PGA Tour, Inc.,*
   897 F.3d 1109 (9th Cir. 2018) .................................................................... 12, 14, 15

*In re LIBOR-Based Financial Instruments Antitrust Litigation,*
   No. 11 MDL 2262 (NRB), 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ........................ 18

*It's My Party, Inc. v. Live Nation, Inc.,*
   811 F.3d 676 (4th Cir. 2016) ................................................................................. 12

*Jack Russell Terrier Network of Northern California v. American Kennel Club, Inc.,*
   407 F.3d 1027 (9th Cir. 2005) .......................................................................... 18, 19

*K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.,*
   61 F.3d 123 (2d Cir. 1995) ..................................................................................... 14

*Kalisch-Jarcho, Inc. v. City of New York,*
   58 N.Y.2d 377 (1983) ............................................................................................... 9

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
   551 U.S. 877, 882 (2007) ....................................................................................... 10

*MacDermid Printing Solutions LLC v. Cortron Corp.,*
   833 F.3d 172 (2d Cir. 2016) ................................................................................... 15

*Madison Square Garden, L.P. v. National Hockey League,*
   No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ............................ 10

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
   542 F.3d 290 (2d Cir. 2008) ............................................................................. 11, 15

*National Collegiate Athletic Association v. Alston,*
   141 S. Ct. 2141 (2001) ........................................................................................... 11

*New York v. Deutsche Telekom AG,*
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) .................................................................. 11

*North American Soccer League v. United States Soccer Federation, Inc.,*
    883 F.3d 32 (2d Cir. 2018) ..................................................................................... 11

*PepsiCo, Inc. v. Coca-Cola Co.,*
    315 F.3d 101 (2d Cir. 2002) ................................................................................... 11

*Reading International, Inc. v. Oaktree Capital Management. LLC,*
    317 F. Supp. 2d 301 (S.D.N.Y. 2003) ................................................................... 16

*Relevent v. United States Soccer Federation,*
    No: 21-2088 (2d Cir. 2021) ...................................................................................... 3

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.,*
    545 F.2d 18 (7th Cir. 1976) ...................................................................................... 9

*Skluth v. United Merchants & Manufacturers, Inc.,*
    559 N.Y.S.2d 280 (1st Dep't 1990) ......................................................................... 7

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.,*
    546 F.3d 196 (2d Cir. 2008) ................................................................................... 12

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ................................................................................................... 11

*Theatre Party Associates., Inc. v. Shubert Org.,*
    695 F. Supp. 150 (S.D.N.Y. 1988) .................................................................. 14, 15

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ....................................................................... 11, 12, 14

*United States Soccer Federation v. Relevent,*
    No. 23-120 (U.S. Supreme Court 2023) .................................................................. 3

*United States v. American Express Co.,*
    838 F.3d 179 (2d Cir. 2016) ................................................................................... 16

*US Airways, Inc. v. Sabre Holdings Corp.,*
    105 F. Supp. 3d 265 (S.D.N.Y. 2015) ..................................................................... 9

*Volk v. Liggett Group Inc.,*
    No. 96 CIV. 1921 SS, 1997 WL 107458 (S.D.N.Y. Mar. 11, 1997) ....................... 7

*Xerox Corp. v. Media Sciences., Inc.,*
    609 F. Supp. 2d 319 (S.D.N.Y. 2009) ................................................................... 10

## STATUTES

Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501, *et seq.* ................... 4, 8, 17

## OTHER AUTHORITIES

Rodney D. Fort, SPORTS ECONOMICS 24 (3d ed. 2011) ............................................................. 13

Tom Bogert, *MLS Expansion Boom Continues at Unprecedented Rate in Modern
    Sports*, MAJOR LEAGUE SOCCER (Oct. 21, 2019),
    https://www.mlssoccer.com/post/2019/10/21/mls-expansion-boom-continues-
    unprecedented-rate-modern-sports ...................................................................................... 15

I.        **INTRODUCTION**

Since this case was first filed, the only constant has been Relevent's willingness to change its theories of liability and harm at every turn to avoid dismissal.  Numerous briefs and hours of oral arguments have been devoted to trying to pin down Relevent on the most basic issues, including what specifically is the agreement that Relevent is challenging as anticompetitive.  While this Court rightly dismissed Relevent's Amended Complaint based on the allegations presented in that document, before the Second Circuit, Relevent pivoted to articulating for the first time that the anticompetitive agreement it was *directly challenging* was a 2018 FIFA Council press release.  Relying on Relevent's 11th-hour representation, the Second Circuit ultimately held that Relevent had alleged sufficient evidence of an agreement for purposes of Section 1 of the Sherman Act, and vacated this Court's judgment.

U.S. Soccer respectfully submits that the Second Circuit's decision is in error, and from a legal perspective represents a fundamental departure from established law, both within and outside of this Circuit.  U.S. Soccer petitioned the Supreme Court for a *writ of certiorari*, and recently the Supreme Court invited the Solicitor General to file a brief expressing the views of the United States on the issues.  While U.S. Soccer believes that the Supreme Court should grant the petition and reverse the Second Circuit's decision, there are myriad reasons not implicated by the Second Circuit's decision why Relevent's claims are not viable.  And, at the same time, the Second Circuit's decision, if it does stand, reinforces other reasons this case must be dismissed.

