**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RELEVENT SPORTS, LLC,

                    Plaintiff,

        v.

FÉDÉRATION INTERNATIONALE DE
FOOTBALL ASSOCIATION and UNITED
STATES SOCCER FEDERATION, INC.,

                    Defendants.

Case No. 1:19-cv-08359-VEC

**ORAL ARGUMENT
REQUESTED**

---

**PLAINTIFF RELEVENT SPORTS, LLC'S MEMORANDUM OF LAW IN
OPPOSITION TO USSF'S MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

SUMMARY OF MATERIAL FACTUAL ALLEGATIONS ...................................... 3

    A.    Relevent's Efforts To Host Official Season Soccer Games In The U.S. Were Thwarted By USSF's Enforcement Of The Market Division Agreement ............. 3

    B.    FIFA And USSF Continued To Enforce The Geographic Market Division Policy Despite Warnings From The Department Of Justice ................................. 5

PROCEDURAL HISTORY ........................................................................................ 5

LEGAL STANDARDS ............................................................................................... 6

ARGUMENT .............................................................................................................. 6

I.    THE 2016 SETTLEMENT AGREEMENT DOES NOT BAR RELEVENT'S ANTITRUST CLAIM ....................................................................................... 6

    A.    Relevent's Antitrust Claim Is Outside The Scope Of The 2016 Release Because It Challenges A Policy That Was Adopted After The 2016 Release ........ 7

    B.    Relevent's Antitrust Claim Is Also Outside The Scope Of The Covenant Not To Sue ......................................................................................................... 9

II.    THE FAC PLAUSIBLY ALLEGES THE FIFA POLICY IS AN UNREASONABLE RESTRAINT OF TRADE NO MATTER WHAT STANDARD—PER SE, QUICK LOOK, OR FULL-BLOWN RULE OF REASON—IS APPLIED ................................ 12

    A.    The FAC Plausibly Alleges A Horizontal Market Division Agreement That Is Per Se Unlawful ......................................................................................... 13

    B.    If The Per Se Rule Is Not Applicable, The Challenged Horizontal Market Division Agreement Should Be Condemned Under Quick Look Analysis .......... 16

    C.    Even If Full Rule Of Reason Analysis Is Required, The FAC Has Stated A Section 1 Violation .................................................................................... 17

        1.    The FAC Pleads A Plausible Relevant Market. ...................................... 17

        2.    The Market Division Policy Is Plausibly Alleged To Have Anticompetitive Effects ............................................................................ 20

III.    RELEVENT HAS ANTITRUST STANDING AND IS AN EFFICIENT ENFORCER OF THE ANTITRUST LAWS ................................................. 21

IV.    USSF AND FIFA ARE NOT A SINGLE ENTITY ..................................... 23

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head*,
    486 U.S. 492 (1988)................................................................................14

*In re Aluminum Warehousing Antitrust Litig.*,
    2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) ..........................................24

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016)...................................................................22

*Am. Needle v. NFL*,
    560 U.S. 183 (2010).................................................................15, 24, 25

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2023 WL 6006525 (S.D.N.Y. July 31, 2023) ......................................... 22

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)........................................................6, 13, 21

*Ariz. v. Maricopa Cnty. Med. Soc'y*,
    457 U.S. 332 (1982)........................................................................14, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................3, 6, 13, 17

*Baidu, Inc. v. Register.com, Inc.*,
    760 F. Supp. 2d 312 (S.D.N.Y. 2010).....................................................11

*Belfiore v. N.Y. Times Co.*,
    826 F.2d 177 (2d Cir. 1987)...................................................................25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................3, 6

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
    985 F. Supp. 2d 612 (S.D.N.Y. 2013).....................................................18

*Boris v. USFL*,
    1984 WL 894 (C.D. Cal. Feb. 28, 1984).................................................15

*Bridgeport Music, Inc. v. Universal Music Grp., Inc.*,
    440 F. Supp. 2d 342 (S.D.N.Y. 2006)......................................................6

*Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*,
  403 F. Supp. 3d 191 (S.D.N.Y. 2019)..............................................................20, 21

*Chapman v. N.Y. State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008)......................................................................18

*Chicago Pro. Sports Ltd. P'ship v. NBA*,
  95 F.3d 593 (7th Cir. 1996) ................................................................13, 16

*Clarett v. NFL*,
  306 F. Supp. 2d 379 (S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124
  (2d Cir. 2004)......................................................................................16

*Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*,
  166 F. Supp. 2d 891 (S.D.N.Y. 2001)............................................................18

*Concord Assocs., LP v. Ent. Props. Tr.*,
  817 F.3d 46 (2d Cir. 2016)........................................................................18

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984)........................................................................2, 24, 25

*In re Credit Default Swaps Antitrust Litig.*,
  2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)......................................................8

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009)......................................................................22

*Denver Rockets v. All-Pro Mgmt., Inc.*,
  325 F. Supp. 1049 (C.D. Cal. 1971) ............................................................15

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ..................................................................25

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)..............................................................................16

*Full Draw Prods. v. Easton Sports, Inc.*,
  182 F.3d 745 (10th Cir. 1999) ..............................................................14, 15

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)........................................................................21

*Golden Pac. Bancorp v. FDIC*,
  273 F.3d 509 (2d Cir. 2001)....................................................................6, 10

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006)......................................................................17

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ........................................................................18

*Hunt v. Mobil Oil Corp.*,
    654 F. Supp. 1487 (S.D.N.Y. 1987).................................................................10

*In re Am. Express Merchs.' Litig.*,
    634 F.3d 187, 197 (2d Cir. 2011) ...................................................................10

*Int'l Boxing Club of N.Y., Inc. v. United States*,
    358 U.S. 242 (1959).........................................................................................20

*Int'l Fid. Ins. Co. v. Cnty. of Rockland*,
    98 F. Supp. 2d 400 (S.D.N.Y. 2000)..............................................................10

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ..........................................................................17

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995).........................................................................16, 17

*L.A. Mem'l Coliseum Comm'n v. NFL*,
    726 F.2d 1381 (9th Cir. 1984) ........................................................................19

*Laumann v. NHL*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012).............................................................19

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) ................................................................13, 16

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955).........................................................................................12

*Le v. Zuffa, LLC*,
    216 F. Supp. 3d 1154 (D. Nev. 2016) .............................................................19

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007).........................................................................................14

*LG Elecs. Inc. v. Saint Lawrence Commc'ns, LLC*,
    2019 WL 1595861 (S.D.N.Y. Apr. 15, 2019)...................................................6

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) .................................................25

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016)........................................................21, 22

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016)............................................................................20

*Madison Square Garden, L.P., v. National Hockey League*,
  2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) .................................................11, 25

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985).......................................................................................10

*MLB Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008).......................................................................15, 16

*NASL v. NFL*,
  670 F.2d 1249 (2d Cir. 1982).................................................................19, 24, 25

*NASL v. USSF*,
  883 F.3d 32 (2d Cir. 2018)...............................................................................20

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978).......................................................................................14

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021)...............................................................................13, 15

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984).............................................................................13, 16, 19

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)..............................................................17

*Palmer v. BRG of Ga.*,
  498 U.S. 46 (1990)...................................................................................13, 16

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002)............................................................................17