*First*, Relevent's claims against U.S. Soccer remain barred by the release and covenant not to sue that is set forth in a 2016 settlement agreement between Relevent and U.S. Soccer.  While Relevent tries to parse the operative language (and once again twist its theories) in an attempt avoid the clear import of the agreement it freely entered into, the reality is that Relevent is challenging the issue it contractually agreed to release and not sue on.  Indeed, to the extent Relevent tried to contort the temporal element of its claim to avoid the import of the release and covenant, the Second Circuit's decision actually negates those efforts, making dismissal clearly appropriate.  *Second*, irrespective of the Second Circuit's ruling on what constitutes direct evidence

of concerted action, Relevent's allegations of conspiracy still are not appropriately analyzed under the *per se* approach.  That means that Relevent is required to properly plead the required elements of market definition and anticompetitive effects under the rule of reason.  Relevent fails to do so in all respects.  While Relevent will likely claim these are factual issues that should not be decided on a motion to dismiss, it is clear that Relevent's proposed relevant markets are internally inconsistent and so implausible under the law that dismissal is appropriate.  At the same time, Relevent does not present anything beyond the most insufficient barebones conclusion that the conduct at issue has had an anticompetitive effect.  *Third*, even if Relevent had properly alleged an antitrust violation, it does not have standing to bring an antitrust action to remedy that conduct.  Relevent's injuries are wholly derivative of other participants', and if the conspiracy truly is what Relevent alleges, then it certainly cannot be deemed to be an efficient enforcer of the antitrust laws.  *Finally*, in an effort to find this Court has personal jurisdiction over FIFA, the Second Circuit concluded that U.S. Soccer engaged in the allegedly anticompetitive conduct as FIFA's agent.  While U.S. Soccer rejects that it is FIFA's agent, to the extent the Court holds that it is bound by the Second Circuit's conclusions on the matter, Relevent's vertical conspiracy claim is barred by the Supreme Court's decision in *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

For all these reasons, Relevent's case should, once again, be dismissed with prejudice.

## II.     BACKGROUND

### A.     <u>Factual History</u>

U.S. Soccer respectfully questions the utility of providing a full recitation of the facts alleged in Relevent's Amended Complaint, given that throughout this case, Relevent has shown a proclivity towards changing its alleged facts whenever they prove challenging to its legal theories. U.S. Soccer also recognizes that this Court is wholly familiar with the factual history from the multiple rounds of motion to dismiss briefing.  To the extent the Court requires a full recitation of the relevant factual background, U.S. Soccer respectfully directs the Court to the statement of facts contained in U.S. Soccer's December 7, 2020 Memorandum of Law in Support of its Motion to

Dismiss the Amended Complaint (Docket No. 66) at pp. 4-7, which it incorporates herein by reference.

### B.   Procedural History

Once again, U.S. Soccer respectfully refers the Court to its prior recitation of the procedural history of this matter, which it incorporates by reference. *Id.* at pp. 7-9. After completion of motion to dismiss briefing on Relevent's Amended Complaint in the matter, on June 15, 2021, the Court held oral argument. *See* Docket No. 94. On July 20, 2021, this Court issued an Opinion and Order dismissing Relevent's complaint with prejudice. Docket No. 96. Specifically, the Court held that due to several pleading deficiencies, Relevent did not sufficiently allege either a vertical or horizontal conspiracy. *Id.* In that opinion, the Court specifically noted that because it determined that Relevent had failed to state an antitrust claim, it was not considering Defendants' other arguments for dismissal. *Id.* at p. 6 n.6.

Thereafter, Relevent appealed. On March 7, 2023, the Second Circuit Court of Appeals (Lohier, J.) ruled that Relevent's Amended Complaint directly challenges the 2018 FIFA Council press release "as violative of the antitrust laws," and that as a result, the "promulgation of [the policy] ... constitute[s] direct evidence of § 1 concerted action." Docket No. 101 at p. 4. Accordingly, the Court held that no further allegation of an agreement was necessary. *Id.* As a result, the Second Circuit vacated this Court's judgment and remanded the matter for further proceedings. *Id.* at 25. On April 4, 2023, Defendants petitioned the Second Circuit for panel rehearing, or, in the alternative, for rehearing *en banc*. *See Relevent v. United States Soccer Federation*, No: 21-2088 (2d Cir. 2021) at Docket Nos. 146, 147. On May 8, 2023, the Second Circuit issued an order denying those petitions. *Id.* at Docket No. 155. Motions to stay the mandate were filed, and on May 18, 2023, those motions were denied. *Id.* at Docket No. 165. Thereafter, on August 4, 2023, U.S. Soccer petitioned the United States Supreme Court for a *writ of certiorari*. *See United States Soccer Federation v. Relevent*, No. 23-120 (U.S. Supreme Court 2023). On November 13, 2023, the Supreme Court issued an order inviting the Solicitor General to file a brief in the matter expressing the views of the United States. *Id.*

## III.   ARGUMENT

The Second Circuit's decision held only that Relevent has sufficiently pled concerted action.  Docket No. 101 at p. 4.  The Second Circuit's decision does not otherwise address or impact the arguments U.S. Soccer presented as to why Relevent's claims should not be permitted to move forward.  Indeed, as shown below, the Second Circuit's decision, at least in one respect, provides further support for U.S. Soccer's argument that Relevent's claims must be dismissed.