*Perks v. TD Bank, N.A.*,
  444 F. Supp. 3d 635 (S.D.N.Y. 2020)..................................................................6

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*,
  351 F. Supp. 462 (E.D. Pa. 1972) ...................................................................19

*Relevent Sports, LLC v. USSF*,
  61 F.4th 299 (2d Cir. 2023) ................................................................... *passim*

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*,
  545 F.2d 18 (7th Cir. 1976) ...........................................................................11

*Robertson v. NBA,*
    389 F. Supp. 867 (S.D.N.Y. 1975) ........................................................................15

*Taylor v. Vt. Dep't of Educ.,*
    313 F.3d 768 (2d Cir. 2002)..................................................................................17

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001)..........................................................17, 18, 19, 20, 21

*U.S. Airways, Inc. v. Sabre Holdings Corp.,*
    105 F. Supp. 3d 265 (S.D.N.Y. 2015)..................................................................11

*United States v. Am. Express Co.,*
    838 F.3d 179 (2d Cir. 2016)..................................................................................21

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015)..................................................................................14

*United States v. Topco Assocs., Inc.,*
    405 U.S. 596 (1972)........................................................................................12, 14

*United States v. Visa U.S.A., Inc.,*
    344 F.3d 229 (2d Cir. 2003)..................................................................................20

*USFL v. NFL,*
    644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ............19

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council,*
    857 F.2d 55 (2d Cir. 1988)......................................................................22, 23, 25

*Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.,*
    356 F.2d 371 (9th Cir. 1966) ...............................................................................15

*Xerox Corp. v. Media Scis., Inc.,*
    609 F. Supp. 2d 319 (S.D.N.Y. 2009)..................................................................11

**Statutes**

15 U.S.C. § 1 ....................................................................................................... *passim*

Plaintiff Relevent Sports, LLC ("Relevent") respectfully submits this Opposition to Defendant United States Soccer Federation, Inc.'s ("USSF") second motion to dismiss the First Amended Complaint ("FAC"),[1] ECF No. 130 ("USSF Mot.").

## PRELIMINARY STATEMENT

In an attempt to further delay this action, USSF has filed yet another motion to dismiss, renewing arguments previously before this Court, raising improper factual disputes, and ignoring—wholesale—facts plainly pled by Relevent, all while disregarding or misconstruing the Second Circuit's rulings in this action.  USSF does not hide the fact that it refuses to accept what is now the law of this case, proclaiming on page one of its motion that the Second Circuit's decision "is in error" and "represents a fundamental departure from established law."  USSF Mot. at 1. USSF's renewed arguments fail to present any basis for dismissal.

*First*, USSF's argument that Relevent's antitrust claim is barred by a 2016 release and covenant not to sue is baseless.  Those clauses are, on their face, inapplicable to Relevent's antitrust claim and, even if the covenant did apply, it could not shield USSF's post-covenant antitrust conspiracy as a matter of public policy.

*Second*, the allegations in the FAC more than plausibly demonstrate that both USSF and FIFA are participating in a horizontal market division agreement, which is what Relevent alleges caused it to suffer antitrust injury.  Specifically, Relevent alleges that the policy is a horizontal geographic market division that gives each National Association's top-tier soccer league monopoly rights over official games within its geographic borders.  Such a horizontal market division conspiracy, if proven at trial, is either per se unlawful or condemnable with a quick look review. And, at a minimum, it would be unlawful under the full-blown rule of reason.  USSF may dispute

---

[1] Capitalized terms, acronyms and abbreviations herein have the same meaning as set forth in the FAC.  Unless otherwise indicated, emphasis is added and internal citations and quotation marks are omitted throughout.

these detailed factual allegations of a horizontal market division conspiracy, but they far exceed the pleading standards to state a plausible Section 1 claim.  Moreover, these allegations are buttressed by their favorable treatment in the Second Circuit's decision and the DOJ's warning letter, attached to the FAC, which advised Defendants that the government views this conspiratorial conduct as a possible Section 1 violation.

*Third*, there is no basis for USSF to contend that Relevent lacks antitrust standing because its injury claims are derivative, or that Relevent is an inefficient enforcer of the antitrust laws.  To the contrary, the FAC allegations show that Relevent is a direct participant in the relevant market as a promoter of official season games and that it suffered an antitrust injury distinct from that which other market participants, such as fans, may suffer.  In such circumstances, the law is clear that Relevent has antitrust standing to bring its claims.

*Fourth*, USSF distorts the Second Circuit's finding that USSF acted as FIFA's agent for personal jurisdiction purposes in a meritless attempt to shield itself behind the *Copperweld* doctrine.  USSF itself has made clear that it "unequivocally disputes that it is, or has ever been, FIFA's agent."  USSF Mot. at 17.  And in any event, the FAC unequivocally pleads that USSF and FIFA are separately owned entities with different economic interests, which renders the *Copperweld* doctrine inapplicable.  Further, USSF's discussion of *Copperweld* is inexplicably directed at a vertical conspiracy claim Relevent is no longer pursuing, which USSF acknowledged before the Second Circuit.

## <u>SUMMARY OF MATERIAL FACTUAL ALLEGATIONS</u>

On this motion to dismiss, the following FAC allegations must be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[2]

**A.     Relevent's Efforts To Host Official Season Soccer Games In The U.S. Were Thwarted By USSF's Enforcement Of The Market Division Agreement.**

In August 2018, Relevent agreed with LaLiga, Spain's top-tier men's professional soccer league, and two of its teams (FC Barcelona and Girona FC), to host an official season game in the U.S.  FAC ¶ 111.  Concerned that USSF's economic partner, MLS, would face competition from foreign official season games in the U.S., USSF worked to obtain FIFA's assistance in adopting a policy to block the game from taking place.  *Id.* ¶¶ 114, 116-117 & n.33, 71.  USSF officials used their roles in FIFA's decision-making bodies to advocate for and secure the adoption of a FIFA policy requiring all National Associations (like USSF), their professional leagues (like MLS), and their teams (like New York City FC) to adhere to a geographic market division that would, in the short term, block Relevent's proposed LaLiga game and, in the long term, give each top-tier league the exclusive right to play official season games within its FIFA-allocated territory.  *Id.* ¶¶ 37-51, 114-17; *see also* FIFA Press Release, Ex. B to Boehning Decl., ECF No. 127-2.  Under the FIFA policy, each top-tier league was protected from competition from other leagues that might want to play an official game outside of its allocated territory.  In the U.S., the horizontal market division agreement has the anticompetitive effect of protecting MLS's monopoly in the market for men's top-tier official season professional soccer league games.  *Id.* ¶¶ 20, 89, 101, 163.

---

[2] Relevent recognizes the Court is familiar with the factual allegations in this matter and incorporates by reference the full recitation of the factual background contained in Relevent's February 5, 2021 Opposition to FIFA's and USSF's Motions to Dismiss the Amended Complaint (ECF No. 77), at 2–6.  An abbreviated version is provided herein.

To promulgate this policy, the FIFA Stakeholders Committee agreed to recommend that the FIFA Council adopt the market division policy.[3]  *Id.* ¶¶ 42-45.  Then, the FIFA Council—at the Stakeholders Committee's urging, and in direct response to USSF and other FIFA members' request concerning Relevent (*id*. ¶¶ 114, 116)—adopted the market division policy.  On October 26, 2018, the Council announced:

> Consistent with the opinion expressed by the Football Stakeholders Committee, the [FIFA] Council emphasised [sic] the sporting principle that official league matches must be played within the territory of the respective member association.