### A.   Relevent's Claims Are Barred By A Release And Covenant Not To Sue

1.   Relevent Agreed To Release And Not To Pursue Claims Challenging U.S. Soccer's Sanctioning Authority Over International Matches Or Its Fees

Relevent's claims should be dismissed because they are barred by a release and covenant not to sue.  In 2016, Relevent and U.S. Soccer entered into a settlement agreement to resolve claims threatened by Relevent regarding U.S. Soccer's authority to sanction international soccer matches and to charge corresponding sanctioning fees.  *See* Docket No. 34-6 (2016 Settlement Agreement). The critical concession that Relevent obtained in the 2016 settlement was U.S. Soccer's agreement to revise and reduce its sanctioning fee structure for "all International Games promoted in the United States which take place on *and after* June 1, 2016."  *Id*. Art. 2.  This imposed a ceiling on the sanctioning fees that U.S. Soccer charges for such matches.  *Id.*  In exchange, Relevent acknowledged that "U.S. Soccer is authorized by the Ted Stevens Olympic and Amateur Sports Act and FIFA to sanction International Games played in the United States," *id*. Art. 1(i), and agreed to a release of claims and a covenant not to sue that relinquished any and all future claims against U.S. Soccer relating to this sanctioning authority and any corresponding sanctioning fees:

> Relevent . . . does hereby release and forever discharge U.S. Soccer . . .of and from any and all action or actions . . . known or unknown . . . which the Relevent Parties now have or hereafter may have against the U.S. Soccer Parties, or any of them, by reason of any act, cause, matter or thing ***from the beginning of time through the date of this Agreement in any way relating to or arising out of (i) U.S. Soccer's authority to sanction International Games*** . . .

> Relevent . . . covenants and agrees that, . . . it shall not assert and shall forever refrain and forbear from commencing, instituting,

> prosecuting, or otherwise bringing . . . any Claim, bankruptcy claim, or proceeding of any kind against the U.S. Soccer Parties, or any of them, in any way challenging (x) **U.S. Soccer's jurisdiction over International Games**, (y) **U.S. Soccer's authority to charge Sanctioning Fees**, or (z) the reasonableness of the Sanctioning Fees charge by U.S. Soccer.

*Id*. Art. 3(a), 4 (emphasis added); Am. Compl. ¶ 155.  The only condition imposed on the releases and covenant was that U.S. Soccer could not increase its sanctioning fees—which it has not.

2.  <u>The Second Circuit's Decision Makes Clear That Relevent Has Released The Claims At Issue Here</u>

As the Court is aware, one of the ways in which Relevent has flip-flopped throughout this case is with respect to identifying the alleged anticompetitive agreement.  The alleged FIFA geographic market division policy that Relevent bases its claim on did not come into existence *"starting in 2018."*  Am. Compl. ¶ 158.  Rather, the notion that regular season matches should be played in a league's home territory has been around for decades, and is embodied in FIFA's Article 73 statue that long predates Relevent's founding and relationship with U.S. Soccer.  *Id.* ¶ 93.  That Article states specifically that "Associations, leagues or clubs that are affiliated to a member association may only join another member association or take part in competitions on that member association's territory under exceptional circumstances.  In each case, authorisation must be given by both member associations, the respective confederation(s) and by FIFA."  *See* Docket No. 34-2 (FIFAs Statutes, April 2016 Edition) Art. 73.

So why did Relevent, in its Amended Complaint, avoid all references to Article 73 and the fact that FIFA's rules have precluded the matches at issue from going forward?  The simple answer is because it was desperately trying to avoid the import of the 2016 release.  There can be no legitimate dispute that the alleged conduct, *i.e.*, U.S. Soccer participating in an alleged conspiracy to prevent foreign league regular season matches from going forward, falls within the scope of the broad release Relevent granted U.S. Soccer, *i.e.*, a claim "in any way relating to or arising out of (i) U.S. Soccer's authority to sanction International Games."   Indeed, Relevent essentially acknowledged as much in its prior opposition to Defendants' motions to dismiss where it said "although the 2016 agreement released USSF from any legal claim for *past* conduct '*in any way*

5

*relating to or arising out of* [USSF]'s authority to sanction International Games' (Buterman Decl. Ex. 6 at 3 (ECF No. 34-6), such broad language is absent from the covenant not to sue over *future* USSF conduct."  Docket No. 77 at p. 50 (emphasis in original).  For that reason, Relevent took pains to avoid Article 73 (which predates it execution of the release) and focus instead on the 2018 pronouncement (which postdates the execution of the release).  But, Relevent was (at least before this Court) always careful to not state definitively that the 2018 pronouncement was the alleged agreement, because doing so raised a separate problem in that no one from U.S. Soccer voted on the 2018 pronouncement.  Instead, Relevent strategically asserted that what happened on October 26, 2018, was that "the FIFA Council adopted a policy *embodying* the anticompetitive market division agreement at issue in this case."  Am. Compl. ¶ 37 (emphasis added).

After its case was dismissed in this Court, Relevent had no choice and pivoted in the Second Circuit to claiming for the first time that the 2018 pronouncement was the anticompetitive agreement itself.   But to avoid the problem that U.S. Soccer did not vote on the 2018 pronouncement, Relevent argued that ***U.S. Soccer's earlier decision to abide by FIFA's rules*** was sufficient concerted action for a rule or policy that later comes into effect.  *See* Docket No. 101 at p. 20 ("[h]ere, Relevent alleges that the national associations, leagues, and teams have 'surrendered [their] freedom of action . . . and agreed to abide by the will of the association[]. . . . That is enough.").  The Second Circuit made clear that the *conduct* that it was holding was sufficiently pled in this matter for purposes of the motion to dismiss was not merely the 2018 pronouncement, but rather "the adoption of the policy, *combined with the member league's prior agreement, by joining FIFA, to adhere to its policies,*" which it held "constitutes an agreement on the part of all—whether they voted in favor of the policy or not—to adhere to the announced restriction on competition."  *Id.* at 16 (emphasis added).