*Id.* ¶ 117 & n.33; *see also* Boehning Decl. Ex. B, FIFA Press Release.

As a condition of their FIFA affiliation, each National Association, including USSF, and its member leagues and teams agreed to—and did in fact—adhere to the market division policy. *Id*. ¶¶ 2-6, 34, 98.[4]  Absent the FIFA policy, such leagues would be free to participate in official season games in each other's territories.  *Id.* ¶¶ 5, 47, 166-67.  But with the policy in place, each league was granted exclusive rights—i.e., a monopoly—to stage official season games in its own territory.  *Id.* ¶¶ 3, 29, 54, 101, 170.  These agreed-upon protections worked.  For example, after the FIFA Council announced the policy in response to Relevent's proposed official season LaLiga game in the U.S., FC Barcelona withdrew from its commitment to play in that game.  *Id.* ¶ 121.  USSF subsequently denied Relevent a sanction for another official season game, this one between teams from Ecuador's LigaPro Serie A, citing the FIFA market division policy.  *Id.* ¶¶ 123-30.

---

[3] At the time, the FIFA Stakeholders Committee included USSF Board Member and MLS Commissioner Don Garber, and then-USSF President Carlos Cordeiro.  FAC ¶¶ 42-45.  Other Council and Committee members who supported the adoption and enforcement of the policy included executives of other top-tier men's professional soccer leagues and National Associations, which are actual or potential competitors with each other.  *Id.* ¶¶ 47, 166-67.

[4] Any non-complying FIFA affiliate may be suspended by, or expelled from, FIFA.  *Id.* ¶¶ 34, 98, 166-67.

**B.      FIFA And USSF Continued To Enforce The Geographic Market Division Policy Despite Warnings From The Department Of Justice.**

After Relevent filed this action, USSF and FIFA doubled down on the market division agreement.  *Id.* ¶¶ 135-38.  On February 27, 2020, the Stakeholders Committee, at the urging of MLS and other top tier leagues, voted to propose that the market division policy be formally codified in the FIFA Statutes.  *Id.* ¶ 138.  In March 2020, the DOJ's Antitrust Division notified USSF and FIFA that their implementation of the geographic market division agreement in the U.S. could be a per se violation of Section 1.  *See id.* Ex. A ("DOJ Ltr.").  Despite this warning, USSF and FIFA continued to apply the market division policy in the U.S., causing antitrust injury to Relevent.  FAC ¶¶ 11, 155-58, 172-78, 185.

## PROCEDURAL HISTORY

On September 14, 2020, Relevent filed the FAC, adding new conspiracy and jurisdictional allegations and joining FIFA as a defendant.  ECF No. 57.  Defendants moved to dismiss the FAC for failing to state a claim, and FIFA also moved on personal jurisdiction grounds.  ECF Nos. 66, 69.  The Court granted Defendants' motions on the ground that Relevent had not pled sufficient facts showing concerted action.  ECF Nos. 96, 98.

Relevent appealed.  ECF No. 100.  On March 7, 2023, the Second Circuit held that Relevent had alleged concerted action in violation of Section 1 against FIFA and USSF by challenging the FIFA market division policy.  ECF Nos. 104, 104-1.  The Second Circuit further held that the FAC facially established personal jurisdiction over FIFA, finding that its allegations, taken as true, established that USSF acted as FIFA's agent in this District to implement the FIFA policy, and remanded for further proceedings.  ECF Nos. 104, 104-1.

On April 4, 2023, USSF filed a petition for panel rehearing, which was denied.  *Relevent Sports, LLC v. USSF*, Case No. 21-2088, ECF Nos. 147, 155 (2d Cir.).  USSF subsequently sought

a *writ of certiorari* from the U.S. Supreme Court, which is currently pending.  *USSF v. Relevent*, No. 23-120 (U.S. 2023).  Defendants again moved to dismiss the FAC on December 11, 2023. ECF Nos. 122, 130.

## LEGAL STANDARDS

To state a claim against USSF, the FAC must "allege sufficient facts, taken as true, to state a plausible claim for relief."  *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639 (S.D.N.Y. 2020) (Caproni, J.); *see also Twombly*, 550 U.S. at 556.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The FAC need only contain "allegations sufficient to raise an entitlement to relief above the speculative level," *Perks,* 444 F. Supp. 3d at 639, i.e., "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).  Where such factual allegations are made, "[a] court ruling on a [12(b)(6)] motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."  *Id.* at 185.

## ARGUMENT

I.    **THE 2016 SETTLEMENT AGREEMENT DOES NOT BAR RELEVENT'S ANTITRUST CLAIM.**

Relevent's antitrust claim is not within the limited scope of the 2016 release and covenant not to sue USSF, which must be "strictly construed against" USSF as the party seeking to enforce it.  *LG Elecs. Inc. v. Saint Lawrence Commc'ns, LLC*, 2019 WL 1595861, at *2 (S.D.N.Y. Apr. 15, 2019); *see also Bridgeport Music, Inc. v. Universal Music Grp., Inc.*, 440 F. Supp. 2d 342, 345 (S.D.N.Y. 2006) (covenants not to sue "are not looked upon with favor by New York courts"); *cf. Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 515 (2d Cir. 2001).

USSF's arguments for applying the 2016 release are imbued not only with fact disputes that cannot be resolved on a motion to dismiss, but with misrepresentations of Relevent's antitrust claim, which is directed at the implementation of the 2018 FIFA policy.  USSF repeatedly suggests that Relevent has "flip-flopped" (at 5), "pivoted" (at 1, 6), and engaged in selective citation (at 5-6) in order to argue that the 2016 release is inapplicable.  But it is USSF that mischaracterizes the FAC allegations and the Second Circuit's decision to argue that the challenged FIFA policy is somehow both *past* conduct foreclosed by the 2016 release and *future* conduct barred by the covenant not to sue.  By its terms, the 2016 release and covenant not to sue does not—and could not, as a matter of public policy—apply to Relevent's antitrust challenge to the 2018 FIFA policy.

### A.    Relevent's Antitrust Claim Is Outside The Scope Of The 2016 Release Because It Challenges A Policy That Was Adopted After The 2016 Release.

USSF argues that it agreed to adhere to FIFA's rules prior to 2016 and that this fact, combined with the Second Circuit's statement that USSF's agreement to abide by FIFA rules was part of the alleged conspiracy, means the challenged conduct took place before the 2016 release and is thus within its scope.  USSF Mot. at 6-7.  There is no dispute that the 2016 release is limited to conduct pre-dating the 2016 Settlement Agreement ("Settlement").  ECF 34-6.  And the challenged FIFA policy and USSF's enforcement of it did not begin *until 2018*, when USSF urged the FIFA Council to adopt the market division policy in response to Relevent's attempt to host a LaLiga game in the U.S.  FAC ¶¶ 114, 116, 117 & n.33; Boehning Decl. Ex. B.  Accordingly, there is no basis for USSF to claim that the 2016 release applies to USSF's actions—beginning in 2018—that are challenged here.  *Id*. ¶¶ 119-122, 128-130.