The clear import of the Second Circuit's decision is that the conduct at issue that supposedly violates the antitrust law cannot be boxed into a 2018 timeframe.  Indeed, without U.S. Soccer's prior agreement to join FIFA and adhere to its policies, the 2018 pronouncement could not on its own, even under Relevent's theory, import liability on U.S. Soccer since it did not vote

on the matter.  Stated differently, the only *conduct* that U.S. Soccer engaged in related to this issue that subjects it to potential liability is its agreement to join FIFA and adhere to its policies.  That occurred well before 2018, meaning that when Relevent released U.S. Soccer from past conduct "in any way relating to or arising out of [USSF]'s authority to sanction International Games" it necessarily was releasing U.S. Soccer from the claim it brings here.  Fundamental fairness dictates that if Relevent can rely on U.S. Soccer's pre-2016 conduct for purposes of pleading an antitrust violation, then U.S. Soccer must be able to point to that same conduct for purposes of arguing Relevent's claimed antitrust violation is subject to the 2016 release.  To rule otherwise would allow Relevent to eat its cake and have it too.

To get its antitrust case reinstated, Relevent changed its theory of liability to one that alleged the conspiracy took place in 2018.  But to avoid the infirmities with that theory (*i.e.*, the fact that U.S. Soccer admittedly did not agree to anything in 2018), it was forced to rely on U.S. Soccer's conduct that took place well beforehand.  That brings Relevent's 2016 release squarely into play and requires dismissal of this action.

       3.    <u>Relevent's Claim That The Conduct At Issue Does Not Fall Within<br>The Scope Of The Covenant Not To Sue Is Unavailing</u>

In addition to the above, Relevent's claims are also barred by its covenant not to sue.  Under New York law, which governs the entire 2016 settlement, "agreements are construed in accord with the parties' intent." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002).  Covenants not to sue are agreements "to forego potential legal claims." *Volk v. Liggett Grp. Inc.*, No. 96 CIV. 1921 SS, 1997 WL 107458, at *4 (S.D.N.Y. Mar. 11, 1997).  They are inherently "prospective," and "effective not only as to those claims 'already accrued' as of the time that the instrument is executed, but also as to any claims 'which might arise subsequent to th[at] date.'"  *Id.* (quoting *Skluth v. United Merchants & Mfrs., Inc.*, 559 N.Y.S.2d 280, 282 (1st Dep't 1990)).  Thus, the temporal arguments that Relevent presents in defense of the import of the release, while unavailing for the reasons identified above, indisputably have no bearing on the applicability of the covenant not to sue.

Relevent seeks to avoid the import of the covenant not to sue by asserting that the conduct at issue does not fall within scope of that agreement, a scope it asserts is much narrower than that of the release.  Docket No. 77 at p. 50.  Relevent is wrong; the conduct at issue here falls within the scope of the conduct on which it agreed moving forward not to sue.  As noted above, Relevent covenanted not to sue on any claim in any way challenging U.S. Soccer's jurisdiction over International Games.  Am. Compl. ¶ 155.  The claims here arise out of U.S. Soccer's denial of Relevent's application to stage an official foreign league match in the U.S.—an exercise of authority that Relevent expressly agreed is lawfully conferred upon U.S. Soccer by FIFA and the Ted Stevens Act.  *See* Docket No. 34-6, Art 1(i).  It is this conduct, supposedly undertaken pursuant to an "agreement to comply with the policy adopted by the FIFA Council" that prohibits the sanctioning of any official season international soccer game events in the United States, (Am. Compl. ¶ 129), that gives rise to the claims.

It is thus incredulous for Relevent to aver that "[t]his action does not challenge [U.S. Soccer's] jurisdiction [over international games] or authority to charge sanctioning fees."  *Id.* ¶ 157.  That is *exactly* what it does—Relevent is directly challenging as illegal U.S. Soccer's sanctioning authority over international games on FIFA's "behalf."  *Id.* ¶¶ 54, 60, 70, 84, 98, 101, 182.

Relevent also suggests that its claims are not barred because "there is no mention of antitrust claims" in the covenant.  *Id.* ¶ 156.  That too is wrong.  The covenant not to sue unambiguously covers "any Claim"—a term defined as "any and all action or actions, cause or causes of action, in law or in equity, suits, … liability, claims, demands, damages, loss, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent."  Docket No. 34-6, Art. 3(a).  To suggest otherwise is to ignore the covenant's plain language, as well as the interpretive canons that contract terms should be read "to allow the scope of [their] meaning to expand to [their] greatest natural parameters," *City of New York v. Pullman, Inc.*, 477 F. Supp. 438, 443 (S.D.N.Y. 1979), and to the benefit and understanding of the promisee, *Chase Manhattan Bank v. New Hampshire Ins. Co.*, 749 N.Y.S.2d 632, 637 (Sup. Ct. 2002).  The covenant would be

meaningless if its protections could be so easily circumvented.  The law does not read such provisions so uncharitably.

4.     There Is No Public Policy Bar To Enforcing The Covenant Not To Sue

Relevent's final attempt to avoid the consequences of its prior contractual commitments is to contend that public policy precludes an application of the covenant to its antitrust claims because they seek relief for violations "starting in 2018."  Am. Compl. ¶ 158.  That argument is wrong given Relevent's arguments to the Second Circuit which the Second Circuit accepted—and it is also independently baseless.