USSF's assertion (at 6-7) that it joined FIFA and agreed to follow its rules prior to 2016 is of no moment.  It ignores the key factual allegation that the FIFA Council did not adopt the market division policy until two years later.  Nor can USSF dispute the allegation that the challenged

policy began in 2018 by arguing that there was a dormant article in the FIFA statutes prohibiting out-of-market official season games prior to 2016. *Id*. at 5-6 (discussing Article 73 of the FIFA Statutes). What matters is that the FAC allegations, which must be accepted as true, charge that the challenged market division policy began in 2018. FAC ¶¶ 39, 81, 111-134.[5] Indeed, the Second Circuit found that Relevent's antitrust claim challenged the 2018 policy, holding that "the very promulgation of [that] Policy" in 2018 "is direct evidence of an agreement for purposes of Section 1 of the Sherman Act." *See Relevent Sports, LLC v. USSF*, 61 F.4th 299, 310 (2d Cir. 2023) ("*Relevent II*") (Relevent "plausibly allege[d] that in adopting the 2018 Policy, FIFA and its member associations adopted an anticompetitive geographic market division."). It is thus the law of the case that the challenged concerted action began in 2018, when the FIFA policy was adopted—not when USSF joined FIFA.

Moreover, even if discovery reveals that the 2018 FIFA policy was linked to an older FIFA rule, the 2016 release would still not bar Relevent's antitrust claim. "In the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him to recover the damages caused by that act." *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *15 (S.D.N.Y. Sept. 4, 2014). The 2016 release thus cannot bar Relevent's antitrust claims based on USSF's post-release actions to adopt and implement the 2018 FIFA policy, even if it were a continuation of an older FIFA Rule that had been lying dormant.

---

[5] As the Second Circuit recognized, the FAC allegations contradict USSF's assertion that Relevent "changed its theory of liability to one that alleged the conspiracy took place in 2018." *Relevent II*, 61 F.4th at 309 (rejecting Defendants' argument that Relevent "forfeited or waived its direct evidence theory," citing Relevent's allegations attacking the 2018 Policy as direct evidence of concerted action); *contra* USSF Mot. at 7; *see* FAC ¶¶ 26, 34-35, 98, 117, 166, 174.

**B.      Relevent's Antitrust Claim Is Also Outside The Scope Of The Covenant Not To Sue.**

USSF's effort to contort the covenant not to sue into a basis for dismissal also lacks merit. In 2016, Relevent entered into a covenant not to sue USSF that was limited to USSF's "***jurisdiction***" over International Games and authority to impose certain sanctioning fees (not at issue here). *See* FAC ¶¶ 155-56; Settlement at Art. 4. USSF ignores this limitation and makes the unfounded assertion that the covenant "unambiguously covers 'any Claim.'" USSF Mot. at 8.

In reality, Relevent only covenanted that it would not, in the future, "challeng[e] [USSF]'s jurisdiction over International Games." FAC ¶ 155; Settlement at Art. 4. To come within this covenant, USSF argues that a challenge to its participation in the FIFA policy is equivalent to challenging its jurisdiction. USSF Mot. at 5. But simply saying this does not make it true. The FAC makes no such jurisdictional challenge, and USSF points to none. To the contrary, the FAC *acknowledges* USSF's jurisdiction over international soccer games played in the U.S. *See* FAC ¶¶ 54, 101. What Relevent challenges is USSF's participation in a FIFA market division policy that violates U.S. antitrust law. *Id.* ¶ 157.[6] That claim is not within the limited ambit of the covenant not to sue.

Further, there is no basis for USSF's conflation of the language of the release with the more limited language of the covenant not to sue to assert that the covenant bars any future claims relating to USSF's "sanctioning authority." USSF Mot. at 4-5. That is not what the covenant says. *Compare* Settlement Art. 3(a) (releasing past claims "in any way relating to or arising out of (i) U.S. Soccer's ***authority to sanction*** International Games") *with id*. Art. 4 (covenanting not to bring

---

[6] As an example, a plaintiff challenging a company's participation in a price-fixing agreement is not challenging that company's jurisdiction to set the prices of its products, but, rather, how that jurisdiction was misused to participate in an unlawful conspiracy. The same is true here. Relevent is challenging USSF's misuse of its undisputed "jurisdiction over International Games" to enforce the unlawful FIFA market division policy.

claims in the future "in any way challenging (x) U.S. Soccer's **_jurisdiction_** over International Games"). The narrower language of the covenant—limited to challenges to USSF's _jurisdiction_ over International Games—simply does not apply to Relevent's antitrust claim, which challenges USSF's _participation in_ and _enforcement of_ the FIFA market division policy.

Finally, USSF's overbroad reading of the covenant violates the canon of _expressio unius est exclusio alterius_. The parties clearly knew how to express broader coverage for the covenant if that is what they intended. _See Golden Pac._, 273 F.3d at 516. Indeed, "[s]ophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning." _Int'l Fid. Ins. Co. v. Cnty. of Rockland_, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000). Here, the parties chose different language for the covenant not to sue because it has a more limited scope than the release. And that narrow scope renders the covenant inapplicable to Relevent's antitrust claims against USSF's participation in the FIFA market division policy.

**C.    As A Matter Of Public Policy, The Covenant Cannot Shield USSF From Liability For Its Post-2016 Antitrust Violation.**

Even if the covenant were interpreted to encompass Relevent's antitrust claim, it would be unenforceable against USSF's post-2016 antitrust violation as a matter of public policy. It has long been "a firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy." _In re Am. Express Merchs.' Litig._, 634 F.3d 187, 197 (2d Cir. 2011); _see also, e.g., Hunt v. Mobil Oil Corp._, 654 F. Supp. 1487, 1516 (S.D.N.Y. 1987); _Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc._, 473 U.S. 614, 637 n.19 (1985). USSF does not dispute that there is a public policy against

limiting prospective antitrust liability.  *See* USSF Mot. at 9.  Rather, it asserts that because the

covenant is "limited in subject matter," it escapes the public policy bar.  *See id.*  USSF is wrong.

USSF (at 9) tries to avoid the public policy bar by relying on materially distinguishable

cases that either released only past conduct or were expressly limited in ways the 2016 covenant

is not.  *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.* concerned a 1973 covenant not to sue

that expressly covered antitrust claims (USSF's does not) and only applied to claims based on

conduct that *pre*-dated the 1973 settlement agreement.  545 F.2d 18, 20 (7th Cir. 1976) (discussing

"the antitrust claim asserted herein, which is based on [the defendant's] allegedly illegal conduct

from 1968 through 1972").  *U.S. Airways, Inc. v. Sabre Holdings Corp.* turned on "unique factual

circumstances" and enforced a covenant of limited duration (seven years) where the antitrust

violations were known to the parties and identified in the covenant when it was executed.  105 F.

Supp. 3d 265, 273, 279 (S.D.N.Y. 2015).  The covenant in *Xerox Corp. v. Media Scis., Inc.* was

"conditional," based on the parties' intent to arbitrate over a specified fact "likely to be relevant

under . . . the Sherman Act."  That court found that the covenant would not "waive or release any

future liability" of the defendant.  609 F. Supp. 2d 319, 327-28 (S.D.N.Y. 2009) (enforcing

covenant because it was "not a general release or waiver of antitrust liability").[7]

Similarly, the *Madison Square Garden, L.P., v. National Hockey League* court only

permitted a release of claims based on conduct "up to and including the date of execution of this .