The public policy bar invoked by Relevent is not as broad as it claims.  Even "a broad covenant not to sue is not ordinarily contrary to public policy simply because it involves antitrust claims." *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20–21 (7th Cir. 1976).  "[I]n the absence of proof that it was the product of duress, such a release is fully enforceable." *Id.*  Courts have held that agreements limiting a party's future antitrust liability do not violate public policy if they contain some limitations and are specific to the functioning of an ongoing business relationship.  *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 279 (S.D.N.Y. 2015) (enforcing a settlement relieving a party from future antitrust liability limited to a number of years and negotiated "in light of an ongoing business relationship").  That is the case here, as the covenant is limited in subject matter and was negotiated amidst an ongoing business relationship between two sophisticated parties intending to forever resolve disputes over U.S. Soccer's sanctioning authority and fees over international games.  It is therefore enforceable. *See Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 317 (S.D.N.Y. 2010) ("Contractual provisions that 'clearly, directly and absolutely' limit liability for 'any act or omission' are enforceable, 'especially when entered into at arm's length by sophisticated contracting parties.'") (quoting *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384 (1983)).  And public policy does not warrant otherwise.  *See Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 319, 326

(S.D.N.Y. 2009); *see also Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518, at \*6 (S.D.N.Y. Oct. 10, 2008).[1]

Additionally, nothing in the covenant serves to absolve U.S. Soccer of future liability for *all* antitrust violations, which is the defining feature of provisions that raise public policy concerns. *See Xerox*, 609 F. Supp. at 326 ("[C]ourts have refused to enforce general releases and arbitration agreements that they have found act to waive or immunize parties from liability for future antitrust violations."). The covenant encompasses all claims that relate to certain subject matters over which the parties intended for there to be eternal peace. The fact that Relevent has cast its recurring international match grievances as antitrust claims does not morph the covenant into something that immunizes U.S. Soccer from all future antitrust violations contrary to public policy.

Accordingly, there is no public policy bar to enforcement of the covenant not to sue, and its application requires dismissal of this case.

### B. <u>Relevent Fails To Sufficiently Plead A *Per Se* Violation Of Section 1</u>

Irrespective of the Second Circuit's decision, Relevent's Section 1 claims do not fit into the narrow realm of *per se* illegality. *First*, any agreement between FIFA and U.S. Soccer is necessarily a vertical relationship and, therefore, must be analyzed under the rule of reason. The Supreme Court firmly shut the door on *per se* treatment of vertical restraints. *See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007).

*Second*, Relevent's horizontal conspiracy claims are not "so manifestly anticompetitive that . . . [they] would almost invariably tend to restrict competition and decrease output," *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346 (S.D.N.Y. 2018), and, therefore, must be analyzed under the rule of reason. Indeed, courts should "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or

---

[1] Indeed, *Madison Square Garden*, which Relevent relies on to circumvent the covenant (Am. Compl. ¶ 158 n.57), cuts against Relevent. Over a public policy objection, the court enforced a covenant to bar the plaintiff's claims regarding certain NHL policies, because the covenant permissibly covered claims related to the "continued … enforcement of pre-existing [NHL] policies" that were in effect at the time of the settlement. 2008 WL 4547518 at \*6. The same is true of the FIFA rules and U.S. Soccer's international games and sanctioning authority underlying Relevent's claims here, which remain unchanged since the time Relevent agreed to the covenant not to sue.

combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v. Dagher,* 547 U.S. 1, 5 (2006); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988).  Antitrust precedent is clear that the rule of reason applies in cases addressing rules of sports organizations, like here, where Relevent's challenge is to the rules and decisions of the governing body of a sport.  *See, e.g., N. Am. Soccer League v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018) ("Regulation of league sports is a textbook example of when the rule of reason applies.").[2]

### C. <u>Relevent Fails To Sufficiently Allege A Violation Under The Rule Of Reason</u>

Because this is not a *per se* case, in order to maintain its claims, it was incumbent on Relevent to sufficiently plead the elements of a rule of reason claim, which include relevant markets and anticompetitive effects.  Relevent has failed with respect to both.

#### 1. <u>Relevent's Alleged Relevant Market Is Implausible</u>

Relevent fails to sufficiently plead a violation of Section 1 under a full rule of reason analysis because it has not alleged a cognizable relevant antitrust market.  Under the rule of reason, Relevent must plausibly allege that the alleged agreement has harmed competition in a properly-defined "relevant market."  *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.).

An antitrust plaintiff must "assert[] sufficient facts to allege plausibly the existence of both a product and geographic market."  *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52-53 (2d Cir. 2016).  A properly defined geographic market must "'correspond to the commercial realities' of the industry and be economically significant."  *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 203 (S.D.N.Y. 2020) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962)).  A proper product market must include "'products that have reasonable interchangeability for the purposes for which they are produced.'"  *Concord Assocs.*, 817 F.3d at 52 (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)).  While market

---

[2] *See also Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2001); *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 334 (2d Cir. 2008)

definition can be "deeply fact-intensive," if the "complaint's 'relevant market' definition is facially unsustainable," it should be dismissed. *Todd*, 275 F.3d at 199; *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *see also Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming dismissal of antitrust claim given a facially defective market definition); *Bookhouse of Stuyvesant Plaza Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013) (dismissal appropriate when the complaint omits an "obvious potential substitute").

a.    <u>Relevent's Geographic And Product Markets Are Fatally Mismatched</u>

While Relevent claims a *nationwide* geographic market comprising the United States, its alleged product market is limited to inherently *localized* products: tickets to, and promotion of, *live* performances of men's top-tier official season professional soccer league games in the U.S. *Compare* Am. Compl. ¶¶ 3-5, 14, 20, 157, 163, 167-68, 175, *with id.* ¶ 87. As the Second Circuit explains, numerous "courts have held that the market for certain entertainment services—such as, for example, tickets to movie theater showings—is local or regional." *Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 228 (2d Cir. 2006), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). That is because "it can be impractical for consumers to travel great distances to procure particular services," and—as a matter of "common sense"—a "purchaser of a concert ticket is hardly likely to look outside of her own area." *Id.*[3]

Relevent's product market also inexplicably excludes television broadcasts of the same matches despite the fact that fans watch such games and sponsors promote them on television. The problem for Relevent is that once broadcasts of Relevent's matches are included in the product market, the alleged "nationwide" geographic market becomes too narrow. That is because, for consumers of broadcast matches (viewers or sponsors) and broadcasters (who are themselves consumers of soccer matches), it does not matter whether a Barcelona-Girona game is played in

---

[3] *See also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) (noting that "[b]ecause the demand for concerts is local, promoters need to target their advertising to the area surrounding a particular venue" and that "the market for concert promotion is local").