. . [a]greement," after distinguishing cases involving future conduct.  2008 WL 4547518, at *5-10

(S.D.N.Y. Oct. 10, 2008).  As the Court knows, the FAC is clear that the challenged concerted

---

[7] USSF also cites to an inapt trademark case that does not analyze or mention any antitrust claim or policy.  *See Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 317 (S.D.N.Y. 2010).

action is the FIFA market division policy, which was not proposed or adopted by the FIFA Council until two years *after* execution of the 2016 Agreement.  FAC ¶¶ 116-17.

Unlike USSF's authorities, the 2016 covenant does not mention antitrust claims, and, as USSF admits, its antitrust liability waiver is not limited in duration or to past conduct.  *See* USSF Mot. at 9-10.  Courts have consistently found unenforceable covenants not to sue over future antitrust violations that were not identified in the covenant as preexisting conduct.  *See, e.g., Lawlor v. Nat'l Screen Serv. Corp*., 349 U.S. 322 (1955).

## II.     THE FAC PLAUSIBLY ALLEGES THE FIFA POLICY IS AN UNREASONABLE RESTRAINT OF TRADE NO MATTER WHAT STANDARD—PER SE, QUICK LOOK, OR FULL-BLOWN RULE OF REASON—IS APPLIED.

The FAC contains detailed allegations of an agreement between USSF and the other National Associations, implemented by FIFA, to enforce a horizontal, geographic market allocation of men's top-tier official season soccer games amongst their member leagues and teams. *See, e.g*., FAC ¶¶ 5, 8, 20, 88-92.  These leagues and teams were actual or potential competitors with each other.  *Id.*; *see also Relevent II*, 61 F.4th at 310 (Defendants' argument that "the national associations that are members of FIFA are not competitors . . . runs headlong into Relevent's allegations").  Absent the FIFA policy, these leagues and teams would be free to compete in each other's allocated territories.  *E.g.,* FAC ¶¶ 1-8, 160-78.  This horizontal market division agreement can be enforced by each National Association, including USSF, under the FIFA policy prohibiting any league or team from playing an official season game outside its home territory.  *E.g.*, *id.* ¶¶ 5, 11, 70, 93.  Backing up this policy is the threat of punishment for non-compliance.  *Id.*

The conspiracy alleged is precisely the type of horizontal market division agreement that is per se unlawful under Section 1 of the Sherman Act.  "One of the classic examples of a *per se* violation of [§] 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition."  *United States v. Topco Assocs., Inc.*, 405

U.S. 596, 608 (1972); *see also* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 2030b (5th ed. 2020) ("As a general proposition, the per se rule against naked horizontal market-division agreements applies equally to firms that were actual competitors before the division agreement took effect and to firms whose competition was merely potential."); DOJ Ltr. at 2. On this basis alone, the FAC's allegations of a horizontal market division conspiracy are more than sufficient to state a per se Section 1 claim at the pleading stage. *Anderson News*, 680 F.3d at 184-85.

Even if per se analysis were unwarranted, quick look condemnation would still be required. *See NCAA v. Alston,* 141 S. Ct. 2141, 2157 (2021) (citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101-02 (1984)). It is well-established that the quick look rule applies to sports association rules that directly restrain horizontal competition. *See Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998); *Chicago Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 600 (7th Cir. 1996).

USSF, however, urges the Court to find that Relevent has alleged, at most, merely a vertical agreement that must be analyzed under the full rule of reason. USSF Mot. at 10. This argument is contrary to the FAC's allegations (which must be accepted as true) of a horizontal market division agreement. *Iqbal*, 556 U.S. at 678; *see, e.g.,* FAC ¶¶ 1, 4-5, 20, 92, 167. And even if full rule of reason analysis were required, Relevent's allegations are more than sufficient to state a claim for an unreasonable restraint of trade in the relevant market, despite USSF's effort to manufacture factual disputes. *See Relevent II*, 61 F.4th at 308-09 (horizontal agreement pled).

A.    **The FAC Plausibly Alleges A Horizontal Market Division Agreement That Is Per Se Unlawful.**

The horizontal geographic market division agreement alleged in the FAC is a "classic example[] of a *per se* violation of §1[:] an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *Palmer v. BRG of Ga.*,

498 U.S. 46, 49 (1990).   The Supreme Court "has reiterated time and again that horizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition"; i.e., "*per se* violations of the Sherman Act."  *Topco*, 405 U.S. at 608.; *accord Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).   And the per se rule applies equally to the market division rules of private industry membership organizations, such as FIFA and USSF.  *See Ariz. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 353-55 (1982) (per se rule applied to association rule restraining horizontal competition); *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692-99 (1978) (same); *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 501 n. 6 (1988) (per se rule applied).

While USSF may disagree with the FAC allegations, the Second Circuit has already recognized that Relevent has plausibly alleged a horizontal market division agreement.  *See Relevent II*, 61 F.4th at 310.  Further, the FAC alleges facts showing that this horizontal market division policy has restricted output in the United States by blocking official season games that would otherwise take place in a competitive market.  FAC ¶¶ 1-2, 99, 162-63.  The FAC identifies three official season games that were scheduled to be played in the U.S. but were blocked by the market division policy.  FAC ¶¶ 111-34.  The FAC also alleges that, absent the FIFA policy, "there are a number of foreign men's top-tier professional soccer leagues and teams, including those in Spain, Ecuador, and Mexico, that would participate in official season games . . . in the U.S." *Id.* ¶ 166.  These allegations of an output-restricting horizontal agreement are more than sufficient to state a claim for a per se Section 1 violation.  *See United States v. Apple, Inc.*, 791 F.3d 290, 322 (2d Cir. 2015); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 753-54 (10th Cir. 1999).

USSF cannot escape per se liability by labeling this a "case[] addressing rules of sports organizations."  USSF Mot. at 11.  Sports organizations have no immunity from the per se rule

when they engage in horizontal restraints unconnected to any procompetitive sports league objective (such as setting game rules or organizing league operations).  *See, e.g.*, *Easton Sports*, 182 F.3d at 750-51 (applying per se rule to boycott by trade association and its members in bow-hunting sports industry); *Boris v. USFL*, 1984 WL 894, at *1 (C.D. Cal. Feb. 28, 1984) (player restraint by the United States Football League and member teams condemned as per se illegal); *Denver Rockets v. All-Pro Mgmt., Inc.*, 325 F. Supp. 1049, 1066-67 (C.D. Cal. 1971) (NBA draft rules constituted a per se illegal group boycott); *Robertson v. NBA*, 389 F. Supp. 867, 890-91 (S.D.N.Y. 1975); *Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*, 356 F.2d 371, 376-77 (9th Cir. 1966).  Indeed, the DOJ has already warned USSF and FIFA that their horizontal market division policy could be held per se unlawful.  DOJ Ltr. at 2.