Miami or in Spain.  Accordingly, if broadcasts are properly included in the product market, the geographic market necessarily has to be *global*, because U.S. consumers and sponsors are perfectly *able* to view and sponsor televised broadcasts of soccer matches played around the world.  This flaw in defining the relevant market also warrants dismissal.  *See Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) (dismissing complaint that "failed to allege any facts explaining why the relevant geographic market is domestic rather than worldwide"); *see also Concord Assocs.*, 817 F.3d at 53-54 (affirming dismissal where the plaintiff "provided no basis on which to justify [its] proposed geographic market definition" and "conveniently" proposed a market definition that excluded gambling markets in other states that were well known and accessible to consumers); *Bookhouse of Stuyvesant Plaza*, 985 F. Supp. 2d at 621.

### b.    Relevent's Alleged Product Market Is Implausibly Narrow

Relevent's alleged product market also fails because it rests upon the premise that there are no reasonable substitutes for "official season professional soccer league games." Am. Compl. ¶ 86. The Amended Complaint ignores obvious alternatives including, for example, friendlies (*i.e.*, professional matches that do not count towards league or tournament standings), World Cup games, National Team games, and other professional sports that attract similar fan and sponsor interest.  There is no explanation why fans, sponsors, or broadcasters do not consider any of these other products to be *reasonable substitutes* for official league soccer matches even though the fundamental economics of sports suggest that they are.  *See, e.g.*, Rodney D. Fort, SPORTS ECONOMICS 24 (3d ed. 2011) ("Consumers view all manner of other entertainment as substitutes for sports.").  For instance, Relevent contends that friendlies are not a substitute for regular season games, even if played by the same two teams, because friendlies do not count towards the league standings, "do not have the same 'high stakes,'" and "often do not feature the participating teams' best players[.]"  Am. Compl. ¶ 96.  But Relevent also alleges that Women's and Men's national team games are not substitutes, even though those games have high stakes and feature the best players.  *Id.* ¶ 95.  Critically, Relevent does not explain why soccer fans or sponsors would not

divert to these other kinds of soccer matches if there were a price increase on regular league games to "significantly above the competitive level." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995); *see also AD/SAT, Div. of Skylight, Inc., v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999).

Relevent's own history also belies its market definition. Relevent alleges it has successfully "organized and promoted the famed [ICC tournament] . . . throughout the world, including in the U.S." every year since 2013; its exhibition matches have been "three of the five highest-attended soccer games in the U.S."; and its "2014 'friendly' between Real Madrid (Spain) and Manchester United (England) still holds the attendance record for a soccer game in the U.S." Am. Compl. ¶¶ 17-18; *see* also Compl. ¶¶ 53-54. As Relevent's experience demonstrates, exhibition matches compete directly with MLS's (the top tier league in the U.S.) regular season matches, and other top-tier regular season matches around the world. Relevent cannot just wish away all of these admitted, common sense substitutes when it comes to defining a relevant market. *See Heerwagen*, 435 F.3d at 228; *see also Theatre Party Assocs., Inc. v. Shubert Org.*, 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) (dismissing antitrust claims where the alleged relevant market was limited to "the most popular Broadway shows" and excluded "other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events"); *Hicks*, 897 F.3d at 1121 (relying on "judicial experience and common sense" to reject a plaintiff's product-market definition at the pleading stage) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

The Second Circuit has reasoned that where, as here, the plaintiff fails "even to attempt a plausible explanation as to why a market should be limited in a particular way," the complaint should be dismissed. *Todd*, 275 F.3d at 200 & n.4 (citing *Gianna Enters. v. Miss World (Jersey) Ltd*., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982)); *see also Concord Assocs*., 817 F.3d at 53-54. Relevent does not explain why its alleged relevant market excludes numerous other admittedly substitutable products and is geographically limited to the United States. The reason why is because the market has been gerrymandered to fit Relevent's case. That is the hallmark of an implausible market definition, and it warrants dismissal. *See Theatre Party Assocs., Inc.*, 695 F.

Supp. at 156; *Hicks*, 897 F.3d at 1121 (dismissing alleged market definition that was "not natural," "artificial," and "contorted to meet [plaintiffs'] litigation needs").

2.    Relevent Fails To Allege Anticompetitive Effects

In addition to failing to properly plead relevant markets, Relevent also fails to properly plead anticompetitive effects.  There is "only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).  This requires plausible allegations (and ultimately proof) of increased prices, reduced output, or reduced quality. *Id.* at 183.  Relevent certainly alleges that it was harmed, but harm to one competitor is *not* necessarily harm to competition, as the Second Circuit has repeatedly confirmed.  *See, e.g.*, *Salvino*, 542 F.3d at 308.