*North American Soccer League v. USSF* ("*NASL*") is inapplicable.  *Contra* USSF Mot. at 11.  In that case, the plaintiff, NASL, did not claim that the USSF's challenged conduct was subject to per se condemnation, so the Second Circuit had no occasion to consider whether per se analysis would be appropriate.  883 F. 3d 32 (2d Cir. 2018).[8]  The cases USSF relies on that have held the full rule of reason applicable to sports league restraints, like *American Needle*, all involved the internal rules of a sports league where some horizontal restraints are needed for the league to operate at all.  *Am. Needle v. NFL*, 560 U.S. 183, 195-97 (2010); *NCAA v. Alston*, 141 S. Ct. 2141, 2156-57 (2021); *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 334 (2d Cir. 2008).  Such cases have no application here, where the challenged FIFA policy is not an internal sports league rule necessary for competitive balance or some other allegedly procompetitive reason.  Instead, the FIFA policy is a naked restraint on the horizontal competition *between* separately owned and

---

[8] USSF's reliance on *Alston* is likewise misplaced.  The plaintiff in *Alston* did not advocate for application of the per se rule, and the issue was thus not presented.  Nonetheless, the discussion in *Alston* recognized that both per se and quick look analysis should be applied in appropriate cases involving horizontal restraints, without any exception for the sports business.  *Alston*, 141 S. Ct. at 2156-57.

operated sports *leagues*, which compete with each other just as the Today Show and Good Morning America compete with each other.  Such an agreement is a "classic example[] of a *per se* violation of §1."  *Palmer*, 498 U.S. at 49.

### B.    If The Per Se Rule Is Not Applicable, The Challenged Horizontal Market Division Agreement Should Be Condemned Under Quick Look Analysis.

Even if the Court were to find that the per se rule does not apply, the challenged market division policy would still be subject to condemnation under "quick look" analysis, which provides a shortcut to finding a rule of reason violation in a case like this, where the restraint is a horizontal agreement between competitors that directly restricts competition.  *See, e.g.*, *Bd. of Regents,* 468 U.S. at 109-10 (condemning under quick look NCAA rules restricting ability of its members to broadcast college football games); *Law*, 134 F.3d at 1020 (applying quick look to horizontal restraint on coaching salaries); *Chicago Pro. Sports*, 95 F.3d at 600 (quick look applied to sports league rule).  The Supreme Court has held that an analysis of market power is not required to subject "naked" horizontal restraints to quick look condemnation.  *See Bd. of Regents*, 468 U.S. at 108; *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461 (1986); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995); *Chicago Pro. Sports*, 961 F.2d at 675-76.

The FAC allegations readily support condemnation of the FIFA market division policy under quick look analysis.  USSF enforced the policy with FIFA's threat to require a group boycott of any team or league that violated the FIFA policy.  FAC ¶¶ 100-01, 117.  With just a "cursory examination," it can be determined from the FAC allegations that the FIFA policy had the anticompetitive purpose and effect of protecting each league's allocated market.  *Salvino*, 542 F.3d at 317; FAC ¶¶ 3, 48-51, 89-90, 142, 169-72.  Therefore, if the per se rule is not applicable, the FAC states a Section 1 violation under the "quick look" test.  *See Clarett v. NFL*, 306 F. Supp. 2d 379, 408 (S.D.N.Y. 2004) (applying quick look to NFL rule because "one can scarcely think of a

more blatantly anticompetitive policy than one that excludes certain competitors from the market altogether"), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004).

### C.    Even If Full Rule Of Reason Analysis Is Required, The FAC Has Stated A Section 1 Violation.

No matter what standard of analysis is applied, the FAC has pled facts to state a Section 1 claim.  To try to escape that reality, USSF poses a series of disputes with the FAC allegations that are not cognizable on a motion to dismiss.  USSF Mot. at 10-16*; see Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002).

Applying the full rule of reason is highly fact-intensive and rarely appropriate for a determination on the pleadings.  *See Maricopa*, 457 U.S. at 343.  As discussed below, the FAC has pled facts satisfying each element of a rule of reason violation, and USSF's many disagreements with these allegations have no place at this stage of the litigation.  *See Relevent II*, 61 F.4th at 310 (where Defendants' "argument runs headlong into Relevent's allegations," the court "must accept as true" the FAC allegations); *see also Iqbal*, 556 U.S. at 678.

### 1.    The FAC Pleads A Plausible Relevant Market.

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant [] market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).[9]  Dismissal is inappropriate where the alleged market "bear[s] a rational relation to the . . . analysis of the interchangeability of use or the cross-elasticity of demand." *Id.*

---

[9] The fact-intensive nature of this inquiry is underscored by USSF's cited cases, which address market definitions only after detailed factual findings, extensive discovery, and expert reports. *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) (affirming "factual determination as to the bounds of the relevant geographic market"); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) (summary judgment); *K.M.B. Warehouse*, 61 F.3d 123 (summary judgment); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) (bench trial); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) (summary judgment).

at 200.  USSF's factual disputes with the alleged relevant market cannot be resolved on this motion.[10]

First, the FAC alleges facts plausibly showing that the U.S. is a relevant geographic market. USSF argues that the alleged geographic market should be global.  USSF Mot. at 12-13.  In the same breath, however, USSF alleges that the market is "inherently *localized*."  USSF Mot. at 12 (emphasis in original).  USSF's contradiction demonstrates the impropriety of asking the Court to reject Relevent's geographic market definition at the pleading stage.  *Todd*, 275 F.3d at 199-200. Relevent plausibly alleges that "[t]he relevant market is geographically limited to the U.S. . . . because [professional soccer league] games outside the U.S. do not permit regular attendance by U.S. fans or the purchase of on-site stadium sponsorships in the U.S."  FAC ¶ 97.  The FAC also alleges that USSF took actions to have the FIFA policy promulgated with the specific purpose of protecting MLS's monopoly position *in the U.S. market*.  *E.g.*, *id.* ¶¶ 3, 89-90, 99, 114, 135-37. And USSF and FIFA themselves recognize the U.S. as a separate market in which USSF has been granted exclusive authority to grant sanctions.  *Id.* ¶¶ 86-101.  The FAC thus plainly alleges "facts explaining why the relevant geographic market is domestic rather than worldwide" and provides a "basis on which to justify [its] proposed geographic market definition."  *Com. Data*, 166 F. Supp. 2d at 897; *Concord Assocs., LP v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).[11]

---

[10] USSF's cases granting dismissal for insufficiently alleged markets at the pleading stage did not involve *any* plausible relevant market allegations.  *See Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237-39 (2d Cir. 2008) (failure to distinguish training services market for childcare providers from larger market for same services); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 620-22 (S.D.N.Y. 2013) (alleged market could not be limited to portion controlled by plaintiffs' competitor); *Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) ("fail[ure] to allege . . . why computers other than 'mainframes' should be excluded from the relevant product market"); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-23 (9th Cir. 2018) (failure to plead markets for on-person endorsements and in-play advertising limited to PGA golf tournaments).