All that could matter to the Court's anticompetitive effects analysis is Relevent's conclusion that U.S. Soccer's adherence to FIFA's rule has "reduced output and lowered the quality of games."  Am. Compl. ¶ 171.  Such conclusions are never sufficient under *Twombly* and Relevent never pleads facts to explain how output or quality of professional soccer has actually been impacted.  Relevent's manufactured relevant markets exclude the very games it successfully promotes and other high-quality soccer games such as Men's and Women's National Team games.  But, Relevent describes its own ICC games as part of a "world-class tournament." https://www.internationalchampionscup.com/support-about-us.  Relevent also touts the success of the games it has promoted with the approval of U.S. Soccer.  Am. Compl. ¶¶ 17-18 (Relevent-promoted game between Manchester United and Real Madrid holds U.S. attendance record of 109,000 fans).  When coupled with an "unprecedented expansion" in the number of MLS teams and games being played (Tom Bogert, *MLS Expansion Boom Continues at Unprecedented Rate in Modern Sports*, MAJOR LEAGUE SOCCER (Oct. 21, 2019), https://www.mlssoccer.com/post/2019/10/21/mls-expansion-boom-continues-unprecedented-rate-modern-sports), it is clear that output of soccer has increased dramatically even if the relevant geographic market were limited to the United States.  Such increased output is "indicative of a

thriving market," *United States v. Am. Express Co.*, 838 F.3d 179, 206 (2d Cir. 2016), and Relevent never explains why the Court can or should ignore these realities.  Relevent fails to plausibly plead any adverse effect on competition.

   D.    <u>**Relevent Lacks Antitrust Standing**</u>

   Even if Relevent had presented this Court with a valid antitrust claim, it specifically does not have standing to bring it.  Relevent's claim is that it has plausibly alleged an "anticompetitive scheme" with FIFA, U.S. Soccer, "and various horizontally competing FIFA-affiliated [members] to … boycott professional soccer leagues, clubs, and players that participate in" official foreign league matches.  Docket No. 35 at 8.  But if the conspiracy is massive as Relevent claims, then the necessary conclusion is that Relevent, as only a *potential promoter* of foreign league matches, is not an efficient enforcer of the antitrust laws in asserting such a claim.  This Circuit uses a two-part test to determine whether a plaintiff has antitrust standing: an "antitrust plaintiff [must] plausibly . . . allege (a) that it suffered 'a special kind of antitrust injury,' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Comm'cns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (citing *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983)).  Any injuries to Relevent as a soccer promoter from a boycott of the "professional soccer leagues, clubs, and players" are necessarily derivative of the injuries to the entities and individuals who are subject to the supposed boycott.  This precludes Relevent from being the kind of "efficient enforcer" with antitrust standing.[4]

   Moreover, Relevent's attempts to manufacture a relevant antitrust market limited to precisely the kinds of soccer matches it wants to promote also highlight that Relevent is not an "efficient enforcer" of the antitrust laws.  Intentionally aligning the product and geographic markets to the specific business interest it is attempting to advance in this litigation brings into

---

[4] *See, e.g.*, *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. N.Y. 1995) ("[D]erivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not . . . confer antitrust standing" ) (citation and internal quotation marks omitted); *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003) ("Suppliers to direct market participants 'typically cannot seek recovery under the antitrust laws because their injuries are too secondary and indirect to be considered antitrust injuries.'").

stark light how, as a soccer promoter rather than the actual professional soccer leagues, clubs, and players that would participate in the matches at issue or the soccer fans who would consume them, Relevent's injury is derivative at best. It is, therefore, not the kind of "efficient enforcer" with the requisite antitrust standing to pursue these antitrust claims.

> **E.**   **USSF, FIFA, And The Alleged Co-Conspirators Are Not Independent Economic Actors Under *Copperweld***

There is one final problem with Relevent's claims in this case, which again is a product of the Second Circuit's decision. Despite the fact that this Court did not rule in its opinion on whether Relevent had sufficiently alleged the required facts for asserting that the Court has jurisdiction over FIFA, the Second Circuit decided to undertake an analysis and reach the conclusion that this Court had personal jurisdiction. However, in order to reach that holding, the Second Circuit adopted an extreme position that U.S. Soccer, when undertaking the supposed conspiratorial acts that give rise to the alleged damages (*i.e.*, rejecting Relevent's application to promote the Ecuadorian match in this country), was acting as FIFA's agent. While U.S. Soccer unequivocally disputes that it is, or has ever been, FIFA's agent, to the extent the Court is bound to accept the Second Circuit's determination on that matter, it precludes any claim based on the notion that U.S. Soccer and FIFA have conspired with one another.

> **1.**   **U.S. Soccer Is Legally Incapable Of Conspiring To "Comply" With FIFA's Directive To Violate Section 1**

As the NGB for the sport, U.S. Soccer must be a member of FIFA pursuant to the Ted Stevens Act and comply with FIFA's rules. Indeed, Relevent alleges that FIFA "authorizes USSF . . . to act on its behalf to sanction professional soccer leagues in the U.S. and this District." Am. Compl. ¶ 84. In its March 7, 2023 Order, the Second Circuit held that on the record before it, U.S. Soccer acted "for the benefit of, with the knowledge and consent of, and under some control by" FIFA as "FIFA's agent." Docket No. 101 at p. 11. Thus, when it comes to the application of FIFA's rules, if the Second Circuit's decision is accepted as to agency, there would be no independent or divergent economic interests between U.S. Soccer and FIFA. Indeed, to read the Second Circuit's decision otherwise would be inconsistent with its entire theory of why Relevent

has met its burden with respect to pleading concerted action.  This means that Relevent's vertical conspiracy claim would be barred by *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