[11] The alleged geographic market bears no resemblance to the gerrymandered market in *Concord*.  *Contra* USSF Mot. at 13.  There, the Second Circuit rejected a proposed market because similar facilities were offered within a comparable distance from the alleged customers' residences.  817 F.3d at 53-54 ("[P]laintiffs fail to present a plausible basis for explaining why an additional [25] miles makes the difference.").  There is no comparison between

Second, the FAC pleads facts showing that official season top-tier men's professional soccer league games constitute a separate relevant product market with distinct attributes that render these games non-interchangeable for fans and sponsors. FAC ¶¶ 94-96. These allegations refute USSF's claim that Relevent "fails even to attempt a plausible explanation as to why a market should be limited in a particular way." USSF Mot. at 14. Indeed, the FAC pleads facts demonstrating the unique attractiveness of official season top-tier men's professional soccer league games in contrast to "friendly" exhibition games, in which there are no high stakes and often no incentive to play teams' top players. FAC ¶ 96. The FAC plausibly alleges that fans do not view men's top-tier official season professional soccer league games as interchangeable with games played by National Teams, lower division leagues, women's professional leagues, or in other sports. *Id.* ¶¶ 94-95. And the product market is supported by the FIFA policy itself, which distinguishes "official league matches" from all other soccer games. *Id.* ¶ 117. While USSF disputes this fact-based market definition, the FAC provides a "plausible explanation as to why [the] market should be limited in [this] particular way." *Todd*, 275 F. 3d at 200.

Moreover, a substantial body of case law refutes USSF's claim that the alleged product market is too narrow. USSF Mot. at 13-15. Courts routinely accept narrow market definitions for sports properties because they align with the highly specialized preferences of sports fans.[12] For

---

the 25 miles of local travel in *Concord* and the hundreds, often thousands, of miles of international travel separating the relevant U.S. market here from other geographic markets. This is why the Second Circuit has found the U.S. to be a relevant geographic market for analyzing various sports league restraints. *See USFL v. NFL*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) (finding U.S. relevant market for professional football games); *NASL v. NFL*, 670 F.2d 1249, 1262 (2d Cir. 1982) (finding U.S. relevant market for sports ownership capital).

[12] *See, e.g., Bd. of Regents*, 468 U.S. at 111-12 (market limited to "college football broadcasts"); *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984) (NFL football); *USFL*, 644 F. Supp. at 1057 (professional football); *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1165-67 (D. Nev. 2016) ("live Elite Professional MMA bouts"); *Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F. Supp. 462, 502 (E.D. Pa. 1972) ("major league professional hockey"); *Laumann v. NHL*, 907 F. Supp. 2d 465, 491 (S.D.N.Y. 2012) ("there are peculiar and unique characteristics that set major league men's ice hockey . . . apart from other sports or leisure activities [and] that close substitutes do not exist").

example, the Supreme Court affirmed a product market limited to "the promotion of championship boxing contests in contrast to all professional boxing events." *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249-52 (1959).  Similarly, the Second Circuit found separate markets for top-tier and second-tier men's professional soccer leagues to be plausible in another antitrust case involving USSF.  *NASL v. USSF*, 883 F.3d at 42-43.  Relevent's alleged market is "plausible on its face," which is all that is required at the pleading stage.  *Todd*, 275 F.3d at 205.

## 2. The Market Division Policy Is Plausibly Alleged To Have Anticompetitive Effects.

USSF's argument that "Relevent never pleads facts to explain how output or quality of professional soccer has actually been impacted" is baseless.  USSF Mot. at 15.  As USSF acknowledges, anticompetitive effects consist of "increased prices, reduced output, or reduced quality."  *Id*.  Whether a plaintiff can demonstrate anticompetitive effects is a "fact-intensive" inquiry.[13]  *Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 202 (S.D.N.Y. 2019).  The FAC alleges that, absent the challenged FIFA policy, output in the U.S. market would increase because official season games between teams from countries like Spain, Ecuador, and Mexico would occur in the U.S.  *E.g.*, FAC ¶¶ 166, 175.  It is also plausibly alleged that official season games competition with MLS would increase product quality in the relevant market.  *Id.* ¶¶ 8, 104, 171; *cf. United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240-41 (2d Cir. 2003) (quality reduced by restriction on competition).  Relevent's plausible allegations that the FIFA policy has "reduced output and lowered the quality of games" are more than sufficient to

---

[13] Harm to competition may be proven "indirectly" by showing "(1) that the conspirators had sufficient 'market power' to cause an adverse effect, and (2) some other ground for believing that the challenged behavior harmed competition." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 185 (2d Cir. 2016).  Here, Relevent plausibly alleges that Defendants exert monopoly power over access to the relevant market.  FAC ¶¶ 86-101.  And the allegations of limited output and reduced competitive choice caused by the FIFA policy provides "some other ground for believing that the challenged behavior harmed competition."  *MacDermid*, 833 F.3d at 185.

satisfy this fact-bound rule of reason element at the pleading stage.  *See, e.g.,* FAC ¶¶ 100, 171, 175-77; *Todd*, 275 F.3d at 214; *Anderson News*, 680 F.3d at 182-85.

USSF's assertion (at 15-16) that "output of soccer has increased dramatically" in the U.S. is legally irrelevant at the pleading stage as it is not part of the FAC.  But even if true, the rule of reason question is not whether output has increased in an absolute sense, but whether the market division policy has caused output to fall below competitive levels.  *United States v. Am. Express Co.*, 838 F.3d 179, 205-06 (2d Cir. 2016).  For example, it is no defense for USSF to claim there are now more MLS games than before when the FAC alleges that those same MLS games would have occurred *plus* additional official season games.  Here, unlike in *American Express*, Relevent *has* plausibly alleged facts showing that the market division policy resulted in an output of official season top tier men's soccer games below competitive levels (and reduced quality and consumer choice).  *Compare id. with* FAC ¶¶ 111-34, 166-72.  USSF's contrary "facts" cannot negate those plausible allegations.  *Caruso*, 403 F. Supp. 3d at 202.

## III.   RELEVENT HAS ANTITRUST STANDING AND IS AN EFFICIENT ENFORCER OF THE ANTITRUST LAWS.

Relevent has antitrust standing to pursue its claims and plausibly alleges facts showing that it has "'suffered a special kind of antitrust injury,' and . . .  that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws."  *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).  The FAC demonstrates that Relevent suffered a "special kind of antitrust injury" by being deprived of the opportunity to promote official season soccer games in the U.S.  FAC ¶¶ 19-22, 37.  Relevent's injury therefore "stem[s] from a competition-reducing aspect or effect of the Defendant[s'] behavior, [and] . . . is of the type the antitrust laws were intended to prevent."  *In re London Silver Fixing, Ltd. Antitrust*

*Litig.*, 213 F. Supp. 3d 530, 551 (S.D.N.Y. 2016) (Caproni, J.); *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *8 (S.D.N.Y. July 31, 2023) (same).

Nor is Relevent's injury "derivative" (*contra* USSF Mot. at 16), as the FAC alleges facts showing that this injury directly resulted from USSF's application of the FIFA policy to block Relevent from promoting official season games.  FAC ¶¶ 11, 157-58, 172-78, 185.  Sports promoters' injuries are not merely "derivative" of antitrust injuries to other parties.  *See Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 69-70 (2d Cir. 1988) (rejecting argument that the producer-sponsors of men's professional tennis matches had suffered "purely derivative' [injuries] of whatever claim the players may have").  Relevent's inability to promote official season games is an antitrust injury that harms Relevent as a direct participant in the relevant U.S. market for conducting official season games.  FAC ¶¶ 3, 23, 37-51, 88, 111-30, 173.  And direct market participants presumptively have antitrust standing.  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016); *London Silver*, 213 F. Supp. 3d at 550.