In *Copperweld*, the Supreme Court held that a corporation and its wholly-owned subsidiary were legally incapable of conspiring to violate Section 1.  467 U.S. at 771.  The coordinated activity of parties lacking separate interests or sources of economic power "do[es] not suddenly bring together economic power that was previously pursuing divergent goals," because conduct violates Section 1 only if it "deprives the marketplace of the independent centers of decision making that competition assumes and demands."  *Id.* at 769.  Known as the "single-entity" rule, it has been applied beyond parent-subsidiary relationships "to a broader variety of economic relationships."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2019 WL 1331830, at *37 (S.D.N.Y. Mar. 25, 2019) (quoting *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005)).  "[L]egally distinct entities cannot conspire among themselves if they 'pursue[ ] the common interests of the whole rather than interests separate from those of the [group] itself."  *City of Mt. Pleasant v. Assoc. Elec. Coop., Inc.*, 838 F.2d 268, 274 (8th Cir. 1998).  The inquiry is "functional"; "[t]he crucial question is whether the entities alleged to have conspired maintain 'economic unity,' and whether the[y] . . . were either actual or potential competitors."  *Jack Russell Terrier Network*, 407 F.3d at 1034.

Here, with respect to the sanctioning of official foreign league matches, if the agency determination of the Second Circuit survives FIFA's motion to dismiss, U.S. Soccer and FIFA are legally incapable of conspiring to violate Section 1.  They certainly are not competitors.  And while the Second Circuit may have held that Relevent sufficiently alleged direct evidence of an "agreement," the actual allegations of Relevent's claimed injury are nevertheless about U.S. Soccer's "exercise[] … of [its] authority to act **on behalf** of FIFA as its National Association in the U.S.," and its "use[] [of] that FIFA authority to sanction—or refuse to sanction—professional soccer league games played in the U.S."  Am. Compl. ¶ 70 (emphasis added); *see also id.* ¶¶ 54, 101, 182.  In other words, Relevent's allegation is that pursuant to its obligations as the FIFA

member association in the United States, U.S. Soccer carries out FIFA's global rules for international matches at the national level.  According to Relevent's own allegations, U.S. Soccer's exercise of that authority is not coordinated conduct between two entities with divergent economic interests.  Rather, it is obligatory compliance by a FIFA member with FIFA's rules—something inimical to what can legally amount to "concerted" action.

Relevent's Section 1 claim resembles the failed claims of a conspiracy between a national dog breed club and its regional affiliates to boycott a competing organization in *Jack Russell Terrier Network*.  There, a group of Jack Russell Terrier breeders and owners challenged the "Conflicting Organization Rule" by the Jack Russell Terrier Club of America ( "JRTCA")—a rule permitting only Jack Russell Terriers registered with the JRTCA to participate in the club's dog shows.  407 F.3d at 1029.  The plaintiffs—breeders and owners whose Jack Russell Terriers were registered with the competing American Kennel Club ("AKC")—alleged that through the enforcement of the Rule, the JRTCA and its regional affiliates had conspired to boycott AKC-affiliated dog owners and breeders in violation of Section 1.  *Id.*

The court, affirming dismissal of the complaint, held that the plaintiffs had "not alleged sufficient facts to support a claim that the JRTCA and its affiliates are separate entities pursuing different economic goals, capable of conspiring for Sherman Act purposes."  *Id.* at 1035.  As the court explained, "[b]oth the national club and its affiliates have a common goal—the best interests of the Jack Russell Terrier—and both the JRTCA and its regional affiliates hope to protect their identical economic interest—the current and future value of the Jack Russell Terrier breed, as determined by the JRTCA-breed standards."  *Id*.  The purpose of the regional affiliates was "to be affiliated with the national club and to promote the JRTCA breed standard and philosophy"; they "in no way" compete, so the Section 1 claim "f[ell] within the sphere of *Copperweld* preclusion and accordingly is not a viable antitrust claim."  *Id.* at 1035.

Just like the affiliates of JRTCA are extensions of the national club that share a common goal, so too does U.S. Soccer as a national member association of FIFA.  U.S. Soccer and FIFA share a common goal of promoting the growth and development of the sport of soccer—FIFA at

the global level; U.S. Soccer at the national level.  They are not alleged to (and do not) compete—on any dimension.  The anticompetitive theory advanced by Relevent, and adopted by the Second Circuit on the record before it, arises entirely out of a member association's enforcement of FIFA's sanctioning authority over international matches "on behalf of FIFA."  *See* Am. Compl. ¶¶ 54, 70, 182.  Merely labelling them "separate economic actors" (*id.* ¶ 161) does not cut it.  Under *Copperweld*, the relationship between these alleged "co-conspirators" is not one susceptible to a claim under Section 1.

## IV.    CONCLUSION

For the foregoing reasons, U.S. Soccer respectfully submits that this Court should, once again, dismiss Relevent's Amended Complaint with prejudice.

Dated:  December 11, 2023            Respectfully submitted,
         New York, New York

                                           LATHAM & WATKINS LLP

                                           /s/ *Lawrence E. Buterman*
                                           Lawrence E. Buterman
                                           LATHAM & WATKINS LLP
                                           1271 Avenue of the Americas
                                           New York, New York 10020
                                           Tel: (212) 906-1200
                                           Fax: (212) 751-4864
                                           lawrence.buterman@lw.com

                                           Christopher S. Yates (admitted *pro hac vice*)
                                           LATHAM & WATKINS LLP
                                           505 Montgomery Street, Suite 2000
                                           San Francisco, CA 94111
                                           Tel: (415) 391-0600
                                           Fax: (415) 395-8095
                                           chris.yates@lw.com

                                           *Attorneys for Defendant United States*
                                           *Soccer Federation, Inc.*