USSF contends (at 16) that "Relevent is not an 'efficient enforcer' of the antitrust laws" because "leagues, clubs, and players" and fans are more appropriate plaintiffs.  However, an efficient enforcer need not be the "most motivated" potential party, but merely an entity "significantly motivated [by] natural economic self-interest."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689-90 (2d Cir. 2009).  Relevent's strong economic motive to strike down the FIFA policy is evident, as its business is to partner with top-tier men's professional soccer leagues and teams to host official season games in the U.S., a business that was blocked by the FIFA policy.  FAC ¶¶ 111-30.  The fact that other parties might also have an antitrust claim based on the FIFA policy does not deprive Relevent of antitrust standing to pursue an action for its own unique injuries as a participant in the market.  *See, e.g., Amazon.com*, 2023 WL 6006525,

at *16 (other parties may bring claims against Amazon, but the plaintiffs' suit presented no risk "that different groups of plaintiffs would be attempting to recover for the same exact injury").

Further, there is no merit to USSF's argument that Relevent is not an "efficient enforcer" because it is only a "potential promoter." To the contrary, Relevent has a history of promoting friendlies in the U.S. It also has an established track record of lining up teams to play official season games in this country, which did not take place only because of the challenged market division policy. *See* FAC ¶¶ 19-22, 125, 172-75. As a promoter, Relevent is a direct market participant with clear antitrust standing, and, even if Relevent were just a potential promoter, it would still have standing to bring an antitrust claim. *See Aluminum Warehousing*, 833 F.3d at 158; *Volvo*, 857 F.2d at 61-62, 70, 76 (plaintiff had antitrust standing even as a self-described "*potential* owner and producer").

## IV.    USSF AND FIFA ARE NOT A SINGLE ENTITY.

Finally, USSF's assertion that Relevent's Section 1 claim should be dismissed because Relevent and FIFA are a single entity is frivolous. USSF Mot. at 18. This contention directly contradicts the Second Circuit's finding that the FAC's "allegations clearly depict a rule governing how an association's separate members' **separate businesses** compete." *Relevent II*, 61 F.4th at 310. The Second Circuit also determined, based on the FAC allegations, that "USSF . . . is FIFA's agent and transacts substantial business on behalf of FIFA in New York." *Id*. at 305. But that determination does not suggest, let alone establish, that USSF and FIFA are a single economic entity incapable of conspiring with each other.

First, USSF has made it clear that it "unequivocally disputes that it is, or has ever been, FIFA's agent." USSF Mot. at 17.[14] USSF's assertion renders dead on arrival its conflicting claim

---

[14] FIFA likewise disavows that USSF is FIFA's agent. FIFA Mot. at 7-11. Indeed, FIFA contends that USSF *must* maintain its autonomy to comply with the Ted Stevens Olympic and Amateur Sports Act. *Id.* at 10.

that it nonetheless should be able to use the Second Circuit's finding of an agency relationship as a basis for Section 1 immunity under *Copperweld*'s "single-entity rule." *Id*. at 17-20 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)).

Second, it is the law of the case that the FAC pleads concerted action by USSF, FIFA, and other FIFA members. *Relevent II*, 61 F.4th at 309-10. Indeed, USSF does not even address the fact that the FIFA policy would still be an agreement among USSF and the other National Associations who have agreed to adhere to the policy, even if USSF *were* a single entity with FIFA. *See* USSF Mot. at 17-20.

Third, the FAC pleads facts that USSF and FIFA are not commonly owned and have separate economic interests. FAC ¶¶ 161, 162, 164. USSF's argument tries to obscure these allegations by assuming that *all* principal-agent relationships are incapable of conspiring. USSF Mot. at 18. Not so. A principal and agent can still be separate economic entities for Section 1 purposes. Agents are only considered part of a single entity, incapable of conspiring with their principals, if the agent exists "merely [to] carry[] out the decisions of principals." *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 6472656, at *10 (S.D.N.Y. Oct. 23, 2015). Relevent made no such allegation here, and the Second Circuit did not make any contrary determination. *Relevent II*, 61 F.4th at 310.

Fourth, the FAC alleges that FIFA's separate leagues, teams, and National Associations are actual or potential competitors that would independently compete against USSF and MLS in the relevant U.S. market if they were not restrained by the FIFA policy. *E.g.*, FAC ¶ 166. The Supreme Court has "repeatedly found" that *Copperweld* does not apply even to "members of a legally single entity . . . when the entity [i]s controlled by a group of competitors and serve[s], in essence, as a vehicle for ongoing concerted activity." *Am. Needle*, 560 U.S. at 191; *see also NASL*

*v. NFL*, 670 F.2d at 1261-62 (overturning application of *Copperweld* to NFL rule limiting the competitive behavior of its teams); DOJ Ltr. at 2 ("U.S. antitrust laws [which] prohibit competitors from, among other conduct, agreeing to divide geographic markets among themselves . . . apply to FIFA and its affiliates, including [USSF].").[15]

Fifth, the FAC makes clear that USSF is the National Association for soccer in the U.S. and carries out substantial activities independent of FIFA.  FAC ¶¶ 70-71.  And each National Association adhering to the geographic market division policy, including USSF, is alleged to be "a substantial, independently owned, and independently managed business."  FAC ¶¶ 24, 29-30, 66; *Am. Needle*, 560 U.S. at 196.  The Second Circuit has found that such "[individual] representatives of [sports] associations" can violate Section 1.  *See Volvo*, 857 F.2d at 71-73.

Finally, USSF's *Copperweld* argument cannot overcome the principle that fact disputes about the single-entity defense cannot be resolved on a motion to dismiss.  *See Madison Square Garden*, 2008 WL 4547518, at *13.  This principle clearly applies here, where the FAC alleges that USSF, FIFA, and the other National Associations are separately owned entities with economic interests in competing with each other.  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1149 (9th Cir. 2003) ("where firms are not an economic unit and are at least potential competitors, they are usually not a single entity for antitrust purposes").  USSF's argument that the Second Circuit's agency determination establishes a single-entity relationship is just another fact-based dispute that must be rejected.  *See Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 182-83 (2d Cir. 1987).

## CONCLUSION

For all of the foregoing reasons, USSF's second motion to dismiss should be denied.

---

[15] *Jack Russell Terrier Network* and *In re LIBOR-Based Fin. Instruments Antitrust Litig.* do not alter this conclusion. *Contra* USSF Mot. at 18-19.  *Jack Russell* is inconsistent with the Supreme Court's subsequent *American Needle* decision and is inapposite to the allegations here, as the plaintiffs there "did not allege that [defendant] and its regional affiliates were . . . competitors [at all]."  407 F.3d 1027, 1035 (9th Cir. 2005); *compare* FAC ¶¶ 4, 166-67.  *LIBOR* supports *Relevent's* position, as it rejected the argument that acts of subsidiaries and affiliates should automatically be imputed to the defendants under the single-entity doctrine.  2019 WL 1331830, at *37-38 (S.D.N.Y. Mar. 25, 2019).

Dated:  February 7, 2024                Respectfully submitted,

**WINSTON & STRAWN LLP**

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
Jonathan J. Amoona
Angela A. Smedley
Adam I. Dale
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
jamoona@winston.com
asmedley@winston.com
aidale@winston.com

*Counsel for Relevent Sports, LLC*